**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**STEVEN ANGELINI**　　　　　　　＊

　　　Plaintiff,　　　　　　　　＊

v.　　　　　　　　　　　　　　＊　　　Case No.: 1:17-cv-02354-ELH

**BALTIMORE POLICE DEPARTMENT** ＊

　　　Defendant.　　　　　　　＊

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

**PLAINTIFF'S MEMORANDUM  IN OPPOSITION TO THE DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING**

Plaintiff, by and through undersigned counsel, respectfully request this Honorable Court Deny

Defendant Baltimore Police Department's (BPD) Motion for Summary Judgment for the reasons set

forth below.

## I.　　SUMMARY OF ARGUMENTS

BPD argues that the court should dismiss Plaintiffs case for essentially three reasons; two of those

three reasons fail.

First, BPD's claim that Plaintiff is judicially estopped from bringing the instant case is a red

herring.  BPD fails to demonstrate *any* intent on the part of the Plaintiff to deceive the court, despite

engaging in several years of discovery in this case and conducting an almost eight-hour deposition of

Plaintiff. Furthermore, Plaintiff's claims in the bankruptcy case were not even ripe as Plaintiff did not

have his right-to-sue letter from the EEOC at the time of his bankruptcy filing and this action was

not instituted until August 2017, almost a year after the bankruptcy filing.

Second, BPD claims that plaintiff cannot present evidence of unlawful retaliation and a retaliatory

hostile work environment.  This totally misses the mark as Plaintiff easily demonstrates that he

engaged in a protected activity and was then systematically victimized and traumatized for years by

the BPD without any legitimate reason or purpose. BPD confuses the timeline, omits numerous material facts, and tries to redress its earlier wrongdoing by placing the blame at the feet of the victim. Even assuming the BPD could prove *subsequent* legitimate business actions in certain circumstances, the pattern of behavior and the timing of Plaintiff's claims generate a prima facia case of a retaliatory hostile work environment. Indeed, the evidence shows that Plaintiff had an impeccable, unblemished record until he engaged in protected activity by complaining about discrimination, after which a campaign of retaliation against Plaintiff ensued.

Finally, Plaintiff submits on Count II, however, firmly believes that evidence of the wrongdoing will later be admissible at trial to demonstrate the length and breadth BPD is willing to go to cover the tracks of their own wrongdoing.

## II. FACTS

Plaintiff largely adopts the extremely limited Statement of Facts[1] as presented by the BPD, but highlights that numerous additional material facts were significantly omitted in Defendant's Memorandum, and supplements facts that exhibit BPD's flagrant retaliation against Plaintiff, as is discussed, *infra.*, that the BPD intentionally left out in order to color the narrative.

Plaintiff was born and raised in the Southeastern Police District (hereinafter "SED") of Baltimore City. His parents still reside in his childhood home. *See* Plaintiff's Deposition at 14-17, attached hereto as **Exhibit 37**. Plaintiff's parents had four children from their marriage, including Plaintiff. *Id.* It is undisputed that Plaintiff had no issues in the workplace between his joining the BPD in 2006 and shortly after January 2012. *See* Def. Mem. in Supp. of Mot. for Sum. Jdmt., P. 2 (ECF #66, Att. #1); *See also* Pl. Depo. at 40, Exhibit 37. Plaintiff was a well-decorated officer and was even hand-selected to work in a specialized unit by Maj. Davis between 2010 and December

---

[1] It is patently clear that the facts as presented as "undisputed" facts by BPD are not undisputed facts but are merely argument disguised as such. BPD's timing of events is accurate, but the facts omit critical issues and characterizes opinions of witnesses whose credibility and judgment is to be determined by the trier of fact.

2011 with Officer Daniel Quaranto. *Id.* at 22-24; 38-41. From the work in that specialized unit, he received several commendations including Officer of the Month and Baltimore Ravens NFL game tickets. *See* Deposition of Daniel Quaranto, attached hereto as **Exhibit 1**, at 14.

On or around January 2012, Plaintiff's workplace issues began almost immediately after Plaintiff learned of his father's bisexuality --which was also discovered and became known in the SED-- at which point he became the subject of sexually offensive and malicious taunts, ridicule, and jokes. When he lodged complaints about the treatment, the retaliation began. The BPD in its Motion for Summary Judgment conveniently and misleadingly omitted that Plaintiff's father's ex-boyfriend began to stalk and harass Plaintiff's parents, see *Id.* at 46, that Plaintiff's parents called the police "multiple times," and that Southeast District officer Kamberger "told [Plaintiff] that he responded to my parent's house for a call for service." *See* Pl. Depo. at 40, Exhibit 37. It is unclear how many times police were called to the residence because Officer Kamberger and other Southeast District responders did not write a report, but "if [Officer Kamberger] knew they were [Plaintiff's] parents…I [Kamberger] would have wrote [sic] a report." *Id.* at 51; Ex. 1 at 17. Thus, contrary to Defendant's representations in it Motion, the sexual orientation of Plaintiff's father was well known to the rank and file and management of the BPD due to the numerous police calls and visits.

Ultimately criminal charges were filed through the court commissioner's office in the District Court of Maryland. Plaintiff's parents went to court and the ex-boyfriend was criminally prosecuted for stalking and harassment and received probation before judgment.[2]

It is unclear when or how Plaintiff's familial situation became the topic of conversation within the Southeast District, however Plaintiff became aware of being treated differently, having graphic images and words drawn on his police vehicle (prior to the October 2012 incident) and speaking to

---

[2] The Ex-boyfriend was charged, convicted and received the benefit of Probation Before Judgment, which has since been expunged. As an officer of the court, undersigned counsel has a copy of the case search print out from prior to the expungement but has not attached such to this filing due to Md. Code Ann. Crim. Pro. §10-101, et. seq.

Sgt. Ettice Brickus about his father's sexual orientation. *Id.* at 54-57; Ex. 1 at 17. The evidence developed in discovery further confirms that other members of the BPD recall hearing and knew about a call for service regarding an officer and Plaintiff's parents. *See* Deposition of Ettice Brickus at 56, attached hereto as **Exhibit 36**.

### i. The October 2, 2012 Graffiti Incident

Plaintiff feared reporting the homophobic graffiti in the men's locker room because he feared being retaliated against based upon the demeanor of Sgt. Kenneth Williams. *See* Pl. Depo. at 66-68, (ECF #66, Att. #5). After reflecting on the incident and Sgt. Williams' reaction he decided to file a formal complaint with BPD's EEOC Department.[3] *Id.* at 70. Plaintiff made an appointment for October 5, 2012.

BPD claims that it investigated Plaintiff's October 2, 2012 complaint and on November 21, 2012 issued a report detailing their findings. *See* Def. Mem. in Supp. of Mot. for Sum. Jdmt., P. 5 (ECF #66, Att. #1). Plaintiff never received a copy of the attached investigatory letter and adamantly disputes that an investigation was actually conducted (as the BPD alleges) stating, "EOD never came out to the district and did an investigation and asked people. I've seen other investigations done before. They never came out and spoke to anyone. They never came out and asked individuals to write 95s anonymously. They never went upstairs to the bathroom stall to get a good look at what happened. How can Sgt. Williams just put a cross over it, a magic marker? Why not take time to paint it, a comment like that?" *See* Pl. Depo. at 108, (ECF #66, Att. #5).

### ii. Plaintiff's many requested transfers

---

[3] BPD's internal EEOC investigatory unit has gone by several names throughout the course of this lengthy case, including EEOD, EEOC, and EODS. It has also gone under at times and separate at times from the Internal Affairs section. For purposes of clarity any reference to BPD EEOC Internal department will simply be labeled as "BPD EEOC."

Plaintiff, beginning on October 3, 2012, the day after he filed the initial complaint with SED internal affairs, requested no less than seven transfers out of the SED between October 2012 and July 2013.[4] *See* Photocopies of Form 70 Transfer Requests, attached hereto as **Exhibit 2**. Transfers within the Baltimore Police Department are requested via "Form 70" documents. *See* Deposition of Richard Worley, attached hereto as **Exhibit 3**, at 16-20. Those documents are filled out and submitted with supervisors and are to be sent up the chain of command. *Id.* There is no special language required for the Form 70 Transfer Request. *Id.* The Form 70 is not permitted to be disregarded, torn up, or refused by BPD Commanding Officers. *Id.* at 23-24.

Plaintiff had his transfer requests ignored, given back to him, torn up, or thrown away. Indeed, on certain occasions, the requests were torn up, and the shreds of paper were handed back to Plaintiff as a further exercise of taunting and retaliating against him. *See Exhibit 2.* All but the last transfer was not sent up the chain of command to BPD supervisors.

