```
1   STEVEN ANGELINI,                 *   IN THE
2           Plaintiff                *   U.S. DISTRICT COURT
3                                    *   FOR THE DISTRICT
4       vs.                          *   OF MARYLAND
5   BALTIMORE POLICE DEPARTMENT      *   Case Number
6           Defendant                *   1:17 cv 2354 elh
7   *       *       *        *        *        *
8
9           The deposition of DANIEL QUARANTO was taken
10  on August 5, 2019, commencing at 10:00 a.m. at The Law
11  Offices of Eldridge and Nachtman, LLC, 217 North
12  Charles Street, Baltimore, Maryland, before Monica A.
13  Sienkiewicz, Notary Public.
14
15
16
17  *   *   *   *   *   *   *   *   *   *   *
18
19
20  REPORTED BY:
21  MONICA A. SIENKIEWICZ
```

**PLAINTIFF EXHIBIT 1**

**Page 2**

```
1  APPEARANCES:
2
3       KURT E. NACHTMAN, ESQUIRE
4       Eldridge & Nachtman, LLC
5       217 N. Charles Street
6       Baltimore, Maryland 21201
7            On behalf of the Plaintiff
8
9       JUSTIN CONROY, ESQUIRE
10      KAY HARDING, ESQUIRE
11      100 North Holliday Street
12      City Hall
13      Baltimore, Maryland 21202
14           On behalf of the Defendants
```

**Page 3**

```
1              I N D E X
2  WITNESS                                PAGE
3  DANIEL QUARANTO
4     Examination by Mr. Nachtman         4, 60
5     Examination by Mr. Conroy           54
6
7     (There were no exhibits marked for
8  identification.)
```

**Page 4**

```
1              P R O C E E D I N G S
2  WHEREUPON --
3            DANIEL QUARANTO,
4  the witness, having been first duly sworn to tell the
5  truth, the whole truth and nothing but the truth, was
6  examined and testified, as follows:
7       EXAMINATION BY MR. NACHTMAN:
8     Q.   Good morning.
9     A.   Good morning.
10    Q.   State your name for the record, please.
11    A.   Daniel Quaranto.
12    Q.   Do me a favor, everything you say is being
13 recorded.  So make sure you keep your voice up.
14    A.   Uh-huh.
15    Q.   Your body camera is off, right?
16    A.   Yes.
17    Q.   Is there a light or something that tells you
18 when they are on or off?
19    A.   Yes.
20    Q.   I wanted to make sure.  Have you ever had your
21 deposition taken before?
```

**Page 5**

```
1     A.   No.
2     Q.   It is very similar to courtroom testimony.
3  You've testified in court before, right?
4     A.   Yes.
5     Q.   So it's a little bit different in that it is
6  just like a court proceeding, you under oath, but there
7  is no judge here.  So from time to time, the attorneys
8  for the Baltimore Police Department who are sitting
9  here to your right, may make objections.  You'll want
10 to give them an opportunity to voice that and you can
11 respond to the question or they may, although probably
12 not, instruct you to not respond to the question, so
13 you have to listen to that, okay?
14    A.   Okay.
15    Q.   I see you shaking your head up and down right
16 now.  It is a common problem in depositions and in
17 courtroom testimony, please make sure you give a verbal
18 response, yes, no, I don't know or maybe.  Please don't
19 respond uh-huh or ah-hah because those don't turn into
20 actual responses that are recordable by the
21 stenographer, okay?
```

PLAINTIFF EXHIBIT 1

Page 6

1   A.   Understood.
2   Q.   If you have any questions, please ask the
3   question of either BPD's lawyer or me.  If you don't
4   understand the question, please let me know that you
5   don't understand it.  Do you understand?
6   A.   Yes.
7   Q.   Before we begin, do you have any other
8   questions at all?
9   A.   No.
10  Q.   Okay.  Also do me a favor, she is recording
11  this so that she can prepare a transcript for trial
12  later on.  You also do need to keep your voice up.  You
13  heard ambulances and buses and trucks go by and we have
14  an AC system.  You are very soft-spoken, so keep your
15  voice up so she can hear your responses, okay?
16  A.   Sure.
17  Q.   Can you state your full name, please?
18  A.   Daniel Quaranto.
19  Q.   And can you give me your work address?
20  A.   The mailing address is 242 West 29th Street,
21  Baltimore, Maryland 21211.

Page 7

1   Q.   What is your current rank?
2   A.   Sergeant.
3   Q.   And what is your badge ID?
4   A.   211 and ID number is I236.
5   Q.   How long have you been with the Baltimore
6   Police Department?
7   A.   Eleven years completed.
8   Q.   And can you please provide your previous
9   history of assignment, to the best of your
10  recollection?
11  A.   Field trained after Police Academy in the
12  Eastern District.
13  Q.   What class were you?
14  A.   0801.
15  Q.   Okay.
16  A.   After that, I was assigned to a foot unit for
17  a few months and worked in the foot patrols in the
18  central district.  After that I was assigned to the
19  southeast district and I remained there.  For a year, I
20  worked with Steve, still assigned to the southeast and
21  the patrol division but in an initiative unit, if you

Page 8

1   will.
2   Q.   What was that initiative unit?
3   A.   We had a small geographical location that we
4   were tasked with actively patrolling and policing
5   through proactive means.  So we were not responsible
6   necessarily to handle 911 calls for service.
7   Q.   Was that you and Steve?
8   A.   That was, yes.
9   Q.   And when you say Steve, do you mean Steven
10  Angelini, the Plaintiff?
11  A.   Yes.
12  Q.   Was that the 225 post?
13  A.   It was yes, at the time.
14  Q.   Can you describe that geographic area for the
15  stenographer, for the record?
16  A.   So the southern border was Orleans Street,
17  Route 40.  The northern border was Monument Street and
18  our western border was North Linwood Avenue and the
19  Eastern border was North Highland Avenue.
20  Q.   What was the significance of that post?
21  A.   Historically, a high crime area.  You know, a

Page 9

1   lot of violent crimes, so to dedicate a car
2   specifically to be up there helps to deter that and
3   prevent it.
4   Q.   Whose idea was that?
5   A.   My understanding was it came through Major
6   Davis, but I don't know.
7   Q.   And you and Steve Angeline were hand selected
8   for this special assignment?
9   A.   Yes.  I don't -- I don't recall exactly if
10  Steve asked for me to work with him, but we were both
11  selected.  I don't know if he recommended me to work
12  with him.  I am not sure of the exact reasoning behind
13  the selection.
14  Q.   This was in 2011, up through summer of 2012,
15  if you recall?
16  A.   I don't recall the exact dates, around 2011
17  and 2012.
18  Q.   After southeast -- I will circle back on that
19  225 post in a minute.  After southeast district, where
20  were you assigned?
21  A.   So I did a short detail downtown with a newly

Page 10

1  formed license plate reader unit, part of special
2  operation section but ultimately I asked to return to
3  the southeast. From there --
4  Q.  When was that, if you recall?
5  A.  Somewhere after -- all I know is that Steve
6  was assigned, too. I don't recall it was after we
7  worked together in the 225 post.
8  Q.  And after that, where did you go?
9  A.  Back to the southeast and ultimately promoted
10 and upon being promoted, transferred to the northeast
11 district. After that, I went to my current assignment
12 which is part of our traffic section, crash team.
13 Q.  What do you do now, as a member of the crash
14 team?
15 A.  I supervise six accident reconstructionists,
16 and we handle fatal accidents, accidents with life
17 threatening injuries that are likely to become fatal
18 and all departmental vehicle accidents. I supervise
19 them but am also responsible for a caseload myself.
20 Q.  How many cases do you currently have?
21 A.  In the unit?

