```
 1  STEVEN ANGELINI,                    *   IN THE
 2          Plaintiff                   *   UNITED STATES DISTRICT
 3                                      *   COURT FOR THE DISTRICT
 4  vs.                                 *   OF MARYLAND
 5  BALTIMORE POLICE DEPARTMENT         *   Case Number
 6          Defendant                   *   1:17-CV-2354-ELH
 7  *       *       *       *       *       *
 8
 9          The deposition of LT. COLONEL RICHARD WORLEY
10  was taken on August 29, 2018, commencing at 10:00 a.m.
11  at EN Lawyers, 217 North Charles Street, 3rd Floor,
12  Baltimore, Maryland, before Monica A. Sienkiewicz,
13  Notary Public.
14
15
16
17  *   *   *   *   *   *   *   *   *   *   *
18
19
20  REPORTED BY:
21  MONICA A. SIENKIEWICZ
```

**PLAINTIFF EXHIBIT 3**

Page 2

| | | |
|---|---|---|
| 1 | APPEARANCES: | KURT NACHTMAN, ESQUIRE |
| 2 | | 217 North Charles Street, 3rd Floor |
| 3 | | Baltimore, Maryland 21201 |
| 4 | | Telephone: (443) 559-4384 |
| 5 | | Kurt@enlawyers.com |
| 6 | | On behalf of the Plaintiff |
| 7 | | |
| 8 | | COLIN PATRICK GLYNN, ESQUIRE |
| 9 | | Baltimore City Law Department, 100 N. |
| 10 | | Holliday Street, Legal Affairs Division |
| 11 | | Baltimore, Maryland 21202 |
| 12 | | Telephone: (443) 683-2287 |
| 13 | | Colin.glynn@baltimorecity.gov |
| 14 | | On behalf of the Defendant |
| 15 | | |
| 16 | | MICHAEL GLASS, ESQUIRE |
| 17 | | 201 North Charles Street, Suite 1900 |
| 18 | | Baltimore, Maryland 21201 |
| 19 | | Telephone: (410) 779-0600 |
| 20 | | On behalf of the Plaintiff |
| 21 | Also Present: | Steven Angelini |

Page 3

I N D E X

| WITNESS | PAGE |
|---|---|
| LT. COLONEL RICHARD WORLEY | |
| Examination by Mr. Nachtman | 4, 38 |
| Examination by Mr. Glynn | 37 |

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | BPD policy 1701 | 10 |
| 2 | document | 22 |
| 3 | e-mails | 23 |
| 4 | Form 70 | 24 |
| 5 | e-mail chain | 28 |
| 6 | policy 1705 | 38 |

(The exhibits are attached to the transcript.)

Page 4

P R O C E E D I N G S

WHEREUPON --

LT. COLONEL RICHARD WORLEY,
the witness, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified, as follows:

EXAMINATION BY MR. NACHTMAN:

Q. Good morning. For the record, my name is Kurt Nachtman and I represent Mr. Steven Angelini in a case that has been filed in the United States District Court for the District of Maryland against Baltimore City Police Department. Can you state your name for the record, please?

A. Yes, Richard Worley.

Q. And what is your current rank and badge ID number?

A. Lieutenant Colonel and my Badge Number is 5.

Q. Your sequence number?

A. George 291.

Q. Thank you. Can you state your work address for me, please?

Page 5

A. The mailing address is 242 West 29th Street, Baltimore, 21211.

Q. And can you -- we've had some folks retire due to the length of time that this case has been ongoing. So I am going to ask you, and unless you retire, I don't anticipate using your home address. Could you please provide your home address for the stenographer?

A. ███████████████████████████████████
████████████

Q. So before we get going, I have a couple preliminary questions for you. Have you ever been deposed before?

A. Yes.

Q. How many times have you previously been deposed?

A. Two or three, probably.

Q. I am sure you have previously testified before in court?

A. Yes.

Q. So you understand that a deposition is a little bit different than court testimony?

**PLAINTIFF EXHIBIT 3**

Page 6

1  A.  Yes.
2  Q.  From time-to-time, your attorney may make some
3  objections but unlike court there is no judge.  So the
4  objections are simply preserved for later use in a
5  court proceeding.  Do you understand that?
6  A.  Yes.
7  Q.  You also understand, obviously, because you
8  have answered everything yes or no, that you have to
9  respond verbally for any inquiry that I make of you?
10  A.  Yes.
11  Q.  Umm, ah, nods, none of that works.
12  A.  Yes.
13  Q.  Okay.  How long have you been working at the
14  Baltimore City Police Department?
15  A.  Twenty years.
16  Q.  Okay and can you please provide the court
17  reporter your previous assignment history?
18  A.  Yes.  First, I was in the academy and I came
19  out and I was in the Western District until 2003,
20  wherein I got promoted to Sergeant.  I went to the
21  Southwest District and I was there until 2008 and

