IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN ANGELINI

    Plaintiff,

v.    Case No.: 1:17-CV-2354-ELH

BALTIMORE POLICE DEPARTMENT

    Defendant.

### Affidavit

1. My name is Steven Angelini.
2. I am an employee of the Baltimore City Police Department (BPD) and have been since 2006.
3. After Officer Daniel Quaranto discovered the graffiti in the Men's Room stall located in the Southeast District (SED), I initially made a complaint to, what was at the time, the Internal Affairs section's District investigations, Sgt. Kenneth Williams.
4. I struggled with making the complaint because my family's history had become fodder for the rumor mill of the SED and because I feared retaliation from BPD.
5. When I initially told Sgt. Williams about the graffiti, I then told him not to worry about it, mostly because I feared retaliation for making the complaint and making trouble.
6. BPD has a long history of retaliation against anyone who makes complaints, whether in EEOC situations or in situations involving corrupt officers.
7. After sleeping on the decision, I made the decision to stand up and contact BPD EODS (Baltimore City's EEOC complaint division, BPD EEOC).
8. On my way to the BPD EEOC, my immediate supervisor, Sgt. Ettice Brickus, made comments to me about the clothing I was wearing that I perceived to be sexual in nature and due to my gender.
9. I went to BPD EEOC and made a formal complaint about both the graffiti and about the comments made to me by Sgt. Ettice Brickus.
10. I never received notification of any result in that formal complaint until discovery in this lawsuit.
11. Upon my return to the SED later that day, I immediately changed into my uniform and was confronted by Sgt. Brickus. She immediately began questioning why I went "downtown" to make a formal complaint. She said that the major wouldn't want it.
12. I immediately knew that my workplace would not be the same.
13. After the initial complaint, Sgt. Brickus, knowing that I had included her comments in my complaint to BPD EEOC, Sgt. Brickus singled me out at every opportunity she had, picking on my clothing, my timeliness, and my work, each without merit and even though I was on light duty at the time.
14. Almost immediately after the October complaint, Brickus ordered me to report to roll call for the beginning of the shift, even though when a person is on light duty they are usually to immediately report to the desk to replace the person who is on the previous shift doing

**Exhibit 5**

administrative tasks. This made me unpopular with the other BPD employees whom I was to be replacing at the desk, because it made their respective shifts run longer than it should have.
15. In January 2013, the workplace environment grew far worse.
16. The parking situation in SED during shift change was terrible with fewer spots available then there were personal vehicles and patrol cars. I parked in the only open spot, one of three marked "NSU," knowing I would move my car once roll call was finished at the start of my shift. This was common practice that I witnessed other officers and supervisors, including Sgts Brickus and Drennon, do regularly.
17. Sgt. Drennon, of NSU, personal car was already parked in one of the three NSU spots. An NSU patrol vehicle was parked in another NSU spot. The other NSU vehicle was out on the street, so I expected to have a few moments to check in for roll call and then move my car.
18. Sgt. Drennon, who is friends with Sgt. Brickus asked Sgt. Brickus to have me move my car.
19. Sgt. Brickus ordered me to move my car, and I attempted to comply (it was absolutely common for officers to have to move cars all the time, being double parked and in the wrong spots).
20. Before I could do so, Sgt. Drennon blocked me from going to the parking lot.
21. I was prevented from moving my car by Sgt. Drennon and Sgt. Brickus. Eventually I moved my car and proceeded to my shift for the day.
22. Ultimately, I was never charged by internal affairs, despite having my police powers suspended for several weeks.
23. I believe the parking lot suspension was pretextual because I was not suspended until the end of my shift, even though the incident happened at the beginning of my shift and the preface and mechanism used to suspend me were of an emergency nature.
24. At my time at the SED I had seen hundreds of people park their cars in various designated spots and move them, without repercussion.
25. Sgt. Brickus was close personal friends with the 2nd in command at SED, Capt. Burrus.
26. I feared my own supervisors and command. I feared that Sgt. Brickus was targeting me because of my complaint against her. I also feared that she was spreading rumors about me and my work product and work habits.
27. In March 2013 I was involved with a shooting.
28. In that incident I shot a man who was discharging a shotgun in a Highlandtown back yard. That man succumbed to his injuries.
29. Four guns, including two high powered assault rifles, were recovered along with drugs.
30. Unlike other Officers, I never received any commendations, awards, or medals for my actions.
31. I heard that Sgt. Brickus, who was the Acting Lieutenant on the night of the shooting, was criticizing my actions to a group of other officers, saying that my actions were not lawful.
32. The BPD and Baltimore City State's Attorney's Office cleared me of my actions.
33. I suffered severe anxiety and fear as a result of the shooting, but that fear and anxiety was compounded by the fact that my own supervisor appeared to be out to get me.
34. Later in April of 2013, Sgt. Brickus was then openly criticizing me to other officers and would make comments on the radio about me as if I were in trouble.
35. As a police officer, if your fellow officers do not support you, it is truly a life or death situation.
36. In April 2013 I transferred to a different shift. I hoped for a new start.
37. Sgt. Brickus had already communicated her dislike and displeasure with me to the other supervisors of that shift.
38. As a result, the supervisors on the other shift regularly gave me the worst shifts, forced me to wear long sleeve uniforms in hot weather, gave me the worst assignments, and took away my pre-scheduled vacation.

