Exhibits: 1 - 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


STEVEN ANGELINI,                )
        Plaintiff,              )
                                )
v.                              ) No: 1:17-CV-2354-ELH
                                )
BALTIMORE POLICE DEPT,          )
        Defendant.              )


                *   *   *   *   *   *   *


        The deposition of KIMBERLY BURRUS, was held

on Monday, September 10, 2018, commencing at 9:55

a.m. at Eldridge & Nachtman, LLC, 217 North Charles

Street, Third Floor, Baltimore, Maryland 21201,

before Ann M. Lavoie, Court Reporter and Notary

Public.




                    IRWIN REPORTING
                301 W. Pennsylvania Avenue
                  Towson, Maryland 21204
                      (410) 494-1880

**PLAINTIFF EXHIBIT 10**

```
                                        Page 2
1              A P P E A R A N C E
2
3   ON BEHALF OF PLAINTIFF:
4   ELDRIDGE & NACHTMAN, LLC
      By:  Kurt Nachtman, Esq.
5           217 N Charles St
            Baltimore, Maryland 21201
6           kurt@enlawyers.com
            Telephone: 443-559-4384
7
8
9   ON BEHALF OF DEFENDANTS:
10  BALTIMORE CITY LAW DEPARTMENT/LEGAL AFFAIRS DIV.
      By:  Colin Glynn, Esq.
11          100 N. Holliday Street
            Suite 101
12          Baltimore, Maryland 21202
            colin.glynn@baltimorecity.gov
13          Telephone: 410-396-3297
14
15  ALSO PRESENT:
16     Mr. Eric Maddy
17
18
19
20
21
```

```
                                        Page 3
1              I N D E X
2   Testimony of:                        Page
3   Kimberly Burrus
4      By Mr. Nachtman                    4
       By Mr. Glynn                       53
5
6              E X H I B I T S
7   No.  Description                      Page
8   1    General Order Q-1                14
9   2    General Order 5-87/Q-7           14
10  3    General Order Q-13               14
11  4    Notes                            25
12  5    Color Photograph                 36
13  6    Color Photograph                 36
14  7    Color Photograph                 36
15  8    Confidential Memorandum          42
16  9    Confidential Memorandum          42
17  10   Form 70                          43
18  11   Two Form 70s                     45
19  12   Color Photograph                 46
20  13   Color Photograph                 46
21

       *** ORIGINAL EXHIBITS ATTACHED ***
```

```
                                        Page 4
1              P R O C E E D I N G S
2
3        Whereupon --
4        KIMBERLY BURRUS was called as a
5   witness, having been duly sworn to tell the truth,
6   the whole truth and nothing but the truth, was
7   examined and testified as follows:
8   EXAMINATION BY MR. NACHTMAN:
9        Q.  Good morning.
10       A.  Good morning.
11       Q.  My name is Kurt Nachtman.  I represent
12  Steven Angelini in a federal lawsuit that's been
13  filed against the Baltimore City Police Department.
14       I'm just going to go over a couple
15  housekeeping items, before we begin, okay?
16       A.  Okay.
17       Q.  Can you state your full name for the
18  record?
19       A.  My full name is Kimberly Monique Burrus.
20       Q.  And can you spell your last name?
21       A.  Sure.  B-U-R-R-U-S.
```

```
                                        Page 5
1        Q.  Can you state your work address for me
2   please?
3        A.  It's 242 West 29th Street, Baltimore,
4   Maryland 21218, I think.
5        Q.  I've asked everybody this.  I don't plan on
6   using anything other than people's work address,
7   although because of the age of this case we've had a
8   number of people retire during the course of this
9   matter.
10       So can I get your home address please?
11       A.  ████████████████████████████████
12
13       Q.  I'm just going to ask you a couple
14  preliminary questions.
15       Have you ever been deposed before?
16       A.  No.
17       Q.  Have you ever testified in court before?
18       A.  Yes.
19       Q.  A deposition is a lot like testifying in
20  court.  You're under oath.  You have to answer
21  questions that are asked of you.  It's a little
```

**Page 6**

1 different in that there's not a judge here, there's
2 not a jury sitting watching what's going on.
3      From time to time your attorney is going to
4 make objections. Those objections are to preserve
5 the record for later on.
6      If there is a trial in this case, the judge
7 will make a decision as to whether pieces of this
8 testify would be admissible or not admissible.
9      If your attorney doesn't want you to answer
10 a particular question, he's going to instruct you
11 not to answer. Otherwise, if you don't hear
12 anything, you should just answer the question as
13 asked, even if he makes an objection.
14      Okay?
15   A. (Nods.)
16   Q. I see you nodding your head.
17   A. I'm sorry.
18   Q. That was the next thing I was going to say
19 is that you've got to give a verbal response. Head
20 nods, "uh-huh," "uh-uh" generally don't suffice. I
21 have read plenty of transcripts over the course of

**Page 7**

1 my career that are filled with "uh-huh" or "uh-uh."
2      Unfortunately, we do require a -- although
3 we all may know what you are indicating, the
4 transcript does require a verbal response with "yes"
5 "no," "maybe," "I don't know."
6   A. Understood.
7   Q. Thank you.
8      What is your current rank and sequence
9 number?
10   A. My current rank is major. My sequence
11 number is G, George, 131.
12   Q. How long have you been a member of the
13 Baltimore City Police Department?
14   A. I have 21 years completed.
15   Q. Can you please kindly provide your previous
16 history of assignment with the BPD, including dates,
17 to the best of your recollection?
18   A. From officer up until now?
19   Q. The whole history.
20   A. My EOD, entry on duty, date is 8/7/97. I
21 spent approximately ten years in patrol, before I