### iii. Inappropriate sexual innuendo from October 5, 2012 and aftermath

The BPD attempts to portray comments to Plaintiff laden with innuendo as "joking," however, the comments need to be placed in the context of the taunting levied at Plaintiff during the period in question. BPD presents the facts regarding Sgt. Ettice Brickus ("Brickus") as a "comment about being out of proper uniform" and the comments about his clothing as "joking." *See* Deposition of Ettice Brickus at 21, attached hereto as **Exhibit 36**. Brickus claims that she and Plaintiff had "Shared and engaged in jokes…in the past." *Id.* at 61. However, Plaintiff, in his deposition had a very different recollection of their relationship, stating:

Q. Did you believe that she had been joking?
A. No.
Q. What do you mean by that?
A. No. She -- we never joked around like that. Me and her never joked around like that. I never had a personal relationship with her that we would joke around.
Q. Did you believe that her statements were made with an intent to harm you?

---

[4] Transfer requests were made on 10/3/12, 2/18/13, 4/17/13, 4/23/13, 6/26/13, 7/4/13, and 7/28/13.

A.   110 percent.
Q.   What makes you say that?
A.   She said it in front of my peers, loud, purposely to humiliate me in front of everybody
Because I was going down do EOD -- EDOS (sic), whatever it's called.  And that she was
making fun -- making fun of my clothing, trying to imply that I was going on -- down there to show
off my pecs or show -- show off my muscles to other detectives down there.

*See* Plaintiff's Deposition at 101-102, Exhibit 37.

Plaintiff went so far as to inform Sgt. Cumba at BPD EEOC of the incident at the district with

Sgt. Brickus and his fear of retaliation, specifically stating, "I fear retaliation, that it would be best

that [Sgt. Cumba] move me while this investigation was going on…especially after the comment

with Sgt. Ettice Brickus." *Id* at 99.

Plaintiff was sent back to the SED by BPD EEOC.  *Id.*  Upon return to SED Plaintiff had

another noteworthy exchange with Brickus where she questioned *why* Plaintiff had filed a complaint.

*Id.*  The exchange is compelling because Brickus also agrees that some exchange occurred in her

own deposition.  Here is Plaintiff's recollection of the exchange:

Q.   Did you then go and speak with Sgt. Brickus later during your shift?
A.   **When I got back, I changed**.  And she was in O-9's office.  I knocked on her door and
told her I was back.
Q.   What happened then?
A.   **She told me to come in**, close the door behind me.
Q.   And then?
A.   She wanted to know why, that I felt the comments were offensive on the wall.  And why I
was making a big deal -- a big deal out of it.  And -- and I replied to her, it's none of her -- I told her
     it's not her -- it's not her business why I'm offended by it.  And then she replied back, don't --
the Major doesn't want this to go downtown.  I [Brickus] can't believe you met -- went downtown
with it.  You could have kept it in-house.  And then -- that's from what I rec -- my recollection of
the conversation.  And then --
Q.   I'm sorry, go ahead.
A.   Do you have any further questions?
Q.   Did you speak to her about any concerns you had with her comments earlier?
A.   Yes, sir.
…
A.   Told her that it was offensive what she did.  That as a supervisor and as a -- as a
supervisor, she should know better not to do that.  Not to -- not to put my business out there
like that.  And to offend me and to make fun of me in front of my peers.
Q.   How did she respond when you said that?
A.   Said she was just joking.
…

Q. Did she apologize in any way?
A. She never said, oh, I'm sorry for saying that to you, no.

*Id* at 99-101. [emphasis added]

Sgt. Brickus recounts the same conversation in her deposition, only with a very different tone and spin stating: "So he came to the door, and the officers have to ask for permission to enter the office, which he did, and **I allowed him to enter the office and to have a conversation with me**. Once he came into the office, **I observed him in the same attire and I said you're still inappropriately dressed for work**, at which time he stated to me that he thought that it was like TV and once he went down to EEOC that he would not be returning to the district, which is why he was dressed that way. And he goes on to tell me that you know he was upset about his experience at EEOC." *See* Deposition of Ettice Brickus at 63, Exhibit 36.

Pursuant to BPD policy EEOC complaints are confidential. *See* BPD Policy G.O. Q-1 attached hereto as **Exhibit 4**. Inappropriate conduct per BPD's own polices include "'Cat Calls' such as words…comments…or graphic comments about another's body." *Id.* BPD's own policy says, "Any person who files a complaint or charge, participates in an investigation or charge, or identifies an employment practice that is prohibited by any of the above polices and regulations is protected from retaliation. *Id.* To the extent, *arguendo*, that Brickus' taunts were mere "joking," they would violate the BPD's own written policies and would be inappropriate for the workplace. *Id.*

iv. **Brickus picks on Plaintiff (October to December 2012)**

Between October and December 2012 Plaintiff was on light duty due to a work-related injury, therefore he was at the front desk of the SED due to an ACL tear. *See* Plaintiff's Deposition at 122, Exhibit 37. Brickus was Plaintiff's supervisor and regularly made comments about Plaintiff's clothing and Plaintiff faking his injury in flagrant violation of BPD written policy. Plaintiff recounts the following in his deposition: "Like she was like, oh, your shoes, what do you have? Do you have like your sun shoes on? Well, they're -- they're colorful. Or like -- some wear a different pair of shoes

every day up there. You know, I like collecting shoes. And she would make comments about my shoes. And she would make comments about my pants. I might of had a wrinkle in there. She was like, well, take an iron to it. Use a iron. You ever heard of an iron? Make comments, small comments like that. And then I specifically remember, which really made me upset, was that she specifically said, what's taking you long?· What, do you like, riding the desk? Spending your career on the desk? Making fun -- pretty much saying that when -- when I was -- pretty much saying that I was working the front desk and not being on the street. But I had a legitimate injury.· I tore my ACL, I believe But -- and then she started just nitpicking.· And she really -- I would stay away from her.· Like I wouldn't -- that's why being at the front desk kind of -- at the end of the day worked out for me because I wasn't on the street." *Id.* at 123.

### v. Parking spot incident – January 17, 2013

The BPD presents a parking incident --where Plaintiff allegedly parked in a parking place where he was not supposed to park-- attempting to portray the incident as Plaintiff violating the rules and being a problem employee.  The BPD ignores, however, that numerous other officers routinely parked in the same parking place without incident, yet Plaintiff was singled out and targeted for allegedly violating the policy.  Thus, there is a material dispute of fact as to what occurred over the parking incident.  Plaintiff asserts that he was going to move his vehicle when he was prevented by Sgt. Drennon and targeted specifically because, he believes, of his prior complaint with the BPD EEOC section. *See* Affidavit of Steven Angelini, attached hereto as **Exhibit 5.** Drennon and Brickus assert that Plaintiff refused to move his vehicle.  *See* Deposition of Ettice Brickus at 31-41, Exhibit 36. It is undisputed that an encounter occurred and that parking at the SED is difficult at best. *See* **Exhibit 5**.  However, even Brickus' own sketch of where the encounter occurred, and commentary suggest that Drennon prevented Plaintiff from moving his vehicle.  *See* Deposition of Ettice Brickus at 31, Exhibit 36; Exhibit 4 of Ettice Brickus' deposition attached hereto as **Exhibit 6**; **Exhibit 5**.

Furthermore, the whole group of supervisors involved in Plaintiff's original complaint and subsequent victimization are personal friends. Sgt. Kenneth Williams and Sgt. Verna Drennon are intimately involved. *See* Deposition of Ettice Brickus at 55, Exhibit 36. Both are personal friends with Sgt. Euttice Brickus. *See Id.* at 24. Brickus is also personal friends with Capt. Kimberly Burrus. *Id.*

This is noteworthy because first, Plaintiff is the first and only person to have been suspended over a parking lot incident; second, Brickus skipped her normal chain of command and placed a phone call to Capt. Kimberly Burrus to have Plaintiff suspended, *Id.* at 41-43; Exhibit 5 of Deposition of Euttice Brickus, Suspension of Officer Steve Angelini dated January 17, 2018 letter signed by Lt. John Windle, attached hereto as **Exhibit 7**; and, third <u>numerous</u> officers parked in that designated spot without incident or repercussion. See photos of personal vehicles in assigned NSU parking spot attached hereto as Exhibit 8. Ultimately, the incident BPD claimed as insubordination ended up as "undisciplined" by Internal Affairs and was found to be without merit. *See* Exhibit 5.

### vi. Plaintiff and Daniel Quaranto recovered four guns from the streets of Baltimore yet received no accolades or accommodation unlike similarly situated officers (March 2013)

Plaintiff and his partner at the time, Officer Daniel Quaranto, were dispatched to a call for "someone shooting a shotgun in their backyard." *See* Exhibit 1 at 39. The officers "run around the corner into the backyard where [the shots come from]…confront the guy at gunpoint and order him to drop his gun." *Id.* at 40. "He doesn't drop it, so Steve [Plaintiff] fires one round and strikes him. He [suspect] goes down and we secure him." *Id.* Plaintiff and Quaranto recover drugs, a shotgun, a handgun, and two assault rifles from the suspect. *Id.* They are cleared by BPD investigators and by the Baltimore City State's Attorney's Office. Exhibit 5.