Page 11

1  Q.  No, you personally?
2  A.  I have no -- I have one case we are waiting on
3  meeting with the State's Attorney's Office but I have
4  no open cases.
5  Q.  When you got promoted you said you supervised
6  six accident reconstructionists?
7  A.  When I got promoted I worked in northeast and
8  went down to the crash team. I have six detectives
9  underneath me.
10 Q.  When you get promoted to Sergeant, what types
11 of specialized training do you receive in terms of
12 managing personnel underneath you?
13 A.  So it's a MPTC requirement within a year you
14 attend first line supervisor training, so I attended
15 that at the academy. I believe it is a week but it is
16 possible it is two. I am not a hundred percent
17 certain, that is the only mandated training.
18 Q.  Let me ask you, when you went to the northeast
19 district, you were a Sergeant in patrol?
20 A.  Correct.
21 Q.  Did you have an occasion, at that point, to

Page 12

1  supervise Officer Angelini?
2  A.  Yes.
3  Q.  And do you remember approximately what time
4  frame that was?
5  A.  I was only there from September of '15 to
6  October of '16, somewhere in between there.
7  Q.  So about a year?
8  A.  I don't believe he worked for me the entire
9  time, no.
10 Q.  Did you have an occasion to fill out a green
11 sheet for Officer Angeline?
12 A.  Yes.
13 Q.  Did you note any problems with Officer
14 Angelini's performance on his green sheet?
15 A.  I don't believe so.
16 Q.  Do you have a copy of that green sheet?
17 A.  No.
18 Q.  What is a green sheet?
19 A.  It is your -- we do it twice a year, it is
20 your evaluation from your immediate supervisor.
21 Q.  And Officer Angelini received all excellent

Page 13

1  marks from you, if you recall?
2  A.  That I recall, but I don't have it in front of
3  me, but I do believe it was a good review.
4  Q.  Did you ever personally have any issues with
5  Officer Angelini's work product on the street?
6  A.  No.
7  Q.  How long have you known Officer Angelini?
8  A.  I would say since shortly after he was
9  transferred to the southeast.
10 Q.  When did you begin conducting, if you recall,
11 the date, approximate date? When did you begin working
12 in a car with Angelini, covering your respective post
13 as partners?
14 A.  Oh, as partners?
15 Q.  Yes.
16 A.  Like I said before around 2011, 2012 time
17 period, about a year long but the exact start date I
18 don't recall.
19 Q.  So tell me again a little bit about this
20 special detail, this 225 post detail that you received
21 from Major Davis, was that -- that was before October

Page 14

1  2012, correct?
2  A.  Yes.
3  Q.  How do you know it was before October, 2012?
4  A.  It said 2011 and 2012.
5  Q.  Did you and/or Officer Angelini receive any
6  accommodations from the Baltimore Police Department as
7  a result of your work at that special detail, if you
8  recall?
9  A.  I know I received Officer of the Month one
10 month.  I know we were given preseason tickets to a
11 Ravens game from Major Davis, for what, I am sure it
12 was -- I don't know for what but I am sure it was some
13 sort of at a boy, if you will.  I don't recall any
14 others.
15 Q.  Okay.  Did you -- can you tell me a little bit
16 about the results in that detail in terms of crime
17 reduction?
18 A.  So the specific crime reduction, I don't have
19 the numbers.  I am proud of the work that we did.  I
20 think we made some very good cases and got some very
21 good convictions.  I like to think we reduced violent

Page 15

1  crime over there but I don't have the specific numbers.
2  Q.  Did you have a number of gun seizures out of
3  that assignment?
4  A.  I can think of now at least one.
5  Q.  Make a lot of significant arrests, felony
6  related arrests on that assignment?
7  A.  Yes.
8  Q.  And did Officer Angelini receive accomodations
9  for his work on that assignment, if you know?
10 A.  I do know he has received Officer of the Month
11 in the past but I don't know when.  I cannot specify
12 when.
13 Q.  Okay.  I am going to direct your attention to
14 January, 2012, approximately.  Do you recall having
15 your attention drawn to or responding to any incidents
16 involving Officer Angelini's family members who reside
17 in the southeast district?
18 A.  So, I don't know the date.  I do know that I
19 had responded and took a report for a hit and run or an
20 obstruction of property on his father's car.
21 Q.  What, if anything, do you recall about that?

Page 16

1  A.  I believe it was parked around the corner but
2  he never provided any information as far as how it
3  occurred.
4  Q.  Did you take a report and generate a report
5  number?
6  A.  Yes.  I did write a report, whether I wrote an
7  accident report or an incident report, that I don't
8  recall.
9  Q.  And did it ever come to your attention that
10 Officer Angelini's father was having domestic related
11 issues with another man?
12 A.  Yes.
13 Q.  How did it come to your attention?
14 A.  Steve told me.
15 Q.  What did Steve tell you, if you recall and
16 when?
17 A.  So I could not tell you when, but he had told
18 me that he had discovered -- he walked in the house and
19 his father, either his underwear was down or looking at
20 someone's underwear and trying to say there was some
21 sort of -- something to do with checking someone's

Page 17

1  underwear but he learned that his father was in a
2  relationship with that person.
3  Q.  Was the Plaintiff, Steven Angelini, disturbed
4  by that revelation?
5  A.  I don't know.
6  Q.  If you know?
7  A.  I don't recall anything outstanding during the
8  conversation.  I don't know how he feels.
9  Q.  So did you, at any point learn of more police
10 involvement from the southeast district with Angelini's
11 family who resided in southeast district?
12 A.  Yes.
13 Q.  And so what was your knowledge of that, or is
14 your knowledge of that?
15 A.  I believe Officer Camberger responded and took
16 some sort of domestic related report, that is the
17 extent.  I don't recall what it exactly referenced.
18 Q.  Did you hear about it from any officers, other
19 than Officer Angelini?
20 A.  No.
21 Q.  And what -- strike that.  Who was your

Page 18

1 immediate supervisor in 2012, if you know?
2    A.   I believe the shift commander was Lt. Widell
3 and I believe I worked for Sergeant Kenneth Williams
4 but --
5    Q.   Did you also work for Sergeant Brickus?
6    A.   I mean she was on that shift, I believe. I
7 don't know if I ever worked directly for her. She may
8 have been the supervisor when I was assigned to Sector
9 I for a short period, but I cannot recall.
10   Q.   Who was your supervisor when you were on the
11 225 post detail?
12   A.   Sergeant Williams.
13   Q.   Kenneth Williams?
14   A.   He still fell under that.
15   Q.   Even though you were specially detailed and
16 not responding to regular 911 calls, you still reported
17 to Sgt. Kenneth Williams?
18   A.   I believe so.
19   Q.   Can you tell me sometime in early 2012, about
20 an incident involving a search and seizure warrant?
21   A.   Yes.