Page 7

1  became a Lieutenant.  In 2009, I became a Captain and
2  remained in the Northern District.  Then in 2012, I
3  became a Major and was put in the Northeast District.
4  In 2016, I was promoted to Inspector which is now a
5  Lieutenant Colonel rank, same thing, and I was assigned
6  to Headquarters.
7  Q.  Sorry, what was that again, 2016?
8  A.  Yes.  I was assigned to Patrol and
9  Headquarters and now I am in Homeland Security.
10  Q.  What types of specialized training have you
11  received for law enforcement?
12  A.  I have been to multiple leadership schools and
13  of course the training with the firearms and the baton
14  and that is basically about it but mostly leadership
15  schools.
16  Q.  What is your current job assignment?
17  A.  The Chief of Homeland Security, which I
18  oversee the City Watch Program and communications and
19  information technology and records management and
20  building security and the violence reduction
21  initiative.

Page 8

1  Q.  How many employees do you have under your
2  command?
3  A.  Probably three to four hundred, that is both
4  civilian and sworn.
5  Q.  And while you were in -- while you were the
6  Major of the Northeast District, how many employees did
7  you have under your command?
8  A.  About 180.
9  Q.  All sworn officers?
10  A.  No.  There were a couple civilians, not very
11  many, maybe two, two or three.
12  Q.  So in your leadership training, what types of
13  training did you have in terms of Human Resources
14  related issues?
15  A.  Basically, it is that you -- my motto is
16  always to treat people fairly.  Most of the training I
17  received is stuff I already knew.  So if there are EEOC
18  complaints, there are places you send it.  You have to
19  review it.  The biggest thing is finding out about the
20  issues that get to you before they don't -- or if they
21  don't get resolved they never make it to you.  That is

Page 9

1  part of the issue sometimes you don't even hear about
2  some issue going on within in your command because
3  Sergeants and Lieutenants don't always communicate
4  stuff up the chain of command.
5  Q.  Did you ever go to any trainings for EEOC
6  Compliance issues or Human Resources related issues?
7  A.  Yes, the Department has given several of
8  those.
9  Q.  Do you recall when the last one was that you
10  attended?
11  A.  Probably two years ago, maybe longer.
12  Commissioner Batts brought -- I cannot remember the
13  lady's name but they gave us a certificate that is
14  buried somewhere.
15  Q.  In a file, right.  How about do you recall any
16  specialized Human Resource or EEOC trainings prior to
17  two years ago?
18  A.  Yeah, we got it all through the academy.  When
19  you got into service you'd use it as a supervisor.
20  Q.  Are you aware that the Baltimore Police
21  Department has a non-retaliation policy for all

Page 10

1 complaints that are filed under the EEOC?
2   A.   Yes.
3   Q.   Okay and that would be and I will have this
4 marked.
5        (Deposition Exhibit 1 was marked for
6 identification.)
7   Q.   Showing you what has been marked as Deposition
8 Exhibit No. 1, it is policy -- BPD policy 1701.  This
9 one is dated August 1, 2016.  Could you take a moment
10 and look through that for me, please?
11  A.   Uh-huh.  I am pretty familiar with it.
12  Q.   Is that the current policy that is in place
13 with BPD?
14  A.   I believe so, yes.
15  Q.   It is substantially similar to policies that
16 may have been in place in 2012, 2013, 2014, if you
17 know?
18  A.   The only thing that would have been added is
19 any updates that come as a result of federal cases or
20 changes in our policy.
21  Q.   But it would be substantially similar?