**Exhibit 5**

39. The new supervisors also took away my post car. A post car is a designated vehicle assigned to high performing, experienced officers, it is typically a reward for good work. I had a post car for years in the SED and I had it removed.
40. The new cars I got were anything but new, they were old, broken down, decrepit vehicles without working air-conditioning.
41. Later I moved to the Northeast District. I never knew I should have received the order to go to SWAT tryouts on July 29, 2013 until the institution of this lawsuit and the receipt of discovery.
42. I was heartbroken when I learned about what Richard Worley said about me in his March 2017 email about me being "kicked out of the Southeast" because I had been denied for seven transfers before being allowed to leave.
43. I looked up to Major Worley and I thought he had true respect for my work ethic.
44. On August 29, 2019 I attended now Chief of Patrol ("CoP") Worley's deposition at my attorney's office.
45. After the deposition finished CoP Worley approached me and said, "Hey Steve, Did I ever rip up any of your 70's?"
46. I replied, "No Sir, a few supervisor's in SED ripped them up when I tried to leave SED in 2013".
47. CoP Worley stated, "That's what I thought, I am sorry that happened to you, who was it?"
48. I stated, "a female Captain in the SED, before I was transferred to NED."
49. He replied "I am sorry what was said about you in the email, remember I only hear one side of the story. I didn't know this happened to you, that's so fucked upped."
50. I replied "Sir, you treated me awesome in the NED and I never felt mistreated by you Sir."
51. CoP Worley went on to state he was confused and caught off guard when my attorney asked him, if had ever ripped up anyone's 70 transfer requests.
52. The CoP stated he couldn't think of anytime, during my time in the NED, ripping up any 70 requests from me.
53. CoP Worley even brought up how he only remembers me handing in one 70 transfer request while under his command and it was for the LPR Unit.
54. I reassured him this was about my time in the SED and we had a great working relationship, during his time as Major of the NED.
55. I ended the conversation with CoP Worley by saying" Sir, You and I had a great working relationship in NED, and I appreciate the way you treated when I came to the NED".
56. CoP Worley then handed me his business card and stated, "Steve if you ever need anything, feel free to reach out to me."
57. My attorney was standing about 10 feet away and inadvertently overheard CoP Worley say, "I am sorry for what happened to you." He did not hear the rest of the conversation.
58. Det. Robert Cornejo, the Internal Affairs detective, and I spoke about the citizen complaint on August 18, 2017 at about noon regarding the May 26, 2017 citizen encounter.
59. I told him that my understanding from Sgt. Walford was that my verbal counseling was sufficient to resolve the matter.
60. Det Cornejo said, "I told you before, I don't know what you did, but IAD is out to get you."
61. In a subsequent conversation with a different detective, I was told by Det. Ed Gordon from IAD that Det Cornejo originally found me not guilty for citizen complaint on the traffic stop.
62. Det Cornejo was ordered to reverse his findings from not guilty to guilty by his supervisors. Det Gordon witnessed this conversation between Det Cornejo and his supervisor.
63. Det Cornejo told his supervisor that he couldn't find any wrongdoing on my part.
64. Det Cornejo was told to find something because the case will not get approved and closed until it was changed.