**Page 8**

1 was promoted to a sergeant in May of 2007 or '08.
2   Q. So you were in patrol the entire time that
3 you were an officer?
4   A. For the most part. I had a small
5 assignment in the camera unit. That's all.
6      As sergeant, I was assigned to the Central
7 District.
8   Q. Okay.
9   A. From the Central District, I went to the
10 Northeast District as a lieutenant.
11   Q. Sorry. You were a sergeant in May 2007.
12 Where were you assigned as a sergeant?
13   A. Central District.
14   Q. And then you made lieutenant. When?
15   A. In 2010. I was assigned to the Northeast
16 District, midnight shift. I left the Northeast
17 District, midnight shift as a lieutenant in 2011,
18 2012 maybe. 2011. And I went to DDU, Northeast
19 DDU.
20      In 2012, I left Northeast DDU as the
21 lieutenant and went to the Southeast District as the

**Page 9**

1 captain.
2   Q. When was that?
3   A. That was December of 2012.
4   Q. And when did you get promoted to major?
5   A. In July of 2013. And I was assigned to the
6 Northern District.
7   Q. Do you remember what specific date in July
8 2013 you learned of your promotion to major?
9   A. I don't remember the date.
10   Q. How far before or after the 4th of July was
11 it? If you recall.
12   A. If my memory serves me correctly, it was
13 right around there, because I was on vacation.
14   Q. So it was the beginning of the month and
15 not the end of the month.
16   A. I don't believe so. But I don't recall.
17   Q. What types of specialized training have you
18 received for law enforcement purposes?
19   A. You're making me think.
20      Over 21 years, I can't even remember.
21   Q. Did you go to any programs or classes

**PLAINTIFF EXHIBIT 10**

Page 10

1  off-site, outside of the BPD?

2      A.  I have.  I've gone to LEEDA, FBI LEEDA.

3  I've gone to grant writing class.  I just left the

4  IECP recently.  Other than that, I can't recall

5  right now.

6      Q.  Any types of specialized training in human

7  resources or personnel management as it relates to

8  law enforcement?

9      A.  I can't recall.

10      Q.  Any types of specialized training in terms

11  of EEOC policies and enforcement?

12      A.  I can't recall.  I do know that as command

13  staff, they give you different training classes.

14  But to be able to specifically tell you what classes

15  that we've been given, I can't.

16      Q.  I'm going to direct your attention to

17  approximately December 2012, when you relocated to

18  the Southeast District.  You were the captain of

19  Southeast?

20      A.  Yes.

21      Q.  How many captains are there in the

Page 11

1  Southeast District?

2      A.  Just one.

3      Q.  For the questions that I'm asking right

4  now, I'm specifically talking about December of 2012

5  until July 2013.  So that six-month period.

6      A.  Okay.

7      Q.  What were your roles and responsibilities?

8      A.  So I assisted the commanding officer, who

9  was the major, with personnel issues, deployment

10  issues, crime issues.

11      Q.  You would be, what, in terms of the overall

12  rank at the Southeast District?

13      A.  So I was the second in command.  I was his

14  executive officer.

15      Q.  How many individuals would be under your

16  direct supervision as captain at Southeast District?

17      A.  So the district as a whole would have had

18  roughly from 150 to 200 members at that time maybe.

19      Q.  What shift did you typically work?  Or did

20  you have a typical work shift?

21      A.  No.

Page 12

1      Q.  It would rotate?

2      A.  It would vary because of meetings and

3  responsibilities.

4      Q.  What would cause it to vary?

5      A.  Different times for the meetings.  If a

6  meeting would be longer into the evening, you would

7  come in a little later during the day.  It just

8  depended.

9      Q.  When you were promoted to captain, can you

10  describe for me how you learned of it and how that

11  process occurred?

12      In other words, do you have to submit an

13  application for captain?

14      For example, a sergeant takes a test.  But

15  I know it's a little bit different for command

16  staff.

17      So can you just describe that process for

18  me?

19      A.  Sure.

20      MR. GLYNN:  I will object to the form,

21  but you can answer the question.

Page 13

1      A.  There's actually no formal process.  At

2  that time there was no formal process for promotion

3  for command members.

4      I received a call from them.  I think it

5  was Colonel Skinner who advised that they had looked

6  at some of the work that I had done and that he

7  wanted to promote me, if I would be willing to be

8  promoted.

9      Q.  There was no application process?

10      A.  No.

11      Q.  And how much in advance did you get

12  notified, when Colonel Skinner called you to when

13  you actually got promoted?

14      A.  I remember the exact date of the phone

15  call, which would have been the day after Christmas,

16  December 26th.  I don't really remember the exact

17  date that I started but it wasn't that far after.

18      Q.  And how about your promotion to major in

19  July of 2013?  What was that process like?

20      A.  It was probably the same process.  I don't

21  remember who I spoke to though.  I can't remember.

**PLAINTIFF EXHIBIT 10**

**Page 14**

1  I was actually on vacation at the time that it
2  occurred.
3      Q.  Just to make sure I understand correctly,
4  you were promoted to lieutenant in 2010.  You worked
5  as a lieutenant from 2010 to approximately December
6  2012, when you made captain.  And then December 2012
7  to July 2013, you were promoted to major?
8      A.  Correct.
9      Q.  So that's a fairly significant rank.  Would
10 you agree that it's a fairly significant rank
11 increase over a three-year period?
12     A.  Yes.
13     Q.  Where are you currently assigned?
14     A.  I am currently assigned to CID.  Criminal
15 Investigations Division.
16     Q.  I was going to ask you just for the record.
17         (Exhibit No. 1, General Order Q-1,
18 marked for identification.
19         (Exhibit No. 2, General Order 5-87/Q-7,
20 marked for identification.)
21         (Exhibit No. 3, General Order Q-13,