Typically, when a BPD officer recovers a handgun, it is recognized both within the district and with special awards city-wide, particularly for the recovery for four guns. *Id.* at 42-43. An officer's

immediate supervisor would write the officer up for an award. *Id.* at 44. In this case, Sgt. Brickus was Plaintiff and Quaranto's immediate supervisor that night. *Id.* at 44; Exhibit 5. Plaintiff did not receive a service coin or any special awards or recognition for his actions. *Id.* at 44; Exhibit 5. This is extremely unusual, and Plaintiff later learned that Sgt. Brickus was making comments about his gun seizure not being a clean shooting. Exhibit 5.

### vii. Brickus admits to targeting Angelini (April 2013)

Evidence developed in discovery fully support that not only was Plaintiff targeted, but that officers knew it and admitted to it under oath. Indeed, Office Michael T. McQuade ("McQuade"), formerly of the Baltimore City Police Department, now a member of the Hyattsville Police Department, recalls a breakfast with several coworkers, including Brickus, Sgt. Ferguson, and Officer Richburg, *see* Affidavit of Michael T. McQuade, attached hereto as **Exhibit 9,** where he (i.e., McQuade) states that Brickus "bad mouthed" Plaintiff throughout the 40-minute meal and said that she hated Plaintiff and was trying to entrap him to get him fired. *Id.* McQuade also recounts another incident prior to April 2013 where Plaintiff had a flat tire in his patrol vehicle and Brickus responded over a recorded channel as his supervisor, "that's what you get." *Id.*

### viii. Numerous Transfer Requests to a Different Shift were Repeatedly Denied

In April 2013 Plaintiff again requested transfers to different police districts. Those requests were denied. *See* Exhibit 2. Although Capt. Kimberly Burrus purportedly did not specifically recall tearing up any transfer forms, it is beyond dispute that it happened. *See* Deposition of Kimberly Burrus, attached hereto as **Exhibit 10**. Ultimately supervisors moved Plaintiff to a different shift but at the same district. Plaintiff's retaliation continued and the supervisors (Brickus and Drennon) from one shift elected to talk to his new supervisors (Brokus) about him, engaging in retaliatory actions before he even arrived. *See* Deposition of James Brokus at 112-13, attached hereto as Exhibit 35

Now under the supervision of acting Lt. James Brokus, on the different shift in SED, Plaintiff's hostile work environment got progressively worse, not better, as he continued to suffer retaliation from his original complaint(s) by being denied replacement work equipment, being forced to wear long sleeve shirts in hot weather, by being placed in a car without working air-conditioning, and by being given the worst assignments and vacation schedules, despite being a senior officer, and being forced to work after being placed medically on light duty. *See* Exhibit 5; June 12, 2013 Form 95, attached hereto as **Exhibit 11**; June 26, 2013 Form 95, attached hereto as **Exhibit 12**; City of Baltimore Discharge Instructions July 2, 2013, attached hereto as **Exhibit 13;** Mercy report summary June 29, 2013, attached hereto as **Exhibit 14**. Plaintiff soon discovered that Brokus possessed a secret file on Plaintiff. *See* Deposition of James Brokus at 87-89, Ex. 11a of Def. Mot. For Sum. Jdmt. at ECF #66, Att. #15; Transcript of Audio Recording of June 28, 2013 encounter attached as Exhibit 8B to James Brokus Deposition, attached hereto as **Exhibit 15**.

In June 2013, the retaliation severely compromised Plaintiff's health and injured him to the point he had to be rushed to the hospital. Specifically, on June 29, 2013, Plaintiff was provided a patrol car without air-conditioning and was required to wear a long-sleeve uniform in extreme heat, which resulted in Plaintiff suffering heat stroke, passing out on the SED parking lot and being rushed to the hospital. *See* Plaintiff's Deposition at 228, Exhibit 37 Plaintiff was told by the Mercy Medical Center that he was to be back at work on July 2, 2013 with restrictions to "light duty" until his follow up visit on July 10, 2013. *Id.* at 234. Yet, on July 4, 2013 Plaintiff was ordered by Sgt. James Brokus to a work detail for the 4th of July holiday on full duty, even though he was supposed to be on light duty until July 10th due to the heatstroke/fainting incident. *Id.* at 238-239. *See* Deposition of James Brokus at 46, Exhibit 35 Plaintiff tried to explain that he was to be on light duty and was leaving for vacation at the end of his regular shift. *See* Plaintiff's Deposition at 239-244, Exhibit 37.

In response, on July 4, 2013 in violation of BPD Policy, Sgt. James Brokus had Plaintiff picked up from his home in the back of a squad car and ordered him transported to Mercy Medical Center for an on the spot medical evaluation. *Id* at 246; *See* Deposition of James Brokus at 52-56, Exhibit 35

### ix.    July 28, 2013 assault by a supervisor

This incident culminated from two separate, but intertwined instances of retaliation. First, on July 25, 2013 Plaintiff was to turn in a report at the end of his shift for a serious crime. *See* Plaintiff's Deposition at 262, Exhibit 37. Second, Plaintiff was to be detailed to the Special Weapons and Tactics Team ("SWAT") tryouts on July 29, 2013 and was attempting ascertain the order from supervisors to attend (which supervisors apparently hid from him in attempts to deny him the advancement). *Id.* at 432.

### a.    The (Part 1) Serious Crime Report

Defendant BPD misrepresented Plaintiff not turning in a crime report as "refus[al] to follow the rules for turning in police reports…" Defendant's Memorandum at p. 12. Procedurally, however, all "Part 1" [serious crime] reports are to be turned at the end of a shift to a supervisor. Exhibit 2 at 264. The evidence shows that on July 25, 2013 Plaintiff completed his report but did not see any of his shift supervisors because Plaintiff returned to the station late after a foot chase and because of submitting evidence of a crime to ECU and only saw Sgt. Ettice Brickus (his former supervisor), not that he refused to turn in the police report. *Id.* at 265. Brickus then refused to accept any of Plaintiff's reports. *Id. See also,* July 28, 2013 Form 95, attached hereto as **Exhibit 16**. Plaintiff was off the next two days and on his return, Sgt. Derwin Jackson, questioned him about the report after Plaintiff was trying to review his email regarding scheduling for SWAT tryouts. *Id* at 268. Thus, contrary to Plaintiff refusing to turn in reports, Brickus and the BPD willfully refused to accept such reports part and parcel to its retaliatory campaign to color and portray Plaintiff as a rogue officer.

### b. SWAT tryouts

Plaintiff had an opportunity to be on the BPD's elite SWAT team, however, such efforts were thwarted since the BPD willfully failed to advise Plaintiff of the date of the tryouts. Indeed, on June 14, 2013, Plaintiff requested via email to participate in the SWAT team tryouts that were taking place later that summer. *See* Deposition of Stephen Coughlan, attached hereto as **Exhibit 17**; Emails between Steven Angelini and Stephen Coughlan, marked as exhibits 1, 2, 3, & 7 of Deposition of Stephen Coughlan, attached hereto as **Exhibit 18**. SWAT team is a selective unit which hosts practice tryouts, actual tryouts, and then SWAT school for candidates who pass the tryout. *See* Exhibit 17 at 8. Only between 20 and 25% of candidates who try out for SWAT earn a spot on the SWAT team. *Id.* at 9. The actual SWAT tryout requires that the officers attend the SWAT training for the entire day and are not at their regular shift. *Id.* In order to send the officer trying out to SWAT they must be ordered to do so through what is known as a "detail order" communicated through chain of command. *Id.* The officer trying out needed permission from his supervisors. *Id.* at 13.

In this case, Plaintiff, on July 1, 2013, was listed and ordered to report to SWAT tryouts at the designation training center on July 29, 2013. *See* July 1, 2013 Order attached as Exhibit 5 of Stephen Coughlan Deposition, attached hereto as **Exhibit 19.** That order was never communicated to Plaintiff and without that Detail Order in hand, Plaintiff could not attend SWAT tryouts. *See* Exhibit 17 at 13. As a result, Plaintiff missed his opportunity to try out for the SWAT team and was marked FTA. *See* Attendance sheet from SWAT tryouts, Exhibit 6 of Stephen Coughlan Deposition, attached hereto as **Exhibit 20**. Only during the institution of this legal proceeding did Plaintiff learn that he was, in fact, detailed to SWAT tryouts on July 29, 2013. *See* Plaintiff's Deposition at 432, Exhibit 37.