Page 19

1    Q.   You recall that specific incident involving
2 Sergeant Kenneth Williams?
3    A.   Yes.
4    Q.   What can you tell me about that?
5    A.   We had done a controlled purchase from a
6 location, subsequently drafted a search and seizure
7 warrant.
8    Q.   You drafted the search and seizure warrant?
9    A.   It could have been co compliance, I don't
10 recall but I was a part of it, yes.
11   Q.   Okay.
12   A.   The day we were going to get it signed or
13 executed, we spoke to Kenneth Williams and he jokingly
14 said, I don't want anything to do with it so then when
15 it was time to execute it, Steve got another sergeant,
16 because a permanent rank supervisor is necessary during
17 the execution of a search warrant and when we returned,
18 we were confronted about something along the lines of
19 going behind his back and not notifying him. We were
20 called into the command investigations office and we
21 filled out a non punitive written counseling for

Page 20

1 whatever it is they alleged we did. It did not sit
2 well with me.
3    Q.   Why is that?
4    A.   I don't think that those allegations were
5 founded. So I drafted a response to that. I believe
6 Steve may have, as well. Eventually, I spoke to
7 Kenneth Williams, one on one, and explained to him the
8 same thing I told you. We had come to him and he said
9 he did not want anything to do with it and we got
10 another supervisor and the whole thing was squashed.
11   Q.   What do you mean, squashed?
12   A.   I don't remember if he tore them up or got rid
13 of them, the non punitive counseling was.
14   Q.   Thrown away? Never reported anywhere?
15   A.   Should not be.
16   Q.   So if it was in someone's file, that was
17 against what that direction of the sergeant would have
18 been at the time?
19   A.   That was my understanding, at the time.
20   Q.   So when Sergeant -- let me back up a step. Is
21 Sergeant Kenneth Williams, if you know, still with the

Page 21

1 Baltimore Police Department?
2    A.   Yes.
3    Q.   Where is he working now?
4    A.   Internal Affairs.
5    Q.   Is he friends with or social acquaintances, if
6 you know, at the time Sergeant Brickus?
7    A.   I don't know what the relationship is between
8 the two of them, no.
9    Q.   Did they work on the same shift together?
10   A.   Yes.
11   Q.   For how long, if you know?
12   A.   I don't.
13   Q.   Was it more than a month?
14   A.   I believe Sergeant Brickus switched shifts. I
15 don't recall how supervisors change back and forth from
16 time to time with shifts.
17   Q.   If you knew at the time, in 2011, '12, was
18 Sergeant Williams in a relationship with anyone?
19   A.   Yes.
20   Q.   Romantic?
21   A.   That was my understanding.

Page 22

1  Q. Who?
2  A. Sgt. Drennen, not Sgt. Brickus.
3  Q. Sgt. Kenneth Williams, he was your supervisor
4  and how long until he transferred to Internal Affairs?
5  A. I could not even tell you.
6  Q. Did he remain in southeast for another year or
7  so, if you know?
8  A. He took over investigations for some period of
9  time in the southeast.
10 Q. So after he worked on the 225 post, he was
11 local Internal Affairs. They don't have that position
12 anymore?
13 A. I believe so, correct. The timing I cannot
14 tell you.
15 Q. So he was command. What was, at the time,
16 command investigations? Can you describe that for me?
17 A. Just like you said, it was sort of an internal
18 or in-house version of Internal Affairs that would be
19 with less severe cases. They can investigate within
20 the district and were not sent down to Internal
21 Affairs. So like failure to appear for court --

Page 23

1  Q. Being late for work?
2  A. I don't know what the criteria is but
3  relatively minor things.
4  Q. Okay and at the time that he was commanded
5  investigations at southeast, was he in a relationship,
6  if you know, with Sergeant Drennen?
7  A. I was under the impression that he was.
8  Q. What gave you that impression? Did they come
9  to work together?
10 A. They may have.
11 Q. Did they leave together?
12 A. It is possible. I don't know if someone told
13 me or if it was common knowledge. I don't know the
14 specifics.
15 Q. So after he was command investigations, he
16 went to Internal Affairs Division downtown?
17 A. So that is where he is now. Whether there was
18 a stop in there, I don't know. I was not paying
19 attention.
20 Q. So let me make sure I understand this
21 correctly. So if there was a record of this search and

Page 24

1  seizure warrant incident from when you were assigned to
2  the 225 post on this initiative -- strike that. Did
3  the verbal counseling that got destroyed, did that
4  occur while you were on this special assignment or did
5  that occur at a different time, if you recall?
6  A. I believe it was relatively soon after we were
7  counseled. So a conversation that I had with him that
8  ultimately, I guess explained whatever miscommunication
9  took place, allegedly, took place within -- I don't
10 know, no more than a week. I don't know an exact time
11 frame.
12 Q. Do you recall meeting Sergeant Williams in an
13 alleyway where he ripped up all the paperwork?
14 A. I met with him in the alley. I don't know if
15 he had the paperwork there. We were on a call and that
16 is when I pulled him aside and spoke to him, the
17 conversation I am referencing, explaining that what we
18 are being counseled for is not what took place, that we
19 had come to him and we had done what we were required
20 to do but if your supervisor tells you they don't want
21 anything to do with it, it is a reasonable thing to get

Page 25

1  another supervisor because one is required present.
2  Q. So, your impression of the initial
3  conversation with Sergeant Williams was that he just
4  didn't want to do the work associated with the search
5  warrant or what? What was your impression?
6  A. I am pretty sure he said I don't want anything
7  to do with that.
8  Q. What did that mean to you?
9  A. He did not want to be there.
10 Q. Okay. So not that he did not want to execute
11 that particular search and seizure warrant for any
12 particular reason?
13 A. Not that he specified.
14 Q. So were you ever served any notice of any
15 investigation, as it relates to that search warrant?
16 A. I don't believe so.
17 Q. Ever served any formal charging paperwork from
18 Internal Affairs?
19 A. No.
20 Q. Ever notified that any punitive action was
21 launched on your record?