Page 11

1   A.   Yes.
2   Q.   A 2012 version of this policy would have
3 contained the no retaliation clause on page 4?  Take a
4 look at page 4 of Exhibit 1 for me, please?
5   A.   Yes.  I mean we have had a no retaliation
6 policy since I came a cop.
7   Q.   Okay.  How long were you Officer Angelini's
8 supervisor?  I know you were never his direct
9 supervisor, is that right?
10  A.   Right.
11  Q.   How long were you his supervisor?
12  A.   Whenever he got to the Northeast, I was there.
13 I would think I was his supervisor the entire time he
14 was in the Northeast.
15  Q.   2014 to 2016?
16  A.   Whenever he got there until when I left.
17  Q.   Did you know Officer Angelini prior to your
18 supervisory capacity as his Major?
19  A.   No.
20  Q.   In March of 2017, did you become aware of a
21 situation that occurred in Baltimore County Police

Page 12

1 Department training?
2   A.   Yes.
3   Q.   Who told you about that situation?
4   A.   I cannot remember who told me.  I know I got a
5 phone call about it.
6   Q.   What were you told in that phone call?
7   A.   I was told he was causing a disruption at the
8 training and that he was asking questions and was
9 basically being disruptive in the class.  He was also
10 leaving at lunchtime and not coming back.  This is all
11 secondhand.  I don't think it was from anybody actually
12 in the training.  This was from someone else given
13 information from Baltimore County.
14  Q.   I am going to back up a little bit.  When did
15 you become aware of the transfer by Officer Angelini
16 from Southeast District to Northeast District?
17  A.   When he arrived in the Northeast.
18  Q.   You don't get notified ahead of time?  People
19 just show up for work?
20  A.   They told me he was coming.
21  Q.   Who is they?

Page 13

1   A.   I got an order or an e-mail from my boss
2 saying they were moving Officer Angelini to the
3 Northeast.
4   Q.   Do you recall who sent that e-mail?
5   A.   No.  It would have probably been the area
6 commander at the time, which I believe could have been
7 Lieutenant Colonel Matthews or Lieutenant Colonel
8 Robinson or it could have been the Chief of Patrol.  I
9 don't recall.
10  Q.   What was the substance of that e-mail?
11  A.   They said he had an issue in the Southeast and
12 they were moving him to the Northeast.
13  Q.   What was that issue?
14  A.   Honestly, I don't remember and I did not ask.
15 The way I look at things is when someone comes to me,
16 whatever happened to them in the past, happened to them
17 in the past and I give them a fresh start.  I really
18 did not care.  There were too many variables that could
19 have caused whatever issue it was in the Southeast.
20  Q.   So did you have any verbal conversations with
21 any Southeast District Command Staff?

PLAINTIFF EXHIBIT 3

Page 14

1     A.    I don't believe so.
2     Q.    Were you or anyone under your command
3 instructed by Southeast District or anyone else in the
4 Baltimore Police Department to handle Officer
5 Angelini's transfer any differently than any other
6 transfer?
7     A.    No.
8     Q.    Were you made aware or were you instructed to
9 place him on probation while he was at the Northeast
10 District?
11     A.    No.
12     Q.    Have you ever heard of an officer who is
13 transferred from one district to another in your 20
14 years with the BPD? Have you ever heard of an officer
15 transferred from one district to another having the new
16 district be asked to place that officer on probation?
17     A.    Not that I am aware of.
18     Q.    Is there any policy that would guide such
19 secret probation?
20     A.    I don't think so. I mean it could be but I
21 don't know of any.

Page 15

1     Q.    I mean you are a Lieutenant Colonel. So if
2 someone would be aware, you would be aware of such a
3 policy, right?
4     A.    Uh-huh.
5     MR. GLASS:  Is that yes?
6     A.    Yes.
7     Q.    Thank you. So if officers under your command
8 were told by Southeast District Command to place
9 Officer Angelini on some sort of probation, 30 day, 60
10 day, you were not made aware of that?
11     A.    No. A Major from one district cannot tell a
12 Major from another district what to do. Like if the
13 Southeast Major told me to put him on probation, I
14 don't have to listen to him. He is not my boss. He is
15 an equal. It would have to come from above. I was
16 never told anything from above to put him on any kind
17 of probation.
18     Q.    So what were you told about the disciplinary
19 issues that Officer Angelini faced in the Southeast
20 District?
21     A.    Again, honestly, I don't know. I did not pry.