**Exhibit 5**

65. Det Gordon stated Det. Cornejo was upset and frustrated by this retaliation against me but had no other choice.
66. Det Cornejo told me that in Case No. 2016-0416, Cornejo was watching the body camera video at his desk. Sgt. Brokus and Sgt. Eames, who are both supervisors in IAD, approached his desk and watched my video over his shoulder.
67. Det. Cornejo told me on October 9th, 2016 at approximately 1730hrs, that Sgt Brokus stated he hated my fucking guts and to charge me for any violations Det. Cornejo saw on the video.
68. Sgt Eames stated he didn't like me because I was an instigator and trouble maker.
69. I told Det Cornejo I don't even know who Sgt. Eames is and how does he know me?
70. Det Cornejo didn't know why they both stated that about me but they both didn't like me.
71. Prior to the ECU incident (2014-0040) I had no prior interactions with Internal Affairs, or so I thought. I was scared and never charged in my entire career.
72. Through the course of discovery in the above captioned case, I later discovered that I had an internal affairs record over 70 pages in length. Most, if not all, of which I had never even been notified about or had an opportunity to present my case under the LEBOR.
73. My attorney in the 2014 case informed me that I have a long record and that's why I shouldn't try to fight the charge, not knowing the true contents of my employee file with BPD.
74. BPD was supposed to expunge most of the matters, at the insistence of my current attorney in the above captioned case. It is unknown if that has been done.
75. In September of 2018 my attorney had been in communication with Sgt. Daniel Quaranto about the case. They had exchanged voicemails and emails.
76. It was my belief that Sgt. Daniel Quaranto, who I thought was my friend, was going to provide testimony consistent with my testimony and helpful to my case. I only ever asked him to tell the truth and help me prove my retaliation and to improve the BPD.
77. On September 5, 2018 a former attorney representing the BPD contacted Sgt. Quaranto.
78. I do not know what exactly was said.
79. I was told by Quaranto that the attorney told him that he should not talk to me or my attorney and should not sign any affidavits in my case.
80. This is consistent with what happened to Sgt. Walford.
81. I am a very active police officer and work hard to have positive experiences with members of the community. For example, since May 2017 I have conducted 877 traffic stops and issued 1,618 moving violations. I have this statistical information because I use an e-tickets system which tracks this data. This does not included calls for service. This is a large number of interactions with civilians.
82. For the year of 2018 I issued more traffic citations than any other patrol police officer in Baltimore City. The State issued me the "Smooth Operator Award" for this, for the second time. I believe the other year I received this award between 2014 - 2016.
83. In the time frame since May 2017, I have had two serious workplace injuries effectuating arrests on dangerous felons, both of which required major surgery; placing me out of service for significant periods of time due to recovery. Therefore, for the time frames I was active, I had many daily interactions with civilians and only one complaint for which I was found not guilty.
84. It is virtually impossible for a police officer to interact with the public at that volume and not have some persons dissatisfied with receiving a traffic ticket.
85. I work hard to have positive interactions with the public.
86. When filing my bankruptcy petition, I did speak with my attorney about this case and he advised that it should not be included.
87. My attorney was contacted by lawyers at the Department of Justice in Washington, DC with regards to this case. It took years for the Federal EEOC to complete their investigation and

Exhibit 5

provide me their right to sue letter. I do not know why, but they expressed some interest in taking the case, according to my attorney.

I have freely, knowingly, and voluntarily provided this statement.

I solemnly swear and/or affirm the foregoing statement under the penalties of perjury on this 5th day of January 2020.

*Steven Angelini*

**Exhibit 5**