**Page 15**

1  marked for identification.)
2      Q.  (By Mr. Nachtman) I'm going to show you
3  what's been marked as Exhibit 1.  Take a look at
4  that.  And for the record it's General Order G-1.
5      A.  Okay.
6      Q.  Are you familiar with that document?
7      A.  Somewhat.  Not all of its content.  It's
8  nine pages.
9      Q.  To the best of your knowledge is that the
10 Equal Employment Opportunity policy of the Baltimore
11 City Police Department that was effective in or
12 around December of 2012 through July of 2013?
13     A.  Yes.
14     Q.  And if I can get your attention to the last
15 page.
16     A.  (Complies.)
17     Q.  If you could read that note, for the
18 record, that is at the bottom that's in bold.
19     A.  Okay.
20     Q.  Could you read that out loud?
21     A.  Sure.  "Any person who files a complaint or

**Page 16**

1  charge, participates in an investigation or charge,
2  or identifies an employment practice that is
3  prohibited by any of the above policies and
4  regulations is protected from retaliation."
5      Q.  And were you aware of that policy being in
6  effect as of December 2012 through July 2013?
7      A.  I'm aware that a policy was in effect, yes.
8      Q.  To your knowledge are EEOC complaints which
9  get filed, are they confidential?  If you know.
10         MR. GLYNN:  I'll object to form.
11     A.  I believe so.
12     Q.  I'm going to show you what has been marked
13 as Exhibit No. 2.
14     A.  Okay.
15     Q.  Are you familiar with that policy?
16     A.  Somewhat but not that familiar.
17     Q.  Can you identify what the policy is as
18 Exhibit 2 in front of you?
19     A.  Sure.  This is policy Q-7.  The subject is
20 "Transfers."
21     Q.  Were you aware that this was the policy

**Page 17**

1  that was in effect between December 2012 and July
2  2013?
3         MR. GLYNN:  Object to characterization.
4  Go ahead.
5      A.  We have hundreds of policies.  I'm not
6  sure.
7      Q.  One last one and then we'll circle back.
8  I'm showing you Exhibit 3.
9         Are you familiar with General Order Q-13
10 that's been marked as Exhibit No. 3?
11     A.  Yes.
12     Q.  What is that policy that's in front of you?
13     A.  Sure.  This the "Medical Policy."
14     Q.  Medical Policy.  What does that mean?  If
15 someone calls out sick or gets sick or gets hurt?
16     A.  It governs medical usage in the department.
17     Q.  That would cover anytime any employee of
18 the Baltimore City Police Department has a medical
19 issue at all?  If you know.
20         MR. GLYNN:  Object to the form.  You
21 can answer.

**PLAINTIFF EXHIBIT 10**

**Page 18**

1    A. It specifies in the policy what it is.
2 Yes, but it does govern employees of the Baltimore
3 Police Department.
4    Q. Did you have medical reports and things
5 that you had to fill out, when you were a captain at
6 the Southeast District between 2012 and 2013?
7    A. Actual medical reports?
8    Q. Did you have to fill out leave slips or did
9 someone else do that on your behalf?
10    A. Leave slips for myself?
11    Q. For anyone.
12    A. No, I didn't fill out leave slips.
13    Q. A subordinate of yours would handle any
14 medical-related issues that arose with an officer.
15    A. Yes.
16    Q. Do you recall when you went on vacation in
17 July 2013?
18    A. I don't recall the dates, but I'm sure I
19 can research it.
20    Q. Did you leave at the end of June, or was it
21 July? If you recall.

**Page 19**

1    A. I recall it being in July.
2    Q. Were you working in June of 2013?
3    A. I'm not sure.
4    Q. If an officer was injured or had a
5 medical-related issue at the district or while on
6 duty, is that something as a captain that you would
7 have been notified of?
8    A. No.
9    Q. I'm going to go back to Exhibit No. 2.
10 Take a look at Exhibit No. 2 for me.
11    A. Okay.
12    Q. Could you take a look at page 1 and 2 for
13 me and just take a look at it and familiarize
14 yourself with it for me?
15    A. Page 1 and 2?
16    Q. Page 1 and 2. There's a number of things
17 that are written on there, like bullet points.
18 Could you take a look all the way down through item
19 No. 13 on page 2?
20    A. Okay.
21    Q. Is there in your review --

**Page 20**

1    The member of the agency that's requesting
2 the transfer from one district to another district,
3 is there any particular requirement for an item that
4 is placed?
5    Is there any particular item requirement
6 for any special words other than filling out the
7 form "Complete a Request for Transfer Form 70?
8    MR. GLYNN: Object to form. You can
9 answer.
10    A. Can you re-ask that question again, so I
11 understand what you're asking?
12    Q. Are you familiar with the document, the
13 Form 70?
14    A. Yes.
15    Q. Is there any --
16    Other than item 1A, where it says,
17 "Complete a Request for Transfer Form 70," is there
18 any particularized requirements for what the Form 70
19 should or shouldn't say? To your knowledge.
20    A. For this document, no.
21    Q. When you received Form 70s in December 2012

**Page 21**

1 through July 2013, how did you handle Form 70s?
2    A. So you review them. The officer, or
3 whoever is submitted the Form 70, fills the 70 out
4 in its completion. They give it to their supervisor
5 first, depending on their rank, which would be their
6 sergeant, their lieutenant. Each one of them had to
7 sign.
8    I look for those signatures. And then
9 based on whether the manpower allows and the
10 supervisors agree that the member can be
11 transferred, I approve or disapprove the 70.
12    Q. Is there any option under the Baltimore
13 City policy for either you or any subordinate of
14 yours who receives a Form 70 to not approve,
15 disapprove and then forward it to the next level in
16 the chain of command up?
17    A. Is there any option in the policy?
18    Q. Yes.
19    A. To either approve or disapprove?
20    Can you just ask the question again? I
21 want to make sure.