Conveniently, Sgt. James Brokus and Sgt. Derwin Jackson (Plaintiff's immediate supervisors on or around July 28, 2013) disclaim any knowledge of a detail order for Plaintiff's SWAT tryouts. *See* Deposition of Derwin Jackson at 66, attached hereto as **Exhibit 21**; *See* Deposition of James Brokus at 71-73, Exhibit 35 However, Sgt. Brokus testified that Sgt. Jackson *should* have gotten the communication and it was "for Sgt. Jackson to answer." *Id.* at 72 [emphasis added]. Sgt. Jackson simply said, "I do not have any recollection of any notification as it pertains to Officer Angelini of any SWAT tryouts." *See* Exhibit 21 at 70.

### c. The Assault

Plaintiff details his version of the assault by Sgt. Brokus on a report filed on July 31, 2013. *See* July 31, 2013 Form 95 report, attached hereto as **Exhibit 22**. Whereas the BPD attempts to downplay the altercation and contends that their officers acted from a paperwork issue, the transcript of the recording of the altercation belies their claims and the violence that is apparent throughout the encounter is an issue for the jury. *See* Exhibit 15. Ultimately Plaintiff began to hyperventilate due to a "verbal assault from a superior officer" and was transported by paramedics to Mercy Hospital. *See* July 28, 2013 Ambulance Transportation Report, attached hereto as **Exhibit 23**. Plaintiff had an elevated blood pressure and anxiety. *Id.* He was suspended for medical reasons by Sgt. Jackson and returned to work two days later. Plaintiff immediately requested another transfer. *See* Exhibit 2. Plaintiff, however, was still forced to work in the SED and was not transferred for almost another month, until August 22, 2013. *Id.* During that time he was placed in an uncomfortable and unbearable work environment, subjected to constant questioning by co-workers and continued harassment by supervisors. *See* August 6, 2013 Form 95 and accompanying Facebook Message from "Buzz Grossnickle," attached hereto as **Exhibit 24**. Plaintiff missed his tryout for the SWAT team. *See* Exhibit 20.

### x. Transfer to Northeast District ("NED")

On or around August 22, 2013 Plaintiff received a transfer to the NED. *See* Exhibit 2. Upon arrival at the NED Plaintiff soon learned that he was placed on a secret probation by supervisors from the SED upon transfer to the NED and that he would need to be supervised for 30 days. *See* Plaintiff's Deposition at 299-302, Exhibit 37. Sgt. Rutkowski's deposition confirms that some unknown officer contacted him and informed him that Plaintiff was on a performance improvement program, however no documentation exists of any performance improvement program or secret probation. *See* Deposition of Mark Rutkowski at 10-12, attached hereto as **Exhibit 24.** Rutkowski testified that Plaintiff "had a pretty good reputation as far as I knew him and from what I saw in the Northeast…I thought very highly of him." *Id.* Rutkowski had no explanation for the communication from SED, but he did inform Plaintiff. *Id.*

Though Plaintiff was placed on some sort of "secret probation," no such procedure actually exists or existed under current or past procedures in the BPD. Indeed, Plaintiff's Major in his new district, Major Richard Worley[5] testified that Plaintiff did a good job and received good feedback from the community. See Exhibit 3 at 36. Worley also testified that he has never heard of an officer being placed on probation when being moved from one district to another. *Id.* at 14. Worley further testifies, "A Major from one district cannot tell a Major from another district what to do. Like if the Southeast Major told me to put him on probation, I don't have to listen to him. He is not my boss. He is an equal. It would have to come from above. I was never told anything from above to put him on any kind of probation." *Id.* at 15. Worley, however, did testify in his deposition that he was told by someone, "that [Plaintiff] got kicked out of the Southeast District." *Id* at 30. When asked, "By Whom?" Worley replied, "I don't recall. It was a phone conversation. It could have been a Major or Lieutenant Colonel or any number of people." *Id* at 31. Worley agreed that Plaintiff had been labeled

---

[5] Major Richard Worley is now Col. Worley, Chief of Patrol for all of BPD, per BPD's organizational chart located here: https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/BPD_Org_Chart_April_2019.pdf (accessed December 31, 2019)

as a problem officer "from the Southeast." *Id.* at 32. In 2017 Worley repeated that libelous talk about Plaintiff in an email circulated among command staff about the March 2017 training incident from Baltimore County, stating, "…He was sent to the NED a few years ago as a result of disciplinary issues in the SED. I don't recall exactly what he did but I know he got kicked out of the SED. Thank you, Rich" *Id* at 29. The email was circulated, among other people, "Deputy Commissioner Palmere…Chief Rodney Hill..Major Ian Dabrowski…Deputy Commissioner Jason Johnson…Drew Vedder…Kevin Davis, Commissioner and Osborne Robinson." *Id.*

Worley had no idea why he got "kicked out" of the SED (or that, in fact, he had not actually been kicked out), and also had no idea that Plaintiff had requested no less than seven transfers before being moved to NED. When Worley learned of this after his deposition, he apologized to Plaintiff for all he had gone through and said he had no idea of what had actually happened during Plaintiff's time at the SED (rather than the false and malicious untruths that Worley had been told). *See* Exhibit 5. Significantly, BPD conveniently omits discussion in its Motion of the false and defamatory communications labeling Plaintiff as a "problem officer," that he was "kicked out of the SED," and that he was placed on "secret probation," even though no such protocol or procedure exists for BPD officers.

### xi.    Continued retaliation from SED supervisors who move to Internal Affairs

Despite being placed on "secret probation" by the unknown supervisors out of the SED, Major Richard Worley did seem to truly provide Plaintiff a "fresh start" upon arrival at the NED and stated that Plaintiff had "good work product." *See* Exhibit 3 at 16, 20. Plaintiff received positive commendations and recommendations from members of the community. *Id.* at 23-24. Subsequently, however, Plaintiff was the subject of Internal Affairs investigations. As discussed, *infra*, despite that Internal Affairs Detective Robert Cornejo testified that BPD protocol was that if an investigator knew a investigatory target beforehand, that officer would not conduct the

investigation, both Sgt. Kenneth Williams and Sgt. James Brokus testified under oath that they previous knew Plaintiff, and after moving to Internal Affairs conducted investigations on Plaintiff where they found Plaintiff culpable resulting in charges to Plaintiff.

Indeed, sometime in 2015 or 2016 Sgt. Kenneth Williams (the original Departmental investigator from Angelini's graffiti complaint) and Sgt. James Brokus were both transferred to BPD's Internal Affairs Department (IA or IAD).  *See* Deposition of James Brokus at 78-82, Exhibit 35  Brokus testified that if he knew an officer personally, he "wouldn't handle [the IAD investigation]." *Id.* at 79.  Brokus further testified that "I wouldn't want to know nothing [sic] about it." *Id.* Brokus admits then to having reviewed body camera footage from Officer Steven Angelini. *Id.* The following exchange occurs:

> Q.    Do you remember making any commentary about your personal opinion with regard to Steven Angelini, when you were reviewing that body camera video?
> A.    I may have. I don't recall. I may have. I don't recall
> Q.    You said, "you fucking hate that guy."?
> A.    No. No, I wouldn't say nothing like that. No. No. I wouldn't talk like that. Absolutely not. It's not my demeanor. No way.
> …
> Q. During the course of the charging process, would the supervisors have input into that [charging] process [for internal affairs cases]?
> A. I'm trying to think. It's been a while. They could have input. They could ask for input. They could say things to help as it goes up, sure.
> *Id* at 79-81.

The investigator for IAD, Detective Robert Cornejo (Cornejo) into several of Plaintiff's subsequent matters was also deposed.  *See* Deposition of Robert Cornejo, attached hereto as **Exhibit 26.** Cornejo's immediate supervisor was Sgt. Kenneth Williams while Cornejo was the primary investigator regarding IA case number 2016-0416.  *Id.* at 13; Ex. 23 of Def. Mot. For Sum. Jdmt. at ECF #66, Att. #27.  Cornejo also testified that if an officer or sergeant in IA had a history with an officer, either personal or professional, s/he should recuse him or herself from that investigation.  Exhibit 26 at 15.  Sgt. Williams never disclosed his prior history with Plaintiff, and it would have been important to do so. *Id.* at 15-16.

Cornejo, told Plaintiff, with respect to Case No. 2016-0416, that Cornejo was watching the body camera video at his desk and Sgt. Brokus and Sgt. Eimes, who are both supervisors in IAD, approached his desk and watched my video over his shoulder. Sgt Brokus stated he hated Plaintiff's fucking guts and charge him for any violations you see on the video. *See* Exhibit 5 at ¶66-67.