Page 26

1  A.  No.
2  Q.  So, if there was a record of it, you would not
3  have any knowledge of it?
4  A.  Correct.
5  Q.  I am going to take you back to the summer of
6  2012. Do you recall, I am going to use this term
7  loosely, but do you recall any chatter or conversation
8  within the Police Department regarding Angelini's
9  familial situation with his father?
10  A.  No.
11  Q.  When did -- if you know, when did it become
12  common knowledge at the district of Angelini's familial
13  situation?
14  A.  I don't know. I don't know. The only time I
15  realized it was common knowledge was when a lawsuit was
16  filed, other than that I never heard anyone talking
17  about it.
18  Q.  Was there an incident on October 3, 2012,
19  regarding graffiti in a bathroom stall at the southeast
20  district?
21  A.  The comment about Steve and I, yes, I am aware

Page 27

1  of the comment.
2  Q.  What can you tell me about that, specifically
3  relating to your discovery of it?
4  A.  We were informed -- I don't know by who, quite
5  sometime before it was ever reported that there was a
6  comment made on the bathroom wall. It was not taken
7  seriously, it was quite frankly, there was a lot from
8  my understanding, a lot of things written all over that
9  wall. I do my best not to use that bathroom for other
10  reasons but I do remember being shown a picture of it
11  from, I believe, Steve. It was not until later on, a
12  significant amount of time, until it was reported that
13  night.
14  Q.  What do you mean significant amount of time?
15  A.  That means we knew about this comment for
16  quite sometime and it was reported that night.
17  Q.  So who is we?
18  A.  Steve and I.
19  Q.  When specifically did -- let's break that
20  down. When specifically did you come to discover that
21  comment?

Page 28

1  A.  I don't know the exact time.
2  Q.  When you say time, do you mean day or time,
3  like time of day?
4  A.  I mean day, month.
5  Q.  So if it was officially reported on October 3,
6  2012, how long prior to that, had you known about its
7  existence in the bathroom stall?
8  A.  The exact time, I don't know but long enough
9  that it being reported at that time was, at that point
10  in time, was out of the ordinary.
11  Q.  Was it -- had it been on the stall for days?
12  A.  I don't know how long it was there but I know
13  we knew about it so it had to be there for quite some
14  time.
15  Q.  Was it days?
16  A.  Longer than days, I am sure.
17  Q.  So was it weeks?
18  A.  I cannot recall. I know why it was reported
19  or told to me it was reported on October or whatever
20  day he referenced?
21  Q.  Was it months?

Page 29

1  A.  It could have been.
2  Q.  So when did Officer Angelini discover it, if
3  you know?
4  A.  Around the same time that I was informed of
5  it.
6  Q.  How do you know that?
7  A.  Because we worked together.
8  Q.  Did he tell you that he saw it?
9  A.  He went up there and took a picture of it.
10  Q.  So if the picture was taken on October 3,
11  2012, that was the date he showed you?
12  A.  No -- can you clarify if October, what date is
13  it?
14  Q.  3rd, 2012 --
15  A.  Is the date that he reported to Sergeant
16  Kenneth Williams?
17  Q.  I cannot answer questions, unfortunately.
18  A.  But that is where we are going, right?
19  Q.  Okay.
20  A.  Before that, Officer Angelini was on light
21  duty and people started to get moved to different

Page 30

1  assignments. Angelini told me he was now going to take
2  the opportunity to report the comment, now if they
3  report it and they moved him, that would look like some
4  sort of retaliation, well known to us for quite some
5  time. The exact time, I don't know but that was not
6  newly discovered by any stretch of the imagination.
7      Q.  So, let me make sure I understand this. He
8  showed you the photo of the graffiti in the stall,
9  correct?
10     A.  At some point.
11     Q.  That is when you first learned of it because
12 you did not use that particular bathroom?
13     A.  Correct.
14     Q.  So if the meta data on the photo said it was
15 taken on October 3rd, 2012, that was also the day that
16 was reported, would it be accurate to say October 3,
17 2012, the day it was reported and discovered?
18     A.  No, I could take it on October 1st, 2nd, 3rd,
19 4th, 5th and show you the one on the 12th and not show
20 you all the others taken before that photo that was
21 taken that night he was going to report it. I am not

Page 31

1  denying that that was probably taken on the 12th, in
2  September or August, that is not the same photo that I
3  was shown, no.
4      Q.  How do you know that?
5      A.  We knew about it. It was long before he
6  reported it. He told me what he was doing. We were
7  friends and he told me what was going on and that is
8  how I know. There was a reason it was just out of blue
9  was reported.
10     Q.  Who was being moved?
11     A.  Light duty personnel sometimes get moved to
12 different assignments if they are going to be out for a
13 certain amount of time, the specific assignment, I
14 don't recall. Sometimes they get sent to R master and
15 other assignments and that was the talk around that
16 time.
17     Q.  So let me make sure I get this. So you are
18 so -- you are saying that Officer Angelini reported
19 this, it is your theory that he reported this
20 purposefully so that he would not get moved?
21     A.  Not a theory, it was told to me.

Page 32

1      Q.  Okay. So you are a supervisor now?
2      A.  Uh-huh.
3      Q.  You approve what are called form 70s?
4      A.  Well, I mean I put my version on it. I am
5  not -- you sign and approve or disapprove and put
6  recommendations down and it goes up the chain of
7  command.
8      Q.  Okay. So because I know a lot of things since
9  2012 have changed in the Baltimore Police Department.
10 Has the form 70 transfer request changed?
11     A.  Not to my knowledge.
12     Q.  So since you have been a supervisor or a
13 sergeant, you had the occasion to sign a form 70?
14     A.  Correct.
15     Q.  That is the mechanism by which an officer gets
16 transferred elsewhere?
17     A.  Correct.
18     Q.  So your theory, and I want to make sure that I
19 understand this. Your theory is that Officer Angelini
20 complained about the graffiti in the stall so he
21 wouldn't get moved?

Page 33

1      MR. CONROY:  Objection, asked and answered.
2  You can answer.
3      A.  So what I was told by Steven, right before he
4  reported it, was that he was going to go upstairs and
5  act surprised like it was the first time he saw it and
6  report it to Kenneth Williams. If you check the
7  record, you will see he was on light duty and light
8  duty people may be detailed to other assignments. If
9  you are going to be out for four months, we might need
10 people down to do whatever, so you get detailed instead
11 of working the front desk at the district. That is
12 what was told to me. I did not make up a theory. This
13 was told to me that night.
14     Q.  And who told you that?
15     A.  Steve.
16     MR. NACHTMAN:  Can we go off?
17     (A brief recess was held off the record, and
18 the proceedings were resumed as follows:)
19 BY MR. NACHTMAN:
20     Q.  All right. I am going to direct your
21 attention to a couple days later. Were you aware that

Page 34

1  Officer Angelini went and filed a formal complaint with
2  EODS, the Baltimore City Police Department --
3      A.   Yes.
4      Q.   Internal --
5      A.   Yes.
6      Q.   Were you standing there when he left, that
7  day, the district parking lot?
8      A.   No.
9      Q.   Do you know anything about any commentary made
10 from Sgt. Brickus to Officer Angelini?
11     A.   Yes.
12     Q.   What do you know about that?
13     A.   That Steve told me she made a comment, he had
14 a V cut T-shirt on, something about the comment he was
15 not in the proper attire to work the desk.  You just
16 want them to see your pecks.
17     Q.   Did you hear that comment from anybody else in
18 the district?
19     A.   No.
20     Q.   And can you describe the parking in the
21 southeast district parking lot?