Page 16

1 I did not really care.
2     Q.    Were you told he got kicked out of Southeast?
3     A.    Yes.
4     Q.    But you never inquired as to why?
5     A.    I may have asked why but it does not really
6 matter to me. Like I said, I judge people based on --
7 I think people need -- unless I have never heard of the
8 officer, of Angelini, before he got to the Northeast.
9 So whatever issues he had, to me they were not that
10 extreme or I would have heard about it through the
11 chain at some point. So he came to the Northeast and I
12 looked at it as a fresh start for him. I think I told
13 him that at some point.
14     Q.    Can you tell me about the form 70, are you
15 familiar with the Form 70?
16     A.    Yes.
17     Q.    What is a Form 70?
18     A.    Request for transfer.
19     Q.    So when an officer asks for a transfer, what
20 do you do?
21     A.    First of -- mostly I deny it because the

Page 17

1 staffing is so short. I don't want to give up anybody.
2 Usually, if someone wants to go somewhere else and it
3 is within a patrol district, I will approve it with a
4 replacement. So they can go anywhere they want as long
5 as they give me a person for a person.
6     Q.    If someone files an EEOC Complaint and they
7 ask for a transfer, is that going to be routinely
8 granted by you in your command structure?
9     A.    No, not unless -- whether they filed a
10 complaint or not, does not matter. I am not for
11 shifting issues. That is not the way I do business.
12 If there is an issue in the Northeast, I don't want to
13 send a problem somewhere else. The problem needs to be
14 solved. If you keep shifting problems, it is the same
15 thing with an officer that does not do anything. You
16 are moving him somewhere else and giving him to someone
17 else. My transfer would have nothing to do with
18 whether it's an EEOC Complaint or not. It is still
19 going to be approved with a replacement, that is
20 standard or denied.
21     Q.    If someone filed a request for a transfer and

PLAINTIFF EXHIBIT 3

Page 18

1 there was a replacement officer available, then the
2 transfer would generally be approved?
3   A.   Usually, yes.
4   Q.   Is there any particularized language that
5 needs to be on a Form 70?
6   A.   Just request a transfer and there is --
7 usually there's a space on there to ask why they want
8 the transfer.
9   Q.   Does there have to be anything special on
10 that?
11   A.   Does not have to be filled out at all.
12   Q.   So if an officer -- have you ever, in your 20
13 years on the Baltimore Police Department, have you ever
14 refused to accept a Form 70 from an officer, as opposed
15 to any of the other alternatives, approving it, denying
16 it or sending it up the chain of command to see what
17 happens?
18   A.   Yes.
19   Q.   In what circumstances do you do that?
20   A.   I gave it back to the officer and -- on a
21 couple occasions, I thought the transfer was in haste

Page 19

1 and I gave it back to him and told him to think about
2 it and if they still want to do it, I would take the
3 transfer.  Sometimes what happens with officers and all
4 of us, is we get pissed off at something and
5 immediately start writing.  Like with retirement, I
6 have had guys give me retirement papers and I was like
7 think about this before you push the paperwork through.
8 Once it goes through it is a document.
9   Q.   Once you hand it back to them, how long would
10 you wait before you would accept their next?
11   A.   If they bring it to me the next day and say
12 they still want it, I will take it.
13   Q.   So if someone brought you seven different Form
14 70s and you refused to accept them all until the 7th or
15 8th one, that would not be something that would be
16 spelled out as appropriate in any BPD policy?
17   A.   No.
18   Q.   If a Captain or a Major tore up a Form 70 and
19 refused to accept it, is that something permitted
20 anywhere in the BPD policies?
21   A.   No.

Page 20

1   Q.   Sorry?
2   A.   No.
3   Q.   In terms of his work product, at least based
4 upon what you observed as your time as a supervisor for
5 Officer Angelini, did he have a good work product on
6 the street?
7   A.   Yes.
8   Q.   I am going to ask you a couple of questions
9 about body worn cameras.  Officer Angelini was one of
10 the first people to wear body worn cameras, isn't that
11 right?
12   A.   Correct.
13   Q.   He was doing so with his own personal camera?
14   A.   Yes.
15   Q.   There was a little bit of trouble that arose
16 as a result of that?  I see you smiling.
17   A.   Yes.
18   Q.   Can you tell the court reporter a little bit
19 about that, please.
20   A.   Yes.  He got me yelled at for wearing a body
21 worn camera.  Basically Steve was -- Officer Angelini

Page 21

1 was wearing a body worn camera that was not authorized.
2 We did not have body worn cameras or a policy to wear
3 body worn cameras and somehow he had video of an
4 incident where he was wearing a body worn camera and we
5 did not have a policy for it, so I had to tell him he
6 could not wear it.
7   Q.   You got in trouble?
8   A.   They yelled at me.  Why the hell is he wearing
9 a body worn camera and I was like I don't know.
10   Q.   Did the incident that occur actually -- did
11 the body worn camera footage help Officer Angelini in
12 that incident?
13   A.   Yes.
14   Q.   What was the allegation that was made against
15 him, if you recall?
16   A.   A citizen made an allegation that was
17 completely ruled -- basically was looking at the video
18 that he had, the allegation that he made did not
19 happen, that the citizen made did not happen.  I think
20 I remember seeing it.  It actually helped him.
21   Q.   Do you remember approximately when that was?