PLAINTIFF EXHIBIT 10

Page 22

1     Q.  Sure.
2         Is there any option to not approve,
3  disapprove and forward to the next person in the
4  chain of command?
5         MR. NACHTMAN:  Strike the whole
6  question.
7     Q.  (By Mr. Nachtman) Let's go back.
8     A.  Okay.
9     Q.  Reading this policy, what is it that each
10 level in the chain of command is supposed to do with
11 the Form 70?
12    A.  The member of the agency fills out the 70
13 and completes it.  It is then sent to a supervisor.
14 The supervisor reviews it, approves it or
15 disapproves it and then forwards it to the next
16 supervisor, depending on the rank of the member
17 submitting it, and then it is submitted to the
18 district commander for approval or disapproval in
19 submission to the deputy commissioner.
20    Q.  The district commander in December 2012 to
21 July 2013, would that have been you, or would that

Page 23

1  have been Major Davis?
2     A.  It would have been both of us.  I was his
3  executive officer.  I handled all things in his
4  absence.  He handled all things in my absence.
5     Q.  At least reading item No. 7 and item No. 8,
6  is there any option or is there any indication as to
7  where to go from the district level?
8         I will rephrase that.
9         In Southeast District, in December 2012 to
10 July 2013, what would have been your procedure that
11 you followed with any Form 70 that was submitted?
12    A.  So it is reviewed, either approved or
13 disapproved or sent back for anything, additional
14 information, if it's not filled out completely.  And
15 then it is then forwarded to -- it's not the deputy
16 commissioner but the chief of patrol's office.
17    Q.  At the time that would have been Colonel
18 Skinner at the time?
19    A.  I can't remember.
20    Q.  Can you just do me a favor and take a look?
21 It looks like it's four substantive pages and then

Page 24

1  there's some amendments and looks like a very old
2  version of a Form 70 from 1987.  Could you take a
3  look at that?
4     A.  The one on the last page?
5     Q.  Take a look at the whole policy for me.
6     A.  Oh, my goodness.
7         (Complies.)
8         Okay.
9     Q.  Does anywhere in there permit the tearing
10 up of a submitted Form 70?
11    A.  Anywhere in this document?
12    Q.  Anywhere in that document.
13    A.  No.
14    Q.  When did you come to know Officer Steven
15 Angelini?
16    A.  At some point Angelini put in a request for
17 a 70.  And I can't remember at what point, but he
18 came to discuss his 70 with me.
19    Q.  Did you know him prior to any Form 70s?
20    A.  No, I did not.
21    Q.  Would he have been a subordinate of yours?

Page 25

1     A.  Not directly but yes.
2     Q.  From December 2012 until July 2013?
3     A.  Correct.
4     Q.  Or maybe the first week of January,
5  whenever it was that you arrived at Southeast
6  District.
7     A.  Correct.
8     Q.  To your knowledge was he a good worker?
9     A.  I didn't really have any knowledge.
10        (Exhibit No. 4, Notes, marked for
11 identification.)
12    Q.  (By Mr. Nachtman) I'm going to show you
13 what's been marked as Exhibit 4.
14    A.  Okay.
15    Q.  That's not your handwriting, is it?
16    A.  No.
17    Q.  Do you recall going to an interview at EODS
18 regarding Officer Steven Angelini?
19    A.  I do.
20    Q.  Do you recall meeting with a detective in
21 the head of EODS, Ms. Laura Giantris?

PLAINTIFF EXHIBIT 10

Page 26

1    A.   I remember meeting with Laura, but I don't
2  remember if there was a detective there.
3         Q.   Did Laura take notes of your conversation?
4    A.   I have no idea.
5         Q.   Did you see her writing, while you were
6  talking?
7    A.   I don't remember.
8         Q.   Can you just take a look at this document?
9  I think it's eight pages.
10   A.   Okay.
11        Q.   Do those notes at all help refresh your
12 memory as to the time frame of December 2012 to July
13 2013?
14   A.   No, not really.
15        Q.   Does that help you refresh your memory as
16 to the conversation you had with Ms. Giantris at
17 EODS?
18   A.   I can't remember the exact details, but I
19 do know it was regarding Officer Angelini's 70.
20        Q.   Why was your conversation not tape
21 recorded?

Page 27

1    A.   I have no idea.
2         Q.   Do you recall an incident that occurred on
3  January 18, 2013 over a parking spot?
4    A.   Somewhat.  Yes, I do.
5         Q.   Where were you when this parking spot
6  incident occurred?
7    A.   That I don't remember.
8         Q.   Were you at work?
9    A.   I don't even remember what time it was.  I
10 don't know.
11        Q.   Do you recall receiving any phone calls
12 from anyone notifying you of an incident?
13   A.   Yes.
14        Q.   Do you remember approximately what time of
15 day you received that phone call?
16   A.   I don't.
17        Q.   Afternoon, evening, midnight?
18   A.   I want to say it was the evening, at night
19 or something, but I really don't recall.
20        Q.   Who called you?
21   A.   Sergeant Brickus.

Page 28

1         Q.   If you got a phone call, does that refresh
2  your memory as to whether or not you were at the
3  station?
4    A.   You said at work.
5         Q.   Fair enough.  Fair enough.
6    A.   I don't know.  To be honest with you, I
7  don't know where I was at the time of the phone
8  call.
9         Q.   Were you at the station, when you got the
10 phone call?
11   A.   I don't know.
12        Q.   Did you get the phone call on your work --
13        You have two cellphones there I see sitting
14 next to you.
15   A.   At that time I only had one, which would
16 have been the work phone.
17        Q.   How did you know, at the time, Sergeant
18 Brickus?
19   A.   Me and Sergeant Brickus actually worked as
20 officers together in the Northwest District.
21        Q.   How long did you know her?