Interestingly, Cornejo, in his deposition, when asked about reviewing Angelini's body camera footage in case 2016-0416, definitively states initially that "[he] was alone" while watching the body camera footage. *Id.* at 18. Then when directly asked if "while you were watching the body camera footage in case 2016-0416, Sgt. Brokus was standing over your shoulder and made commentary to you regarding Officer Angelini?," *id.* at 19, Cornejo wavered and said, "to my recollection, again, no." *Id.* at 20. Both responses are in direct contradiction to Sgt. Brokus' outlined testimony *supra* and to Plaintiff's Affidavit at #. Exhibit 5.

Furthermore, Plaintiff's own supervisor in the NED Sgt. Damion Walford paints a very different picture of Plaintiff and Plaintiff's work product and his interactions with IAD. *See* Affidavit of Damion Walford, attached hereto as Exhibit 27. Sgt. Walford had one specific instance where he perceived that IAD was selectively targeting Plaintiff. *Id.*

### xii. BPD's history and environment of hostility

BPD has created an environment where corruption has run rampant, and workplace retaliation is fostered and flourishes. The difficulties with corruption and retaliation against police officers who engage in protected activity --by either identifying officers who violate the rules or law, or file complaints about discrimination or other unfair treatment—became so severe, that the United States Department of Justice was compelled to intervene and force the BPD to enter into a Consent Decree to curtail abusive practices against officers. *See United States v. BPD, et. al.* CM/ECF # 1:17-cv-00099. It has a long and sordid history of retaliating against person who make complaints. *See e.g. Crystal v. Batts*, CM/ECF # 1:14-cv-03989; *United States v. BPD*, et. al. CM/ECF # 1:17-cv-00099; *See*

*also*, Affidavit of Francis Davidson, attached hereto as **Exhibit 28**. BPD disagrees with these characterizations, yet they persist from multiple places. *See United States v. BPD*, 1:17-cv-00099 Document 2-2.

In this case, almost every witness universally has testified that the Plaintiff is a good cop. *See generally* Exhibit 3; Exhibit 25; Exhibit 27. Even Sgt. James Brokus testified that Plaintiff was a "good worker…He was aggressive. He was a good police. He went out, and he worked. He worked." *See* Deposition of James Brokus at 24, Exhibit 35 Instructively, the only witnesses who will go on the record to talk about the work environment and the retaliation suffered by Plaintiff are either former BPD employees or officers who are close to retirement. See e.g. Exhibit 9; Exhibit 27; Exhibit 28.

The BPD has further created an environment where officers will not speak out (or testify) if they know or witness something that violates procedure for fear of being retaliated against. *See* 1:17-cv-00099 Document 2-2. Indeed, even Plaintiff's supposed best friend in the BPD, now-Sgt. Daniel Quaranto, stated that he wants nothing to do with this case. *See generally* Exhibit 1. Quaranto spent an entire year working with Plaintiff in the special "225 detail post" in 2011 and 2012 and later spent time as his immediate supervisor in the NED when Quaranto was promoted to Sergeant. Exhibit 1 at 12, 13. Plaintiff and Quaranto were friends, socialized outside of work, and Plaintiff received a "good review" when filling out his bi-annual supervisor's report about Plaintiff. *Id.*at 12, 13, and 59. Yet, when it came to his being involved in this litigation Quaranto stated that they are no longer friends and said, "I considered Steve a good friend. I thought we had a good friendship but like I said before, I did not want to be pulled into this. There are things that I know because I was his friend at the time and now you expect me to come here and just not tell the truth, I am just –I am just upset." *Id.* at 60. Quaranto, throughout his deposition testimony then alleges very two very serious allegations misconduct. *Id.* at 62. Noteworthy is that Quaranto alleges that Plaintiff

manufactured the graffiti incident in order to *avoid* being moved to a different unit. *Id.* at 61. He

says, "..Officer Angelini was on light duty and people started to get moved to different assignments.

Angelini …was going to take the opportunity to report the comment, now if they report it and they

moved him, that would look like some sort of retaliation. *Id.* at 30. The later questioning by counsel

further clarifies:

> Q.  Your theory is that Officer Angelini complained about the graffiti in the stall so he
> wouldn't get moved?
> A.  So what I was told by Steven, right before he reported it, was that he was going to go
> upstairs and act surprised like it was the first time he saw it and report it to Kenneth Williams. If you
> check the record, you will see he was on light duty and light duty people may be detailed to other
> assignments. If you are going to be out for four months, we might need people down to do
> whatever, so you get detailed instead of working the front desk at the district. That is what was told
> to me. I did not make up a theory. This was told to me that night.
> *Id.*  at 32-33

This fact, when compared with the actual record, Plaintiff requested a transfer the day after he

made the initial complaint, flying in the face of the above testimony. *See* Exhibit 2.

Quaranto was so visibly angry about having to participate in this litigation and having his

deposition taken that BPD's own lawyer, Justin Conroy, questioned him about his body language

and demeanor. This deposition occurred on August 5, 2019, almost 2 years after the institution of

the instant lawsuit and seven years after much of the underlying conduct. Quaranto had long since

known that he was to be the subject of a deposition and fully knew the subject matter of the

deposition. They socialized just two months prior to the deposition. *Id.* at 59. Yet when questioned

about being at the deposition and having to provide testimony Quaranto balks, "I don't feel like a

friend would put me in this position." *Id.* Counsel for BPD shortly after asks, "Just one final

question, I am not obviously able to understood people's physical movements but observing your

body language, are you upset? *Id.* at 60. Quaranto responded "Very." *Id.*

In making the serious allegations of misconduct against Plaintiff, he never reported them to any

supervisors. *Id.*  at 63.

Most interesting about Quaranto's testimony is his body language and what prompted it. It is unknown what BPD superiors and attorneys have said to him, but the record is crystal clear that BPD and former members of BPD's legal team have *repeatedly* tampered with witnesses in this case. The most obvious example is Sgt. Damian Walford. Sgt. Walford was specifically instructed not to sign an affidavit by the former attorney for BPD, Colin Glynn. *See* August 31, 2018 email from Damian Walford, attached hereto as **Exhibit 29**; *see also* Exhibit 21 at 14-17, *See* Deposition of Damian Walford, attached hereto as **Exhibit 34**.

More pernicious is the witness tampering of Quaranto's testimony. It is a fact that Quaranto was friends with Plaintiff and was cooperating with his legal team. *See* Exhibit 5; *See also* September 4, 2018 through September 5, 2018 email exchange, attached hereto as **Exhibit 30**. It is also a fact that Quaranto had an appointment to come into undersigned counsel's office to review and prepare for his deposition in September 4, 2018. *Id.* So far as Plaintiff knew, Quaranto was a cooperative and helpful witness. Exhibit 5. Then on September 5, 2018 at 2:45 PM undersigned counsel received an email directing that all communication goes through counsel, because "my office is representing…Daniel Quaranto…for the limited purpose of advising them as witnesses in this case. Please direct any communications you might otherwise wish to direct to them, to me." *See* September 5, 2018 email from Colin Glynn, attached hereto as **Exhibit 31**.

Former BPD legal counsel, Colin Glynn thus injected himself as witnesses in this case through his own conduct. On April 5, 2018 former BPD attorney Colin Glynn sent over an email, much of which is redacted, to persons in internal affairs. See April 9, 2018 email exchange, attached hereto as **Exhibit 32.** That email exchange was passed around to various members of BPD Internal Affairs staff as a "possible misconduct issue to IA" and included on the cc' line Kenneth L. Williams, the original sergeant in the underlying case. *Id.* Accompanying the email was a series of documents that counsel for BPD alleged Plaintiff had mishandled through the course of discovery in this case.

Ultimately, Plaintiff was cleared of the allegations. *See* Def. Mot. For Sum. Jdmt., Exhibit 26 at ECF #66, Att. #28.

An independent witness, Retired BPD Detective Ed Gordon, confirms Angelini's suspicions that Internal Affairs was, in fact, targeting him. *See* Affidavit of Ed Gordon, Attached hereto as **Exhibit 33**. Gordon first-hand heard from investigating Detective Robert Cornejo that he was ordered by supervisors to change a not-sustained finding to a sustained finding and to charge Plaintiff, in direct contradiction to Cornejo's own testimony. *Id.* Gordon also was a witness to Plaintiff's shooting and heard the rumor mill spin (of an alleged unjustified shooting) after the shooting occurred. *Id.*

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

A party moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). A grant of summary judgment is only appropriate when there is no genuine issue of material fact, given the parties' burdens of proof at trial. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party, then summary judgment is inappropriate." *Anderson*, 477 U.S. at 250; *see also*, *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979).