Page 35

1      A.   A relatively small parking lot, has one, two,
2  three -- three rows maybe and then room for supervisors
3  patrol cars and shift commander and major, every other
4  one.
5      Q.   Is parking at southeast difficult, in 2012,
6  was it difficult?
7      A.   It can be, yes.
8      Q.   And were there no special parking spots in
9  January of 2013, if you recall?
10     A.   If you are referring to the neighborhood
11 services, yes.
12     Q.   Can you describe that spot?
13     A.   I believe it was adjacent to the sector
14 supervisor's cars and a sign noting it was neighborhood
15 services.
16     Q.   Who put that sign up?
17     A.   I was told -- I don't know by who, it was
18 neighborhood services.  I cannot tell you,
19 specifically.
20     Q.   Okay.  Did other people, other than the
21 neighborhood services unit car park in that spot?

Page 36

1      A.   I am sure they did.
2      Q.   Can you describe an incident -- can you just
3  describe for me a parking incident involving Officer
4  Angelini and Sergeant Drennen?
5           MR. CONROY:  Objection, calls for speculation.
6      Q.   If you know?
7      A.   With Sergeant Drennen?
8      Q.   Yes.
9      A.   I mean I can recall one with -- it involved
10 Sergeant Drennen but more Brickus, but Drennen was the
11 one that initially complained, if you will.
12     Q.   What do you know about that?
13     A.   Steve parked his personal car in a
14 neighborhood services spot.  During shift change,
15 people were -- I was amongst sector cubicles and
16 Sergeant Brickus that he got into -- that told him to
17 move over.  I don't know who told him to move but a
18 confrontation happened and it was pulled into the shift
19 commander's office.  I am not sure what was said but I
20 believe Steve moved it afterwards.
21     Q.   Do you recall the Plaintiff, Steve Angelini,

Page 37

1  attempting to move his car and being told not to and
2  then write a 95?
3      A.   It is possible.  I don't recall the specific
4  conversation.
5      Q.   Isn't it true you were standing around the
6  corner when Angelini was being yelled at?
7      A.   What corner?
8      Q.   The command office.
9      A.   It is true, like I said, originally, there are
10 sector cubicles and then a common area.  I believe
11 Sergeant Drennen was in one of the cubicles and
12 maybe -- Sergeant Brickus is the one that got in a
13 confrontation with Steve.  Whatever words were had, I
14 don't recall, I don't know how long ago it was.  Then
15 it was pulled into the shift commander's office behind
16 closed doors, so I have no way of knowing what was
17 said.
18     Q.   Were you aware that Officer Angelini had filed
19 a complaint at EEOC on Sergeant Brickus or her name had
20 come up as one of the individuals against whom he filed
21 a complaint in October, 2012?

Page 38

1  A.  It could have been. Maybe the comment, I
2  don't remember specifically what it was filed. Maybe
3  that comment about the shirt. I don't remember if he
4  filed a comment or not.
5  Q.  Sergeant Brickus, after October, 2012, if you
6  know, did she show animosity towards Officer Angelini?
7  A.  I mean I cannot -- I wouldn't be able to
8  describe one way or another. I don't think she cared
9  for certain people and she liked others but I don't
10 think she cared for me.
11 Q.  Is that because you were friends with Officer
12 Angelini?
13 A.  No way of telling that, I don't know.
14 Q.  When you stopped working with Officer
15 Angelini, was she nicer to you?
16 A.  No. I can remember one incident when we were
17 not working together and she made me take off a rain
18 jacket I had because it was not the department's rain
19 jacket. She just didn't like me. Maybe she did or
20 didn't, I got the impression she did not care for me.
21 Q.  So you don't think that Officer Angelini was

Page 39

1  singled out by Brickus or any of the other supervisors
2  at southeast district in 2012 and 2013 because he filed
3  a complaint with EEOC?
4  A.  No.
5  Q.  How do you know that?
6  A.  I don't, you asked me what I thought.
7  Q.  But the BPD does not have a history of
8  singling out people that make complaints, if you know?
9      MR. CONROY: Objection.
10 A.  BPD has a lot of problems.
11 Q.  Tell me about March, 2013, shooting, you were
12 involved in a police involved shooting?
13 A.  I don't remember the date.
14 Q.  But you were there?
15 A.  Correct.
16 Q.  Tell me about that.
17 A.  We were dispatched to a call for -- I believe
18 the call came out as a discharging, someone was
19 shooting a shotgun in their backyard. We responded
20 there, the four of us, me and Steve, we first attempted
21 to go around the first house. There was shrubbery and

Page 40

1  stuff and fences. We run around the corner into the
2  backyard where it comes from, the shots, confront the
3  guy at gunpoint and order him to drop his gun.
4  Q.  Who is that, you and Officer Angelini?
5  A.  Correct.
6  Q.  Was anyone else with you?
7  A.  In the backyard, no. He doesn't drop it, so
8  Steve fires one round and strikes him. He goes down
9  and we secure him.
10 Q.  What was recovered?
11 A.  He had a shotgun and a handgun next to him and
12 another gun out of the house.
13 Q.  Two AR 15s also recovered?
14 A.  In the house?
15 Q.  I don't know, I was not there.
16 A.  I am pretty sure he told you. He had a
17 shotgun. He was shooting into the grass and I believe
18 there was a handgun. I never saw what they recovered
19 but they recovered something out of the house.
20 Q.  Were there drugs also recovered?
21 A.  He had a pill bottle in his pocket that I

Page 41

1  recovered but I am not sure what else.
2  Q.  And you did not have any stutter fire?
3  A.  Like sympathetic fire?
4  Q.  Sympathetic fire?
5  A.  Correct.
6  Q.  Why is that significant, based on your
7  training as a police officer?
8  A.  So there exists a time where someone may shoot
9  because they hear another shot go off, not because they
10 determined themselves that there is a threat that
11 warrants deadly force. For instance, if I am not to
12 the point where I need to deploy deadly force, but
13 Steve believes he needs to and he shoots and I have an
14 oh wow moment and I shoot, that is what sympathetic
15 fire is and that did not happen.
16 Q.  Is that a positive thing with regard to this
17 shooting?
18 A.  I believe so.
19 Q.  This was a significant seizure of weapons from
20 someone using them on the streets of Baltimore. I
21 could understand you said at least three guns based on

Page 42

1  your recollection, right?
2    A.   Right.
3    Q.   Did anyone else arrive after the shooting
4  happened?
5    A.   A lot of people arrived, commissioner,
6  homicide.  I don't remember if we had a specific.
7    Q.   How about for the shooting itself, was anyone
8  else there?
9    A.   That witnessed the actual shooting, no.  Sgt.
10 Leftner tried to go around another house but was
11 blocked by a fence and Steven Williams, we don't know
12 where he went.
13   Q.   Okay.  Did you get credit for that gun
14 recovery?
15   A.   No, I didn't.
16   Q.   Why not?
17   A.   I assume they did not care for me too much.
18 They put a gun board up, which is common in districts
19 with shift commanders names.  In the southeast, they
20 have cut outs of guns.  So they put the officer's name
21 that recovered it, originally they put Steve and then