Page 22

1  A. It was not long before we ended up starting to
2  get body worn cameras.
3  Q. 2015, maybe? Shortly before or after certain
4  highly publicized incidents?
5  A. Yes.
6  Q. Do you remember shortly after the body worn
7  camera with Officer Angelini advising your officers in
8  your district in an e-mail form to photograph and
9  record as much information as possible?
10 A. Did I do that?
11 Q. Yes. I don't know, do you recall?
12 A. I don't recall.
13 Q. All right.
14    (Deposition Exhibit 2 was marked for
15 identification.)
16 Q. Showing you what has been marked as Exhibit
17 No. 2. Take a look at that for me.
18 A. Yes.
19 Q. Does that refresh your memory?
20 A. Yes.
21 Q. So you did issue --

Page 23

1  A. Uh-huh.
2  Q. It doesn't appear, and frankly, you can
3  characterize it however you want. Is that an order or
4  a suggestion to officers?
5  A. Well, if it came from me, I usually don't make
6  suggestions to the officers. Most of them are not
7  going to take it as a suggestion.
8  Q. Okay.
9  A. Some do.
10 Q. All right. Did Officer Angelini receive
11 accommodations from the community while he was under
12 your command?
13 A. I believe he did, a couple times.
14    (Deposition Exhibit 3 was marked for
15 identification.)
16 Q. Showing you Exhibit 3. I think you have these
17 already. I am going to send them to you again. Can
18 you take a look through these e-mails? It's Exhibit
19 No. 3. Let me know when you've had a chance to review
20 them all.
21 A. Yes.

Page 24

1  Q. So those e-mails were from members of the
2  Northeast District Community?
3  A. Yes.
4  Q. Commanding Officer Angelini's street work?
5  A. Yes.
6  Q. Those are positive e-mails from the community?
7  A. Yes.
8     (Deposition Exhibit 4 was marked for
9  identification.)
10 Q. I am showing you what has been marked as No.
11 4. That is a Form 70 for Officer Angelini that you
12 denied, is that right?
13 A. Yes.
14 Q. It was ultimately overruled by your superior
15 officer?
16 A. Yes.
17 Q. A 60 day detail to a different unit, is that
18 right?
19 A. Yes.
20 Q. So when Officer Angelini handed this Form 70
21 to you, do you recall what you did with it? How you

Page 25

1  treated it and can you tell -- describe that process to
2  the court reporter?
3  A. I disapproved it due to manpower.
4  Q. You did not tear it up and hand it back to
5  him?
6  A. I don't think so, I could have but I doubt it.
7  Q. You did not shove it in his mailbox and tell
8  him to rewrite it?
9  A. The only way I would have shoved it in his
10 mailbox and told him to rewrite it is if it was written
11 wrong.
12 Q. What would be an example of something being
13 written wrong?
14 A. If he is missing any of the pertinent data,
15 pertinent information.
16 Q. What would be pertinent information?
17 A. Anything in those boxes.
18 Q. Sorry, because we are --
19 A. Date, name, rank, current assignment, EOD,
20 which is the date that he was hired, DOB, locator
21 number and sequence number and assignment requested,

Page 26

1 any of those things.
2　　Q.　So in other words, you are saying that if it
3 was not filled out properly in the sense of the boxes
4 that need to be filled out, not necessarily
5 substantively what is in the form?
6　　A.　Right.
7　　Q.　Did you ever disapprove Form 70s because of
8 the reason for the request?
9　　A.　Because of the reason, yes.
10　　Q.　Like if someone wrote, I want a transfer to
11 the Cartoon Enforcement Unit of the Trademark
12 Infringement Division or something completely absurd
13 and ridiculous, would you disapprove it or hand it back
14 to the officer?
15　　A.　It depends. If I thought they were qualified
16 or if I just couldn't lose anybody for manpower. What
17 happens in the Department, I could write approved with
18 a replacement and the only thing that gets done is the
19 approved and the replacement never comes. I started to
20 disapprove a lot of transfers. The Northeast, when I
21 was there, was the most understaffed district in the