Page 29

1    A.   This incident happened in what year?
2         Q.   2012-2013.
3    A.   We were at the Northwest District in 2005
4  maybe.
5         Q.   And you are personal friends with her?
6    A.   Yes.
7         Q.   Would you socialize together?
8    A.   Yes.
9         Q.   How often?
10   A.   Not that often.  Our schedules wouldn't
11 allow.
12        Q.   So sometime in the evening of January 18,
13 2013, you received a telephone call from Sergeant
14 Brickus.  What were you told?
15   A.   She began to tell me about the incident
16 regarding Officer Angelini and Sergeant Drennon
17 about the neighborhood service parking spots and
18 what had transpired.
19        But, in her telling me, she was explaining
20 to me her being upset with Drennon for not coming to
21 her and allowing her to handle it as opposed to just

PLAINTIFF EXHIBIT 10

Page 30

1  going to Officer Angelini herself.
2      Q. Let's back up a step.
3      Tell me about the parking in the Southeast
4  District parking lot. How was the parking
5  situation?
6      A. It's a small lot so there's not a lot of
7  parking. But there are designated spots for
8  particular people. Like the major and the captain
9  have a designated spot, certain supervisors have a
10  designated spot. But then there is overall parking
11  for the officers that report every day.
12      Q. How would you characterize parking during
13  shift change?
14      A. Chaotic.
15      Q. Do me a favor, she's trying to take down
16  what you say. So if you block what you say, she may
17  not hear everything.
18      A. Chaotic.
19      Q. Are there a sufficient number of parking
20  spots for all of the officers who are stationed at
21  Southeast District?

Page 31

1      A. I would say yes and no. The lot is small.
2  And when you're talking about shift change, you're
3  talking about a significant amount of people that
4  are there at the same time.
5      But the other issue with the parking at
6  most of the districts, to include the Southeast, is
7  that people use them as satellite parking.
8      So you will have cars that are parked there
9  that are not necessarily those of the members who
10  actually are assigned to the district.
11      Q. What do you mean by satellite parking? I
12  don't understand.
13      A. You may have someone that works in a
14  operational unit that is not even stationed in the
15  Southeast District, but they may live close to the
16  Southeast District. And so they may park their
17  personal car at the Southeast District, while they
18  go to work and use their departmental car.
19      Q. Did that happen a lot in the Southeast
20  District?
21      A. Yes.

Page 32

1      Q. Was there any attempt made to resolve those
2  parking issues with people parking their personal
3  vehicles there as their own personal parking lot?
4      A. Yes.
5      Q. What was done?
6      A. When you send out the request for them to
7  move their cars, they do. But it is a district
8  parking lot. And so, if they are actually working,
9  it's kind of hard to say, You can't park your car
10  here.
11      Q. As a result of the telephone call on
12  January 18, 2013, what, if anything, did you do?
13      A. So after it was explained to me the
14  behavior and the things that were said from Officer
15  Angelini to the sergeant, I forwarded Officer
16  Angelini be suspended.
17      Q. And you filled out some paperwork
18  associated with that?
19      MR. GLYNN: Object to form. You can
20  answer.
21      A. I did not.

Page 33

1      Q. Someone filled out paperwork that you may
2  have signed?
3      MR. GLYNN: Object to form. You can
4  answer.
5      A. Yes.
6      Q. What were you told had occurred?
7      A. I don't remember all the details. He was
8  irate and screaming and yelling in the sergeant's
9  face, as it was related to me.
10      Q. Which sergeant is that?
11      A. Sergeant Drennon.
12      Q. When did you become aware that a EEOC
13  complaint had been filed against Sergeant Brickus in
14  October 2012?
15      MR. GLYNN: Objection.
16      Q. (By Mr. Nachtman) Among other things.
17      When did you become aware of any October
18  2012 EEOC complaint?
19      MR. GLYNN: Objection to
20  characterization. You can answer.
21      A. I don't even remember when I was made

**PLAINTIFF EXHIBIT 10**

Page 34

1  aware.
2      Q.  Back up a step.
3          Do you recall, in reviewing Exhibit 4,
4  indicating to Laura Giantris whether or not Officer
5  Angelini was a good worker who works hard?
6      A.  I don't know.  I don't recall.
7      Q.  I will show you on page 2.  I'm going to
8  direct your attention to a third of the way down.
9      A.  Sure.  This document says, After meeting
10  plus dealing with him, he has a difficult
11  personality.  Good officer.  Works hard.  He can be
12  sweet and respectful.
13     Q.  I'm going to pause you.
14         Does that refresh your memory as to whether
15  or not you said that about Officer Angelini?
16     A.  It doesn't refresh my memory if I actually
17  said it.
18     Q.  Is that true to your knowledge?
19     A.  Yes.
20     Q.  I'm going to slide you a little bit further
21  down.

Page 35

1          Do you recall indicating to Ms. Giantris,
2  "Everyone talks about him"?  Do you recall saying
3  that?
4      A.  No, I don't recall.
5      Q.  If that's a note that she has, what might
6  that have meant?  If you recall.
7          MR. GLYNN:  Object to form.  You can
8  answer.
9      A.  I have no idea.
10     Q.  Did Officer Angelini get charged as a
11  result of the suspension from January 2013?
12     A.  I don't know.
13     Q.  Would you have any involvement in that
14  process?
15     A.  The charging?
16     Q.  Yes.
17     A.  No.
18     Q.  While you were captain in Southeast
19  District from December 2012 until July 2013, how
20  many people were disciplined for parking-related
21  issues?