In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn there from "in the light most favorable to the party asserting the injury." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Jones v Buchanan*, 325 F.3d 520, 523 (4th Cir. 2003). This is particularly true in the context of discrimination cases. *Murrell v. The Ocean Mecca Motel*, 262 F.3d 253 (4th Cir 2001); *Williams v. Staples, Inc.*, 372 F.3d

662 (4th Cir.2004). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the plaintiff. *Anderson*, 477 U.S. at 248. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.*

### i. Retaliation and a Retaliatory Hostile Work Environment

The case at bar involves the Plaintiff engaging in a protected activity (filing a complaint related to sex discrimination and the inappropriate workplace comments about his clothing from October 2012) and the subsequent specific instances of retaliation and the retaliatory hostile work environment created and fostered by BPD. Elements for Prima Face Case of Retaliation are:

1) Plaintiff engaged in a protected activity

2) In response, employer acted adversely against plaintiff

3) The protected activity was causally connected to the adverse action.

*Fordyce v. Prince George's Cty. Md.,* 43 F. Supp. 3d 537, 548-52 (D. Md. 2014).

The protected activity engaged in by the Employee can even include actions that are not actually unlawful under Title VII. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). The act of an employee complaining of a hostile work environment that the *employee* suspects is unlawful but *actually is not*, is still protected from retaliation. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) [emphasis added]. "Instead, complaining employees are protected if, at the time of their complaint, they 'have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.'" *Id. quoting, Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 282 (4th Cir. 2015) (en banc).

After first establishing a protected activity, the plaintiff must show a *materially adverse employment action*, meaning that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. *Id.* "Very little evidence

of a causal connection is required to establish a prima facie case of retaliation." *Burgess v.Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012). Temporal proximity is sufficient to establish a causal connection at the prima facie stage. *See Carter v. Bell*, 33 F.3d 450, 460 (4th Cir. 1994).

Additionally, retaliation claims under Title VII can be based on an employer's retaliatory creation of a hostile work environment. *Fordyce v. Prince George's Cty. Md.,* 43 F. Supp. 3d 537, 548-52 (D. Md. 2014); *Strothers v. City of Laurel*, 895 F.3d 317(4th Cir. 2018).

"To establish a retaliatory hostile work environment, 'a plaintiff must show that

(1) he experienced unwelcome harassment;

(2) the harassment was [in retaliation for protected conduct];

(3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment to create an abusive atmosphere; and

(4) there is some basis for imposing liability on the employer.'"

*Goldstein v. University of Maryland*, Civil Action No. CCB-18-2376, 2019 WL 4467035 at •10 (D. Md. Sept. 17, 2019) (quoting Wells v. Gates, 336 F. App'x 378, 387 (4th Cir. 2009)).

When determining whether a retaliatory hostile work environment exists, the court should consider the conduct's frequency, severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance. *Id.*

## IV. LEGAL ANALYSIS

### i. Defendant is not judicially estopped from bringing suit

The Plaintiff in this case is not judicially estopped due to his bankruptcy filing from bringing suit because Plaintiff did not intentionally mislead the court to gain an unfair advantage. Additionally, Md. Code Ann. Cts & Jud. Proceedings § 11-504 exempts the personal damages plaintiff may recover from his EEOC claims and renders them exempt from the claims of bankruptcy creditors. Therefore, the plaintiff had no motive to conceal these claims on his

bankruptcy petition and his failure to list his EEOC claims on his bankruptcy proceeding cannot be considered an intentional manipulation of the court. Finally, the instant lawsuit was not even filed until August 16, 2017, long after the June 29, 2016 discharge of the bankruptcy action.

Judicial estoppel is an equitable doctrine that exists to deter improper manipulation of the judiciary. *Calafiore v. Werner Enterprises, Inc.,* 418 F. Supp. 2d. 795, 797 (D. Md. 2006). For judicial estoppel to apply, four factors must be present:

> 1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation;
>
> 2) the position must be one of fact, rather than law or legal theory;
>
> 3) the prior position must have been accepted by the court in the first proceeding; and
>
> 4) the party to be estopped must have acted intentionally, not inadvertently. *Id.*

The fourth element is the "determinative factor" in the application of judicial estoppel. *Lowery v. Stovall*, 32 F.3d 219, 224 (4th Cir. 1996). For the fourth element of intent to be present, "the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'" *Id.*; *See also Martinueau v. Wier*, 934 F. 3d 385, 393 (4th Cir. 2019) ("[J]udicial estoppel applies only when the party who is alleged to be estopped intentionally misled the court to gain unfair advantage, and not when a party's position was based on inadvertence or mistake.").

A debtor's failure to disclose a pending claim is not intentional, and will be considered inadvertent, when the debtor "'lacks knowledge of the undisclosed claim or has no motive for its concealment.'" *Calafiore*, 418 F. Supp. 2d at 798, quoting *Kamont v. West*, 258 F. Supp 495. 500 (S.D. Miss 2003). Even if a debtor has full knowledge of a potential claim, the failure to disclose that claim in a bankruptcy petition can be deemed inadvertent when the debtor lacks a motive for concealment. *Id.* A plaintiff lacks a motive for concealment when an undisclosed claim would not have added assets to the bankruptcy estate. *Id.*

In *Calafiore*, the plaintiff, who brought suit against another driver for injuring incurred in a rear end collision, failed to list a claim against the other driver as an asset in a post-accident bankruptcy petition. *Id.* at 796. The defendant filed a motion for summary judgment, arguing that the plaintiff's negligence claim was barred by judicially estoppel because the plaintiff failed to list the claim on his bankruptcy petition. *Id.* The United States District Court for the District of Maryland dismissed the motion for summary judgment and held that the plaintiff was not judicially estopped from seeking damages in the negligence case to the extent that damages were exempt from the claims of bankruptcy creditors under Maryland law, particularly Maryland's personal injury exemption. *Id.* at 799. The court reasoned that the fourth element of judicial estoppel, intent, was missing because no intent to mislead the court can be inferred from the failure to disclose assets that are exempt from the claims of creditors under applicable law. *Id.*

The U.S. Bankruptcy Code contains a schedule of exemptions of debtor's assets from claims of bankruptcy. 11 U.S.C. § 522. "States may opt out of the federal exemption statute and implement a schedule of their own, which Maryland has done." *Calafiore,* 418 F. Supp. 2d at 799. Maryland Code Ann. Cts and Jud. Proceedings § 11-504 provides a list of assets exempt from the claims of bankruptcy creditors. *Id.* 11-504(b)(2), known as the personal injury exemption, provides that money payable in the event of "injury, or death of any person" is exempt from claims of a bankruptcy creditor. *Id.*

In *Niedermeyer v. Adelman*, the United States District Court for the District of Maryland found that the 11-504 exemption for money payable for "injury of any person" applied to a debtor's claims against his former employer for tort injuries which resulted in mental anguish or damage to plaintiff's reputation. 90 B.R. 146, 149 (D. Md. 1988). The court found that "[t]he test for determining whether a claim for injury of the person falls within the exemption of the statute is whether the claim is for injury to the property of the debtor or whether it is for injury to the person

proper." *Id.* If the injury is to the person proper, it is exempted. *Id.* The court in *Niedermeyer* found that a claim for damages to the plaintiff's "mind or psyche" is injury to the person proper, and therefore exempt under Maryland 11-504(b)(2). *Id.*

In this case, retaliation by BPD against the Plaintiff resulted in psychological damage to the Plaintiff. Under Md. Code Ann., Cts and Jud. Proceedings § 11-504 and *Niedermeyer*, any psychological damages recovered as a result of Plaintiff's EEOC claims are exempt from the claims of bankruptcy creditors. Since the Plaintiff's EEOC claims are exempt from the claims of bankruptcy creditors under Maryland's person injury exemption, Plaintiff had no motive to conceal his EEOC claims in his bankruptcy petition. Any damages obtained as a result of the EEOC complaint would not have increased the assets of the bankruptcy estate. Without a motive to conceal, plaintiff's non-disclosure of the EEOC on the bankruptcy petition cannot be considered an attempt to intentionally mislead the court to gain an unfair advantage. Therefore, judicial estoppel will not apply in this case. As the Fourth Circuit stated in *Martineau*, "[J]udicial estoppel applies only when the party who is alleged to be estopped intentionally misled the court to gain unfair advantage, and not when a party's position was based on inadvertence or mistake." *Matineau*, 934 F. 3d at 393.

Additionally, Plaintiff's claims in this case were not yet ripe upon the filing and discharge of his EEOC action. This case was filed on August 16, 2017. Plaintiff received his right-to-sue letter from the EEOC on May 18, 2017. Plaintiff's bankruptcy was discharged long before, on June 29, 2016. Plaintiff had been contacted by the Federal EEOC in Washington, DC and they had expressed interest in investigating his case, an investigation which took three years. See Exhibit 5 at ¶58. There was no way of knowing if and/or when Plaintiff's claims would ripen.