Page 43

1  the officer that came well after the fact and took the
2  report and wrote -- wrote the report for what happened.
3    Q.   What was his name, Officer Lufadacio?
4    A.   Correct.
5    Q.   Did he have anything to do with the shooting
6  itself?
7    A.   No.
8    Q.   Did you get a service coin for the shooting?
9    A.   No.
10   Q.   Did you get any recognition for the shooting?
11   A.   No.
12   Q.   Did Officer Angelini get a service coin for
13 the shooting?
14   A.   No, no that I am aware of.
15   Q.   Did he get any recognition for the shooting?
16   A.   Not that I know of.
17   Q.   Is that unusual?
18   A.   This is the first time that I have been in a
19 shooting, I did not shoot but in a situation.
20   Q.   In terms of a gun seizure like that, is that
21 unusual not to get recognition for it, especially after

Page 44

1  you are cleared by the State's Attorney's Office of the
2  shooting?
3         Mr. CONROY:  Objection.
4    A.   This place is hit or miss.
5    Q.   What do you mean?
6    A.   Some people get awards for stuff you would not
7  think are award worthy.  Some people don't get stuff
8  for things outstanding and fantastic.  It is common in
9  this place.  It shouldn't be but it is.
10   Q.   What is that based on?
11   A.   I cannot tell you.  I am not issuing any
12 awards.
13   Q.   As a sergeant, don't you issue the awards?
14   A.   No, so I can write people up and forward it to
15 the service board but--
16   Q.   Who is a sergeant who had to nominate an
17 officer for an award?
18   A.   I believe anyone can nominate someone for an
19 award but typically your supervisor would write you up
20 for an award.
21   Q.   If your supervisor was Sergeant Brickus in

Page 45

1  March of 2013, is that right?
2    A.   I don't recall if she was -- she was on our
3  shift but that was Sector 3 that it occurred in and the
4  only time I ever knew her was Sector 1 but she could
5  haven have been shift commander for all I know.  I
6  believe she was shift commander that day because
7  Sergeant Leftner was our supervisor.
8    Q.   Was she acting lieutenant that night?
9    A.   I believe so, now that I say that.
10   Q.   Okay.  So, how long are officers typically
11 permitted to take off after a shooting incident, after
12 they are involved in a police involved shooting?
13   A.   I want to say there is a specific time you
14 have to be off, like three days or something but it is
15 on a case by case basis.
16   Q.   Okay, how long did you take off after the
17 shooting?
18   A.   One day and was told either I come back or go
19 see PSI.  Don't quote me on the one day but I asked for
20 another day off and I was told that the major had said
21 basically tough luck.  If you want to stay off, you

Page 46

1  have to go down to PSI, so I came back.
2  Q. Why would the major have said that?
3  A. Yes.
4  Q. Still Major Davis?
5  A. Yes. The same reason he told another
6  supervisor that when I put in a transfer I can go do
7  nothing there either. The guy did not care for me.
8  Q. So let me make sure I understand this
9  correctly. You are in this 225 post in 2011 and you
10 are getting Officer of the Week and accommodations and
11 gold star behavior and then in March of 2013, you are
12 involved in an on duty shooting, a clean shooting with
13 Officer Angelini where there are at least three,
14 probably more, guns and drugs recovered and you don't
15 get any accommodations or any recognition and you are
16 not even permitted to take time off afterwards, is that
17 right? All under the supervision of Major Davis,
18 correct?
19 A. I think. Repeat it one more time.
20 Q. So in 2011, you are in this special assignment
21 with Officer Angelini, where both of you are receiving

Page 47

1  Officer of the Week and getting accommodations and
2  recognition --
3  A. I only remember one Officer of the month. I
4  don't remember any other accommodations. I thought and
5  we thought that we did a heck of a job. I don't
6  remember any special accommodations.
7  Q. You received recognition for your crime
8  fighting efforts in that time frame from Major Davis?
9  A. Yes.
10 Q. Tickets to a Ravens game?
11 A. Yes.
12 Q. Compare that to March of 2013, when you don't
13 get service going and don't receive recognition for the
14 shooting and not permitted to take another day off?
15 Still under the supervision of Major Davis?
16 A. Correct, at that point of the shooting we are
17 not partners but we are working together in the sector.
18 We are not part of that 225, we are back in patrol and
19 both working Sector 3.
20 Q. What did you hear about any comments that were
21 made in the subsequent roll call by Sergeant Brickus?

Page 48

1       MR. CONROY: Objection. Calls for
2  speculation. You can answer, if you know.
3  Q. If you know?
4  A. Steve told me that he was saying something
5  about the shooting and we should have done other stuff
6  and called out blue fire and stuff like that. I don't
7  know what she said specifically but Steve said she was
8  talking as if it was bad.
9  Q. Wasn't Officer Angelini off work for weeks
10 after the shooting until he was cleared?
11 A. Just like anything else, people talk to one
12 another. I was not present for this either. All I can
13 tell you is what I heard and I did not hear it from
14 anyone. Steve told me, he was upset about it.
15 Q. Isn't it true you told Officer Angelini this?
16 A. No.
17 Q. Okay.
18 A. I don't know how I would have become aware. I
19 was not present.
20 Q. Did know an Officer McQuade?
21 A. Yes.

Page 49

1  Q. Were you present during any breakfast
2  conversations in April of 2013 you had regarding Steven
3  Angelini with Sergeant Brickus?
4  A. No.
5  Q. Do you know how many times Officer Angelini
6  asked to be transferred out of the southeast district?
7  A. Specifically no, but it became a lot. He was
8  turning in a transfer request regularly.
9  Q. You have a lot of equipment as part of the
10 crash scene. Is that right? Some unusual equipment in
11 addition to your regular standard issue police
12 equipment?
13 A. Sure.
14 Q. If you damage any of your equipment, what is
15 the procedure to put it to get it replaced, gun belt
16 and handcuffs, whatever?
17 A. I mean you referenced our specific material,
18 which is a lot -- you probably have to put another bid
19 in and jump through hoops. If you damage departmental
20 property, it depends. You have to write a 95 and if
21 you damage it, you have to write a CC number and the

Page 50

1  supervisor has to put it into internal Blue Team and
2  then you go up and get your replacement.
3    Q.  How long does that take?
4    A.  Something that happens quick but I don't know.
5    Q.  How long does a gun belt take to get replaced,
6  if you know?
7    A.  I don't know.  I imagine quick.
8    Q.  After the shooting, were you on a different
9  shift than Officer Angelini, if you know?
10   A.  Some point he switched to the opposite swing
11 shift.
12   Q.  Other than conversations with Officer
13 Angelini, did you have any firsthand knowledge of any
14 subsequent incidents?
15   A.  Other than --
16   Q.  Other than conversations with Officer
17 Angelini?
18   A.  No.
19   Q.  Are you aware of any health issues that
20 Officer Angelini has had, kidney stones in particular?
21   A.  He told me about them, yes.