Page 27

1 City.
2　　Q.　Because we are being recorded, this is for
3 Federal Court and not for Baltimore City Circuit Court
4 can you describe the geography of the Northeast
5 District?
6　　A.　The Northeast District is one of the nine City
7 Districts and it is the biggest in the City. It
8 encompasses about 17 square miles, which is about 22
9 percent of the City and the residents has about 130,000
10 of the 620,000 residents and it is patrolled by about
11 18 patrol officers at one time. Staffing, I say about
12 180 officers. I think the most I probably ever had was
13 about 130. So the shifts were going out short. We
14 were drafting people to stay and paying tons of
15 overtime to fill the cars. So I could not afford to
16 lose anybody and it was one of the most volatile.
17　　Q.　Did you have officers in your capacity who
18 either made EEOC Complaints or had allegations lodged
19 against them that you, either with your approval or
20 over your objection, were transferred out of your
21 district, if you recall?

Page 28

1　　A.　I don't know but I am sure it has happened.
2　　Q.　So Officer Katran (phonetic) do you recall
3 him?
4　　A.　I do remember him.
5　　Q.　Did he get transferred out of your district
6 after an allegation was made regarding EEOC?
7　　A.　I am not sure.
8　　Q.　You are not sure or you don't recall?
9　　A.　I know he was transferred. I just don't
10 recall why.
11　　　(Deposition Exhibit 5 was marked for
12 identification.)
13　　Q.　Take a look and review. It is not great
14 print.
15　　A.　No problem. Okay.
16　　Q.　Let me know when you are finished reviewing
17 Exhibit 5.
18　　A.　I am finished.
19　　Q.　It's a three page e-mail chain, is that right?
20　　A.　Uh-huh.
21　　Q.　And can you just describe for the record what

Page 29

1 is this e-mail about?
2　　A.　It starts out about Officer Angelini's
3 behavior in the crash school that was in Baltimore
4 County.
5　　Q.　The thing that we talked about earlier in the
6 deposition?
7　　A.　Correct. Basically saying he was disruptive
8 and he left class and did not come back and that e-mail
9 was sent from Officer Patty Bower and I guess it was
10 sent to me. I forwarded it to Milton Corman or Sneed,
11 Sneed was the Major at the Northeast at that time for
12 him to handle it. I guess this came -- all the
13 responses from Internal because after I sent it, I
14 don't recall seeing anything else about it.
15　　Q.　Okay. You have an e-mail that is on this
16 e-mail chain dated March 14, 2017, at 5:28 p.m. You
17 forwarded this e-mail?
18　　A.　Uh-huh.
19　　Q.　Can you name for the record who is on the
20 e-mail that you forwarded and their job title?
21　　A.　I forwarded it to Deputy Commissioner Palmere,

**Page 30**

1 who is now retired, Chief Rodney Hill who is now
2 retired, Major Ian Dabrowski, who is still here, Deputy
3 Commissioner Jason Johnson who is now retired, Drew
4 Vedder who works for City Hall and Kevin Davis now gone
5 as the Commissioner and Osborne Robinson who was the
6 Chief of Patrol is now retired.
7     Q. I am going to direct your attention to the
8 third sentence in that e-mail.
9     A. Which one? The one that I sent?
10     Q. Yes, the one that you sent that we were
11 talking about. The third sentence, can you read that
12 for me, please?
13     A. He went to the Northeast District a few years
14 ago as a result of disciplinary issues in the Southeast
15 District. I don't recall exactly what he did but I
16 know he got kicked out of the Southeast District.
17     Q. So who told you he got kicked out of the
18 Southeast District?
19     A. As I said before when we talked about this, I
20 don't recall exactly. When he came to me, I was told
21 he was being moved out of the Southeast District.

**Page 31**

1     Q. Was he moved or was he kicked out?
2     A. Kicked out, that was the words I was given.
3     Q. By whom?
4     A. I don't recall. It was a phone conversation.
5 It could have been a Major or Lieutenant Colonel or any
6 number of people.
7     Q. Your testimony is you have no idea what the
8 disciplinary issues were in the Southeast District?
9     A. No. Like I said before, I did not care.
10     Q. But without knowing any of the background
11 information, you felt it was appropriate to put in an
12 e-mail that he got kicked out of the Southeast District
13 for disciplinary issues and you carbon copied the
14 Commissioner, two Deputy Commissioners and three
15 Majors?
16     A. My chain of command, yes.
17     Q. But you did not have any background or
18 knowledge of what those disciplinary issues were or if
19 there was any alternative explanation as to why he was
20 transferred from the Southeast District?
21     A. Correct.