Page 36

1      A.  I have no idea.
2          (Exhibit Nos. 5, 6, and 7, Color
3  Photographs, marked for identification.)
4      Q.  (By Mr. Nachtman) I'm showing you what's
5  been marked as Exhibit Nos. 5, 6, and 7.
6      A.  Okay.
7      Q.  Do you recognize those documents?
8      A.  These are Form 70s.
9      Q.  They are dated.  The one is covered.  But
10  the two that you can see the dates on, what's the
11  dates on them?
12     A.  One is 7/4/13.  The other is June 26, '13.
13     Q.  Do you recall ripping up these Form 70s and
14  handing them back to Lieutenant Williams?
15         MR. GLYNN:  Object to characterization.
16  The witness can answer.
17     A.  I don't recall ripping all these up and
18  handing them to the lieutenant.
19     Q.  Charles Williams?
20     A.  No, I don't recall.
21     Q.  Do you recall ripping up any Form 70s that

Page 37

1  Officer Angelini had submitted?
2      A.  I do.  I do.
3      Q.  You just don't know if these are the ones
4  specifically.
5          MR. GLYNN:  Object to form.  You can
6  answer.
7      A.  I don't remember which one specifically.
8      Q.  Do you recall when you received any
9  particular Form 70s from Officer Angelini?
10         MR. GLYNN:  Object to characterization.
11  You can answer.
12     A.  I don't recall.
13     Q.  Is there signatures on any of these
14  exhibits other than where the block says "Member's
15  Signature"?
16         Any other signatures on any of these
17  documents?
18     A.  No.
19     Q.  When do you recall having a conversation
20  with Officer Angelini about the Form 70s?
21         MR. GLYNN:  Object to characterization.

**PLAINTIFF EXHIBIT 10**

**Page 38**

1  You can answer.

2      A.  So I remember having a conversation with

3  Angelini about it.  I don't remember the sequence of

4  events; when it took place or when it was.  I just

5  don't remember the sequence.  I do remember the

6  conversation though.

7      Q.  What do you recall about that conversation,

8  if anything?

9      A.  I remember Angelini coming to my office,

10  and I remember explaining to Angelini that he needed

11  to resubmit his 70 putting the EEOC indication that

12  he wrote on the 70, which I told him was an improper

13  document, for him to write it on the appropriate

14  document, which would have been an administrative

15  report, so that it could be forwarded to the

16  necessary location.

17      Q.  What else did you talk about in that

18  conversation, if anything?

19      A.  I really don't recall.  I remember it being

20  a pleasant conversation.  I remember Angelini being

21  very cordial.  It wasn't contentious at all, but I

**Page 39**

1  can't tell you exactly the details of it.

2      Q.  So your firsthand interaction with Officer

3  Angelini was, you characterize it, cordial?

4      A.  Yes.  We didn't have any issues.

5      Q.  Do you recall telling him, You can't write

6  information about being in a hostile work

7  environment in a Form 70?

8      A.  So I recall telling him that there was an

9  appropriate format in which to document his

10  concerns.

11      Q.  How many 70s do you ever recall seeing from

12  Officer Angelini?

13      A.  I only remember seeing one to be honest

14  with you.

15      Q.  Do you recall telling Officer Angelini that

16  he was never going to get transferred out of the

17  district?

18      A.  Never.

19      Q.  Do you recall agreeing to move Officer

20  Angelini to another shift?

21      A.  I vaguely remember agreeing to move him to

**Page 40**

1  another shift.

2      Q.  Was his preference to move to a different

3  district, if you recall, or move to another shift?

4      A.  It would have been both, because Form 70 is

5  to request to move to another district.

6      Q.  So he submitted a Form 70 then to move to

7  another shift?

8      A.  No.  A 70 is submitted to move to another

9  district.  He would have asked to move to another

10  shift or submit an administrative report to move to

11  another shift.  You don't have to do a 70 to move to

12  another shift.

13      Q.  Where would that administrative report to

14  change shifts go?

15      A.  It would go through the same chain as the

16  70.  It would go to his supervisors and then to me.

17      Q.  Would it go past you to headquarters?

18      A.  It shouldn't have.

19      Q.  But a Form 70 would have to go past you to

20  headquarters?

21      A.  Correct.  It doesn't go past me.  It comes

**Page 41**

1  to me first and then goes to headquarters.

2      Q.  Do you remember having a conversation with

3  Lieutenant Norris from EEOC about Officer Angelini?

4      A.  I vaguely remember.

5      Q.  Do you recall what the subject matter of

6  that conversation was?

7      A.  I do not.

8      Q.  Do you recall the subject matter of the

9  phone call being about Sergeant Brickus?

10      A.  I don't recall.

11      Q.  Let me ask you a question.  Are you

12  familiar at all, as a commanding officer in the

13  Baltimore City Police Department, how officers are

14  notified of the disposition of EEOC matters and

15  complaints?

16      A.  Not that familiar.

17      Q.  In other words, if someone makes a

18  complaint to EEOC, EEOC investigates it, is the

19  officer supposed to get notified of the outcome?

20      A.  I'm not sure.  Once it leaves the district,

21  we don't discuss it.

PLAINTIFF EXHIBIT 10

**Page 42**

1      Q.  Do you recall telling Laura Giantris that
2  supervisors talked about him because of his
3  behaviors?
4      A.  I don't recall.
5          (Exhibit No. 8, Confidential
6  Memorandum, marked for identification.)
7      Q.  (By Mr. Nachtman) I'm going to show you
8  what's been marked as Exhibit No. 8.
9      A.  Okay.
10     Q.  Have you ever seen that document before?
11     A.  Not that I can recall.
12     Q.  Do me a favor and take a look at it.
13     A.  Okay.
14     Q.  Have you ever seen that document before?
15     A.  Not that I can recall.
16     Q.  And you weren't at Southeast District at
17  least as of the date of this document?
18     A.  No, I was not.
19         (Exhibit No. 9, Confidential
20  Memorandum, marked for identification.)
21     Q.  (By Mr. Nachtman) I'm going to show you