### ii.   Plaintiff is not time barred from bringing the instant suit

Acts which occurred prior to June 28, 2013 may be considered in assessing BPD's liability because such acts contributed to a retaliatory hostile work environment which persisted into and

through the statutory time filing period. Additionally, acts that occurred prior to June 28, 2013 can be used as background evidence in support of Plaintiff's timely filed claims involving discrete acts of retaliation by BPD during the statutory time filing period.

### a. Acts Comprising Plaintiff's Retaliatory Hostile Work Environment Claim Are Not Time Barred Under Binding Supreme Court Precedent

BPD's argument that acts which occurred prior to June 28, 2013 are time barred contradicts binding Supreme Court precedent. In *National RR Passenger Corporation v. Morgan*, the Supreme Court held while 42 U.S.C. § 2000e-5(e) "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period . . . consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time filing period." 536 U.S. 101, 101 (2002).

The Court's holding in *Morgan* is grounded in the understanding that a hostile work environment claim involves repeated conduct over a "series of days or perhaps years." *Id.* at 115. In contrast to claims based on discrete acts of discrimination or retaliation, a hostile work environment claim cannot be said to occur on a particular day. *Id.* Furthermore, a single act of harassment in a larger hostile work environment claim may not be actionable on its own. *Id.* Rather, a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. *Id.* at 117.

Since hostile work environment claims are composed of a series of acts constituting one unlawful employment practice, the Court held that if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Id.* Thus, a charge is considered timely as long as the employee files a charge within 180 or 300 days of any act that is part of the hostile work environment claim. *Id.*

The Court in *Morgan* provided hypothetical scenarios to illustrate their holding. *Id.* at 118. In one scenario, the Court stated that if acts on days 1-400 create a hostile work environment and the employee files suit on day 401, all the acts, including the acts occurring from days 1-100, will be considered as long as each act contributed to the hostile work environment. *Id.* An appropriate analogy may be an iceberg poking above the water line. If the tip of the iceberg of acts which constitutes a hostile work environment claim is poking into the 300-day time filing period, the Court is allowed to look at the whole iceberg when assessing liability.

In this case, BPD committed a series of harassing and retaliatory acts that collectively created a hostile work environment. BPD officers first sexually harassed plaintiff in October 2012. After Plaintiff filed a complaint with EOC (BPD's internal EEOC office), he was subjected to a series of retaliatory and harassing acts which created a hostile work environment that persisted well into the 300-day time filing period (June 28, 2013- April 24, 2014 (the date the EEOC complaint was filed)).

A number of the retaliatory acts contributing to the hostile work environment occurred within the 300-day time filing period. For example, on July 4, 2013, plaintiff made a request for a transfer, claiming harassment, hostile work environment, and mistreatment in the Southeast District. *See* Exhibit 2. On July 9, 2013, plaintiff's request for a transfer was torn up by his supervisor and the shreds of his request were returned to him.

On July 28, 2013, Sergeant Brokus harassed and assaulted the plaintiff, further contributing to the hostile work environment; on July 29, 2013, plaintiff missed SWAT tryouts because his direct supervisors deliberately did not inform him of an order accepting Plaintiff's request to apply for the BPD SWAT unit; and, on August 4, 2013, Plaintiff was told by supervisors that he could no longer wear his personal body camera on his lapel, despite that Plaintiff's body camera was responsible for gathering evidence leading to convictions and clearing Plaintiff of a false allegation. Since these and other acts occurred within the 300-day time filing period, the entire period of the hostile work

environment and any act that contributed to the environment which occurred prior to June 28, 2013 may be considered for purposes of determining BPD's liability.

> **b.** **Acts That Occurred Prior to June 28, 2013 May be Used as Background Evidence to Support Timely Claims for Discrete Title VII Violations**

The Court in *Morgan* held that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate 180 or 300 day time period set forth by 42 U.S.C. § 2000e-5(e)(1). *Id.* at 122. However, the Court found that the statute does not bar an employee from using prior acts which occurred outside the 300-day window as "background evidence in support of a timely claim." *Id.* at 113.

 In addition to making timely claims of a retaliatory hostile work environment, plaintiff made timely claims involving discrete acts of retaliation. The retaliatory events discussed above not only contributed to a hostile work environment, they also constitute discrete acts of retaliation. For example, plaintiff was retaliated against on July 9, 2013 when his transfer request, alleging harassment and a retaliatory work environment, was torn up by supervisors and returned to him. Under *Morgan*, events that occurred prior to June 28, 2013 may be used as background evidence to support and explain any timely claims.

Therefore, acts occurring prior to June 28, 2013 may be considered in assessing liability in Plaintiff's hostile work environment claim and as background evidence in supporting Plaintiff's discrete retaliation claims.

> **iii.** **When examining the record objectively, Plaintiff clearly establishes a prima facie case of Retaliatory Hostile Work Environment and multiple discrete acts of retaliation.**

In examining the facts of this case, it is clear that Plaintiff engaged in a protected activity by filing for a complaint regarding the homophobic graffiti about himself on the bathroom stall in

October 2012.  He also will testify that he made a simultaneous formal complaint to BPD EEOC regarding the gender and sexual commentary made by Sgt. Brickus in front of a group of peers as he went to make the formal complaint.  Upon his return to the district that same day, Plaintiff was almost immediately questioned and placed in the crosshairs with his immediate supervisor, Sgt. Brickus saying, "the Major doesn't want this to go downtown.  I can't believe you met -- went downtown with it.  You could have kept it in-house.  And then -- that's from what I rec -- my recollection of the conversation."  *See* Plaintiff's Deposition at 99-101, Exhibit 37.  Plaintiff's workplace was never the same.  Plaintiff continued to suffer adverse actions from supervisors at BPD by requesting and having denied no less than 6 transfers until his 7th is granted almost 9 months later.  In that year, Plaintiff was harassed, punished, threatened, suffered heat stroke, and assaulted. That, in addition to the fact that he learned, first hand, from Officer Michael McQuade that Sgt. Brickus was specifically targeting him to get him fired.  *See* Exhibit 9.  Even when Plaintiff removed 4 guns from the streets of Baltimore City, he still did not receive the accolades he deserved.  Exhibit 1 at 44-45; Exhibit 5.

BPD argues, among other things, that the protected activity was not causally connected to the adverse action by BPD and that Plaintiff is a bad and insubordinate employee.  There may be a material fact in dispute about that, but it is certainly a question for a jury and not a question of law.  The temporal proximity between the complaint and the adverse action alone is enough to send this to the jury.  But Plaintiff has more than that in this case; Plaintiff has multiple witnesses who are no longer with the department who went and will go on record and say that the BPD supervisors were specifically engaging in a targeted campaign against Plaintiff.  *See* Exhibit 8, Exhibit 27, Exhibit 32, Exhibit 33, Exhibit 34.  Even BPD's own former attorney injected himself as a witness into this case and effectively attempted to tamper with Plaintiff's witnesses.  *See* Exhibit 31, 33.

Assuming, arguendo, that Plaintiff is time barred from the October 2012 through June 2013 retaliatory events, there are still ample occurrences, including June 28, July 4, and July 28 and 29, 2013 where (respectively) Plaintiff suffered heat stroke from being placed in an unair-conditioned car in extreme heat; was deprived of his family vacation due to a work detail; was assaulted by a supervisor and transported by an ambulance; and, missed tryouts for the SWAT promotion due to the BPD withholding the information regarding the date of the training session. Those discrete acts of retaliation do not even begin to touch the intentional targeting of Internal Affairs against Plaintiff that happened after his former SED supervisors were transferred there and further sullied his reputation.

Regarding a retaliatory hostile work environment, much of the same conduct as listed, *supra*, applies. Plaintiff experienced unwelcome harassment by SED and later IA supervisors. That harassment was in direct retaliation for protected conduct. The harassment was severe, persistent, pervasive, and at times, violent. BPD command staff were even made pawns in the conduct with Col. Richard Worley defaming Plaintiff in an email to the Commissioner of Police, among others, then later apologizing for his conduct once he found out what he did. *See* Exhibit 5.

### iv.    BPD's "Expert Opinion Evidence" on its Legitimate Business Reasons for its own actions is unsupported in the record and not yet ripe.

BPD argues that Plaintiff is barred from a retaliation claim because it had its own legitimate business reasons for its own actions. BPD essentially says, "Plaintiff is a bad cop" but in doing so can only find support in its own patently flawed and biased internal affairs processes. It also ignores that the disciplinary processes for police officers are complex, long, and require expert opinion.