Page 51

1    Q.  Have you ever witnessed him having any
2  symptoms?
3    A.  I may have.
4    Q.  Can you tell me about that.
5    A.  I don't really -- I say I may have a specific
6  incident doesn't jump out to me but it's very possible.
7  I know he gets them but I think he gets them fairly
8  regularly.
9    Q.  Have you ever had one?
10   A.  No.  I hear they are very painful.
11   Q.  And you handle departmental auto accidents?
12   A.  Yes, sir.
13   Q.  How do those work, when a police officer is
14 involved in an auto accident, what happens?
15   A.  They call for our unit and we come out and to
16 investigate and take statements and photographs, review
17 any evidence that is available and document everything
18 to include an accident report and determine fault
19 forward that over to fleet safety division and
20 determines whether or not it is preventible or not and
21 goes to IA and if there is any punitive or disciplinary

Page 52

1  things, if it is preventible.
2    Q.  Like what?  Like disciplinary aspect of it?
3    A.  You may get a letter, it depends how severe
4  the accident is, if you are negligent or reckless.  I
5  don't make those determinations but people may lose
6  days or pay ten percent of the damage up to a thousand
7  dollars, may have to go to remedial driver's training.
8    Q.  What if an officer lies in their initial
9  report to you about an accident, what happens?
10   A.  We would forward that information to IA.
11   Q.  What does IA do with that?
12   A.  So I know what you are referencing because I
13 spoke to Steve about it.  I don't know.  I don't work
14 in IA.  I know they did not do anything about the
15 lying.
16   Q.  This was recent, wasn't it?
17   A.  Had to be within the last couple years.
18   Q.  After the consent decree?
19   A.  I don't know.
20   Q.  So, when you forward -- so basically you
21 conduct your investigation, do you recommend

Page 53

1  disciplinary action to officers who are involved in on
2  duty accidents?
3    A.  No.
4    Q.  You leave that all to IA?
5    A.  So for this case, that you are referencing --
6    Q.  I am asking in general, if you know?
7    A.  We document everything, if you were to do a
8  whole investigation and send it over to the State's
9  Attorney for review.  They would determine charges.  We
10 document everything.  If there was inconsistencies and
11 we forward that over to Internal Affairs and the
12 detective that works for me, did an interview in
13 reference to that case, as well.  So if you have a
14 question, I'd rather you just ask it.
15   Q.  Did you ever work in Internal Affairs?
16   A.  No.
17   Q.  Did you ever have any interaction with
18 Internal Affairs?
19   A.  Sure.
20   Q.  What was the nature of your interaction with
21 the Internal Affairs Division of the Baltimore Police

Page 54

1  Department?
2  A.  I had to give statements before.
3  Q.  Regarding?
4  A.  I had to give one regarding the shooting.  I
5  had to give one regarding an off duty incident where
6  one of the coworkers assaulted me.  I don't remember
7  any of the others, but nothing rings a bell.
8      MR. NACHTMAN:  I don't have any other
9  questions.
10     (A brief recess was held off the record, and
11 the proceedings were resumed as follows:)
12     EXAMINATION BY MR. CONROY:
13 Q.  Hopefully this will be very brief, I have a
14 couple questions.
15 A.  Okay.
16 Q.  I want to take you back and do it in
17 chronological order, the way we just talked.
18 A.  Okay.
19 Q.  You talked about the incident in the bathroom
20 with graffiti and the testimony was that you and
21 Plaintiff discussed it at some point?

Page 55

1  A.  Sure.
2  Q.  Was that your recollection?
3  A.  Yes.
4  Q.  And what, if anything, did the Plaintiff say
5  to you about it?
6  A.  I don't recall specifics.  I know that we just
7  took it as a joke and really did not pay much mind to
8  it.
9  Q.  Was he upset?
10 A.  It did not come across that way.
11 Q.  Did you know him pretty well as his partner?
12 A.  Yes, sir.
13 Q.  Had you seen him get upset before?
14 A.  Yes.
15 Q.  This behavior was not the same as that
16 behavior?
17 A.  No.
18 Q.  Then you said at some point your testimony
19 was, the night he was going to report -- on or about
20 when he reported the incident, you two had a
21 conversation?

Page 56

1  A.  Correct.
2  Q.  What did he say to you during that
3  conversation?
4  A.  To summarize that for whatever reason people
5  on light duty were being temporarily reassigned.  He
6  was going to upstairs and pretend like he just
7  discovered the comment and report it.
8  Q.  Did he ask for your help with that?
9  A.  No.
10 Q.  You also talked about an issue or knowing
11 about Plaintiff's kidney stones?
12 A.  Yes.
13 Q.  Had you known about any other medical issues
14 that he had?
15 A.  I mean I have -- I know about work-related
16 injuries that he has.
17 Q.  Anything involving -- related to being sick at
18 work?
19     MR. NACHTMAN:  Objection, calls for expert
20 opinion.
21 Q.  If you know?

Page 57

1  A.  I believe I know what you are referencing,
2  yes.
3  Q.  I am referencing an incident involving being
4  overheated.  Any familiarity with that incident?
5  A.  Yes.
6  Q.  Tell me what you know about that and how you
7  know?
8  A.  Again, Steve told me, at this point he was on
9  the other shift.  The specifics of why he had the car
10 or whatever he was upset, so he was going to crank the
11 heat on in the car and chug a Mountain Dew to make
12 himself get sick.  He stepped out of the car and got
13 dizzy and fell to the ground and was taken to the
14 hospital.
15 Q.  Did he tell you about that plan before it
16 happened or afterwards?
17 A.  Before.
18 Q.  Do you know, did he do it?
19 A.  Apparently.
20 Q.  Do you know of any other incidents involving
21 any other graffiti, other than the graffiti in the

Page 58

1 bathroom stall, involving you and the Plaintiff?
2   A.  Like the names, no.
3   Q.  Anything with a depiction of genitalia on your
4 car?
5   A.  Yes.
6   Q.  Can you explain that incident?
7   A.  I believe we were at headquarters and someone
8 had drawn, like a car get soot on it and drawn a penis
9 and wrote baby dick on the hood of the car.
10  Q.  Did you both see it?  You were both present,
11 you and Plaintiff?
12  A.  Yes.
13  Q.  What was Plaintiff's reaction, at the time?
14  A.  I don't recall anything noteworthy other than
15 we probably laughed it off and moved on.
16  Q.  You two, you and Plaintiff, you said at one
17 point you said in your testimony was you two were
18 friends?
19  A.  Yes.
20  Q.  And what has happened subsequently or do you
21 consider yourself still friends?

Page 59

1   A.  At this point, I would say no.
2   Q.  Why?
3   A.  I don't feel like a friend would put me in
4 this position.
5   Q.  Please explain that.  What do you mean by
6 that?
7   A.  What I mean by that is as friends there are
8 things that Steve told me.  Now he is going to put me
9 in a position under oath to not tell what he told me
10 what I know took place.  I don't feel like that is very
11 fair.  It is upsetting.  I thought we were good
12 friends.
13  Q.  When was the last time you two hung out
14 socially, if you recall?
15  A.  We played tennis a month or two back.
16  Q.  Have you guys had any contact since then?
17  A.  Not for about a month until yesterday
18 afternoon.
19  Q.  What happened yesterday afternoon?
20  A.  I got a text to go play tennis or go for a
21 run.