**Page 32**

1     Q. So is it safe to say that Officer Angelini, at
2 least as of March 14, 2017, had been labeled as a
3 problem officer?
4     MR. GLYNN: Object to the form.
5     A. He was from the Southeast.
6     Q. But he wasn't when he came to Northeast, at
7 least in terms of work product?
8     MR. GLYNN: Objection to form.
9     A. Correct. I thought he did an excellent job
10 for me.
11     Q. Were you aware that -- strike that. Do you
12 have any knowledge, prior to forwarding this e-mail, of
13 what, if anything, Officer Angelini had going on in his
14 life health wise when he was taking this level one
15 crash school on March 6, 2017?
16     A. The only thing that I based it on is that
17 e-mail sent to me and a phone call that I don't
18 remember who called and told me about it first.
19     Q. Were you aware that he had kidney surgery for
20 kidney stones a couple of days after he left the crash
21 school?

**Page 33**

1     A. No.
2     Q. And part of the reason why he was leaving half
3 days was because he had kidney stones?
4     A. No.
5     Q. Okay. Do you know Sergeant Eddis Brickus --
6 sorry if I am pronouncing that incorrectly.
7     A. Eddis Brickus, she is now a Captain.
8     Q. Okay. How do you know her?
9     A. As a Captain.
10     Q. Was she in your chain of command?
11     A. No, she is not.
12     Q. Was she ever in your chain of command?
13     A. If she was working in the district, yes. I
14 was an inspector -- when I got sent to Headquarters
15 after I left the Northeast, I was an inspector which is
16 a Lieutenant Colonel which oversees everyone in patrol
17 in the City.
18     Q. Would you have had any day-to-day interactions
19 with her in that capacity?
20     A. No.
21     Q. Do you have any day-to-day interactions with

PLAINTIFF EXHIBIT 3

Page 34

1  her now?
2  A. Yes.
3  Q. Did you discuss the substance of your
4  testimony here today with her?
5  A. No.
6  Q. Did you do anything to prepare for today's
7  deposition?
8  A. Spoke to the lawyer yesterday for about ten
9  minutes.
10 Q. Okay, I appreciate that. Did you review any
11 documents?
12 A. Just that one, I think it was this one. The
13 one with the e-mail about the school, that and a 95
14 that --
15 Q. What was the 95, if you recall?
16 A. I cannot remember what it was about. I just
17 read it.
18 Q. He cannot answer your question for you,
19 unfortunately.
20 A. I know. I am trying to remember what it was
21 even about.

Page 35

1  Q. In Exhibit 5, could you take a look at Exhibit
2  5 again.
3  A. Yes.
4  Q. It says Milt sent a text.
5  A. Yes.
6  Q. Was that a text message, from whom and to
7  whom, if you recall?
8  A. I think -- I think I sent him a text message
9  or somebody sent a text message about the same thing I
10 wrote the e-mail about.
11 Q. That text message, was that to your
12 departmental cell phone?
13 A. Yes.
14 MR. NACHTMAN: You will take a look to see if
15 you can obtain that, Mr. Glynn?
16 MR. GLYNN: I will see what we can do.
17 Q. Do you recall what the substance of that text
18 message was?
19 A. It would have been the same, probably a brief
20 synopsis of this thing here, this whole -- multiple
21 things. It would never have been anything this long.

Page 36

1  Q. Who was on that text message string, if you
2  recall?
3  A. I do not recall.
4  Q. Was it more than one person?
5  A. Yes. It would have probably been me -- I am
6  guessing, me and the Chief of Patrol, at least. I
7  don't know if they would have copied anyone else on it
8  because we were his -- he was under our chain of
9  command for patrol.
10 Q. So you testified previously today that you
11 thought he was doing a good job, correct?
12 A. Yes.
13 Q. In patrol?
14 A. Yes.
15 Q. And you had good, positive feedback from the
16 community, as Exhibit 3 shows?
17 A. Yes.
18 Q. While he was in the Northeast District, you
19 had no disciplinary issues -- while you were in
20 Northeast District, you had no disciplinary issues with
21 Officer Angelini?