**Page 43**

1  what's been marked as Exhibit No. 9.
2          Have you ever seen that document before?
3      A.  No, I have not.  Not that I can recall.
4      Q.  Who made you aware of, if at all, an
5  October 2012 EEOC complaint?
6          MR. GLYNN:  Object to characterization.
7      A.  I don't even know.
8      Q.  Did you ever talk to Sergeant Brickus about
9  an October 2012 EEOC complaint?
10     A.  I can't really remember.  I can't remember.
11     Q.  Who, if anyone, did you talk to regarding
12  an October 2012 EEOC complaint that you can recall?
13     A.  I don't even recall talking to anybody
14  about it.  I can't recall.
15         (Exhibit No. 10, Form 70, marked for
16  identification.)
17     Q.  (By Mr. Nachtman) I'm going to show you a
18  Form 70 that's dated February 18, 2013.
19         Do you recognize any of the signatures on
20  this document?
21     A.  In the supervisor's block, that's Sergeant

**Page 44**

1  Brickus's signature.
2      Q.  What about in the commanding officer's
3  block and the recommendation?
4      A.  I can't make it out.  It looks like the
5  beginning of it is "Major," but I can't really make
6  it out.
7      Q.  If it says "Major," who would that be?
8      A.  It would have to be Bill Davis.
9      Q.  Have you ever seen this document before?
10     A.  Not that I can recall.
11     Q.  Can you read for me the reason for the
12  request that's in that open space?
13     A.  Reason For Request:  I'm in a hostile work
14  environment and fear that I will be retaliated
15  against.  This is the second request for a transfer.
16     Q.  Do you know what happened to that request
17  form?
18     A.  I do not.
19     Q.  I'm showing you what's going to be
20  collectively -- because they're dated the same date
21  -- marked as Exhibit No. 11.

**Page 45**

1          (Exhibit No. 11, Two Form 70s, marked
2  for identification.)
3      Q.  (By Mr. Nachtman) Could you take a look at
4  Exhibit 11?  It's a two-page document.  These are
5  both dated April 23rd.
6      A.  Okay.
7      Q.  Have you ever seen those Form 70s before?
8  They are dated April 23, 2013, collectively Exhibit
9  11.
10     A.  No.  Not that I can recall.
11     Q.  They're not signed by anyone, are they?
12  Other than the member's signature block.
13     A.  Correct, not signed by anyone.
14     Q.  Are you familiar with Lieutenant Norris?
15     A.  I know who he is.
16     Q.  Did he later become a supervisor at
17  internal affairs?  If you know.
18     A.  I don't recall.  Maybe SIRT.  I can't tell
19  you what the acronym stands for.
20     Q.  What's SIRT?  You don't know.
21     A.  I don't.

PLAINTIFF EXHIBIT 10

**Page 46**

1     Q. You said you were personal friends with at
2 the time Sergeant Brickus, is that right?
3     A. Correct.
4     Q. Are you familiar with what vehicle she
5 drove?
6     A. At that time?
7     Q. Yes.
8     A. Maybe a little BMW truck.
9     Q. Were you familiar with at the time Sergeant
10 Drennon's vehicle?
11     A. No, I was not.
12     (Exhibit Nos. 12 and 13, Color
13 Photographs, marked for identification.)
14     Q. (By Mr. Nachtman) Can you take a look at
15 Exhibit 12 please?
16     A. Uh-huh.
17     Q. Do you recognize that car?
18     A. No.
19     Q. Do you recognize the sign behind that car?
20     A. It says "Administrative Lieutenant."
21     Q. Are you familiar with the Southeast

**Page 47**

1 District parking lot?
2     A. Somewhat.
3     Q. I know you parked there for six months five
4 years ago. I understand.
5     A. I knew where my spot was.
6     Q. So you don't recognize this vehicle?
7     A. Is this Sergeant Brickus's car?
8     Q. Unfortunately, I can't answer that question
9 for you. So I'm stuck with your answer.
10     A. I don't know.
11     Q. Take a look at that.
12     A. Okay.
13     Q. There's a sign depicted in Exhibit 13.
14     A. Yes.
15     Q. Is that the spot in question regarding this
16 parking dispute?
17     A. To be honest with you, I don't even know
18 where the spot was.
19     Q. Did the signs ultimately get taken down?
20     A. I have no idea.
21     (Recess was taken.)

**Page 48**

1     Q. (By Mr. Nachtman) I'm going to direct your
2 attention to the 4th of July 2013.
3     A. Okay.
4     Q. Do you recall receiving any telephone calls
5 or working that day and receiving information from a
6 Sergeant Brokus?
7     A. Not that I can recall.
8     Q. Do you recall Sergeant Brokus ordering
9 Officer Angelini to Mercy Hospital?
10     MR. GLYNN: Object to characterization.
11 You can answer.
12     A. Not that I remember.
13     Q. Did you ever receive a telephone call or
14 email or text message or any type of communication
15 from Sergeant Brokus on or around July 4, 2013?
16     A. I don't remember.
17     Q. If Sergeant Brokus had called you about an
18 officer who called in sick, if he was acting
19 lieutenant that day, and he had ordered someone to
20 Mercy Hospital, is that something that would stick
21 out in your memory?

**Page 49**

1     A. Immediate memory; not five years ago. I'm
2 trying here. I don't remember.
3     Q. That's fine. If Sergeant Brokus claimed
4 that you instructed him to take Officer Angelini to
5 Mercy Hospital, is that something that may have
6 occurred?
7     MR. GLYNN: Object to characterization.
8     A. I really don't know. I can't remember.
9     Q. On any regular shift, based on your
10 experience of 21 years in the Baltimore City Police
11 Department, who is the chain of command for any
12 sergeant of a patrol unit?
13     A. The sergeant immediately reports to a
14 lieutenant, unless he's the acting lieutenant for
15 that day. If he's the acting lieutenant, he reports
16 to the captain. If the captain is absent, he would
17 report to the major.
18     Q. So there would be sergeant, lieutenant,
19 captain, major.
20     A. Yes. That's the chain of command.
21     Q. Do you recall on January 18, 2013 what the

**PLAINTIFF EXHIBIT 10**



**Page 50**

1  chain of command would have been for the 3:00 to

2  12:00 shift?