BPD argues that "Plaintiff's disciplinary records, and the administrative charges levied against him, paint the real story here" and that [BPD] "processed these charges in the ordinary course of business." *See* Def. Mem. in Supp. of Mot. for Sum. Jdmt., P. 31-32 (ECF #66, Att. #1). BPD conveniently ignores that its internal affairs process is flawed, biased, and corrupt, and has been

identified by the United States Department of Justice as such. Even the evidence in this case demonstrates that the officers involved in Plaintiff's SED retaliation were also intimately involved in Plaintiff's Internal Affairs matters. Sgt. Kenneth Williams was the person to whom Plaintiff made the first complaint way back in October 2012. Sgt. Kenneth Williams was an approving supervisor for Det. Robert Cornejo. Sgt. Kenneth Williams was included in the investigation into the referral from BPD legal for the document issue from discovery. This flies in the face of the fact that per BPD's Internal Affairs Detective Cornejo, both Kenneth Williams and James Brokus should have recused and screened themselves off from any involvement with Plaintiff's cases.

Furthermore, Expert discovery has been deferred in this case, and expert testimony is required to render any opinion regarding the propriety or impropriety of BPD's internal investigation process. The process is complicated, is governed by the state LIBOR, and (BPD's in particular) has been identified as systematically flawed. *See e.g.* Exhibit 28. Significantly, BPD cannot point to one instance of actual *misconduct* on the part of Plaintiff, but point to alleged insubordination and hang their opinionated hat on it. In fact, the record is clear that Plaintiff's on-the-job work product was outstanding. This should be (and will with expert testimony) demonstrate the simple fact that BPD cannot seem to investigate its own, repeatedly missing problem cops and using internal affairs to target persons labeled as "problem cops" while missing the true felons in their midst. *See United States v. BPD*, 1:17-cv-00099 Document 2-2. In fact, during the pendency of this case BPD's own Gun Trace Task Force was running the streets, committing violent felonies on Baltimore City's own residents and Internal Affairs missed many multiple warning signs. Regardless, BPD's "legitimate business reasons" are seriously in question and are not only for a jury to determine but also will require expert opinion to render them in proper context.

## V. CONCLUSION

The case present problems endemic to the Baltimore City Police Department that extend far beyond this case. Indeed, a culture punishing and intimidating officers who engage in protected activity became so pervasive, pernicious, and damaging that the Department of Justice was forced to intervene and compel the BPD to enter a consent decree where the BPD agreed to curtail such practices. This case presents yet one of many examples of the retaliatory actions taken against police officers who complain of wrongdoing rather than "going along to get along." For the foregoing reasons, BPD's Motion for Summary Judgment should be denied as to Count I. Plaintiff submits on Count II.

Respectfully Submitted,

_____/s/_____     _____/s/_____
Michael E. Glass, Fed. Bar. No. 11805     Kurt E. Nachtman, Fed. Bar. No. 29838
The Michael Glass Law Firm     Eldridge, Nachtman, & Crandell, LLC
201 N. Charles Street, Suite 1900     217 N. Charles Street, 3rd Floor
Baltimore, MD 21201     Baltimore, MD 21201
    kurt@enlawyers.com

*Counsel for Plaintiff*

**Request for Hearing**

Plaintiff requests a hearing on this matter.

_____/S/_____
Kurt E Nachtman, Esq.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**STEVEN ANGELINI**,                    *

    Plaintiff,                    *

v.                    *        Case No.: 1:17-cv-02354-ELH

**BALTIMORE POLICE DEPARTMENT** *

    Defendant.                    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## TABLE OF CONTENTS

I.     SUMMARY OF ARGUMENTS ................................................................................ 1

II.     FACTS ................................................................................................................. 2

    i.     The October 2, 2012 Graffiti Incident ................................................. 4

    ii.     Plaintiff's many requested transfers ..................................................... 4

    iii.     Inappropriate sexual innuendo from October 5, 2012 and aftermath ..................................... 5

    iv.     Brickus picks on Plaintiff (October to December 2012) ........................ 7

    v.     Parking spot incident – January 17, 2013 ............................................ 8

    vi.     Plaintiff and Daniel Quaranto recovered four guns from the streets of Baltimore yet received no accolades or accommodation unlike similarly situated officers (March 2013) .............. 9

    vii.     Brickus admits to targeting Angelini (April 2013) ............................... 10

    viii.     Numerous Transfer Requests to a Different Shift were Repeatedly Denied ....................... 10

    ix.     July 28, 2013 assault by a supervisor .................................................. 12

      a.     The (Part 1) Serious Crime Report ....................................................... 12

      b.     SWAT tryouts ...................................................................................... 13

      c.     The Assault ........................................................................................... 14

    x.     Transfer to Northeast District ("NED") ............................................... 14

    xi.     Continued retaliation from SED supervisors who move to Internal Affairs ........................... 16

    xii.     BPD's history and environment of hostility ......................................... 18

III.     LEGAL STANDARD FOR SUMMARY JUDGMENT ............................................... 22

    i.     Retaliation and a Retaliatory Hostile Work Environment ....................... 23

IV.     LEGAL ANALYSIS ............................................................................................. 24

    i.     Defendant is not judicially estopped from bringing suit .......................... 24

ii.    **Plaintiff is not time barred from bringing the instant suit**..........................................................27

    a.    **Acts Comprising Plaintiff's Retaliatory Hostile Work Environment Claim Are Not Time Barred Under Binding Supreme Court Precedent** ..........................................................................28

    b.    **Acts That Occurred Prior to June 28, 2013 May be Used as Background Evidence to Support Timely Claims for Discrete Title VII Violations**.................................................................30

iii.    **When examining the record objectively, Plaintiff clearly establishes a prima facie case of Retaliatory Hostile Work Environment and multiple discrete acts of retaliation.** ..........................30

iv.    **BPD's "Expert Opinion Evidence" on its Legitimate Business Reasons for its own actions is unsupported in the record and not yet ripe.** .................................................................................32

**V.   CONCLUSION**..........................................................................................................................34

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STEVEN ANGELINI,                    *

    Plaintiff,                    *

v.                                  *          Case No.: 1:17-cv-02354-ELH

BALTIMORE POLICE DEPARTMENT *

    Defendant.                    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## APPENDIX OF EXHIBITS

**Exhibit 1:**    Deposition of Daniel Quaranto

**Exhibit 2:**    Photocopies of Form 70 Transfer Requests

**Exhibit 3:**    Deposition of Richard Worley

**Exhibit 4:**    BPD Policy G.O. Q-1

**Exhibit 5:**    Affidavit of Steven Angelini

**Exhibit 6:**    Hand sketch of SED roll call room by Euttice Brickus

**Exhibit 7:**    January 17, 2013 letter from Lt. Windell suspending Angelini

**Exhibit 8:**    Photographs of NSU spot

**Exhibit 9:**    Affidavit of Michael T. McQuade

**Exhibit 10:**    Deposition of Kimberly Burrus

**Exhibit 11:**    June 12, 2013 Form 95

**Exhibit 12:**    June 26, 2013 Form 95

**Exhibit 13:**    City of Baltimore Discharge Instructions July 2, 2013

**Exhibit 14:**    Mercy report summary June 29, 2013

**Exhibit 15:**    Transcript of Audio Recording of June 28, 2013 encounter attached as Exhibit 8B to James Brokus Deposition

**Exhibit 16:**    July 28, 2013 Form 95

**Exhibit 17:**    Deposition of Stephen Coughlan

**Exhibit 18:**    Emails between Steven Angelini and Stephen Coughlan, marked as exhibits 1, 2, 3, & 7 of Deposition of Stephen Coughlan

**Exhibit 19:**    July 1, 2013 Order attached as Exhibit 5 of Stephen Coughlan Deposition,

**Exhibit 20:**     Attendance List for SWAT tryouts

**Exhibit 21:**     Deposition of Derwin Jackson

**Exhibit 22:**     July 31, 2013 Form 95 report

**Exhibit 23:**     July 28, 2013 Ambulance Transportation Report

**Exhibit 24:**     August 6, 2013 Form 95 and accompanying Facebook Message from "Buzz Grossnickle,"

**Exhibit 25**:     Deposition of Mark Rutkowski

**Exhibit 26:**     Deposition of Robert Cornejo

**Exhibit 27:**     Affidavit of Damion Walford

**Exhibit 28:**     Affidavit of Francis Davidson

**Exhibit 29:**     August 31, 2018 email from Damion Walford

**Exhibit 30:**     September 4, 2018 through September 5, 2018 email exchange

**Exhibit 31:**     September 5, 2018 email from Colin Glynn

**Exhibit 32:**     April 8, 2018 email from Colin Glynn

**Exhibit 33:**     Affidavit of Ed Gordon

**Exhibit 34:**      Deposition of Damion Walford

**Exhibit 35:**     Deposition of James Brokus

**Exhibit 36:**     Deposition of Ettice Brickus

**Exhibit 37:**      Deposition of Steven Angelini