Page 60

1   Q.  Did you guys end up linking up?
2   A.  No.
3   Q.  Just one final question, I am not obviously
4 able to understood people's physical movements but
5 observing your body language, are you upset?
6   A.  Very.
7   Q.  Why?
8   A.  Like I said, I considered Steve a good friend.
9 I thought we had a good friendship but like I said
10 before, I did not want to be pulled into this.  There
11 are things that I know because I was his friend at the
12 time and now you expect me to come here and just not
13 tell the truth, I am just -- I am just upset.
14  Q.  So --
15  A.  Don't put me in that position.
16  Q.  So your testimony is -- straight out -- are
17 you telling the truth today?
18  A.  Yes.
19      MR. CONROY:  That is all I have.
20      FURTHER EXAMINATION BY MR. NACHTMAN:
21  Q.  So let me make sure I understand this.  So,

Page 61

1 you made two fairly serious allegations of misconduct
2 against the Plaintiff, right, and let me make sure I
3 understand this.  So your testimony here today, let me
4 know if I am not summarizing this correctly.  He
5 manufactured the complaint about the bathroom graffiti
6 in order to not be transferred or not be detailed, is
7 that right?
8   A.  Correct.
9   Q.  And you are also saying that he manufactured
10 this -- the heatstroke that he suffered in June of
11 2013, correct?
12  A.  I am not sure that he manufactured, I don't
13 deny the comment that was on the wall.  I do know when
14 it was reported, it was not the first time as if it was
15 said when it was reported.  I don't deny that he had
16 some sort of heat related illness but I do know he told
17 me he was going to contribute to that happening.
18  Q.  So under the general orders, are you required
19 to report this type of misconduct?
20  A.  I am not sure what kind of misconduct.
21  Q.  Did he get Worker's Compensation for the --

Page 62

1   A.   No idea.
2   Q.   Did he miss any work?
3   A.   I don't recall.
4   Q.   How did he -- so, let's talk about the
5   heatstroke incident. So you were aware then, obviously
6   because Officer Angelini told you, he had been detailed
7   to a car that did not have working air conditioning?
8   A.   The specific of the car and stuff, I don't
9   recall.
10  Q.   How did he communicate to you?
11  A.   Telephone.
12  Q.   Did he text you, also?
13  A.   I don't remember. I remember a conversation
14  but I don't remember if it was a text or not.
15  Q.   Do you still have the same phone?
16  A.   No.
17  Q.   Same text messages with Officer Angelini? Do
18  you backup your texts to the cloud?
19  A.   No.
20  Q.   So you would not have any text messages from
21  2012 or '13?

Page 63

1   A.   I don't know.
2   Q.   So, you are here today to tell the truth?
3   A.   Yes.
4   Q.   Isn't it true that Officer Angelini has
5   previously talked to you about coming in here today and
6   the only thing he has asked of you is to tell the
7   truth?
8   A.   Correct.
9   Q.   Doesn't that seem strange to you that Officer
10  Angelini has told you repeatedly to come in here and
11  tell the truth, but you are saying that he has
12  basically made all of this up?
13  A.   No.
14  Q.   No, he did not make it all up?
15  A.   No. There are inaccuracies in what is
16  reported, and right, he told me tell the truth and that
17  is exactly what I did, just because -- I don't
18  understand the question. He tells me to tell the truth
19  and I told the truth.
20  Q.   So at what point when you learned about
21  Officer Angelini's manufactured heatstroke did you

Page 64

1   report it to your supervisor?
2   A.   I didn't.
3   Q.   At what point when you knew about Officer
4   Angelini's manufactured complaint about the bathroom
5   graffiti, did you report it to a supervisor?
6   A.   Again, if this is referencing -- one second,
7   if the comment didn't exist, that is not what I am
8   saying. I would like to be clear that the report that
9   there was a comment made about the two of us, I don't
10  have in dispute. I am not disputing that. I did not
11  think he made up the fact there was a comment on the
12  wall. The timing is not as reported.
13       I was also -- you are right, Steve told me to
14  tell the truth and he also said he doesn't understand
15  why they can ask me about stuff I was not a physical
16  witness to. The part is, I was told by him. We were
17  friends at the time. So I cannot just say because I
18  was not physically there, I was told about it. That
19  was stress too, like telling the truth.
20  Q.   Are you aware of any general orders that
21  require you to report misconduct or malfeasance on the

Page 65

1   part of a Baltimore City Police Officer?
2   A.   I am aware there are policies, yes.
3   Q.   If you caught someone sleeping on the job,
4   should you report it?
5   A.   There are different avenues of that. You
6   might counsel them the first time. It is not clear
7   cut. You may figure out what is going on in their life
8   to cause this and work with them. Eventually may come
9   down to having them written up. There are different
10  options.
11  Q.   Have you, as a supervisor, ever had to write
12  anyone up for falling asleep on the job?
13  A.   Yes.
14  Q.   Recently?
15  A.   No.
16  Q.   Have you ever had to report any other
17  malfeasance for other officers, as a part of your job?
18  A.   So, I guess I don't fully understand the
19  different types of malfeasance. What are you referring
20  to?
21  Q.   Someone doing something wrong. Manufactured a

Page 66

1 heatstroke or falling asleep on the job?
2     A.  I had to write an officer that I had told to
3 write a report for a hit and run.  I had to charge him
4 for that.
5     Q.  So in those cases, you did report the
6 misconduct?
7     A.  Correct.
8         MR. NACHTMAN:  I don't have any other
9 questions.
10        MR. CONROY:  Nothing further from us.  You
11 have the right to read and review your deposition
12 transcript and check it for errors or statements of
13 inaccuracies and you then sign it or you can waive that
14 right.  It is entirely up to you.
15        MR. NACHTMAN:  It is called read and sign or
16 waive.  If you read and sign, you have 30 days.  If you
17 don't make corrections, if you do nothing in 30 days
18 your deposition becomes final.  You can waive it on the
19 record right now.
20        (The deposition was concluded at 11:45 a.m.)
21

Page 67

1        CERTIFICATE OF NOTARY PUBLIC/REPORTER
2 STATE OF MARYLAND
3 COUNTY OF BALTIMORE, to wit:
4     I, Monica A. Sienkiewicz, a Notary Public in and
5 for the State of Maryland, County of Baltimore, do
6 hereby certify that DANIEL QUARANTO personally appeared
7 before me and, after having been duly sworn by me, was
8 examined by counsel.
9     I further certify that I am not an employee of
10 counsel nor related to counsel or the parties in any
11 way and have no interest in the outcome of this
12 proceeding.
13    I further certify this transcript of testimony
14 was prepared accurately by me to the best of my
15 ability, knowledge and belief.
16    As witness my hand and Notarial Seal this 19th
17 day of August, 2019.
18
19    ------------------------------------
20    Monica A. Sienkiewicz, Notary Public
21 My Commission expires 10/09/19.