Page 37

1  A. Yes.
2  MR. NACHTMAN: I don't have any other
3  questions.
4  MR. GLYNN: I will be very brief.
5  EXAMINATION BY MR. GLYNN:
6  Q. Colonel Worley, my name is Colin Glynn,
7  Attorney for the Baltimore Police Department. To your
8  knowledge, is there any Baltimore Police Department
9  rule or regulation requiring a supervisor to accept a
10 transfer request?
11 A. No, there is not. There is a box on there
12 that whoever is requesting a transfer, you can accept
13 or deny it.
14 Q. I will be more clear. When I say accept, I
15 mean not just to approve, but as you've described
16 earlier, I don't characterize your testimony as
17 anything other than you might sometimes hand it back to
18 an officer and say, whatever you said before --
19 A. Yes.
20 Q. -- is there any rule prohibiting you from
21 doing that?

Page 38

1  A. I don't believe so.
2  Q. Is there any rule that would prohibit you from
3  tearing the piece of paper, a Form 70, that you had
4  given back to an officer?
5  A. I don't think so.
6  Q. Could you speak up a little?
7  A. I don't think so.
8     MR. GLYNN: I have no further questions.
9     MR. NACHTMAN: I do have one follow-up, as a
10 result of that.
11    FURTHER EXAMINATION BY MR. NACHTMAN:
12 Q. Take a look at what has been marked as Exhibit
13 No. 6, a copy of that. It is a document dated February
14 8, 2017, policy 1705. Is this the policy that governs
15 how Form 70s should be handled?
16 A. Uh-huh.
17    THE REPORTER: Is that yes?
18 A. Yes.
19 Q. Is it substantially similar to the policy that
20 was in place between 2012 and 2017?
21 A. Yes.

Page 39

1  Q. Have you ever ripped up a Form 70?
2  A. I don't know. I would say probably yes.
3  Q. What would you do with it when you rip it up?
4  Do you recall what officer for whom you did that?
5  A. I would have probably ripped it up and given
6  it back to him and told him to rethink it. What
7  happens is I get to know most of my officers pretty
8  good. If I think they are doing something in haste or
9  doing something to avoid dealing with something, I tell
10 them to rethink it and resubmit it. The same thing I
11 did with Steve, I'd do the same thing with any officer.
12 Q. Would you tell the officer to change the
13 reason on the reason box?
14 A. I could.
15 Q. Because there is no policy that says you
16 can't?
17 A. Right, I can give him or her advice.
18 Q. If the officer gave it to you a second time,
19 would you tear it up and give it back to them?
20 A. No.
21 Q. What about a third time?

Page 40

1  A. No.
2  Q. Fourth?
3  A. No.
4  Q. Sixth?
5  A. No.
6  Q. Thank you.
7  A. And the reason we do give them advice, if they
8  put something generic in that box why they want to be
9  transferred, most of the time when I give them advice
10 to change something in that box it is to benefit them.
11 To tell them I have this experience and this is why I
12 think I am good for this position.
13    MR. NACHTMAN: Thank you for your testimony
14 today.
15 A. You're welcome.
16    MR. GLYNN: No more questions from me. He
17 will read and sign. Electronic only.
18    MR. NACHTMAN: E-tran and PDF.
19    (The deposition was concluded at 10:49 a.m.)

Page 41

CERTIFICATE OF DEPONENT

    I hereby certify that I have read the
foregoing transcript, and the same is a true and
accurate record of the testimony given by me.
    Any deletions or corrections that I feel
are necessary, I will attach on a separate sheet of
paper to the original transcript.

                    LT. COLONEL RICHARD WORLEY
                    _____
                    DATE: _____

Job #7097a

Page 42

```
 1         CERTIFICATE OF NOTARY PUBLIC/REPORTER
 2    STATE OF MARYLAND
 3    COUNTY OF BALTIMORE, to wit:
 4         I, Monica A. Sienkiewicz, a Notary Public in and
 5    for the State of Maryland, County of Baltimore, do
 6    hereby certify that LT. COLONEL RICHARD WORLEY,
 7    personally appeared before me and, after having been
 8    duly sworn by me, was examined by counsel.
 9         I further certify that I am not an employee of
10    counsel nor related to counsel or the parties in any
11    way and have no interest in the outcome of this
12    proceeding.
13         I further certify this transcript of testimony
14    was prepared accurately by me to the best of my
15    ability, knowledge and belief.
16         As witness my hand and Notarial Seal this 13th
17    day of September, 2018.
18
19    _____
20         Monica A. Sienkiewicz, Notary Public
21    My Commission expires 10/09/19.
```