3      A.  No.

4      Q.  If a lieutenant was working that particular

5  day and a supervisor for Sergeant Brickus, would

6  that have been her appropriate chain of command?

7      A.  Yes.

8      Q.  If there was a lieutenant who was working

9  on January 18th, she should have brought whatever

10  issue she had with Drennon and Angelini to that

11  person's attention?

12          MR. GLYNN:  Object to form.  You can

13  answer.

14      A.  Yes.

15      Q.  If you know.  Are Sergeant Drennon and

16  Captain Brickus friends socially?

17      A.  I really don't know.

18

**Page 51**

6

9

**Page 52**

1

**Page 53**

1

19  EXAMINATION BY MR. GLYNN:

20      Q.  Major Burrus, I will be brief.  My name is

21  Colin Glynn.  For the record, I represent the

**PLAINTIFF EXHIBIT 10**

Page 54

1 Baltimore Police Department in this matter.

2        Bear with me, while I dig through this

3 pile.

4        Do you remember this Exhibit 2, General

5 Order 5-87 at the top?

6      A. Yes.

7      Q. Does General Order Q-7 before you, as your

8 understanding of reading the document, set forth

9 every single possible thing that an officer and any

10 level of supervisor can and must do with regard to a

11 transfer?

12      A. No.

13      Q. Is it generic in some forms?

14      A. Somewhat.

15      Q. Does the document in front of you prohibit

16 you from advising an officer as to how to fill out a

17 form, that is, Form 70, specifically?

18      A. No, it does not prohibit me from explaining

19 it to an officer.

20      Q. Does the document in front of you prohibit

21 you from returning that form unsigned to an officer

Page 55

1 after providing advice on how to fill out the form?

2      A. It does not prohibit me.

3      Q. Does the document in front of you prohibit

4 you from hypothetically tearing a Form 70 that's

5 been submitted to you that you have returned to an

6 officer with advice on how to fill out the form?

7      A. It does not.

8      Q. Are you aware of any other rule applicable

9 to officers BPD wide that would have prohibited you

10 from tearing the piece of paper that counsel for the

11 plaintiff has shown you before, the three pieces of

12 paper that were torn up?

13      A. No, I do not.

14      Q. Do you remember counsel for plaintiff

15 asking you questions about a suspension that you

16 ordered for plaintiff, Steven Angelini, in

17 mid-January of 2013?

18      A. Yes.

19      Q. Do you have a specific recollection of

20 ordering that suspension?

21      A. I have a vague recollection of it.

Page 56

1      Q. To your recollection, what are the

2 consequences of the type of suspension you imposed?

3      A. So the process is that an officer would be

4 suspended. He would then be afforded a suspension

5 hearing to determine whether the suspension would

6 remain or if he would be given his powers back.

7      And then a charge may have been drafted and

8 a possible discipline would be rendered, one way or

9 the other.

10      Q. When you say whether "he would be given his

11 powers back," was the suspension a suspension of

12 powers or was he sent home and told not to work?

13      A. No. He was suspended of his police powers,

14 and he was to report to work every day.

15      Q. To the best of your knowledge, did Officer

16 Angelini continue to work during the period of any

17 suspension in 2013?

18      A. I don't remember.

19      Q. Did you have any role in the approval

20 process at the hearing over the suspension?

21      A. No. No.

Page 57

1      Q. Would that decision have been made by

2 someone above you in the chain of command?

3      A. Correct. It would have been made by a

4 chief of patrol or whoever was acting in his

5 absence.

6      Q. Do you have any specific recollection of

7 ever being told by Sergeant -- now Captain Ettice

8 Brickus that, plaintiff, Steven Angelini had made a

9 complaint against her personally?

10      A. I can't recall. I really can't.

11      Q. Do you remember ever hearing about such a

12 thing from any other person other than from officers

13 at the Baltimore Police Department's EEOC or EODS

14 division?

15      A. Not that I can recall.

16      Q. Do you recall any conversation within the

17 Southeast District about Officer Angelini's

18 sexuality?

19      A. No.

20      Q. Do you recall any conversation in the

21 Southeast District about Officer Angelini's family?

**PLAINTIFF EXHIBIT 10**

**Page 58**

1    A.  No.

2         MR. GLYNN:  I have no further

3    questions.

4         MR. NACHTMAN:  Nothing else.  Thank

5    you.

6              (Read and sign.)

7              (Whereupon the deposition was concluded

8    at 11:15 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

**Page 60**

1              CERTIFICATE

2    STATE OF MARYLAND

3    COUNTY OF BALTIMORE, to wit:

4         I, Ann M. Lavoie, a Notary Public of the

5    State of Maryland, County of Baltimore, do hereby

6    certify that the within-named witness personally

7    appeared before me at the time and place herein set

8    out, and after having been duly sworn by me,

9    according to law, was examined by counsel.

10        I further certify that the deposition was

11   recorded stenographically by me and this transcript

12   is a true record of the proceedings.

13        I further certify that I am not of counsel

14   to any of the parties, nor in any way interested in

15   the outcome of this action.

16        As witness my hand and notarial seal this

17   25th day of September, 2018.

18                     *Ann Lavoie*

                       Ann M. Lavoie

19                     Notary Public

20                     My Commission Expires:

                       October 17, 2021

21

**Page 59**

1              CERTIFICATE OF DEPONENT

2

3         I, Kimberly Burrus, do hereby certify

4    that I have read the foregoing transcript of my

5    deposition, and the same is a true and accurate

6    transcription of my testimony, with the exception of

7    the following additions, deletions, or corrections,

8    if any:

9    PAGE LINE      READS         SHOULD READ

10

11

12

13

14

15

16   Job #7097f

17   _____ I have no corrections.

18   Deponent's Signature:_____.

19                   Kimberly Burrus

20   Date:_____

21   Date of Deposition:  September 10, 2018     CR: AML

**PLAINTIFF EXHIBIT 10**