Page 2

```
 1        Videotape Deposition of OFFICER STEVEN U.
 2   ANGELINI, held at the offices of:
 3
 4
 5
 6             Baltimore Police Headquarters
 7             601 East Fayette Street
 8             Legal Affairs Division
 9             Baltimore, Maryland 21202
10
11
12
13        Pursuant to Notice, before Susan Farrell
14   Smith, Notary Public for the State of Maryland.
15
16
17
18
19
20
21
22
```

Page 3

```
 1   APPEARANCES:
 2             Eldridge Nachtman &Crandell, LLC
 3             KURT NACHTMAN, ESQUIRE
 4             kurt@enlawyers.com
 5             217 North Charles Street
 6             3rd Floor
 7             Baltimore, Maryland 21202
 8             443.559.4384
 9                  On behalf of the Plaintiff
10
11             Baltimore City Law Department
12             COLIN GLYNN, ESQUIRE
13             colin.glynn@baltimorepolice.org
14             KAY N. HARDING, ESQUIRE
15             100 N. Holliday Street
16             Suite 101 - City Hall
17             Baltimore, Maryland 21202
18             443.984.2301
19                  On behalf of the Defendant
20
21   REPORTED BY:  Susan Farrell Smith
22   THE VIDEOGRAPHER:  Brian Mackey
```

Page 4

```
 1                  EXAMINATION INDEX
 2
     OFFICER STEVEN U. ANGELINI
 3     BY MR. GLYNN . . . . . . . . . . . . . . . .    9
       BY MR. NACHTMAN  . . . . . . . . . . . . . .  387
 4     FURTHER BY MR. GLYNN . . . . . . . . . . . .  441
 5
 6                  EXHIBIT INDEX
 7
     ANGELINI DEPOSITION EXHIBIT
 8   Exhibit 1  Notice of Deposition               9
 9   Exhibit 2  Complaint                         12
10   Exhibit 3  Charge of discrimination          17
11   Exhibit 4  Packet of commendations           22
12   Exhibit 5  BPD Personnel Cardex              24
13   Exhibit 6  SED District, roll call book      38
14   Exhibit 7  Domestic incident report          48
15   Exhibit 8  Photos, BPD.00433 to 440          62
16   Exhibit 9  Report Form 9295, 10/3/12          64
17   Exhibit 10 Request for transfer 10/3/12       68
18   Exhibit 11 Discrimination complaint form      97
19   Exhibit 12 Form 92/95, 10/5/12              104
20   Exhibit 13 11/21/12 memo to Capt. Matthews  106
21   Exhibit 14 2/1/13 letter from Lt. Norris    111
22
```

Page 5

```
 1   Exhibit 15 11/8/12 memo to all personnel, re: 115
                parking
 2
     Exhibit 16 Form 92/95, 1/17/13, re: parking  150
 3
     Exhibit 17 Group of documents, re: suspension 159
 4
     Exhibit 18 1/29/13 to IID, re: suspension    165
 5              hearing
 6   Exhibit 19 Notice of personnel action, 2/2/13 170
 7   Exhibit 20 Form 92/95, 2/18/13, re: EEOC      176
                complaint
 8
     Exhibit 21 Form 70, 2/18/13                  177
 9
     Exhibit 22 Form 92/95, re: Federal EEOC,     183
10              3/13/13
11   Exhibit 23 E-mail 7/17/13, re: The reason I   199
                took the gun down
12
     Exhibit 24 Form 92/95, 4/21/13, re:          201
13              inappropriate comment
14   Exhibit 25 Form 92/95, 4/21/13, re: request  205
                for shift transfer
15
     Exhibit 26 Form 70 transfer requests         206
16
     Exhibit 27 Form 92/95, 4/23/13, with and     209
17              without handwriting, re: SED
18   Exhibit 28 Form 92/95, 6/12/13, re: need new  212
                equipment
19
     Exhibit 29 Form 92/95, 6/26/13, re: SED      216
20              retaliation
21   Exhibit 30 Protecting yourself against       222
                heat-related illnesses
22
```

Page 6

| | |
|---|---|
| Exhibit 31 Mercy Medical Center 6/29/13 visit | 223 |
| Exhibit 32 Discharge instructions, 6/29/13 | 230 |
| Exhibit 33 Discharge instructions, PSI | 233 |
| Exhibit 34 Work schedule | 235 |
| Exhibit 35 E-mail, 7/6/13, text message | 242 |
| Exhibit 36 Photographs, e-mails | 245 |
| Exhibit 37 Mercy discharge instructions | 249 |
| Exhibit 38 Form 92/95, 7/25/13, re: Late for work | 253 |
| Exhibit 39 Form 70, 7/4/13 | 254 |
| Exhibit 40 Form 92/95, re: Form 70 torn up | 259 |
| Exhibit 41 Letter to Batts | 259 |
| Exhibit 42 Form 92/95, 7/28/13, re: Police infor report | 266 |
| Exhibit 43 Form 92/95, 7/28/13, re: Report handed in (handwritten) | 267 |
| Exhibit 44 Form 92/95, 7/31/13, re: EEOC complaint | 279 |
| Exhibit 45 Form 92/95, 8/6/13, re: Facebook/District comments | 280 |
| Exhibit 46 Text message | 282 |
| Exhibit 47 Form 70, 7/28/13 | 285 |
| Exhibit 48 Form 92/95, 8/14/13, re: Sgt. Jackson gives direct order | 294 |

Page 7

Exhibit 49 Transcript of interview 10/21/13   303

Exhibit 50 Transcript of interview 4/14/14   304

Exhibit 51 Plaintiff's Answers to   307
    Interrogatories
Exhibit 52 Charges   370
Exhibit 53 Charges   377
Exhibit 54 Charges   379
Exhibit 55 Charges   380
Exhibit 56 11 photographs   408

    (Exhibits attached.)

Page 8

1    PROCEEDINGS
2        THE VIDEOGRAPHER: Here begins Tape No. 1
3    in the deposition of Steven Angelini in the
4    matter of Steven Angelini versus the Baltimore
5    Police Department in the United States District
6    Court for the District of Maryland. Case
7    No. 1:17-CV-2354-ELH.
8        Today's date is September 13th, 2018.
9    The time is 9:30 a.m. The video operator today
10   is Brian Mackey. This deposition is taking
11   place at 601 East Fayette Street, Baltimore,
12   Maryland.
13       Counsel please identify themselves and
14   state whom they represent.
15       MR. GLYNN: My name is Colin Glynn. I
16   represent the Baltimore Police Department.
17       MR. NACHTMAN: Good morning. For the
18   record, my name is Kurt Nachtman. I represent
19   Mr. Steven Angelini who is at the table to my
20   immediate left.
21       THE VIDEOGRAPHER: The Court Reporter
22   today is Sue Smith. Will the Reporter please

Page 9

1    swear in the witness.
2            -- OO --
3        OFFICER STEVEN U. ANGELINI,
4    the Plaintiff, called for oral examination by
5    counsel for the Defendant, having declared and
6    affirmed under the penalties of perjury to tell the
7    truth, was examined and testified as follows:
8            EXAMINATION
9    BY MR. GLYNN:
10   **Q. Ready to go? Good morning, Mr. Angelini.**
11   A. Good morning.
12   **Q. My name is Colin Glynn, and we've met**
13   **before. I am the attorney representing the**
14   **Baltimore Police Department, the Defendant you have**
15   **sued in this lawsuit, and I'm going to be taking**
16   **your deposition today.**
17       **I want to start by showing you a document**
18   **we'll mark as Exhibit 1.**
19       (Whereupon Angelini Deposition Exhibit 1
20   was marked.)
21   **Q. It is titled Notice to Take -- Notice of**
22   **Deposition. Have you seen this document before?**

Page 10

1    A.   Can you give me a few seconds to review

2 it?

3    Q.   Absolutely, sure.

4    A.   No, I -- I never seen this actual

5 document.

6    Q.   Do you understand that you're here to

7 have your deposition taken?

8    A.   Yes.

9    Q.   Have you ever been deposed before?

10   A.   No, sir.

11   Q.   Do you understand what a deposition is?

12   A.   Yes.

13   Q.   Could you explain to me what you think a

14 deposition is?

15   A.   What I believe the deposition is -- is

16 taken for, is for both parties in a lawsuit prior to

17 any court proceedings, every witness is taped,

18 either audio or visually taped.

19        You will ask me questions pertaining to

20 the -- the lawsuit filed against Baltimore Police

21 Department and try to obtain any information from me

22 regarding the case.

Page 11

1    Q.   So, to begin with, thank you. I want to

2 make a few simple requests. First, I need to ask

3 that you always wait until after I finish a question

4 before you give your response.

5        The Court Reporter to my right, your left

6 is taking down what we say, and she will have a hard

7 doing time that if more than one of us is talking.

8 Not to impugn her quality, she may be able to listen

9 to two people at once.

10       I'm going to try and make this as

11 conversational as possible. But for the benefit of

12 the record, it's helpful if we take turns.

13       Second, I would ask that you always try

14 and answer with a clear verbal response, like a yes

15 or a no or a sentence. The Court Reporter might

16 have a hard time with head nods, uh-huh, things like

17 that, and they make a transcript hard to read.

18       Third, I'm going to assume that if I ask

19 a question and you -- and you answer it, that you

20 understand the question. If at any time I'm not

21 clear or you don't understand the question, please

22 go ahead and let me know that you don't understand

Page 12

1 the question. I'll try and rephrase it so that

2 we're on the same page.

3        Fourth, this might take a while. So,

4 we'll probably take a few breaks throughout the day.

5 If at any time you need to go to the restroom,

6 please let me know. I'll try to accommodate, though

7 I may ask you to finish answering a question or a

8 particular line of questions.

9        All right. Is all of that fine with you?

10   A.   Yes.

11   Q.   Do you have any -- all right. Are you on

12 any medications or other substances today that would

13 impact your ability to be truthful or candid?

14   A.   No.

15   Q.   I'm showing you a document marked as

16 Exhibit 2.

17       (Whereupon Angelini Deposition Exhibit 2

18 was marked.)

19       MR. GLYNN: Thank you very much.

20   Q.   Can you identify this document for me?

21   A.   Sure, sir.

22   Q.   Do you know what it is?

Page 13

1    A.   Can -- can you -- can you give me a

2 minute to review it?

3    Q.   Sure, take a moment.

4    A.   Thanks. (Complies.)

5    Q.   Do you know what this document is?

6    A.   It appears to be the Complaint filed in

7 Federal Court against the Baltimore Police

8 Department.

9    Q.   Did you review this document prior to

10 coming here today?

11   A.   I reviewed it a while back when we

12 initially filed the Complaint against the Baltimore

13 Police Department.

14   Q.   All right. We're going to refer back to

15 this document, Exhibit 2, throughout today. So,

16 although there will be other exhibits that we may or

17 may not come back to, please hold onto that and --

18 so that we don't have to go looking for it.

19       Did you review any other documents in

20 preparation for today's deposition that you

21 remember?

22   A.   Yes.

Plaintiff Exhibit 37

1 Q. Do you remember what documents they were?

2 A. Yes.

3 Q. What were they?

4 A. Those documents were any 95s or 70s,

5 trying for a request. And all documents that were

6 provided to the Baltimore Police Department through

7 discovery.

8 Q. Other than your attorney, did you speak

9 with anyone about your deposition or in preparation

10 for your deposition?

11 A. Yes.

12 Q. Who?

13 A. My wife.

14 Q. Anyone else?

15 A. No.

16 Q. What is your date of birth?

17 A. My date of birth is [redacted].

18 Q. When were you born? Or, rather, where

19 were you born?

20 A. In Baltimore, Maryland.

21 Q. What is your gender?

22 A. Male.

1 Q. Male?

2 A. Yes.

3 Q. What is your current address?

4 A. 402 Kosoak Road, Middle River, Maryland

5 21220.

6 Q. How do you spell that street?

7 A. It's K as in king, O as in ocean, Sam as

8 in -- S as in Sam, O as in ocean, A as in Adam, K as

9 in king.

10 Q. Do you live with anyone there?

11 A. Yes, I do.

12 Q. Who do you live with?

13 A. I live with my wife, my 12-year old

14 daughter and my dog.

15 Q. What's your daughter's name?

16 A. Sienna.

17 Q. Sienna?

18 A. Sienna.

19 Q. What's your wife's name?

20 A. My wife's name is Jessica.

21 Q. On what date did you become married?

22 A. Back -- I was married in 2005.

1 Q. Have you ever been married before?

2 A. No.

3 Q. What are your parents' names?

4 A. My mom's name is Salvena, also -- her

5 real name is Salvatrice, but she's also goes by

6 Salvena Angelini. And my father's name is Nello

7 Dominick Angelini.

8 Q. Are your parents still living?

9 A. Yes.

10 Q. Were they ever married?

11 A. Yes.

12 Q. Are they still married?

13 A. Yes.

14 Q. If you know, what year did they marry?

15 A. I'm not -- I'm not actually sure the day

16 they were married. It was -- I believe they were

17 married sometime before my older brother was born.

18 Q. So, do you have siblings?

19 A. Yes.

20 Q. How many?

21 A. Three.

22 Q. What are their names?

1 A. My older brother is Roberto Angelini.

2 Then I was born. Then it was my brother Marco

3 Angelini. And then my brother Michael Angelini.

4 Q. How old are your brothers?

5 A. My oldest brother Roberto is three years

6 older than I am, which I'm 38 at this time. Then my

7 brother Marco, he is a year and a half younger than

8 me, I believe, a year and a half. He was born

9 January 25th, 2000 -- excuse me, 2000 -- 1982. And

10 Michael Angelini, he was born in 1984.

11 Q. All right. So, let's take a look at

12 Exhibit No. 2. Can you turn to Page 2? The page

13 numbers are numbered at the bottom. Can you locate

14 Paragraph 5? Do you see Paragraph 5?

15 A. Yeah, I see it. Do you want me to read

16 it?

17 Q. You can while I do that. I'm going to

18 show you a document. We'll mark it as Exhibit 3.

19 (Whereupon Angelini Deposition Exhibit 3

20 was marked.)

21 THE WITNESS: Is this mine?

22 THE REPORTER: Yes.

Page 18

1 Q. Can you identify this document? Take a
2 moment to look at it if you need.
3 A. Sure. (Complies.)
4 Q. Are you ready?
5 A. Uh-huh.
6 Q. What is this document?
7 A. This is a document, that when I went down
8 to the Federal EEOC, that the female Federal agent
9 or, I'm not sure of her exact title, wrote a
10 Complaint up against the Baltimore City Police
11 Department.
12 Q. Is this -- if we look at Paragraph 5, is
13 this the charge of discrimination referenced in
14 Paragraph 5?
15    MR. NACHTMAN: Objection to the extent
16 that it calls for a legal conclusion. You can
17 answer.
18 A. Okay. The best of my recollection, I
19 believe this is.
20 Q. Have you ever filed any other charge of
21 discrimination documents like this before?
22    MR. NACHTMAN: Objection to the extent

Page 19

1 that it's calling for a legal conclusion and
2 opinion.
3 Q. You can answer the question.
4 A. Okay.
5    MR. NACHTMAN: You can answer.
6 A. Sir, can you re -- rephrase the question
7 though?
8    MR. NACHTMAN: As -- as a ground rule,
9 from time-to-time, you've heard me say this
10 before in depositions, I may make objections.
11 If you don't hear me instruct you not to
12 answer, you can answer the question.
13    THE WITNESS: I just give it a brief
14 pause just in case.
15    MR. NACHTMAN: Fine, no problem.
16 Q. Is my question confusing you?
17 A. Yes, it is.
18 Q. All right. You remember you went down to
19 the EEOC you just said and filled out a form that
20 you believe was this form?
21 A. Yes. Can you specify which EEOC though?
22 Q. I'm sorry. When I say the EEOC, as a

Page 20

1 matter of a ground rule, I'm going to be referring
2 to the Federal agency, the EEOC. If -- I know the
3 Baltimore Police Department used to have a unit
4 called EEOC. That unit is now called EODS.
5    If I refer to that unit, I'm going to
6 refer to that unit as EODS just for consistency with
7 this. And if at any point you have a question about
8 which I'm referring to, please always ask for
9 clarification.
10    But I'm going to assume you understand
11 that EEOC means the Federal Government and EODS
12 means Baltimore Police Department's EEO division.
13 A. Thank you for clearing that for me --
14 Q. All right.
15 A. -- because I didn't know which.
16 Q. So, did you ever filed a charge of
17 discrimination with an outside, not Baltimore Police
18 Department entity, the Federal EEOC or any State or
19 local equivalent other than this document?
20 A. No, sir.
21 Q. Turning back to the Complaint, could you
22 turn to Page 3 and locate Paragraph 12?

Page 21

1 Paragraph 12 reads in part, he was a decorated
2 officer while posted at all assignments prior to the
3 Southeast District.
4    Do you see that?
5 A. Yes, sir.
6 Q. What decorations specifically are you
7 referring to in Paragraph 12? Do you remember them?
8 A. What I re -- I'm sorry, the question is,
9 you -- is what decorations, what like commendations
10 I received?
11 Q. Whatever you're referring to there --
12 A. Oh.
13 Q. -- In Paragraph 12, do you remember
14 specifically what -- it says decorated officer. Do
15 you remember whatever decorations you were referring
16 to in that paragraph?
17 A. Yes.
18 Q. What decorations were you referring to?
19 A. I received numerous amounts of officer of
20 the month. I received a letter of commendations for
21 guns and robbery suspects that I apprehended.
22    I received a letter -- specifically

Page 22

1 remember this one, a letter from Internal Affairs
2 Division from a lieutenant stating that he
3 appreciated my -- the way I handled myself when I
4 did -- conducted a traffic stop and wrote an
5 individual a citation. He was -- that he wanted to
6 make a compliment, which isn't usually done down in
7 Internal Affairs, on my behalf.
8          There -- there is -- there is numerous
9 accommodations (sic) which were provided in this
10 case in the discovery that off my head, I don't know
11 right now specifically. But it was -- it was a lot.
12    Q.   I'm going to show you a collection of
13 documents. We'll call this Exhibit 4, I believe.
14          (Whereupon Angelini Deposition Exhibit 4
15 was marked.)
16    Q.   Could you take a moment and flip through
17 that packet?
18    A.   (Complies.)
19    Q.   Are you ready?
20    A.   Yes, sir.
21    Q.   Are these the decorations that you
22 referred to in Paragraph 12?

Page 23

1          MR. NACHTMAN: I'll -- I'll object, and I
2 just want to make a procedural objection. I
3 think some of these documents have notations on
4 them. I'm not sure who has the notations on
5 them. And then they -- they appear to have
6 different Bates stamping. I think it's
7 actually my Bates stamping, but there seem to
8 be some duplicates.
9          MR. GLYNN: There are some that are --
10 that were produced by the BPD and some produced
11 by you. So, they're just together.
12          MR. NACHTMAN: I'm just -- I'm just
13 making a procedural objection to the
14 admissibility of the documents later on at
15 trial. So, to the extent that you're able to,
16 you can answer the question.
17    A.   Sir, can you repeat the question, please?
18    Q.   Allowing for the possible presence of
19 handwriting on these documents, are these the
20 documents or at least some of the documents that you
21 referred to as the commendations in Paragraph 12?
22    A.   From the best of rec -- my recollection

Page 24

1 today, yes, these are the documents that I was --
2 some of the documents I was talking about.
3    Q.   Do you have any other documents in your
4 possession that are not in this that would be
5 commendations that you received prior to 2012?
6          MR. NACHTMAN: Objection. Form. If you
7 know.
8    A.   I'm not sure that all are present to the
9 best of my recollection today because of the
10 numerous cit -- accommodations (sic) I received in
11 the past.
12    Q.   I'm showing you a document we'll mark as
13 Exhibit 5.
14          (Whereupon Angelini Deposition Exhibit 5
15 was marked.)
16    Q.   Do you know what this document is?
17    A.   Can you give me a second, sir?
18    Q.   Go for it.
19    A.   (Complies.) It -- it appears to be a
20 document part of the Police Department which
21 indicates up top of my, how do I say it, my -- my
22 assignments in -- in the Police Department.

Page 25

1    Q.   To the best of your recollection, does
2 the top part of this document accurately reflect the
3 various assignments and transfers you have received
4 while working for the BPD?
5    A.   If you give me a few seconds to look
6 through it.
7    Q.   Take your time.
8    A.   (Complies.) I believe there's one
9 missing, but it -- this -- it appears to be
10 consistent with what I recall of my assignments in
11 the North -- in -- in the Police Department.
12    Q.   What's missing?
13    A.   So, in 2000 -- when I was in VCID and
14 went to Northwest VCID at first -- originally 2008.
15 And then I was permanently assigned to VCID in 2009.
16 But then I was requested to be transferred to the
17 East side of VCID, which has a different locator for
18 a few min -- for a few months prior to going to --
19 to the Southeast District.
20          So, I don't -- I believe that should be
21 on there. That's the only thing that I can recall.
22 I was still technically in VCID, but I was

Page 26

1 transferred to a -- to a different side of VCID.
2    Q.   What's a -- what's a locator?
3    A.   So, a locate number is a number used by
4 the Police Department to determine which department
5 you work in within the Po -- Baltimore Police
6 Department.
7    Q.   All right. Starting at the top of
8 Exhibit 5 on the right, let's work down a little bit
9 to where it says date 3/22/'07, detailed to CWO,
10 slash, CSU. Do you see that?
11    A.   Yes, sir.
12    Q.   What does that mean to be detailed to
13 CWO, slash, CSU?
14    A.   That's a term they use when we graduate
15 and we walk foot prior to given our assignments,
16 permanent assignments to a district.
17    Q.   What were your responsibilities while you
18 were in that assignment?
19    A.   Like all my responsibilities as a police
20 officer to serve and protect with integrity of
21 the -- for the Baltimore City residents, to protect
22 and keep them safe.

Page 27

1    Q.   Further down, do you see where it says
2 date 6/2/'07, detailed to Northwestern District, and
3 then below that, transferred to Northwestern
4 District?
5    A.   Yes, sir.
6    Q.   How did you come to be assigned to the
7 Northwestern District?
8    A.   They were -- they were chosen for us
9 downtown.
10    Q.   Was it by request at all?
11    A.   No, sir.
12    Q.   What type of assignment did you have in
13 the Northwest District? Was it patrol, or what was
14 it?
15    A.   I was a patrol officer.
16    Q.   Did you like working in the Northwestern
17 District?
18    A.   Yes.
19    Q.   Do you remember who your supervisor or
20 supervisors were?
21    A.   Yes.
22    Q.   Who were they?

Page 28

1    A.   Sgt. Valorie Casey.
2    Q.   Just the one?
3    A.   She was my sergeant the whole time while
4 I was there. And then a day -- this -- the day
5 before I left for VCID, I received another sergeant.
6 I can't specifically re -- at this time, I don't
7 recall her name.
8    Q.   While you were in the Northwestern
9 District, did you experience any discrimination or
10 harassment?
11    A.   None. No.
12    Q.   Do you recall working while you were in
13 the Northwestern District with another officer named
14 Ettice Brickus?
15    A.   Yes. I didn't work with her, but -- she
16 wasn't on the same shift.
17    Q.   What do you recall of your working
18 relationship, if any, with Ettice Brickus while you
19 were in the Northwestern District?
20    A.   I had no personal relationship with her.
21    Q.   Did you ever speak with her?
22    A.   Just hi or bye. No conversations with

Page 29

1 her.
2    Q.   Did you have any interpersonal issues
3 with Ettice Brickus while you working in the
4 Northwestern District?
5    A.   Not that I recall at this time, no.
6    Q.   Further down the document, do you see
7 where it says date 11/21/'08, detailed to VCID for a
8 period of 60 days, and then below that 1/22/'09,
9 detailed to VCID through 1/28/'09, and then below
10 that, transferred to VCID?
11         Do you see that --
12    A.   Yes.
13    Q.   -- the three entries? What was VCID?
14    A.   VCID stood for Violent Crime Impact
15 Division. It was formed by -- at the time was
16 Deputy Commissioner Barksdale. That was considered
17 his baby. He formed the unit that was originally
18 considered OCD, which stood for Organized Crime
19 Division.
20         He then changed the name and recruited
21 new detectives, and I was chosen for that -- that
22 position. Conduct the plainclothes narcotics and

Page 30

1  gun interaction -- gun recoveries.
2      Q.   Do you know why you came to be detailed
3  and then permanently was transferred to VCID?
4      A.   Yes.  Because I requested to be -- I put
5  in a 70, which at the time to be moved to VCID in
6  which I was later detailed for a while.  And we were
7  watched over for a period of time to see if we were
8  good enough for that unit, like kind of a probation
9  thing.
10          So, my supervisor, who was Sgt. Miller at
11  the time, stated to me exactly, to me and Officer
12  Herman that we had -- would have to earn and show
13  how good our skills were to be in this unit.  And
14  then after the detail was over, he had to make a
15  decision whether or not that I stay in that unit.
16      Q.   What were your responsibilities in VCID?
17  Other than general police officer responsibilities,
18  what was the specific responsibilities that you did
19  while you were in VCID?
20      A.   We were in plainclothes, unmarked
21  vehicles.  We went out -- we were assigned to a
22  specific area in West Baltimore.  They -- I would

Page 31

1  conduct covert operations to -- to catch drug
2  dealing.  I would drive around in an unmarked
3  vehicle so we wouldn't be seen and blend in the
4  public to observe any -- any crimes, felony crimes
5  or misdemeanor crimes.
6          Specifically we were looking for
7  individuals that were carrying guns or that -- that
8  were selling drugs.  I wrote -- we were to write
9  search warrants on houses or businesses or vehicles
10  if we had enough probable cause to write a search
11  warrant to obtain -- to -- to arrest that individual
12  and search their house or their -- or their
13  vehicles.  But mainly we were a nar -- a narcotics
14  unit.
15      Q.   Did you enjoy working in VCID?
16      A.   Yes.
17      Q.   Further down it says, 2/21/'10, detailed
18  to South Dis -- Southeast District.  And than below
19  that, transferred to Southeastern District.  Do you
20  see that?
21      A.   Yes, sir.
22      Q.   Do you know why you came to be detailed

Page 32

1  and then permanently transferred from VCID to the
2  Southeast?
3      A.   So, what I believe, and I've noticed this
4  through my time in the Baltimore City Police
5  Department -- my approximate time is now I just
6  started my 13th year in May.  Whenever a transfer
7  request is -- happens or -- the transfer is always
8  usually labeled as a detail originally, and then
9  later signed by the Commissioner as a permanent
10  spot.
11      Q.   Well, allowing for that, do you know why
12  you transferred to the Southeast District?
13      A.   Yes.
14      Q.   Why?
15      A.   I requested to leave narcotics.
16      Q.   Why did you request to leave narcotics
17  and go to Southeastern?
18      A.   I was burnt out, and I was ready -- ready
19  for a change.
20          MR. NACHTMAN:  Can we take a break?
21          MR. GLYNN:  Okay.  Take a break.
22          THE VIDEOGRAPHER:  We're going off the

Page 33

1  record, the time is 9:59 a.m.
2          (Whereupon a brief recess was taken,
3  after which the following was heard:
4          THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 10:01 a.m.
6      A.   Begin?  To go back to what we were saying
7  about the reason I left to -- drugs to go to the
8  Southeast, there -- there was numerous reasons.  The
9  first one was, I was getting tired in narcotics, and
10  I was getting burned out.
11          Then like the individuals that worked in
12  the East side VCID because I switched over from the
13  Northwest side to the East side, I didn't like the
14  way they -- they conducted their inves -- drug
15  investigations.  The way they treated people on the
16  street.
17          The way they basically did their police
18  work, and I thought it was out of character.  And I
19  didn't want to be around that stuff, and I was ready
20  to go back to patrol.  And I didn't want to be
21  involved in any of it.
22      Q.   Did you find your time in VCID to be

Page 34

1 stressful?

2    A.   Only when -- yes.  Yes.

3    Q.   Did you ever seek help for stress while

4 you were in VCID?

5    A.   Well, when you say stressful, it wasn't

6 stressful to the point where I needed help, just I

7 needed to get out of narcotics.

8    Q.   Now, before we get to your allegations,

9 we'll begin at Paragraph 14 of the Complaint which

10 refers to the incident in January of 2012, I want to

11 ask you a few questions about your time during this

12 first two years in the Southeastern.

13       What shift did you work when you first

14 arrived in the Southeastern, if you remember?

15    A.   Best of rec -- the best of my

16 recollection, it was -- it was -- I can't remember

17 the -- the code number of the unit, but it was on --

18 there's -- there's three different shifts.  It's

19 hard to tell you right now because I don't know

20 the -- the agency code number for that shift.

21       But, you know, we switched shifts.  So,

22 it would be Baker shift and Charley shift, but --

Page 35

1 can you rephrase your question?

2    Q.   Were you on a permanent shift or a

3 rotating shift?

4    A.   Rotating shift.

5    Q.   Were there three shifts with one

6 permanent midnight shift and two rotating day and

7 evening shifts?

8    A.   Yes, sir.

9    Q.   You were -- and you were on the

10 rotating -- one of their two rotating shifts?

11    A.   Yes, sir.

12    Q.   Did that assignment change between

13 arriving in Southeast in 2012, or did you stay on

14 one of the rotating shifts?

15    A.   In 2012?

16    Q.   Yeah.  Between 2010 when you arrived --

17    A.   Yeah.

18    Q.   -- and 2012, did you stay on one of the

19 rotating shifts?

20    A.   No.  Actually we -- I was chosen to have

21 my own unit by the major.

22    Q.   What unit was that?

Page 36

1    A.   It was a -- an enforcement unit in a --

2 most -- one of the -- one of the areas -- one area

3 which was called 225 post was -- at that time, that

4 was a violent part of the City with -- you know,

5 blasted with homicides and high crime.  And the

6 major told me to pick an in -- pick an individual

7 and start a unit.

8    Q.   Which major?

9    A.   Major William Davis.

10    Q.   Did you pick an individual?

11    A.   Yes.

12    Q.   Who was that?

13    A.   I picked Officer Quaranto.

14    Q.   I'm sorry?

15    A.   Officer --

16       MR. NACHTMAN:  Do me a favor.  Your voice

17 is trailing off.  I need to be able to hear

18 you --

19       THE WITNESS:  I'm sorry.

20       MR. NACHTMAN:  -- and most importantly,

21 she needs to be able to hear you.  So, make

22 sure -- it's not the mike.  You just have to

Page 37

1 keep your voice up a little bit.  You're

2 trailing off a little bit.

3    A.   Officer Quaranto.

4       MR. NACHTMAN:  Thank you.

5    Q.   Is that Daniel Quaranto?

6    A.   Yes.

7    Q.   How long did you work in that assignment

8 with Officer Quaranto?

9    A.   To the best of rec -- to my recollection,

10 I believe it was approximately one year.

11    Q.   When did you stop working that

12 assignment, if you remember?

13    A.   From -- best of my recollection, I

14 believe December 2012 was our last year -- no.  I'm

15 not -- I'm not actually -- I'm not -- I'm not sure,

16 sir.  I don't know that date offhand.  And I don't

17 want to give you a date and I'm -- I'm wrong.  It

18 was --

19    Q.   Did you have a supervisor while you were

20 in that unit?

21    A.   Yes, we did.

22    Q.   Who was that?

Page 38

1     A.     His name was Sgt. Kenneth Williams.
2     Q.     Prior to being in that unit, did you have
3  a supervisor in the Southeast?
4     A.     Yes, sir.
5     Q.     Who was that?
6     A.     Sgt. Kenneth Williams.
7     Q.     So, Sgt. Williams supervised you both in
8  the specialized unit you just described and
9  beforehand?
10    A.     Yes, sir.
11    Q.     Do you remember when Sgt. Williams, if
12 ever, stopped being your supervisor?
13    A.     I don't -- I don't recall at this time
14 right now.
15    Q.     I'm showing you a document. We'll call
16 it Exhibit 6.
17           (Whereupon Angelini Deposition Exhibit 6
18    was marked.)
19    Q.     You can take a look at that briefly. You
20 don't need to read it. Just look at it and see what
21 it is.
22    A.     Uh-huh.

Page 39

1     Q.     Do you recognize these documents and what
2  they are? You don't need to recognize every page,
3  but do you recognize what they are?
4     A.     Yes.
5     Q.     What are they?
6     A.     This is the roll call book from the
7  Southeast District back in December of 2011.
8     Q.     Now, these documents have numbering at
9  the top, black numbering that was put on, I assume,
10 by your counsel on these documents produced by you.
11           Did you have possession of these
12 documents prior to them being produced in this case?
13    A.     Can -- I'm sorry, sir, can you re --
14 repeat that question again? I'm sorry.
15    Q.     Did you keep these documents from when
16 you were in the Southeast? Personally, did you make
17 copies of these and just keep them personally? It's
18 not a trick question.
19    A.     Really I -- I don't recall at this time.
20 I don't -- I have so many documents that I don't
21 recall if I specifically have these documents.
22    Q.     To the best of your recollection -- well,

Page 40

1  how would you describe your experience in the
2  Southeastern prior to January 2012?
3     A.     When I originally -- when I first got
4  there up until -- up until -- until an incident
5  which I filed a Complaint on through EOD, it was --
6  I'm sorry. Up until I filed -- up -- up until
7  2000 -- up until late 2011, it was great. I mean, I
8  was recognized by the major and had no issues.
9     Q.     How did the other officers in the
10 Southeastern treat you? Did they treat you well?
11 Badly?
12    A.     The officers I worked with treated me
13 pretty -- pretty fair, yes.
14    Q.     Did you have any friends among the other
15 officers?
16    A.     I did have a specific friend that I --
17 that I considered a friend, not a co-worker outside
18 the agency, yes.
19    Q.     Who was that?
20    A.     Officer Daniel Quaranto.
21    Q.     Let's talk about January 2012 and the
22 incident you described in Paragraph 14 of the

Page 41

1  Complaint, which is on Page 4.
2            I recognize that this is a sensitive
3  issue. So, please bear with me. To the best of
4  your knowledge, how would you describe the sexual
5  orientation of your father?
6     A.     I'm sorry, I'm sorry. Which paragraph
7  are you speaking about again?
8     Q.     Paragraph 14.
9     A.     14.
10    Q.     In January of 2012.
11    A.     May I read that briefly?
12    Q.     Go for it.
13    A.     (Complies.) All right. I'm sorry, what
14 was your question again?
15    Q.     To the best of your knowledge, how would
16 you best describe the sexual orientation of your
17 father, if you know?
18    A.     I determined -- at that time, I -- I
19 didn't know what my -- my father was, if he was
20 bisexual or -- I be -- know he was bisexual, but
21 that's how -- that's what I determined at that time.
22    Q.     So, that was a little confusing there.

Page 42

1  I'm going to ask you to unpack that. So, prior to
2  January 2012, what was your understanding of your
3  father's sexuality, his sexual orientation to be
4  correct?
5      A.   That he was heterosexual.
6      Q.   Did you have any reason to suspect that
7  your father might not be heterosexual prior to
8  January 2012? It's not a trick question.
9      A.   I understand, but I'm trying to think of
10 something in my head. To the best of my
11 recollection at this time, I -- I didn't find out he
12 was bisexual until sometime in January 2012.
13     Q.   Prior to January 2012, had you ever known
14 or suspected that your father was carrying on an
15 extramarital affair?
16     A.   No. No.
17     Q.   Upon learning -- well, strike that.
18          Did you learn in January 2012 that your
19 father was carrying on an extramarital affair?
20     A.   Yes.
21     Q.   Upon learning that your father was
22 carrying on an extramarital affair, how did you

Page 43

1  feel?
2      A.   I was devastated. I was hurt.
3      Q.   What were you hurt by?
4      A.   I was more hurt that my mom -- how my mom
5  would feel. And that -- that he didn't come forward
6  to my mom.
7      Q.   Did the knowledge that your father was
8  carrying on an extramarital affair affect your
9  family?
10     A.   Yes.
11     Q.   How?
12     A.   We were all -- I mean, we, we meaning my
13 family, was devastated. Devastated over -- over how
14 my mom felt and the lies, and what my mom was put
15 through and --
16     Q.   Did the knowledge that your father was a
17 bisexual affect your family independent of the
18 extramarital affair factor?
19     A.   I can't speak for others, but for myself,
20 no.
21     Q.   Just so I understand you. Did the fact
22 that your father was a bisexual affect you or upset

Page 44

1  you in any way?
2      A.   It didn't -- it didn't affect me -- me as
3  far as him being bisexual. It was the whole
4  cheating part and him not being honest with my
5  mother.
6      Q.   Bear with me about this question. Did
7  there ever occur a time -- an instance where you
8  walked in on your father with the individual with
9  whom he was having an extramarital affair?
10     A.   Actually didn't -- I actually didn't walk
11 in, but observed. So, one day I was working in
12 Southeast, and I usually stop at my parents' house
13 because they live in the Southeast District area,
14 patrol area that I walked (sic) in.
15          And I have a key to the house. And what
16 I normally do is, I park the patrol car. I'll get
17 out. And I walk up to the house. I open the screen
18 door. I usually take a look in because they have a
19 glass -- glass thing.
20     Q.   Okay.
21     A.   And when I looked in, I observed my
22 father getting -- and another man and my father

Page 45

1  sitting on -- on the couch and another man giving
2  him oral sex.
3      Q.   Do you remember when that was?
4      A.   Best -- best of my rec -- my recollection
5  is some -- is between January and February of 2012.
6      Q.   Was that after the incident described in
7  Paragraph 14 with the police officer?
8      A.   Sir, I -- I don't know at this time, sir.
9  I couldn't give you an accurate answer.
10     Q.   You don't remember whether it was before
11 or after that incident?
12     A.   Best I remember, I can't -- I can't
13 remember, sir. It was all -- it was all --
14     Q.   How did that particular incident affect
15 you, the one you just described?
16     A.   I was shocked. I was hurt. I was --
17 give me a minute, sir. I mean, I was devastated.
18     Q.   Were you more hurt by the fact that he
19 was having an extramarital affair or by the rest of
20 the experience? Without getting into any detail,
21 I'm not trying to intrude.
22     A.   Both.

Page 46

1    Q.   So, let's look at Paragraph 14. What do
2  you personally remember about the incident
3  referenced in Paragraph 14?
4    A.   Can you repeat your question, please,
5  sir?
6    Q.   In Paragraph 14, you describe your father
7  calling the police to report that an ex-boyfriend
8  had stalked and harassed him. That patrol officers
9  responded to the call for assistance and took a
10 report, and that the ex-boyfriend was charged,
11 arrested and received probation before judgment for
12 his actions.
13        What do you personally remember about
14 that incident?
15        MR. NACHTMAN:  Right. And I -- I'm going
16 to object to the form of the question, the
17 phrase of the question to the extent you
18 indicated -- counsel indicated that he wrote.
19 It's a Complaint written by counsel that
20 Mr. Angelini has reviewed. Subject to that,
21 you can answer.
22    Q.   Whatever personal knowledge you have, I'm

Page 47

1  not trying to attribute characterization, I want to
2  know what personal knowledge you had.
3    A.   So, my mom on occasion would call me and
4  tell me that -- stuff that was going on with my
5  dad's boyfriend. And she had told me that she had
6  called the police to her house. Can't be specific
7  on what date. That two Southeast officers
8  responded.
9         I remember asking her, did you -- did you
10 say anything to let them know that you were -- that
11 I was a police officer? She said, no, Steve. She
12 told me no. She didn't want to -- to get me
13 involved. She didn't want to -- she didn't want to
14 tell anyone that -- she didn't want anyone to know
15 what was going on in her home. She wanted to keep
16 it private within her home.
17        And -- and the police -- and she did not
18 want me -- she did not want to tell them that her
19 officer -- her son was a police officer. I remember
20 her specifically telling me that and which I can
21 understood -- can understand where my mom was coming
22 from at the time.

Page 48

1         And then I remember sometime after that,
2  I was at work, and I was approached by Officer
3  Kamberger in the Southeastern District lot.
4    Q.   Before we get to that, we'll get to that,
5  I want to do one thing at a time. So, in terms of
6  the incident involving your parents on that day,
7  you've answered that question.
8         So, I'm showing you a document marked
9  Exhibit 7.
10        (Whereupon Angelini Deposition Exhibit 7
11 was marked.)
12    Q.   Do you recognize this document? Take a
13 moment to look at it.
14    A.   Sure. (Complies.)  Yes, sir.
15    Q.   What is this document?
16    A.   This was a domestic form written by the
17 Baltimore Police Department, Northeastern District
18 in 2012.
19    Q.   Does this document identify you
20 personally anywhere as having been involved in this
21 incident?
22    A.   No, sir.

Page 49

1    Q.   Is your father Nello Angelini identified
2  on this?
3    A.   Yes.
4    Q.   Now, you said these were Northeast
5  District police officers who responded?
6    A.   Yes, sir.
7    Q.   Do you have any reason to believe that
8  the Northeast District officers who responded to
9  this scene were aware that you were the son of Nello
10 Angelini referenced in this document?
11    A.   No, sir.
12    Q.   Did the incident with your father
13 subsequently become a criminal case?
14    A.   Yes.
15    Q.   Did you attend any court proceedings in
16 that case?
17    A.   No.
18    Q.   Did you ever speak with the prosecutor
19 about the case?
20    A.   No.
21    Q.   Prior to the incident in October 2012,
22 which we'll get to shortly, did you personally ever

Plaintiff Exhibit 37

Page 50

1  tell any other officers in the Southeast District
2  about this incident reflected in this report?
3      A.  No.
4      Q.  All right. Let's go Paragraph 16. Well,
5  let's go to Paragraph 16 in the Complaint wherein it
6  states, shortly thereafter, Plaintiff's father's
7  sexual orientation became a very public topic of
8  gossip at the Southeast District police station.
9          Do you see that in Paragraph 16?
10     A.  Yes.
11     Q.  Could you explain the basis you have for
12  that statement? Understanding your counsel's
13  earlier objection, but what personal knowledge do
14  you have to support that statement?
15         MR. NACHTMAN: Objection. You can
16  answer.
17     A.  Yes.
18     Q.  What personal knowledge do you have to
19  support the statement that he -- your father's
20  sexual orientation became a very public topic of
21  gossip at the Southeast District police station?
22     A.  I can't remember the exact date. But

Page 51

1  after my parents called the police to their house,
2  Sgt. Kam -- excuse me, Officer Kamberger approached
3  me on the Southeast District parking lot on the
4  ramp. I specifically remember this. On the ramp.
5         He had said to me, do you have parents
6  that live in Southeast Avenue around -- I don't know
7  the exact words at this time. But the best of my
8  recollection without looking at any documents that
9  are in -- or in any of my notes, he had said to me,
10  if I would have known your parents -- that they were
11  your parents, I would have wrote a police report.
12         I said pretty much that he should have
13  please wrote a report anyway because of the domestic
14  incident, and there's a reason why my mom didn't say
15  anything to him.
16     Q.  So, Sgt. Kamberger, you said? Is that
17  who you said?
18     A.  I apologize. I made a mistake. It's
19  Officer Kamberger.
20     Q.  I'm sorry, Officer Kamberger. Was
21  Officer Kamberger assigned to the Northeast District
22  or the Southeast District?

Page 52

1      A.  Southeast District.
2      Q.  Now, you said before that the officers
3  who responded to this incident were in the Northeast
4  District. What involvement, if any --
5          MR. NACHTMAN: Objection.
6      Q.  Allowing for the objection, what
7  involvement --
8          MR. NACHTMAN: Sorry.
9      Q.  -- if any, do you understand Officer
10  Kamberger had in this incident?
11         MR. NACHTMAN: Objection to the
12  characterization of his testimony.
13     Q.  You can still answer.
14     A.  So, what I believe you're
15  misunderstanding, sir, that the police were called
16  multiple times. Not just -- not just once. Not
17  just -- this is a different incident.
18         The -- so, this is an incident that took
19  place that where my mom and dad called the police in
20  the Northeast District, but then -- I don't know the
21  exact date that my mom called in the Southeast
22  because there was more -- more crimes committed to

Page 53

1  my parents than just this one time.
2          So that -- I know for a fact that -- that
3  officer Kamberger told me that he responded to my
4  parents' house for a call for service. And I
5  remember my mom telling me that she called the
6  police because of my dad's boyfriend committed a
7  crime and --
8      Q.  Did Officer Kamberger indicate to you
9  that he had any knowledge about your father's sexual
10  orientation at that time?
11     A.  He just basically said that your mom and
12  dad has a issue going on. And at that time, I
13  stopped him and said I didn't want to speak to him
14  anymore about it. It's a private matter.
15     Q.  Are you aware of any other involvement
16  between the Southeast District police officers and
17  your parents other than the two -- the one incident
18  you just described with Sgt. Kamberger -- or Officer
19  Kamberger, I'm sorry?
20     A.  The best of my recollection at this time,
21  I don't -- I don't know if they called any other
22  times without my knowledge. I don't know.

Page 54

1    Q.   Other than Officer Kamberger, did any
2  other officers ever approach you in 2012 to speak to
3  you about your parents?
4    A.   No, sir.
5    Q.   Did any other officers ever approach you
6  and speak to you about your father's sexuality?
7    A.   No, sir.
8    Q.   Did you personally over -- observe or
9  overhear communications by other BPD employees about
10  your father's sexuality?
11    A.   No, sir.
12    Q.   Were you told by other people that other
13  BPD employees were discussing your father's
14  sexuality?
15    A.   No, sir.
16    Q.   Do you have any other reason that we
17  haven't discussed for believing that your father's
18  sexual orientation became a very public topic of
19  discussion at the Southeastern District police
20  station?
21    A.   My personal belief, due to several
22  incidents that I stated to Baltimore Police

Page 55

1  Department's EEOC -- E -- EDOS (sic), I believe
2  there was gossip going around.
3    Q.   So, let's unpack that. Correct me if I'm
4  misunderstanding, are you saying that -- you are
5  inferring that there was gossip going around, but
6  that you were never told of any gossip?
7    A.   Correct.
8    Q.   And you never heard of any gossip?
9    A.   Just observed. Observed things.
10    Q.   Things that you -- did you observe things
11  that led you to suspect that there was gossip going
12  around?
13    A.   Correct. Yes.
14    Q.   All right. I want to refer you next to
15  Paragraph 16 of the Complaint wherein it states,
16  Angelini became increasingly sensitive to the gossip
17  about his father and to inappropriate sexual remarks
18  made by other members of the BPD.
19        Could you explain the statement and what
20  it means to you?
21    A.   So --
22        MR. NACHTMAN: Objection. You can

Page 56

1  answer.
2    Q.   You can answer.
3    A.   So, my -- my belief was the homosexual
4  comment written on the bathroom stall and pictures
5  of penises and balls drawn -- drawn on my police
6  car, they called it Baby Dick, that they were trying
7  to make fun of me. That their purpose -- like not
8  verbally saying it to me, but trying to make it
9  known.
10        Do you have a tissue, please?
11    Q.   I don't have any. If you need to, we can
12  take a break, but I don't have any.
13    A.   I'm good.
14    Q.   Prior to 2012, were you previously less
15  sensitive to comments in the workplace of a sexual
16  nature?
17    A.   Be more specific, sir.
18    Q.   In Paragraph 16 it says, Angelini became
19  increasingly sensitive. Do you see where I'm
20  referring in Paragraph 16, the second sentence?
21    A.   Uh-huh.
22    Q.   Were you less sensitive to comments about

Page 57

1  a sexual nature in the workplace prior to January
2  2016 -- 2012?
3    A.   I never observed any other comments
4  before.
5    Q.   Have you ever made sexual remarks in the
6  workplace or with co-workers outside of work?
7    A.   Can you rephrase that please?
8    Q.   Have you ever made a comment of a sexual
9  nature while at work?
10        MR. NACHTMAN: Objection. You can
11  answer.
12    A.   I don't recall that I did.
13    Q.   Have you ever remarked on the sexual
14  orientation of another person?
15    A.   Can you rephrase that question? I'm
16  not -- I'm not understanding.
17    Q.   Have you ever had a conversation with a
18  third party about the sexual orientation of someone
19  else?
20    A.   I had a conversation with Sgt. Brickus
21  about my dad.
22    Q.   Other than your father, have you ever had

Page 58

1 a conversation with a third party about the sexual

2 orientation of someone else?

3          MR. NACHTMAN: Objection. You can

4 answer.

5     A.   Not that I recall, sir, at this time.

6     Q.   Have you -- strike that.

7          Has any other co-worker ever spoken to

8 you or complained about the appropriateness of

9 comments you've made while working as an employee of

10 the BPD?

11          MR. NACHTMAN: Objection. You can

12 answer.

13     A.   I was -- I've never been reprimanded or

14 in trouble for -- for any comments made to anyone

15 else about their sexuality.

16     Q.   Well, that's not exactly my question.

17 So, let's go with: Prior to 2013, has any co-worker

18 ever spoken to you or complained about the

19 appropriateness of any comments, whether about

20 sexual orientation or not, that you made while as an

21 employee of the BPD?

22     A.   Not that I recall.

Page 59

1     Q.   All right. Let's go to Paragraph 17 of

2 the Complaint. You can take a moment, it's only two

3 sen -- three sentences, to review that.

4     A.   (Complies.)

5     Q.   So, Paragraph 17 refers to graffiti that

6 you mentioned earlier. Before you encountered the

7 graffiti that day, had you been told about it

8 beforehand?

9     A.   I was never told about it beforehand.

10     Q.   So, let's go back then to just before you

11 discovered the graffiti. Where were you?

12     A.   I can be specific to where -- exactly

13 when it happened. I was sitting at the front desk.

14 Officer Quaranto approached me at the front desk. I

15 was on light duty. And say, hey, did you see the

16 comments in the bathroom stall? I said, no. What

17 comments?

18          He was like, it says me and you are

19 homos. That's when I got up and walked upstairs

20 while he watched the front desk and I -- and I saw

21 where he was talking about.

22     Q.   Why were you on light duty?

Page 60

1     A.   I don't recall at this time what I did --

2 why I was on light duty at that time.

3     Q.   So, what did you do next once you went

4 upstairs to see the graffiti?

5     A.   I remember seeing it. I went straight to

6 Sgt. Williams, who is I believe at that time a IAD

7 detective in the station. I immediately told him

8 that I was disturbed and -- of the comments put up

9 on the wall.

10     Q.   What did you -- what did you say or hear

11 from Sgt. Williams?

12     A.   Sgt. Williams pretty much said, it's not

13 a big deal. It's just guys doing what they do. And

14 he pretty much made me feel that -- like it wasn't

15 offensive. Shouldn't be offensive.

16     Q.   Did you --

17     A.   No big deal about it.

18     Q.   Did you find it offensive?

19     A.   Immed -- I was -- I was upset that it was

20 put up there, but it hadn't hit me yet, the reason

21 that it was put up there. Like at that moment, I

22 was more mad that an individual made a homosexual

Page 61

1 comment about me, that I didn't think right away and

2 connect the dots exactly yet of why it was put up

3 there.

4     Q.   Why were you upset that someone made a

5 homosexual comment about you?

6     A.   I was upset that -- even if it was

7 someone else's name, I would be upset. Why -- why

8 write -- any kind of homosexual comment about anyone

9 is disturbing.

10     Q.   Why is it disturbing?

11     A.   Because of the -- the department claims

12 that they're LGBT friendly, but -- I don't know how

13 to look and people were making homosexual jokes

14 about other individuals. How -- it's not right.

15          Then -- and any kind of -- any -- any

16 kind of a derogatory comments about anyone should be

17 put on a wall, the bathroom stall or anywhere in the

18 district.

19     Q.   Did you consider the comment to be

20 derogatory?

21     A.   Derogatory, offensive.

22     Q.   These are not trick questions. I'm just

Page 62

1 trying to drill --

2    A.   I understand, sir. I'm just a little

3 upset about this. It just brings back memories.

4    Q.   All right. I'm showing you an exhibit

5 marked as Exhibit 8. It's a collection of photos.

6        (Whereupon Angelini Deposition Exhibit 8

7 was marked.)

8    Q.   Would you take a moment and review those?

9    A.   (Complies.) I remember these

10 specifically.

11    Q.   Are these photos fair and accurate

12 depictions of the graffiti as you witnessed that --

13 it that day, and in some cases after it had been

14 marked over?

15    A.   It's on Page BPD.00435. That was -- the

16 best of my recollection, this might have been the

17 picture that I -- that I took to document.

18    Q.   Do you remember taking a picture of the

19 graffiti in question?

20    A.   Yes, sir.

21    Q.   Did you give that picture to

22 Sgt. Williams?

Page 63

1    A.   No. I showed Sgt. Williams on my phone,

2 but I didn't -- I didn't provide him with any

3 pictures. I showed him.

4    Q.   After speaking with Sgt. Williams about

5 the graffiti, what did you do?

6    A.   So, after I told him that -- that I was

7 upset about that, he downplayed it and told me that,

8 you know, that he'll -- he'll write -- he'll write

9 the incident up, but, you know, there's no need to

10 be -- be upset about it. It's all locker room talk.

11 And that you shouldn't be offended by it and no big

12 deal.

13        And at that point I said, sir, you know

14 what, sir, don't even worry about it. Don't even --

15 don't even -- don't worry about it. Don't worry

16 about it. I'm -- I don't care anymore. Don't worry

17 about it. Don't do an investigation. Don't do

18 nothing.

19        And then I went home and told my wife,

20 and she was like -- me and her talked about it. And

21 then I was like, no, I got -- someone's -- it's got

22 to be reported. Something's got to be known to the

Page 64

1 district about this. It's not right. They claim

2 that they're LGBT friendly, but then they put this

3 on the wall.

4    Q.   Did you talk to anyone else that day

5 about the incident other than your wife and

6 Sgt. Williams?

7    A.   Sgt. Quaranto.

8    Q.   What did you say to Sgt. Quaranto?

9    A.   He was a officer at the time, and I told

10 him that it's not right. Why do they -- why do they

11 do that? Told him that I was filing a complaint.

12    Q.   Are you a homosexual? Sorry for asking,

13 but are you?

14    A.   No, I'm not a homosexual.

15    Q.   Are you a bisexual?

16    A.   No, I'm not bisexual.

17    Q.   Did you file any reports on this

18 incident?

19    A.   Yes, sir.

20    Q.   I'm showing you a document. We'll call

21 it Exhibit 9.

22        (Whereupon Angelini Deposition Exhibit 9

Page 65

1 was marked.)

2    Q.   Do you recognize this document?

3    A.   I sure do.

4    Q.   What is it?

5    A.   So, when I went home and told my wife

6 about it, and she said I should document it. And I

7 said I should and then report it. I wrote a 95 up

8 because I wanted a proper investigation done, and

9 that I was offended.

10    Q.   Are you the author of this document?

11    A.   Yes, I am. I did write this, yes, I did.

12    Q.   Turning to the document, I want to direct

13 you to the sentence that reads, also the reason I

14 didn't write the 95 immediately was because I feared

15 that I would be retaliated against.

16        Do you see that sentence, the last

17 sentence in the first paragraph?

18    A.   Yes, sir.

19    Q.   What did you mean when you wrote that

20 sentence?

21    A.   So, we use Administrative 95s to document

22 stuff throughout the department. Anything. It

Page 66

1 could be to -- where you lost your tools, your work
2 tools, or you lost -- or anything, anything. This
3 is just a 95 administrative form to document any
4 incidents or -- or witnessed anything. Or anything
5 you could write a 95 on to address any other kind of
6 issues.
7    **Q.   Bear with me. This sentence**
8 **specifically, what did you mean when you said that**
9 **you feared that you would be retaliated against?**
10    A.   So, you -- I'm not understanding the
11 question you're asking me. The whole sentence or
12 just one part of the sentence?
13    **Q.   Did you fear that you would be retaliated**
14 **against when you reported the graffiti?**
15    A.   Yes.
16    **Q.   Why?**
17    A.   Just based on the demeanor of
18 Sgt. Williams when I initially told him. He
19 portrayed it as nothing, and I don't think he really
20 wanted to -- to -- how do I put it? To handle
21 something like this. Like he -- the way -- it's
22 hard to describe his demeanor to you.

Page 67

1       He's nonchalant about -- about -- he was
2 nonchalant about this incident. He wasn't like, you
3 need -- you need to -- you need to write a document
4 up. You need to -- you need to photograph it. I
5 need to -- I'm going to investigate this.
6       He didn't give no assurance that -- like
7 this was a big deal. He just played it off like it
8 was nothing. Like, oh, someone -- someone drew --
9 drew something on a wall or wrote something on a
10 wall. Like, what's it matter to you?
11      So, I was like, I had a feeling that if
12 I -- if I was going to do something about this, that
13 personally like it was going to be a big deal
14 because -- because Sgt. Williams didn't really want
15 to do anything about it.
16    **Q.   Who did you think was going to retaliate**
17 **against you?**
18    A.   At this time, anyone from the North --
19 Southeast command staff or anyone. Because it
20 didn't look good on the department. And I know the
21 way things work in the department. If you speak
22 forward about anything, you get -- you get -- you

Page 68

1 get blamed for it like it's your fault.
2    **Q.   Did you file a transfer request on**
3 **October 3rd, 2012?**
4    A.   Yes, I did.
5       (Whereupon Angelini Deposition Exhibit 10
6 was marked.)
7    **Q.   I'm showing you a document marked as**
8 **Exhibit 10. Is that the transfer request you filed**
9 **on October 3rd, 2012?**
10    A.   Best of -- to my recollection, it appears
11 to be so.
12    **Q.   To the best of your recollection, are you**
13 **the author of this document, not the form, but the**
14 **handwritten portions?**
15    A.   I wrote -- I wrote this whole -- I wrote
16 the -- everything in handwriting on here is mine.
17    **Q.   Why did you request -- why did you**
18 **request a transfer?**
19    A.   Sir, I didn't feel welcome at Southeast
20 anymore. After that comment, I didn't feel -- I
21 didn't feel comfortable there. I didn't want to be
22 there no more. Seeing that on the wall, I didn't

Page 69

1 want to be in that district anymore. I felt
2 uncomfortable.
3    **Q.   Did you expect --**
4    A.   I felt people were homophobic.
5    **Q.   Did you expect the transfer request to be**
6 **granted?**
7    A.   Yes.
8    **Q.   Was it?**
9    A.   Not -- not specifically this one. I
10 don't remember -- this one wasn't. This one wasn't.
11 I don't believe so. At this time, this wasn't
12 granted.
13    **Q.   Do you have any knowledge about why that**
14 **was?**
15    A.   At this time, I -- I was made aware later
16 on that I couldn't put these comments in here on the
17 70, that I -- that it was unprofessional to put
18 these comments in here. Well, anything that had to
19 do with --
20    **Q.   We'll get to that. At the time in**
21 **October 2012 or thereabouts, were you told anything**
22 **about this transfer request and it being granted or**

Page 70

1 not?
2    A.   No, sir.
3    Q.   Did you also make an internal
4 discrimination complaint with what we're calling
5 EODS, the Equal Opportunity and Diversity Section
6 although it had a different name back then?
7    A.   Yes, sir.
8    Q.   Who did you -- all right. Strike that.
9         When did you first reach out to EODS?
10   A.   To the best of my recollection today, it
11 was -- I believe it was on October 5th I went down
12 to EEOD -- EDOS (sic).
13   Q.   Who did you speak with?
14   A.   Sgt. Cumbo.
15   Q.   What was said between you and Sgt. Cumbo?
16   A.   Told me that -- that I would -- he would
17 investigate this. And I explained to him another
18 complaint while I was down there.
19   Q.   So, let's back up a moment. Before you
20 went to EODS on October 5th and spoke with
21 Sgt. Cumbo, did you have any prior communications
22 with EODS?

Page 71

1    A.   To the best of my recollection, I might
2 have called to set up an appointment, I believe,
3 sir. That's the only reason I could think of right
4 now why I had a appointment that day at 3:00, at
5 3:30.
6    Q.   Did you have an appointment on
7 October 5th at 3:30 with EODS?
8    A.   Yes. I had an appointment, I believe so.
9 The best of my recollection, it was October 5th at
10 this point.
11        MR. NACHTMAN: Do you need a break?
12        THE WITNESS: Yeah. I need -- I need a
13 break if you don't mind.
14        MR. NACHTMAN: All right. Let's take
15 five.
16        MR. GLYNN: Let's take a break.
17        THE VIDEOGRAPHER: We're going off the
18 record, the time is 10:44 a.m.
19        (Whereupon a brief break was taken, after
20 which the following was heard:
21        THE VIDEOGRAPHER: We're back on the
22 record. The time is 10:52 a.m.

Page 72

1    Q.   Mr. Angelini, so, let's talk about
2 October 5th, 2012. Do you remember if you were
3 working that day?
4    A.   Yes.
5    Q.   Can you speak up?
6    A.   Yes, sir.
7    Q.   Do you remember what shift you were
8 working?
9    A.   Yes, sir.
10   Q.   Do you remember what your assignment was?
11   A.   Yes, sir..
12   Q.   What was your shift and assignment that
13 day?
14   A.   I was desk duty, light duty, no
15 enforcement, day work. No, excuse me, night work
16 1439 to -- to 1100 -- I mean, 2300 hours which is
17 11:00 p.m.
18   Q.   When -- if you're working the desk, what
19 are your duties in that assignment?
20   A.   The duties are to answer the phones. To
21 write reports if anyone comes in and requests a
22 report. Maintain security that -- at the front

Page 73

1 desk. Make sure individuals don't come in with
2 any -- without any ID or their reasoning for being
3 there.
4    Q.   All right. Before a shift begins, is
5 there something called roll call?
6    A.   Yes, sir.
7    Q.   What is roll call?
8    A.   Roll call is for officers that are coming
9 onto the shift. Usually go over the crimes that
10 occurred on the street. Any BOLOs, if they're
11 looking for anyone. If there's been any -- any
12 updates on crime or -- and --
13   Q.   Did you --
14   A.   -- sometimes inspection.
15   Q.   Do they call roll at roll call?
16   A.   Yeah. They -- they do for -- they do for
17 the officers, yes. Like the post cars, they give
18 everybody their post cars.
19   Q.   Are all officers required to arrive for
20 roll call before the beginning of their shift?
21   A.   Only the individuals that are working the
22 post car.

Plaintiff Exhibit 37

Page 74

1    Q.   If you're not working the post car, are
2 you required to appear for roll call?
3    A.   So, some of -- like even now, it happens
4 still today like where -- if you work the desk, you
5 just relieve the person at the desk. And you just
6 take over the desk. That individual just goes home.
7    Q.   So, in October 2012, were you required
8 to appear for roll call that day?
9    A.   I'm -- let me see. October 2012.
10   Q.   October 5th, 2012, the day we're talking
11 about, did you have to go to roll call that day?
12   A.   Yes, be -- yes, I was ordered to start
13 going to roll call, yes.
14   Q.   Why were you ordered to appear for roll
15 call, if you know?
16   A.   Specifically Sgt. Brickus ordered me to
17 roll call because she had believed that I was coming
18 in late. And I explained to her that I wasn't.
19 That I was going straight to the front desk to
20 relieve officers.
21   Q.   When did she give you that order?
22   A.   Sometime in between December and October.

Page 75

1    Q.   Was that before this incident on
2 October 5th, 2012?
3    A.   Yes.
4    Q.   Was it well before or just shortly
5 before?
6    A.   The best of my recollection, it was
7 maybe not -- not too far from this -- this time. Or
8 maybe -- maybe -- I believe it was sometime in
9 December, if I can recall correctly.
10   Q.   So, it was after this time?
11   A.   No. It was before this.
12   Q.   It was before -- all right.
13   A.   Because that's why I was in roll -- I was
14 in roll call that day.
15   Q.   All right. Stand on that answer. What
16 time is roll call for the 3:00 to 11:00 shift?
17   A.   14 -- I think it was 1439 or 1436. 1439,
18 I believe.
19   Q.   Did you arrive in time for roll call on
20 October 5th, if you recall?
21   A.   Yes. October 5th is -- yes. I was on
22 time, yes.

Page 76

1    Q.   On October 5th, 2012, who was your
2 supervising sergeant?
3    A.   I had a OIC that day.
4    Q.   Who would have been the OIC supervising
5 you that day?
6    A.   OIC Toddman.
7    Q.   What is OIC Toddman's full name, if you
8 remember?
9    A.   Sir, I'm sorry, I don't remember her
10 first name at this -- this time.
11   Q.   Were you -- at that time, did you have
12 any kind of reporting relationship with Sgt. Ettice
13 Brickus?
14   A.   Not -- what do you mean by reporting,
15 sir? Can you rephrase that reporting?
16   Q.   Was she in your chain of command?
17   A.   Yes. She would be in my chain of
18 command, yes.
19   Q.   Would she have supervised Sgt. -- or
20 Officer -- OIC Toddman?
21   A.   Depending on if she was either a
22 sergeant -- if she was 0-9 that day, yes. If not,

Page 77

1 Supervisor Toddman would take care of Sector 3,
2 which is the sector I was in. And Sgt. Brickus was
3 Sector -- Sector 1. So, OIC Toddman was acting
4 sergeant.
5    Q.   So, unless Sgt. Brickus was acting
6 lieutenant, which you said O-9, she would not have
7 been supervising you. But if she was acting
8 supervisor, then she would have been in your chain
9 of command?
10   A.   Yeah. So, OIC Toddman would be my first
11 chain of command, correct.
12   Q.   It would go from you to OIC Toddman who
13 is your sector commander to whoever was the
14 lieutenant that day?
15   A.   Correct.
16   Q.   Prior to that point in October 2012, how
17 would you describe your working relationship with
18 Sgt. Brickus?
19   A.   She would pick on me.
20   Q.   Tell me more about that.
21   A.   Well, not really -- I mean, just -- I
22 mean, I wouldn't say picking on me. Like not really

Plaintiff Exhibit 37

Page 78

1 picking on me. Just made me go -- like force me to
2 go to roll call. That's the only -- the thing I can
3 think of. That's it.
4   Q.  I'm sorry. Go ahead.
5   A.  That's the only thing I can think of
6 right now, just -- just -- she just wanted me to go
7 to roll call. And that was about it.
8        Now, other than that, she really
9 didn't -- really -- we really didn't -- we really
10 didn't have any communications like that. I don't
11 know how to try to explain it. We weren't -- I was
12 just hi and bye, and she was hi and bye. And this
13 one time she told me I needed to start coming to
14 roll call. That's it.
15   Q.  Had you ever been a direct report to
16 Sgt. Brickus?
17   A.  '12?
18   Q.  In October 2012, yes.
19   A.  I didn't -- I think I believe -- sometime
20 I worked for her. I'm not sure. I think it was
21 prior to that that I worked in her sector. Yes. I
22 believe, yes, I worked for her sector.

Page 79

1   Q.  Did you have any difficulties working for
2 her in her sector?
3   A.  I'm trying to think. No. Not really,
4 no. I just didn't -- I just didn't like the area --
5 really working that area, and I just wanted to move
6 some -- to a Sector 3 area.
7   Q.  Now, you said before that you had an
8 appointment with EODS that afternoon. Did you
9 expect that you would be working your shift that day
10 on October 5th, 2012?
11   A.  No. Honestly, sir, I thought --
12 believing that once I went down to E -- EDOS (sic)
13 after I explained to them what occurred from the
14 comments that were made about me that -- and -- and
15 I informing them that I didn't feel welcome there
16 anymore, that they would move me because they move
17 people all the time.
18   Q.  Did you believe that EODS would transfer
19 you somewhere else or detail you somewhere else?
20   A.  Yes, sir.
21   Q.  Had anyone ever told you that EODS
22 transferred or moved people?

Page 80

1   A.  Yes.
2   Q.  Who told you that, if you remember?
3   A.  I don't recall, but there's times where
4 individuals get moved abruptly without anyone even
5 knowing they're no longer with us. And then you
6 hear a rumor that they were moved by -- because then
7 someone filed a EOD complaint on them.
8        And they -- they moved them so they
9 wouldn't have inter -- interaction. Say if I filed
10 a complaint on you if you were my supervisor or an
11 officer or anyone that I would -- say me and you
12 worked together and I said that I filed a EOD
13 complaint.
14        E -- EDOS (sic) -- I'm not used to
15 calling it that, I'm sorry. I have to look every
16 time. I'm used to calling it EEOC.
17   Q.  Yeah. But that will be confusing; so,
18 bear with me.
19   A.  I know, I'm sorry. EDOS (sic). So, if I
20 filed the EDOS (sic) complaint on you, they would
21 move -- they would either move me or you depending
22 on the situation.

Page 81

1   Q.  So, you had heard that that had
2 happened in the --
3   A.  I've seen it happen. I just don't recall
4 the -- the people at this time. But I have -- do
5 have one for you specifically that I know that it
6 happened recently in the Northeast District.
7   Q.  It was recent?
8   A.  Within the past two, three years.
9   Q.  All right. Had you previously provided
10 notice, any notice to any supervisor that you would
11 be missing work that day in order to meet with
12 someone from EODS?
13   A.  So, I approached that -- so, I must have
14 spoken to them on the phone sometime prior to me
15 reporting to roll call. Because I informed OIC
16 Toddman that I had to go down to E -- EDOS (sic)
17 for -- for an incident and I needed to file -- to
18 file a complaint, and that I had an appointment with
19 them at 1530 hours.
20   Q.  Was that the same day, October 5th, that
21 you told OIC Toddman that?
22   A.  Yes. It was right after -- I remember

Page 82

1 specifically right after roll call.
2   **Q. Did you ever speak with Sgt. Brickus**
3 **about your appointment with EODS?**
4   A.   So, as roll call was letting out, she
5 approached me when I was speaking to O -- OIC
6 Toddman.
7   **Q. OIC Toddman approached you?**
8   A.   No.  Sgt. Brickus approached me.
9   **Q. What happened?**
10   A.   She was like why -- she said to me -- she
11 questioned why I was dressed the way I was and not
12 dressed --
13   **Q. All right.**
14   A.   -- for the desk.
15   **Q. What is the required uniform for a police**
16 **officer on duty working the front desk?**
17   A.   It's either court attire or -- court
18 attire.
19   **Q. What's court attire?**
20   A.   You need to be your khaki pants and --
21 it -- it changed.  The --
22   **Q. What was court attire in October 2012?**

Page 83

1   A.   It would be khaki pants and like a BPD
2 shirt with -- like police shirt like what we would
3 wear to a -- to in-service.
4   **Q. Would that be something similar to what**
5 **you're wearing right now?**
6   A.   No.  No.  This is like -- this is a
7 little overdressed.  And then -- then you -- you
8 would have to wear something professional at the
9 front desk.
10   **Q. Were you wearing the required uniform**
11 **court attire, as you say, when you arrived to work**
12 **on October 5th, 2012?**
13   A.   No.  I had a -- from what I recall, I had
14 a shirt on and a pair of pants on and -- and shoes
15 on.
16   **Q. What kind of shirt, pants and shoes were**
17 **you wearing that -- and did that comply with the --**
18 **the uniform standard that day?**
19   A.   So, I -- I wore clothing that would
20 disguise me from being a police officer because I
21 would be out in the public while on duty.  So, I
22 wore -- wore -- I didn't -- because usually at the

Page 84

1 front desk, I would wear police -- like a police --
2 a shirt, like a shirt, Polo shift.  I have a Polo --
3 police Polo shift that has an emblem right here and
4 it says police on the back.
5       And it was navy blue, long sleeve, and I
6 would wear them with khakis.  And that was fine at
7 the front desk.
8       And I didn't want to wear that because I
9 was going in the public, and I'm not allowed to have
10 any interaction with the public.  If they identify
11 me as police, I couldn't -- I couldn't intervene.
12   **Q. Do you mean because you were on light**
13 **duty?**
14   A.   Yeah.
15   **Q. So, what kind of shirt were you wearing**
16 **that day?  Do you remember?**
17   A.   I -- I really -- I don't remember exactly
18 what shirt I was wearing.
19   **Q. Did you speak with -- strike that.**
20       **You said just before you had a**
21 **conversation with Sgt. Brickus.  Let's go back to**
22 **that.  Did she ask if you were coming to work that**

Page 85

1 **day?**
2   A.   She had asked me why I was wearing what I
3 was wearing that day.  And that's when I went on to
4 state to her that I had a appointment at 1530 hours
5 with EEOD, they call it EDOS (sic).
6   **Q. EODS.**
7   A.   Yeah, E -- I'm sorry, I'm sorry.  EDOS
8 (sic).  And I had an appointment with them, and that
9 I would -- I might not come back at this point.
10   **Q. Did she make any comment at that time**
11 **about the fact that you were out of uniform?**
12   A.   She -- yes, she did.  She did make --
13 make a comment of it.
14   **Q. To the best of your recollection, what**
15 **exactly did she say?**
16   A.   So, she -- from the rec -- best of my
17 recollection, I remember her saying to me that that
18 wasn't front desk attire.  That I was showing off my
19 pecs.
20   **Q. Did she say anything else?**
21   A.   She said that when I got back from the
22 appointment that I needed to see her.  Because I

Page 86

1 told her that I would change back into my clothing.
2 I brought the -- my clothing I would wear at the
3 front desk just in case they put me back on duty.
4 And I told her I was coming -- she -- she told me to
5 come see her after my appointment was done down at
6 EDOS (sic).
7   **Q.   Did you say anything else to her?**
8   A.   Not that I recall at this time I'm
9 specifically saying anything to that point, no.
10  **Q.   You said she said that you wanted to show**
11 **off your pecs. What do you think she meant by that?**
12      MR. NACHTMAN: Objection.
13  **Q.   You can answer.**
14  A.   So, at the time, I was in pretty decent
15 shape, and she was trying to say that -- I felt in
16 my personal opinion what I believe that comment
17 meant?
18  **Q.   I'm asking for your opinion.**
19  A.   That she was commenting on my pecs, that
20 I was showing off my muscles, and that I was showing
21 off my muscles that -- it's what I took as a --
22 as -- and that -- that -- for that comment.

Page 87

1   **Q.   Were you wearing a tight shirt that day,**
2 **if you recall?**
3   A.   I don't recall, sir.
4   **Q.   Were you wearing a shirt that had sleeves**
5 **that day?**
6   A.   Yes. If I was wearing a shirt to go down
7 to EDOS (sic), of course I would have sleeves, sir.
8   **Q.   Did the comment about your pecs bother**
9 **you at the time?**
10  A.   Yes.
11  **Q.   What about it bothered you?**
12  A.   I felt that it was inappropriate and
13 unprofessional by a sergeant to state that, that
14 what I was -- that my -- my pecs, that I was showing
15 off my pecs. Because that wasn't my intentions any
16 shirt I wear to show off my pecs. And that it was
17 not relevant to -- just because I wasn't wearing
18 front desk attire, that I wasn't trying to show off
19 any -- anything.
20      I didn't understand where she was coming
21 from. I felt that it was inappropriate. Because if
22 I had said that to another individual, either female

Page 88

1 or male, and I start saying to them that you have
2 nice this, nice that, it's not right. You can't --
3 you can't.
4   **Q.   Did you tell Sgt. Brickus that the**
5 **comment bothered you?**
6   A.   I told her later on. Later on.
7   **Q.   But not at that time?**
8   A.   Not at that moment, no.
9   **Q.   Was that the entirety of the conversation**
10 **at that point?**
11  A.   I start -- I looked for a ride to go
12 down -- downtown and --
13  **Q.   Before we get to that. Was anyone else**
14 **present for your conversation with Sgt. Brickus**
15 **of -- in which she had mentioned your pecs?**
16  A.   Just one of -- just -- for best of my
17 recollection, I remember OIC Toddman being there.
18  **Q.   Let's look back to your Complaint.**
19 **Page 5, Paragraph 20. Are you with me on Exhibit 2,**
20 **Page 5, Paragraph 20?**
21  A.   This?
22  **Q.   Yeah. Just keep that one exhibit with**

Page 89

1 **you. The other exhibits you can keep in a pile with**
2 **the Court Reporter. If we need them, we can refer**
3 **back to them.**
4   A.   No problem. All right. I'm sorry, sir,
5 which -- which --
6   **Q.   Paragraph 20, Page 5.**
7   A.   Yes, sir.
8   **Q.   So, if you read Paragraph 20 it says, she**
9 **also then later said, the mayor doesn't want you to**
10 **go down there and make this formal complaint. Why**
11 **can't -- may have written there, I mean major.**
12      **The major doesn't want you to go down**
13 **there and make this formal complaint. Why can't you**
14 **let this go? Why does it affect you?**
15      **Do you see that?**
16  A.   Yes, sir.
17  **Q.   Do you recall Sgt. Brickus making that**
18 **statement at some point that day?**
19  A.   Yes, sir.
20  **Q.   When was that?**
21  A.   That specific statement about the major
22 doesn't want you -- that was made inside O-9's

Plaintiff Exhibit 37

Page 90

1 office when I got back.
2 Q.   So, when you were referring to
3 Sgt. Brickus asking you to come back, is that the
4 time period when you're talking about --
5 A.   Yes, sir.
6 Q.   -- after your meeting?
7 A.   Yes, sir.
8 Q.   At the time that Sgt. Brickus made that
9 statement, had you already made your complaint to
10 EODS?
11 A.   No, not yet. I hadn't personally gone
12 down there and made my complaint, no.
13 Q.   Hold -- hold on. Let's back up. So,
14 you just said, and if necessary I can ask the Court
15 Reporter to read it back, but that you went to talk
16 to Sgt. Brickus and she said to come back after your
17 meeting at EODS; right?
18 A.   Correct.
19 Q.   And then you went to your meeting at
20 EODS?
21 A.   Well, just go back. Sgt. Brickus came to
22 me when I was speaking to OIC Toddman.

Page 91

1 Q.   Yeah. Tell me how it happened.
2 A.   So, right after roll call, everyone gets
3 up, starts to walk out. I approached OIC Toddman.
4 We -- Sector 3 was in the back of the room and,
5 remember, O-9 or a sergeant -- we got Sector 1,
6 Sector 2, Sector 3. There are seated rows.
7     Sector 3 is in the back. I don't
8 remember who was O-9. I don't remember who was
9 Sector 1. I'm not sure if Sgt. Brickus was O-9 that
10 day. I'm not -- I don't recall any of that
11 specifically.
12     But I remember me telling OIC Toddman
13 that I had an appointment at -- and I kind of tried
14 to keep it private. That's why I went towards the
15 back. I waited until people walk out.
16     Sgt. Brickus had stated -- walked towards
17 the doors where they fold open to go back into the
18 -- where the room is where they have the pool table
19 and stuff like that towards the fr -- towards the
20 exit.
21     And when I was talking to OIC Toddman,
22 she had came back, like stayed right by the doors

Page 92

1 and walked towards me, back towards me. And that's
2 when she made the comment about, that I wasn't
3 dressed appropriate for the front desk.
4 Q.   Is that also when she said you should
5 come back later and meet with me?
6 A.   Yeah. She -- well, she had said -- she
7 said -- first she said, I believe you're showing off
8 your pecs. I explained to her that I had an
9 appointment. That's why I was dressed like this.
10     And that's when she made the comment
11 that, oh, well, you're going off to show your pecs
12 down there. Like trying to imply like I was trying
13 to show off my muscle to people or something.
14 Q.   All right. Bear with me. I'm just
15 trying to get the timeline down.
16 A.   Right, right.
17 Q.   So, that happened.
18 A.   Yeah.
19 Q.   Was that the same conversation when she
20 said, come back after your appointment and meet with
21 her?
22 A.   So, when I told her that I was going to

Page 93

1 find a ride downtown -- for an officer to ride me
2 downtown, that's when she says, make sure you come
3 back. Because I told her that I would change if I
4 had came back to the district.
5     Because honestly I told her that I didn't
6 think I was coming back anymore to the district
7 after filing the complaint with EDOS (sic) because I
8 didn't -- I didn't want to come back anymore after
9 what I saw.
10     I was going to do my best and tell them
11 that I was scared and didn't want to be -- go back
12 to that district. And -- and I told her, I said, if
13 I do come back, I'll come and see you and change --
14 and change in my uniform to work the front desk.
15 Q.   So, what happened after that?
16 A.   So, I was looking for a ride. Found
17 someone who would drive me downtown.
18 Q.   Who was that?
19 A.   Honestly I can't recall who drove me that
20 time at this -- at this time. I don't remember who
21 drove me.
22 Q.   Did you get a ride downtown?

Page 94

1    A.    Yeah, I got a ride downtown. So, I
2  remember walking out of the entrance, the police
3  officers' entrance where we come out of roll call.
4  And then there's a hallway. Then there's a door
5  that walks outside.
6         I remember walking out. Opening the door
7  and walking out. And Sgt. Brickus and numerous
8  other officers were standing by. Usually officers
9  sit there and wait for the other patrol cars to pull
10 up from the other shift when they get called in.
11        They see their patrol car come in, and
12 they go get their car. They hang out kind up -- up
13 by the ramp. And as I was walking out, I remember
14 someone saying, oh, Angelini, nice shirt.
15   Q.    Do you remember who that was?
16   A.    I -- I can't exactly recall who -- who it
17 was at this time. Best of my recollection, I don't
18 remember at this time like who -- and I don't know
19 if I ever identified a person who said it. I can't
20 remember.
21        But I remember someone saying, I like
22 your shirt. And then people started laughing. And

Page 95

1  I continue walking. And I hear Sgt. Brickus say,
2  comment to me, oh, Angelini is going down to EDOS
3  (sic) to go show off his muscles down there. And
4  everybody starts laughing.
5         I turned back at her like -- with this
6  disgusted look in my face at her. Like, what was --
7  what was that about? You just humiliated me in
8  front of my friends and just told everyone I was
9  going to EDOS (sic). Why? Why? What was the
10 purpose of that? I don't get it.
11        Now, she's pretty much told everybody I
12 was going down to ED -- EDOS (sic). She made me
13 feel like I was being a -- a snitch or like -- or
14 making a big deal of nothing. Like I'm sure she --
15 like it was no purpose for -- it was not right for
16 her to do that in front of everybody.
17        And I just started -- I was just mad.
18 And then I hear her say, oh, I better be careful.
19 She says, I better be careful he's going to file a
20 complaint on me down there. And people started
21 laughing.
22        And, so, when I went down there, I was

Page 96

1  disgusted. I was just totally disgusted. And I
2  told Sgt. Cumbo what happened too. This is why I
3  can't come back.
4    Q.    Was that the entirety of the incident in
5  the parking lot to the best of your memory?
6    A.    Best of my memory, she just made those
7  comments to me and people were laughing.
8    Q.    Do you remember specifically any other
9  officers being present for that event?
10   A.    I specifically remember one.
11   Q.    Who was that?
12   A.    Officer Carlos.
13   Q.    Do you remember Carlos' last name, or is
14 that his last name?
15   A.    I can't recall at this time. Sir, I
16 remember -- I think -- I just called him Carlos.
17   Q.    Did you ultimately make it to EODS?
18   A.    Yes, I did.
19   Q.    Who did you speak with there?
20   A.    Sgt. Cumbo.
21   Q.    What did you tell Sgt. Cumbo?
22   A.    I explained to him what happened, what I

Page 97

1  discovered on the wall at district. And then --
2    Q.    Did you tell him about the incident with
3  Sgt. Brickus that you just described?
4    A.    Yes, sir. I told her as I was coming
5  down here, that I was pretty much put on blast that
6  I was coming on down here and filing a complaint.
7  That she made fun of my pecs and trying to say
8  pretty much that -- this is what I believe that it
9  was her main purposes.
10        Oh, Angelini is showing off his pecs
11 originally in the first comment. And then she says
12 in front of everybody that I'm showing off my
13 muscles down there, to the detectives down there,
14 implying that -- like, oh, I just want to look good
15 down there to other -- other men or women.
16   Q.    Did you fill out any paperwork?
17   A.    I do recall filling out something.
18   Q.    I'm showing you an exhibit. We are now
19 at 11, I think?
20        THE REPORTER: Yes.
21        (Whereupon Angelini Deposition Exhibit 11
22 was marked.)

Plaintiff Exhibit 37

Page 98

1  Q.  Do you recognize this document?
2  A.  Yes, sir.
3  Q.  Is that handwriting on this form yours?
4  A.  Yes, sir.
5  Q.  What is this document?
6  A.  This is -- the first time I ever filled
7  one out and Sgt. Cumbo said, just fill it out for me
8  to initiate your complaint.
9  Q.  Did you fill out any other paperwork with
10 Sgt. Cumbo?
11 A.  No. He just told me to fill this out,
12 and he told me to give him the story of what
13 happened.
14 Q.  Did anything else happen to your --
15 during your visit to EODS that day that you would
16 like to mention at this time?
17 A.  Specifically, no. But I -- I explained
18 to him that I needed to get out of that district.
19 And he told me that I -- he had no way -- he had no
20 way to move me. And -- and I told him that I was --
21 that I fear retaliation, that it would be best that
22 he move me while this investigation was going on.

Page 99

1        And -- and I told him how -- and why.
2  And especially after the comment with Sgt. Ettice
3  Brickus, I was -- I was just -- I don't know. I
4  just thought for sure that he wasn't going to -- he
5  wasn't going to put me in that predicament.
6  Q.  Did Sgt. Cumbo tell you whether or not
7  you had to return to work?
8  A.  Yeah. He told me I had to return to
9  work.
10 Q.  Did you return to work?
11 A.  Yes, sir.
12 Q.  Did you then go and speak with
13 Sgt. Brickus later during your shift?
14 A.  When I got back, I changed. And she was
15 in O-9's office. I knocked on her door and told her
16 I was back.
17 Q.  What happened then?
18 A.  She told me to come in, close the door
19 behind me.
20 Q.  And then?
21 A.  She wanted to know why, that I felt the
22 comments were offensive on the wall. And why I was

Page 100

1  making a big deal -- a big deal out of it. And --
2  and I replied to her, it's none of her -- I told her
3  it's not her -- it's not her business why I'm
4  offended by it.
5        And then she replied back, don't -- the
6  major doesn't want this to go downtown. I can't
7  believe you met -- went downtown with it. You could
8  have kept it in-house. And then -- that's from what
9  I rec -- my recollection of the conversation. And
10 then --
11 Q.  I'm sorry, go ahead.
12 A.  Do you have any further questions?
13 Q.  Did you speak to her about any concerns
14 you had with her comments earlier?
15 A.  Yes, sir.
16 Q.  What did you say to her?
17 A.  I told her.
18 Q.  Sorry. Keep it up so we can hear you.
19 A.  Told her that it was offensive what she
20 did. That as a supervisor and as a -- as a
21 supervisor, she should know better not to do that.
22 Not to -- not to put my business out there like

Page 101

1  that. And to offend me and to make fun of me in
2  front of my peers.
3  Q.  How did she respond when you said that?
4  A.  Said she was just joking.
5  Q.  I'm sorry?
6  A.  She said she was joking when -- just
7  joking.
8  Q.  Did she tell you that she had been
9  intending to joke when she made those comments? Is
10 that what you're saying?
11 A.  No. She said -- we -- the police
12 officers are joking with you, Angelini.
13 Q.  Did she apologize in any way?
14 A.  She never said, oh, I'm sorry for saying
15 that to you, no.
16 Q.  What did you think of her response?
17 A.  She still didn't care what she said,
18 that.
19 Q.  Did you believe that she had been joking?
20 A.  No.
21 Q.  What do you mean by that?
22 A.  No. She -- we never joked around like

Plaintiff Exhibit 37

Page 102

1 that. Me and her never joked around like that. I
2 never had a personal relationship with her that we
3 would joke around.
4    Q.   Did you believe that her statements were
5 made with an intent to harm you?
6    A.   110 percent.
7    Q.   What makes you say that?
8    A.   She said it in front of my peers, loud,
9 purposely to humiliate me in front of everybody
10 Because I was going down do EOD -- EDOS (sic),
11 whatever it's called. And that she was making
12 fun -- making fun of my clothing, trying to imply
13 that I was going on -- down there to show off my
14 pecs or show -- show off my muscles to other
15 detectives down there.
16        What does that have to do with anything?
17 Like where does that come from? Like I don't get
18 it.
19    Q.   Was anyone else present during that
20 conversation in O-9's office?
21    A.   No. She shut the door and told me shut
22 the door. And then she continued to ask me why.

Page 103

1 She pretty much wanted to know why I was offended by
2 that comment. Like, well, why did I make a big deal
3 about the homosexual comment like I should -- if I'm
4 not homosexual, I shouldn't feel -- feel offended.
5    Q.   I want to refer you back to what you said
6 before about her saying that Major Davis would not
7 want the complaint to go downtown. Why do you think
8 she would have said that? I'm asking for your
9 opinion.
10    A.   My personal opinion?
11        MR. NACHTMAN: Objection. You can
12 answer.
13    A.   My personal opinion, because Major Davis
14 would have got yelled at by -- probably by someone
15 downtown for allowing -- for allowing something to
16 be put up. They didn't want that to go downtown
17 because it was a homophobic -- homophobic comment.
18        And they -- the department claims they're
19 LGBT friendly, officer friendly. LGBT community
20 friendly. And for that comment to be made on the
21 wall, that did -- that does not show that the
22 department is BPD friendly.

Page 104

1        It doesn't show and for -- if it got out
2 of his district and went downtown, there could be
3 consequences on major -- on the major or anyone in a
4 command staff at the Southeast District. It doesn't
5 look -- doesn't make the district look good.
6        And Southeast District, we had -- we have
7 homo -- we had a -- we had a -- we had an off -- a
8 sergeant who was -- who was -- who was gay. And if
9 he saw that complaint, that's not fair to him
10 either.
11    Q.   Who was that?
12    A.   Sgt. Bally.
13    Q.   Do you remember his full -- his full
14 name?
15    A.   No. I don't remember his first -- full
16 name.
17    Q.   I'm showing you a document which will be
18 Exhibit 12.
19        (Whereupon Angelini Deposition Exhibit 12
20        was marked.)
21    Q.   I'll show you this one. Do you recognize
22 this document?

Page 105

1    A.   Yes, sir.
2    Q.   What is it?
3    A.   Do you mind if I read it really quick?
4    Q.   Yes, go ahead.
5    A.   (Complies.) It's a 95 I wrote to
6 document what occurred and what was going on.
7    Q.   Are you the author of this document?
8    A.   Yes.
9    Q.   To the best of your recollection, are all
10 the statements in this document correct?
11    A.   To the best of my recollection, yeah.
12    Q.   What did you do with this document after
13 you had written it?
14    A.   I made a photocopy for myself, and I
15 handed a copy in.
16    Q.   When you say you handed it in, how does
17 that work?
18    A.   You give to your chain of command, next
19 up in chain of command which would have been OIC
20 Toddman.
21    Q.   I'm showing you a document which we'll
22 call Exhibit 13.

**Plaintiff Exhibit 37**

Page 106

1    (Whereupon Angelini Deposition Exhibit 13
2    was marked.)
3    Q.   Do you recognize this document?
4    A.   I only recognize this from the discovery
5    in the police department.
6    Q.   I'm going to ask you a few questions
7    about this document.
8    A.   Uh-huh.
9    Q.   Looking at the second para -- the second
10   full paragraph, it says -- sorry. Hold on a second.
11       In this document it says, the
12   investigator spoke to Officer Steven Angelini and
13   Daniel Quaranto. Do you remember someone from EEO
14   compliance other than Sgt. Cumbo speaking to you?
15   A.   I don't recall, sir, at this time.
16   Q.   Do you remember ever communicating with
17   Detective Charles Anderson?
18   A.   Sounds familiar, but I don't recall
19   specifically why and what -- for what. Sounds
20   familiar. The name sounds familiar. I'm sorry
21   to -- at this time, I don't recall.
22   Q.   Can you -- it's pretty short. It's

Page 107

1    really one page and a second page. You don't need
2    to worry about it. Can you read the whole document
3    if you haven't already?
4    A.   You want me to read it out loud, sir,
5    or --
6    Q.   No. Just to yourself.
7    A.   (Complies.) Yeah. Oh, sorry, sir, going
8    back to your other question, may I answer that to
9    Mr. Anderson?
10   Q.   Which question? Yes.
11   A.   I do remember speaking over the phone
12   with Detective Anderson. He had asked me do I know
13   who possibly could have wrote the comment on the
14   wall. And I said no.
15   Q.   Are you finished reviewing this document?
16   A.   Yes. Yeah, I'm done.
17   Q.   So, taking the document for what it is,
18   obviously the document contains statements that you
19   might not have personal knowledge of. But having
20   read this document, do you have any reason to
21   question the investigation of Detective Charles
22   Anderson into the graffiti incident, and do you

Page 108

1    believe it was in any way inadequate, you know,
2    there were additional things that should have been
3    done that are not identified in this document?
4    A.   Yes, sir.
5    Q.   What is that?
6    A.   First of all, sir, Sgt. Kenneth Williams
7    is not -- he's not EEOC certified. When I first
8    initially went to him, he didn't take it serious.
9    Why would he take the investigation serious?
10   Q.   Well, come back to my question. What --
11       MR. NACHTMAN: Objection. He was
12   answering your question, Colin. Just let him
13   finish his answer, please.
14   Q.   Go ahead.
15   A.   EOD never came out to the district and
16   did an investigation and asked people. I've seen
17   other investigations done before. They never came
18   out and spoke to anyone. They never came out and
19   asked individuals to write 95s anonymously.
20       They never went upstairs to the bathroom
21   stall to get a good look at what happened. How can
22   Sgt. Williams just put a cross over it, a magic

Page 109

1    marker? Why not take time to paint it, a comment
2    like that?
3        Sgt. Williams is not EOD certified. If
4    he didn't know the rules or regulations and they
5    failed to come out and investigate this -- and not
6    only that, if you're reading off this, I filed -- I
7    made another complaint when I went down there with
8    Sgt. Brickus. I don't see any of that on here.
9        I was never given this paper to tell me
10   that the case was closed out. Never. I even
11   continued to call down there to find out the status
12   of my investigation, and it got ignored.
13   Q.   All right. So, do you have any personal
14   knowledge, setting aside this document, of what
15   investigative steps were taken by EODS in response
16   to your complaint?
17   A.   Yeah. I asked around if anyone, the EOD
18   ever asked them any questions or ever come to the
19   district. No one. No, no, no.
20   Q.   Who did you speak with?
21   A.   Few people. I asked Officer Quaranto.
22   He said no, he didn't see them come out. I asked

Page 110

1  Sgt. Williams, did the EODS come out, or EDOS (sic)
2  come out. And he said, no. Quite a few people that
3  I asked.
4  **Q.  Did you ever speak with anyone else from**
5  **EODS about this incident?**
6  A.  Many a times.
7  **Q.  Who?**
8  A.  Sgt. Felicia -- I mean Detective
9  Feliciano. Sgt. -- I mean Director Giaan -- Laura
10 Giantris. I spoke to --
11 **Q.  Just to limit -- just to limit the**
12 **question. Prior to filing your subsequent EEOC**
13 **charge we looked at before, in this time period in**
14 **late 2012 or early 2013, did you ever speak with**
15 **anyone else from EODS about your complaint other**
16 **than Sgt. Cumbo and Detective Anderson?**
17 A.  I'm not sure if Detective Pitts and
18 another female detective, I'm not sure when that
19 interview was conducted. It could be '13. It could
20 be '14. I'm not -- the best of my recollection, I'm
21 not sure, but I explained to them everything as
22 well.

Page 111

1  **Q.  The document is dated November 21, 2012.**
2  **Were you aware in November 2012 that the doc -- the**
3  **investigation into your claim had been closed?**
4  A.  Never, sir.
5  **Q.  When did you find out?**
6  A.  I found out when I was given this
7  documentation as discovery.
8  **Q.  I'm showing you an exhibit marked as**
9  **Exhibit 14.**
10 (Whereupon Angelini Deposition Exhibit 14
11 was marked.)
12 **Q.  Do you recognize this document?**
13 A.  Yes, sir.
14 **Q.  What is it?**
15 A.  Lt. Michael Norris gave me this document
16 sometime in late February.
17 **Q.  Is this the first time that you learned**
18 **that your case had been closed when you received**
19 **this document?**
20 A.  Which case are you concerned about,
21 sir -- speaking about?
22 **Q.  The case referenced in the document. The**

Page 112

1  **investigation in the document.**
2  A.  Can you be more specific because there
3  was numerous Complaints I filed, and I'm not sure
4  which EEOD number this is.
5  **Q.  Fair enough. Do you remember having any**
6  **conversation with Lt. Michael Norris at the time you**
7  **received this document?**
8  A.  No, sir.
9  **Q.  How did he get it to you?**
10 A.  I don't recall if it was mailed to me in
11 my mail or if it was in my mailbox at work.
12 **Q.  All right. Let's change subjects for a**
13 **moment. I want you to go back in your recollection**
14 **to the Fall of 2012 in the Southeast District. Back**
15 **in Fall 2012, what was the parking situation**
16 **like in the Southeast District station parking lot?**
17 A.  Fall 2012?
18 **Q.  Fall of 2012.**
19 A.  A disaster.
20 **Q.  What was the disaster? What was going**
21 **on?**
22 A.  There was not enough parking for us

Page 113

1  officers.
2  **Q.  Were parking spaces assigned, or was it**
3  **just first come, first served?**
4  A.  For officers and sergeants with their
5  personal vehicles, it was first curve -- first come,
6  first serve.
7  **Q.  Were some spaces assigned?**
8  A.  Yes.
9  **Q.  Who had assigned spaces?**
10 A.  Major, deputy. I mean, at the time,
11 deputy major would have been now captain. And then
12 there were spots reserved for lieutenants and
13 sergeants for the patrol -- their patrol vehicles.
14 **Q.  Who assigned the parking spaces that were**
15 **assigned?**
16 A.  The major, I believe. Best of my
17 recollection, I -- I believe it's the major or it
18 could be the City. I'm not exactly sure 100
19 percent.
20 **Q.  So, you don't really know?**
21 A.  My opinion or you want to know --
22 **Q.  I'm just asking if you have any personal**

Page 114

1 knowledge.

2    A.   I have no personal knowledge who put the
3 signs up there and assigns spots, no.

4    Q.   Did you have an assigned parking space?

5    A.   No, sir.

6    Q.   What were you supposed to do if you
7 arrived and you couldn't find a space to park in?

8    A.   I was never told what to do.

9    Q.   Was there street parking that you could
10 use for overflow parking?

11    A.   There was street parking, but I believe
12 it was for -- for -- you had to have a pass to park
13 on the street that I be -- that I recall.

14    Q.   Were there any other nearby parking lots
15 that officers were allowed to park in?

16    A.   No.  Not that -- not that I recall, no.

17    Q.   Did officers sometimes double park?

18    A.   Yes.

19    Q.   Did you sometimes double park?

20    A.   I'm trying to recall if I ever double
21 parked.  Me personally, did I double park?

22    Q.   Yes.

Page 115

1    A.   Not that I recall.  I don't personally
2 double park.

3    Q.   Did officers --

4    A.   Not that I --

5    Q.   Sorry.  Did officers sometimes park in
6 assigned spaces that were not assigned to them?

7    A.   Yes.

8    Q.   If an officer parked in a space assigned
9 to another officer and the other officer showed up,
10 was the first officer expected to move his or her
11 vehicle?

12    A.   There was -- they either would call on
13 the speaker phone on the house to move it, or they
14 would just block you in.  And then sometimes if,
15 depending on -- on the situation, they would ask you
16 to move it, yes.

17    Q.   I'm showing you a document marked as
18 Exhibit 15.

19         (Whereupon Angelini Deposition Exhibit 15
20 was marked.)

21    Q.   Do you recognize this document?

22    A.   Through discovery.  Yes, I do through

Page 116

1 discovery.

2    Q.   Do you remember having ever seen this
3 document while you were working in the Southeast
4 District?

5    A.   Never saw this document.

6    Q.   Do you remember ever being ordered at any
7 time in 2012 that if parking spaces are marked, do
8 not park there if it is not your spot?

9    A.   I'm sorry, can you repeat that question?

10 I was look -- I was reading through this, this thing
11 while you were talking.  I apologize for that.  Can
12 you repeat your question?

13    Q.   Do you remember there ever being a
14 discussion or an order by any of your supervisors in
15 the Fall of 2012 to the effect of, if an assigned --
16 if a parking space is assigned and is not assigned
17 to you, do not park there?

18    A.   No.  But there was something to the
19 effect of, don't double park.  That I remember.

20    Q.   Other than the instruction not to double
21 park, do you remember any other particular
22 instructions in the Fall of 2012 about parking?

Page 117

1    A.   I'm not sure if it was then or a few
2 months later where we had -- where parking passes
3 were issued out for Southeast District.  So, I'm not
4 sure if that came up then or afterwards.  I don't
5 know exact timing on that.

6    Q.   Other than instances involving yourself,
7 do you have any personal knowledge of whether any
8 officer to whom a space was assigned ever arrived to
9 work and found someone else's vehicle in their
10 space?

11    A.   I personally never saw a supervisor tow
12 another individual.  They -- they had to move their
13 car.  Is that what you're -- I'm sorry, can you
14 rephrase that question?  I apologize.

15    Q.   That's basically what I'm asking.  Have
16 you ever witnessed another officer being told to
17 move their car or telling another officer to move
18 their car because they were parked inappropriately?

19    A.   I was only -- I heard over one time on
20 the radio where Sgt. Brickus accused me of double
21 parking and it wasn't my vehicle.  I had -- me and
22 another officer had the same exact GTI.

Page 118

1    And she thought it was me -- she thought
2 it was me and was like -- got on air and said, have
3 Angelini move his car now. He's double parked. And
4 I got on the air and said, it's not my car -- my
5 vehicle, ma'am.
6    But other than that, I never seen -- I've
7 seen other officers parked in inappropriate spots
8 that didn't belong there. But I never saw the
9 supervisor ask them to move it or anything
10 personally, no.
11   **Q.   But you have seen people double parked in**
12 **if they parked incorrectly? Is that what you said**
13 **before?**
14   A.   I've seen double parked. I've seen --
15 and this is after my incident. I seen people double
16 parked. And before my incident. I seen double
17 parked. I've seen people -- officers pull into
18 spots that were labeled for operations lieutenant,
19 and they weren't an operations lieutenant.
20      I seen people parked in the sergeant's
21 patrol vehicle spot, and they weren't sergeants.
22 I've seen people parked -- double parked. Like I

Page 119

1 said, I've seen numerous times that happened.
2      And I -- and I personally asked that
3 officer on purpose after my incident if they were
4 asked to move or had asked to write a 95 where they
5 were parked at, and the answer was no.
6    **Q.   If an officer who had an assigned parking**
7 **space arrived at work and someone else was parked in**
8 **that parking space, what should that officer do?**
9    A.   I'm sorry, ask that question one more
10 time. I apologize.
11   **Q.   If an officer who was assigned a parking**
12 **space, let's say the operations lieutenant, arrived**
13 **at work and there was someone else parked in the**
14 **operations lieutenant sparking space, what should**
15 **the operations lieutenant do?**
16   A.   So, usually they get -- either get on the
17 radio, the police radio, or they get on the -- have
18 the front desk officer -- because there's numerous
19 times if I -- as I was working the desk I would get
20 a call from a supervisor outside asking if anyone
21 owns -- if he can put -- if I can put a page out if
22 anyone owns that vehicle, can they please move it.

Page 120

1    It's either that way or they would go on
2 the air and ask an individual whose car this belongs
3 to and can you please move it.
4    **Q.   So, they would try to figure out whose**
5 **car it was, and then they would tell them to move**
6 **it.**
7    A.   Uh-huh.
8    **Q.   Is that what would happen?**
9    A.   Uh-huh.
10       THE REPORTER: Yes?
11   A.   Yes, I'm sorry. I apologize. My
12 apologies, yes.
13   **Q.   Let's fast forward to January -- let's**
14 **fast forward to January 17th, 2013. At that point,**
15 **January 2013, was Sgt. Brickus your supervisor?**
16   A.   January 17th, you're saying?
17   **Q.   January 17th, was she your supervisor at**
18 **that time?**
19   A.   That's my recollection -- recollection
20 is, no. I believe I was in Sector 3 at the time, I
21 believe.
22   **Q.   So, who was the sergeant or acting**

Page 121

1 **sergeant running Sector 3?**
2    A.   It would be -- my sergeant when I was at
3 Sector 3 was Derek Leoffler, Sgt. Derek Leoffler.
4    **Q.   Subsequent to the incident earlier we**
5 **described on October 5th, had you had any issues**
6 **with Sgt. Brickus?**
7    A.   Before or after? What are you --
8    **Q.   In between October 5th and January 17th,**
9 **did you have any interaction issues --**
10   A.   Yes.
11   **Q.   -- with Sgt. Brickus?**
12   A.   Yes, I did.
13   **Q.   What were those?**
14   A.   So, I remember being picked on. I came
15 to work. She specifically made fun of my shoes.
16 She would say -- make comments about my pants or
17 my -- my shoes. Then she would make comments to the
18 point, well, when you coming back? Why are you
19 taking so long out on work?
20      Like claiming that I was faking, like
21 faking my injury when I had surgery. She would like
22 ask me, well, when you coming back? When you coming

Page 122

1  back to full duty? You spend more time at a desk
2  than you do on the street.
3      Q.  So, let's break that down. So, what
4  sorts of comments would she make about your shoes or
5  your pants?
6      A.  Like she was like, oh, your shoes, what
7  do you have? Do you have like your sun shoes on?
8  Well, they're -- they're colorful. Or like -- some
9  wear a different pair of shoes every day up there.
10 You know, I like collecting shoes. And she would
11 make comments about my shoes.
12      And she would make comments about my
13 pants. I might of had a wrinkle in there. She was
14 like, well, take an iron to it. Use a iron. You
15 ever heard of an iron? Make comments, small
16 comments like that.
17      And then I specifically remember, which
18 really made me upset, was that she specifically
19 said, what's taking you long? What, do you like,
20 riding the desk? Spending your career on the desk?
21 Making fun -- pretty much saying that when -- when I
22 was -- pretty much saying that I was working the

Page 123

1  front desk and not being on the street. But I had a
2  legitimate injury. I tore my ACL, I believe.
3      Q.  Do you remember when that was?
4      A.  That was sometime between October --
5  after me filing the complaint on her -- because I
6  told her that I filed a complaint on her, and she
7  was upset about that.
8      But -- and then she started just
9  nitpicking. And she really -- I would stay away
10 from her. Like I wouldn't -- that's why being at
11 the front desk kind of -- at the end of the day
12 worked out for me because I wasn't on the street.
13     Q.  Is that the reason why you were working
14 the desk, because of your ACL injury?
15     A.  It was one -- best of my recollection,
16 one of my injuries. I believe -- I believe it was
17 ACL because I had injured -- was it my ACL? It was
18 one of my injuries. One of my injuries. Yeah, it's
19 one -- I can't specifically remember if it was my
20 ACL. I think --
21     Q.  It was one of your injuries?
22     A.  One of my injuries, yeah.

Page 124

1      Q.  Were you working on January 17th, 2013,
2  if you remember?
3      A.  Can you be more specific, please?
4      Q.  January 17th, 2013, which is the day
5  we're going to talk about involving a parking
6  dispute, do you remember that day?
7      A.  Would that be the day I was suspended?
8  I'm asking because I'm not sure if it was the 17th
9  or --
10     Q.  If you look at Paragraph 22 on Page 6 of
11 the Complaint, do you have the Complaint still in
12 front of you? It's going to be our road map through
13 this story.
14     A.  I'm sorry, sir, what number is it?
15     Q.  Paragraph 22.
16     A.  What page?
17     Q.  Page 6.
18     A.  Thank you. This is on or about -- I'm
19 sorry.
20     THE REPORTER: Read to yourself.
21     A.  I'm sorry. According to this document, I
22 was working the -- the 17th.

Page 125

1      Q.  Do you have a personal recollection of
2  that, or are you just reading the document? It's
3  not a trick question.
4      A.  No, I'm just -- I was -- I was working --
5  I was full duty working by the 17th, the -- for best
6  of my recollection, I believe I was working.
7      Q.  Were you no longer on light duty?
8      A.  I was no longer on light duty.
9      Q.  What were you working, what assignment?
10     A.  I was working Sector 3.
11     Q.  Is that a patrol assignment?
12     A.  That's an area assignment, and I had a
13 permanent post car, 32 car.
14     Q.  What time is roll call on the shift you
15 were working that day, if you remember?
16     A.  1439 hours.
17     Q.  Do you remember when you got to work that
18 day, was there any available parking in the district
19 station lot?
20     A.  There was none that day.  I -- I couldn't
21 find one. I drove around the lot a few times. And
22 I seen that there was a spot open, and I was parked

Page 126

1  in it.

2     Q.   Where did you park?

3     A.   I parked in a spot that was indicated for

4  neighborhood services unit.

5     Q.   When you say it was indicated, was there

6  a posted sign saying that the space was assigned to

7  a neighborhood services unit?

8     A.   Yes, sir.

9     Q.   Were you assigned to the neighborhood

10  services unit?

11    A.   No, sir.

12    Q.   Did you on that day have any reason to

13  question the authority of whoever put that sign up?

14        MR. NACHTMAN: Objection. You can

15  answer.

16    A.   No, but I had no other choice to park

17  anywhere else.

18    Q.   Were you running late for roll call?

19    A.   No.

20    Q.   Did you believe that you were permitted

21  to park there temporarily during roll call?

22    A.   I believed personally that it would not

Page 127

1  have affected anyone or anything for me to park

2  there until after roll call was done because the

3  Patrol Car 4 at issue was out on the street.

4     Q.   When you say it was out on the street,

5  would that mean that it would have come back during

6  or at the end of roll call?

7     A.   It could have possibly came back, yes.

8     Q.   Who was Sgt. Venera Drennon?

9     A.   She was the NSU sergeant.

10        THE REPORTER: You have to take your hand

11  down.

12        THE WITNESS: Oh, I'm sorry. My

13  apologies.

14        THE REPORTER: She was the --

15    A.   NSU sergeant.

16    Q.   When you say NSU, you're referring to

17  neighborhood services?

18    A.   Yes.

19    Q.   Had you previously ever parked in a space

20  assigned to neighborhood services, like the one you

21  parked on -- in on that day?

22    A.   I believe I possibly could have parked in

Page 128

1  other -- in marked spots before, yes.

2     Q.   Had you ever had a conversation with

3  Sgt. Drennon about parking in the neighborhood

4  services parking spaces --

5     A.   No.

6     Q.   -- previous to that day?

7     A.   No.

8     Q.   And Sgt. Drennon never told you not to

9  park in neighborhood services parking spaces?

10    A.   Never.

11    Q.   Prior to this incident, how would you

12  describe your relationship, if any, with

13  Sgt. Drennon?

14    A.   We weren't -- we were not on talking,

15  like I didn't speak to her, she didn't speak to me

16  really much.

17    Q.   Do you mean because you didn't have a

18  reason to speak or because you specifically didn't

19  speak with her?

20    A.   I specifically stayed away from her

21  because of -- of comments she made to me before in

22  the past.

Page 129

1     Q.   What comments?

2     A.   She told me not to put in for -- I wanted

3  to put in for the neighborhood services unit. She

4  told me not to put in for it because I would be

5  wasting my time because I'm a sneaky officer.

6     Q.   Do you remember when that was?

7     A.   Not the best of my recollection, no, but

8  I know it was before the parking spot.

9     Q.   Do you remember what year it was?

10    A.   It was between 2011 when I worked for her

11  boyfriend Sgt. Williams and, I'm sorry, it was

12  before -- before 2011 when I worked with her

13  boyfriend Sgt. Williams, and -- and 2013. It was

14  between that time. I remember there was a posting

15  for NSU.

16    Q.   So, it might have been in 2011 or 2012,

17  but you don't remember when?

18    A.   No, I don't exactly remember when.

19    Q.   So, how did it come out that she said to

20  you that she thinks you're sneaky? Like paint the

21  picture for me. What happened?

22    A.   Well, she personally said it to my face.

Plaintiff Exhibit 37

Page 130

1    Q.   Where were you?

2    A.   I -- so, there was a posting for NSU on

3    the wall saying, anyone inter -- any members

4    interested putting in for -- for NSU, we have an

5    opening. So, I decided that, you know what, I would

6    like to interact with the community, deal strictly

7    with the community.

8         So, I wrote a 95 because it was

9    internally. When anything is internally and want to

10   be moved, you write a 95, not a 70 for a request.

11   So, I wrote a 95. And it said to be handed to

12   Sgt. Drennon, if you're interested.

13        I go hand her my 95. And I tell her,

14   ma'am, I'd like to be part of your unit. Here's my

15   95. When is the interviews, if you don't mind? She

16   said, don't waste your time, Angelini. I don't want

17   you in my unit.

18        I said, ma'am, with all due respect, why?

19   What did I do wrong to you?

20   A.   She's like, you are a sneaky officer.

21   Q.   Did anything else get said during that

22   conversation? Do you remember?

Page 131

1    A.   That was it, and I walked away.

2    Q.   Why do you think she said that to you?

3    A.   I have no idea whatsoever. The only

4    thing I could think of is, she is -- was in a

5    relationship with Sgt. Williams. And Sgt. Williams,

6    I worked for Sgt. Williams. Other --

7    Q.   During what time period, if you remember,

8    was Sgt. Williams your supervisor?

9    A.   From 2000 -- actually from when I first

10   came to the Southeast District. When I first went

11   to the Southeast District, he was my first

12   supervisor.

13   Q.   Would that have been more than a year?

14   A.   Oh, way more. Yeah, I believe so. More

15   than a year. Maybe two years.

16   Q.   Do you believe -- whether you have any

17   personal knowledge, do you believe that

18   Sgt. Williams may have told Sgt. Drennon that you

19   were sneaky or something that would lead her to

20   conclude that?

21   A.   Either him or someone else because I

22   never worked for her. So, for her to come up with

Page 132

1    that assumption, I don't understand where she got it

2    from.

3    Q.   Do you have any other place where she

4    might have gotten that from other than

5    Sgt. Williams?

6    A.   No, sir. I mean, it could have been

7    anyone, but she was in a relationship with

8    Sgt. Williams. And the only reason I'm concluding

9    that is because I worked for Sgt. Williams. That's

10   what made me think it could be him.

11        Because when you -- you would have -- you

12   would have to hear something about me, and it would

13   have to be someone that you're friends with or have

14   a close relationship with to speak about me that I

15   am sneaky.

16        So, I -- I believe it was Sgt. Williams,

17   but personally I don't know. That's what I believe.

18   I don't -- I can't say definitely who said it.

19   Q.   What was your impression of your working

20   relationship with Sgt. Williams?

21   A.   I believe it was great. I had great --

22   done great work. And he said I was the best cop

Page 133

1    he's ever seen in the police department.

2    Q.   Had he ever told you that he thought you

3    were a bad officer or sneaky or anything like that?

4    A.   Never.

5    Q.   If you had been assigned to neighborhood

6    services, would Sgt. Drennon have been your

7    supervisor?

8    A.   Yes. Yes.

9    Q.   Did you know prior to applying that she

10   had an opinion of you?

11   A.   No, sir, or else I wouldn't have put it

12   in.

13   Q.   After parking your car, what happened

14   next? Sorry for jumping around a little.

15   A.   So, would you like me to tell you the

16   exact story because I can picture it in my mind

17   right now --

18   Q.   Go for it.

19   A.   -- exactly what happened?

20   Q.   I'll stop you if we get to a point where

21   I want you to stop, but you can go.

22   A.   I remember that day that I pulled into

Page 134

1 the district lot. It was around 1425, 1430. I
2 walk -- I drive in. I drive around the parking lot.
3 Don't see any parking whatsoever. No parking. I
4 can't find a parking spot.
5          Cutting it close, I drive by -- I see
6 that Sgt. Drennon had her personal vehicle parked in
7 one of the spots. I noticed that the departmental
8 Police Vehicle 2 at issue was missing. So, I said,
9 I'll take the chance and I'll park here rather than
10 be late. Go to roll call and then move it soon as I
11 was done.
12          So, I remember pulling in. Getting out
13 of my vehicle. I had walked up by the wall where
14 the spots are hung up. And I remember seeing
15 Sgt. Drennon -- or Sgt. Brickus had just pulled up
16 right after I did. She pulls up into the either
17 Sector 3 supervisor spot for a patrol vehicle or the
18 lieutenant operations spot.
19          I remember making eye contact with her.
20 She was on her cell phone. Didn't say a word to me.
21 I walked up the ramp. Walked into the door.
22 Seen -- notice a couple officers sitting in the

Page 135

1 Sector 1 cubicle. Walked in there, started talking
2 to Officer Zias.
3          Which time, all of sudden, Sgt. Brickus
4 comes in. States to me that I needed to move my
5 vehicle, and that I needed to write an
6 Administrative 95 on why I parked there per
7 Sgt. Drennon. I said -- to which time I said that
8 -- best of my recollection at this time I remember
9 saying to her, are you serious?
10          And she says, are you speaking to me? I
11 said, ma'am, with all due respect, I have no problem
12 moving my vehicle. But if I have to write a
13 Administrative 95, that I would like to be formally
14 charged through the department for parking my
15 vehicle there.
16          And she became irate. Are you talking to
17 me that way? Ma'am -- and I got up and I started to
18 walk out. I said to myself, I'm tired of being
19 picked on. I had enough. I had enough. I just
20 want to leave this district. And I walked out.
21          And what happened was, Sgt. Drennon come
22 to find out was sneak -- sneaking and listening in

Page 136

1 behind a wall. Listening to the conversation.
2 Eavesdropping. So, when that happened, got up,
3 walked out, went to go walk around, and I almost ran
4 into her and went like that because I didn't know
5 anybody was there.
6          So, I continue to walk around her and
7 began to walk by the -- to walk out. I get screamed
8 at. Angelini, get back in here and go to O-9's
9 office.
10   Q.   Who screamed at you?
11   A.   Sgt. Brickus. I turned around -- for
12 some reason, I don't know why this happened, but
13 when she said that to me, I went to the locker where
14 I go every day and tried to grab the Lidar gun.
15          THE REPORTER: Tried to grab the what?
16   A.   Lidar gun. It's L-I-D-A-R, Lidar gun.
17 It's a laser that shoots for speed. Because I like
18 doing traffic, and I use that gun. There was only
19 one gun at the time, and I usually try to grab it
20 first before anybody else grabs it. Because if
21 somebody else grabs it, good luck that day, you're
22 not getting it.

Page 137

1          So, I don't know why, it was just my
2 brain. I wasn't doing it on purpose or anything. I
3 just -- as I was walking by, I said, let me grab
4 the -- grab the Lidar gun. So, I went to start the
5 code and she screamed at me again, get in O-9's
6 office.
7          So, I walked in O-9's office. As I walk
8 in O-9's office, her, Sgt. Drennon and then for some
9 reason, Sgt. Brokus was already seated in O-9's
10 office because he had worked -- he was working the
11 shift prior. They shut the door on me.
12          And then based on my recollection that
13 day, I remember them saying what -- like pretty much
14 what's my problem? Why -- why I parked there? I
15 said, ma'am, I said I'm tired of being picked on.
16 Leave me alone.
17          I said -- best of my recollection I said,
18 you guys don't like me. I want to leave this
19 district and no one is allowing me to. I'm tired of
20 being picked on. And that was -- and sergeant -- I
21 remember them saying, well, we're not picking on
22 you.

Page 138

1    And I said -- that was the end of it. I
2 remember them telling me to move my car, and I moved
3 my car. I don't remember where I parked it at or
4 what I did from there. That I don't remember.
5    **Q.  All right. So, I'm going to ask you a**
6 **few questions to break a few portions of that story**
7 **down.**
8       **So, when Sgt. Brickus first spoke to you,**
9 **did she tell you that Sgt. Drennon had asked you to**
10 **move your vehicle? Through her, not spoken to you,**
11 **but did Sgt. Brickus say, Sgt. Brickus --**
12 **Sgt. Drennon told me to tell Angelini to move his**
13 **vehicle. Is that something like what happened?**
14    A.   No. She says specifically, I remember,
15 you need to move your vehicle. And per
16 Sgt. Drennon, you need to write a 95 --
17 Administrative 95 on the reason why you parked
18 there.
19    **Q.   Did you consider that an order to move**
20 **your vehicle?**
21    A.   Yes, I did.
22    **Q.   Did you think that was an unreasonable**

Page 139

1 **order?**
2    A.   No. Not at all.
3    **Q.   Did you tell her that you would move your**
4 **vehicle after roll call?**
5    A.   I had asked her if I could move my
6 vehicle after roll call because there was no
7 parking, but she didn't let me finish. She
8 interrupted me and felt that I was being, I guess,
9 insubordinate or whatever she claims that I was.
10      But I was just trying to explain to her
11 that, ma'am, there's no parking. Is it okay if I
12 move it after that? And she didn't want to hear any
13 of that, and she became irate and said -- that
14 was -- I mean, that's what I recall her saying to
15 me.
16    **Q.   Did she insist that you needed to move**
17 **your vehicle before roll call?**
18    A.   She just said I'm -- she just asked me
19 one time if I could move my vehicle and -- and that
20 I need to write a 95. And all I said was, I asked
21 her first, is it okay to park it there until after
22 roll call? I was just asking for a favor because

Page 140

1 there's no parking.
2       We all had issues about parking. And she
3 didn't -- never, never let me finish to tell her
4 like, you know, there's -- there's no one parked
5 there right now. It won't hurt anyone right now.
6 Just until roll call. Roll call is not that long.
7    **Q.   Did she seem to be very impatient about**
8 **the subject?**
9    A.   She was -- she was upset that I had -- I
10 guess I had said, with all due respect, you can
11 formally charge me. But I remember strictly saying,
12 with all due respect. I wasn't hostile as they
13 claim I was.
14    **Q.   So, let's talk about the request about**
15 **the administrative report. What is it an**
16 **administrative report?**
17    A.   Administrative report is a 95.
18    **Q.   A form --**
19    A.   Form 95.
20    **Q.   A form that says 95 at the top?**
21    A.   95, yes. It is to document any internal
22 or outside -- or outer. Any -- anything. Any

Page 141

1 actions or anything you would like to write on a
2 Form 95 to document for any reason -- any reason so
3 the department would know about it or your records
4 for anything. A 95, you can write anything on a 95.
5 It's just a document of stuff throughout the
6 department.
7    **Q.   Is it a catchall form for anything that**
8 **doesn't have another form for it already?**
9    A.   Catchall form? I guess you can
10 categorize it as that if you want to.
11    **Q.   I don't need to argue with you about**
12 **that. The documents that we saw before where you**
13 **had written reports to -- or at least one report to**
14 **Major Davis, was that a 95?**
15    A.   Yeah, that's -- well, when we were in the
16 academy, we were taught how to write 95s and what --
17 and the format of it. We were always told to
18 address your major as -- on the 95 as the top thing.
19 Put your -- the district you're working at for
20 the -- and who the district major was. And then you
21 put in the -- the official channels. If I can show
22 you on the 95, this is the format how they told us.

**Plaintiff Exhibit 37**

Page 142

1    Q.    Which exhibit are you looking at?

2    A.    I'm looking at Exhibit 9. So, when we

3   were at the academy, we were told to always address

4   to your major. Always write official channels. To

5   write who it's from. And then your -- and your

6   title, whatever you like the title of.

7          And then you always write respectfully.

8   And then you always sign it and then write your name

9   at the bottom of it.

10   Q.    So, that Exhibit 9 is an example of a 95

11  like what you're talking about here?

12   A.    Correct.

13   Q.    And Sgt. Drennon wanted you to write a

14  report on a similar form like that about this

15  incident?

16   A.    Yes.

17   Q.    Is there any special significance to

18  being ordered to write an administrative report or

19  95 on something?

20   A.    Well, my belief was -- is that me writing

21  this Document 95 by -- and ordered by her was to

22  reprimand me in some kind of way because I was being

Page 143

1   picked on all the time. Ever since, you know, I

2   filed the complaint, that I felt that I could not

3   win in this district no matter what I did.

4          If I was late for roll call that day, I

5   would have been in trouble. If I parked there, I

6   would have been in trouble. If I would have double

7   parked, I would have been in trouble. If I would

8   have parked on the street, I would have been towed

9   and then have no car.

10         It's like I couldn't win. I felt

11  defeated. So, I felt at that point that she's

12  requesting a document, which I never seen anyone

13  else had to write a 95, why would I have to write a

14  95?

15         And I was just like, at this point I had

16  enough. I was so fed up. I couldn't do it anymore.

17  I was so mentally beat down by the Southeast

18  District that all I wanted to do was just leave. I

19  didn't want to be there no more.

20         Or after the homo comment, and they

21  wouldn't let me leave. That's all I wanted to do.

22  And they wouldn't let me leave. And they're

Page 144

1   purposely looking to hurt me. Purposely, purposely,

2   purposely. So, I felt offensive when she told me to

3   write the 95 because I never seen anyone else write

4   a 95 and they park in those spots.

5    Q.    Did you think being asked to write a 95

6   was hurtful?

7    A.    Yes.

8    Q.    Did you think it was a ridiculous

9   request?

10   A.    I think it was -- I think it was

11  personal.

12   Q.    When you say personal, what do you mean?

13   A.    I never seen her ask anyone else that

14  parked in those spots to write a 95 or heard of

15  anybody writing a 95 for parking in an inappropriate

16  spot.

17   Q.    Did you ask Sgt. Brickus if the request

18  was serious?

19   A.    As I explained to you earlier, sir, that

20  I said to her when she first walked in that I --

21  when she said to me that she -- you need to move my

22  vehicle and write a 95. I said to her, are you

Page 145

1   serious? That's exactly what I said to her.

2    Q.    Did you believe at that point that you

3   had engaged in any misconduct?

4    A.    No, sir.

5    Q.    Did Sgt. Brickus threaten at that point

6   to charge you with any misconduct?

7    A.    No, sir.

8    Q.    Did you ask Sgt. Brickus to formally

9   charge you with misconduct?

10   A.    I asked her to formally charge me, yes,

11  sir.

12   Q.    Why did you ask her to do that?

13   A.    It would be another reason to get out of

14  this district, it would be a way out maybe so I

15  could be heard in front of downtown. Maybe someone

16  important that cared that I can get out of this

17  district. Because I handed in 70s to be asked to

18  leave, and no one listened to me.

19         Nobody asked -- I asked for help to get

20  out of here. I wanted to be suspended. Maybe have

21  a suspension hearing, I could -- they'd find out

22  that I requested 70s and it would go and downtown

Page 146
1 someone knew about it, and it was my way out. I
2 wanted to be charged. I didn't care at that point
3 anymore.
4    Q.    Now, I don't want to add a
5 characterization here; so, I'll let you do it. But
6 would you say that now you are feeling very
7 emotional describing this incident?
8    A.    Reliving this incident every day for the
9 past six -- six years, yes, is just very emotional.
10 Takes a beat down on me.
11    Q.    Were you emotional at the time?
12    A.    I wasn't emotional. I was upset. I was
13 feeling beat down by the same people over and over.
14 Picking on me. Picking on me about nothing. I was
15 a great worker. Hard worker.
16       All I did was file a complaint to report
17 something. And what did I deserve to get this
18 treatment?
19    Q.    Did you ever raise your voice in your
20 conversation with Sgt. Brickus?
21    A.    Me personally? My belief, no. But I am
22 Italian and I speak loud and I speak with my hands.

Page 147
1 Some people take offense to that. And they always
2 claim that I'm loud. And I told internal -- EEOC
3 about it, that my Italian descent I speak loud, I
4 speak with my hands.
5    Q.    Do you think you spoke loud and with your
6 hands on that instance?
7    A.    Most likely I probably did because I
8 always speak loud.
9    Q.    After you asked to be formally charged,
10 did Sgt. Brickus order you to report to the shift
11 commander's office?
12    A.    Sir, I told you that, that when I went to
13 go walk outside and move my car, that she told me to
14 report back to O-9's office.
15    Q.    Who was the shift commander that day?
16    A.    I believe it was St. Brickus, the best of
17 my recollection. No, no, no, no. Let me take that
18 back. Strike that back, ma'am. It was actually
19 Lt. Windel.
20    Q.    Do you remember Lt. Windel being present
21 in the district that -- during that shift?
22    A.    Not yet.

Page 148
1    Q.    Do you mean that you believe Lt. Windel
2 hadn't arrived yet for that shift?
3    A.    Oh, I don't want to believe -- speculate
4 where he was because --
5    Q.    I don't want you to speculate. Only what
6 you know and what you think might have happened.
7    A.    I did not see him yet. But I know 100
8 percent right now that he was definitely working
9 that day, 100 percent.
10    Q.    But you don't know whether he had arrived
11 to the district at that time?
12    A.    I couldn't tell you if he was outside
13 smoking his cigars like he usually does, or if he
14 was -- I don't know what he was doing, sir.
15    Q.    Once inside the shift commander's office,
16 did you say that Sgt. Drennon did not like you?
17    A.    I did say that, correct.
18    Q.    Did you say that Sgt. Drennon was out to
19 charge you?
20    A.    I did say that, correct.
21    Q.    Did you describe previous instances where
22 you had had issues with Sgt. Drennon?

Page 149
1    A.    Yes, I did.
2    Q.    Do you remember what you said?
3    A.    I do remember saying that Sgt. Drennon
4 does not like me, and she personally told me that I
5 was sneaky and didn't want me in the unit, her unit.
6 I remember stating something to that effect.
7    Q.    Anything else?
8    A.    I just remember saying that you're all
9 out to get me.
10    Q.    Did Sgt. Brickus tell you that you had
11 been disrespectful and insubordinate?
12    A.    She never personally told me that.
13    Q.    Did Sgt. Brickus then give you an order
14 to move your car?
15    A.    She told me I could move my car now.
16    Q.    Did you move your car?
17    A.    Yes.
18    Q.    Where did you move your car to?
19    A.    I don't recall.
20    Q.    Later that day, did you write an
21 administrative report outlining the events we just
22 discussed?

Page 150

1   A.   Yes, sir.
2   Q.   I'm showing you a document which will be
3   Exhibit 16.
4         THE REPORTER: Exhibit 12? Off the
5   record.
6         THE VIDEOGRAPHER: We're going off the
7   record. The time is 12:10 p.m.
8         (Whereupon a brief recess was taken,
9   after which the following was heard:
10        THE VIDEOGRAPHER: We're back on the
11  record. The time is 12:20 p.m.
12        (Whereupon Angelini Deposition Exhibit 16
13  was marked.)
14  Q.   Officer Angelini, do you have a document
15  in front of you marked Exhibit 16?
16  A.   Yes, sir.
17  Q.   Do you recognize that document?
18  A.   Give me just a brief to go through it.
19  Q.   Yes.
20  A.   (Complies.) All right, sir.
21  Q.   Are you the author of this document?
22  A.   Yes, sir.

Page 151

1   Q.   Is this a report that you wrote to Major
2   Davis on January 17th, 2013?
3   A.   Yes, sir.
4   Q.   Does this document accurately reflect
5   your recollections of the events described?
6   A.   Yes, sir.
7   Q.   Lower down on the document there's a
8   sentence that says, I feel that Sgt. Drennon along
9   with Sgt. Brickus do not like me and are out to get
10  me because you are sneaky.
11        Do you see that portion? We talked about
12  that subject before, but --
13  A.   Yes, sir. Yes, sir. I see it.
14  Q.   Do you see the part in the document, sir,
15  as I see -- I believe Sgt. Drennon thinks I'm sneaky
16  because of Sgt. Williams. Sgt. Williams attempted
17  to charge Officer Quaranto and I for conducting a
18  search warrant.
19        And then it goes on. Do you see that
20  portion?
21  A.   Yes, sir.
22  Q.   Could you briefly describe that incident

Page 152

1   with the search warrant?
2   A.   Sure, sir, I'll gladly do that. So,
3   Officer Quaranto and I made an arr -- made an arrest
4   in -- involving narcotics. We did some
5   surveillance. And Officer Quaranto wanted to write
6   his first search -- search warrant. So, I told him
7   I'd be his co-affidavit.
8         So, we had gone to Sgt. Williams and
9   asked Sgt. Williams if he wanted to be with us when
10  we raided the house, that we were -- we told him
11  that we're writing a search warrant on a house. And
12  that if he wanted to be part of it when we raid it
13  later that day. And he said, no, he didn't want to
14  be part of it. So, what happened was --
15  Q.   Keep going.
16  A.   Okay. So, after we're getting assigned,
17  we found another supervisor. Her name was Jackie
18  Hubbard who worked in narcotics, if she would help
19  us because Sgt. Williams said he would not want to
20  be there with us when we conducted the raid.
21        And I remember when we asked him that
22  there was another officer seated inside the cubicle,

Page 153

1   Sector 2 cubicle when we asked him, and he said he
2   didn't want to be no part of it.
3         So, Officer Quaranto and I got
4   Sgt. Jackie Hubbard to help us conduct a search
5   warrant at a location because we had to have a
6   sergeant present per the policy to conduct a search
7   warrant at a location.
8         So, we did the search warrant. I believe
9   it was the next day, Sgt. Williams spoke to me and
10  Quaranto and said that he was going to file a
11  incident report on us for not -- for not coming to
12  him about the search warrant.
13        And then Sgt. Quaranto and I were like --
14  I couldn't understand why he would say something like
15  that when we did go to him. And if anything, we
16  were do -- we were doing a great job by taking
17  initiative to do a search warrant. And for him to
18  come after us for doing good work, why would you
19  come after us? And we felt that we were being
20  misled and lied -- lied about.
21        So, we wrote -- personally we wrote our
22  own 95s of what happened and put the witness' name

Page 154

1  in there who heard what happened -- who was there
2  present when Sgt. Williams was asked by us if he
3  wanted to par -- to be part of this search warrant.
4        So, when we -- when we told him we had
5  95s written up and that we believe his story is
6  inaccurate, he said, let's meet up in a alleyway. I
7  remember this. We were on -- we were on -- in that
8  225 zone. He calls us on the radio and tells us to
9  meet somewhere.
10        We met at a location, and I remember
11  walking into the alley. He says, let me have your
12  95s. I hand him my 95. Sgt. Quaranto hands him his
13  95. He goes, choo, choo, he rips them up. Says,
14  this is over with. We handle this as men right
15  here. Next time just -- you know, if you guys are
16  going to do a warrant and -- just come to me.
17        And like we said, sir, we did come to
18  you, sir. And he's like, all right, don't worry
19  about it. It was a misunderstanding. But we took
20  care of this as grown men. We handled it. It's
21  squashed. Nothing is going to happen. Don't worry
22  about your 95s.

Page 155

1        So, I had made an additional copy of my
2  95. And the only reason you have this evidence and
3  know about this incident is because of me
4  discovering it to you because it was in my files.
5        There was no actions taken through the
6  Baltimore Police Department for -- for any incident
7  pertaining to Sgt. Williams. But the only reason
8  you know about this incident is because I provided
9  it to you because of my documentation.
10    **Q.   Do you think Sgt. Williams initially**
11  **thought that you had done something wrong?**
12    A.   I believe that -- I don't know what to
13  believe what he believed. I really don't understand
14  where he was coming from because we don't have to
15  write search warrants. That's an extra. That's
16  extra good work, writing search warrants.
17        And we went to him, and Sgt. Quaranto and
18  I, we never been in trouble before. And for him to
19  claim saying that we didn't go to him was a complete
20  lie. And Sgt. -- and Dorado was there, Officer
21  Dorado, and he overheard it. He was our witness.
22    **Q.   All right. Turning back to Sgt. Drennon**

Page 156

1  **very briefly, other than that -- I'll strike that**
2  **entire question.**
3        **As a result of the incident on**
4  **January 17th, 2013, were you charged with a**
5  **disciplinary infraction?**
6    A.   I was brought up on charges, never given
7  due process. Just -- I was actually -- let me --
8  let me rephrase that. I was brought up on charges,
9  suspended of all my police powers, and put to work
10  the desk at the Southeast District. And never
11  brought up on charges a day and a year later without
12  due process.
13    **Q.   I'm showing you a document marked --**
14  **strike that.**
15        **So, as a result of the incident on**
16  **January 17th, 2013, were your police powers**
17  **temporarily suspended?**
18    A.   Yes, sir.
19    **Q.   What does that mean to have your police**
20  **powers temporarily suspended?**
21    A.   That I'm no longer a pol -- I can no
22  longer take police actions. The rules and

Page 157

1  regulations state that -- that I not have any
2  contact with the public or any police duties. That
3  I'm -- my weapon is taken away. My police ID is
4  taken away.
5        That I will have a suspension hearing as
6  soon as possible for a reinstatement hearing, and
7  that I'm no longer a police officer at this time.
8    **Q.   Did you miss any days of work as a result**
9  **of that?**
10    A.   Yes, I did.
11    **Q.   What days did you miss?**
12    A.   I put in vacation days. Well, I
13  didn't -- I'm sorry, let me rephrase that, I
14  apologize. I didn't miss -- miss days, but I used
15  vacation days to stay home and avoid working the
16  front desk along with Sgt. Brickus.
17    **Q.   Other than using those days of vacation,**
18  **did you lose any days of vacation?**
19    A.   No, sir.
20    **Q.   Were you required to work a different**
21  **schedule while your police powers were temporarily**
22  **suspended?**

Page 158

1   A.  No, sir.

2   Q.  What kind of work did you do while your

3   powers were suspended?

4   A.  Worked the front desk. And take reports

5   and answer the phones.

6   Q.  Was that the same type of work that you

7   had done when you were on light duty the year

8   before?

9   A.  Yes, sir. Yes, sir.

10  Q.  Do other officers sometimes do similar

11  work to work in the front desk and answering phones?

12  A.  Yes, sir.

13  Q.  If you know, what is the procedure

14  whereby police powers get suspended?

15  A.  What is the procedure, sir?

16  Q.  Do you know -- if you don't know, you can

17  say no. Do you know the procedure for how an

18  officer's police powers get suspended?

19  A.  I -- I don't personally know those

20  procedures, no. No, sir.

21  Q.  Do you personally know who has the

22  authority to suspend police powers?

Page 159

1   A.  A sergeant and above.

2   Q.  Are you guessing or -- or do you actually

3   know that a sergeant or above has the authority to

4   suspend police powers?

5   A.  Actually I don't -- sir, I really don't

6   know the actual process or who has the authority. I

7   know an officer can't suspend another officer. I

8   know that.

9   Q.  I'll show you a group of documents marked

10  Exhibit --

11  THE REPORTER:  17.

12  Q.  -- 17.

13  (Whereupon Angelini Deposition Exhibit 17

14  was marked.)

15  Q.  Could you tab -- could you briefly look

16  through that -- actually don't do that. Let's do

17  them one at a time, a little easier.

18  So, let's look at the first document. Do

19  you recognize this document?

20  A.  Can you give me a brief second to review

21  it, please?

22  Q.  Yes.

Page 160

1   A.  (Complies.) Yes, sir, I've seen this,

2   sir. Yes, I understand it.

3   Q.  What is this document?

4   A.  This is a Document 95 stating my

5   suspension.

6   Q.  Based on your own recollection, who was

7   it that ordered this suspension of your police

8   powers?

9   A.  Sgt. Brickus.

10  Q.  Do you have a recollection of

11  Sgt. Brickus personally ordering the suspension of

12  your police powers?

13  A.  I was told by Lt. Windels -- Windel that

14  Sgt. Brickus wanted -- ordered the suspension.

15  Q.  Who was it that actually suspended your

16  police powers?

17  A.  Lt. Windel.

18  Q.  Do you have any reason to believe that

19  the decision to suspend your police powers was

20  illegal?

21  MR. NACHTMAN:  Objection.

22  Q.  You can answer if you know.

Page 161

1   A.  Yes, I believe it was illegal.

2   Q.  What reason do you have to believe it was

3   illegal?

4   MR. NACHTMAN:  Objection. You can

5   answer.

6   A.  If I was -- the -- the general order

7   states from a suspension, the reason for suspension

8   is to -- for the safety of the -- the police

9   department, the officers and the public.

10  If I was such a -- a risk to the public,

11  the police department and the -- and the citizens,

12  why did I get suspended at the end of my shift and

13  not at the beginning when they accused me of being

14  so erratic then?

15  Why would you put the public at risk?

16  Why would you put the members of the department at

17  risk? And then later suspend me later on, they

18  would take on a liability issue if -- if I would

19  have done something on the street at that time.

20  Q.  Is that your only reason?

21  A.  And also I -- I believe that Sgt. Brickus

22  is best friends with Captain Burrus. Never

Page 162

1 contacted Lt. Windel about the suspension until she
2 got confirmation from Captain Burk -- Captain Burrus
3 after 2030 hours after I had a conversation with her
4 the same day and got -- told her she wanted me
5 suspended.
6        And they both concluded to suspend me,
7 and then Lt. Windel was notified because he told
8 me -- Lt. Windel told that it was over -- in over
9 his head. He had nothing to do with it.
10   **Q.   Did he tell you that Captain Burrus had**
11 **ordered the suspension?**
12   A.   He told me exactly -- this is the exact
13 words. He said, Sgt. Brickus notified -- called
14 Sgt. -- excuse me, Captain Burrus. They had a
15 discussion and now I'm suspended. And it was over
16 his head.
17   **Q.   Is that all you know about the line of**
18 **authority on the suspension?**
19   A.   Me personally? And based on policy, I
20 believe Sgt. Brickus skipped chain of command.
21   **Q.   When you say she skipped chain of**
22 **command, do you mean you think that Sgt. Brickus**

Page 163

1 **should have contacted Lt. Windel before contacting**
2 **Captain Burrus?**
3   A.   Correct.
4   **Q.   What makes you say that she should have**
5 **contacted Lt. Windel?**
6   A.   We have a chain of command, sir, that
7 we're supposed to follow. Chain of command goes
8 officer-sergeant, sergeant-lieutenant,
9 lieutenant-captain, captain-major.
10   **Q.   Do you know if Sgt. Burrus spoke to**
11 **Lt. Windel?**
12   A.   Sgt. Burrus?
13   **Q.   I'm sorry, Sgt. Brickus.**
14   A.   Sgt. -- Lt. Windel explained to me that
15 he was not aware of anything until she -- he got the
16 phone call from Sgt. -- Captain Burrus that I was
17 going to be suspended. And he told me that
18 Sgt. Brickus and Burrus had a conversation and
19 that -- after that, they determined I should be
20 suspended.
21   **Q.   Did Lt. Windel tell you that Sgt. Brickus**
22 **had broken the chain of command?**

Page 164

1   A.   He personally didn't tell me, no. But he
2 said it was over his head.
3   **Q.   So, when you say you believe he -- she**
4 **broke the chain of command, that is an inference**
5 **that you're making?**
6   A.   Based on what Lt. Windel told me, that
7 Sgt. Brickus never came to him and asked if I should
8 be suspended, she definitely broke the chain of
9 command.
10   **Q.   For how long were your police powers**
11 **suspended?**
12   A.   I'm giving an approximate amount of time,
13 and don't quote me on this, and best of my
14 recollection, approximately maybe over a month.
15   **Q.   Do you remember -- do you have a specific**
16 **recollection of when your police powers were**
17 **restored?**
18   A.   Based on my recollection today, and don't
19 quote me on this 100 percent, I want -- I'm going to
20 say Super Bowl Sunday, or sometime around that --
21 that time.
22   **Q.   All right. Were you given a hearing**

Page 165

1 **after your police powers were suspended?**
2   A.   I was given a hearing. Not as fast that
3 I would -- as I would have liked, but, yes, I was
4 given a hearing.
5   **Q.   Can you turn to the third page of the**
6 **document that I gave you before?**
7   A.   (Complies.) Yes, sir.
8   **Q.   Is that your signature at the bottom?**
9   A.   This -- this Exhibit --
10   **Q.   Third page --**
11   A.   -- Exhibit 17?
12   **Q.   I'm sorry, fourth page. I apologize.**
13 **The fourth page. It says at the top, Form 99153.**
14   A.   Yes, sir.
15   **Q.   Is that your signature at the bottom?**
16   A.   Yes, sir.
17   **Q.   Did you receive that document?**
18   A.   Yes, sir.
19   **Q.   I'm showing a document marked Exhibit 18.**
20        (Whereupon Angelini Deposition Exhibit 18
21 was marked.)
22   **Q.   This document -- have you ever seen this**

Plaintiff Exhibit 37

Page 166

1 document before?
2    A.   Yes, sir.
3    Q.   What is it?
4    A.   It is the discussion that happened at
5 my -- at my trial board.
6    Q.   When you say your trial board, do you
7 mean your suspension?
8    A.   I mean, I'm sorry, my suspension hearing.
9    Q.   Did you attend that meeting?
10   A.   Yes, sir.
11   Q.   Based on your under -- recollection, was
12 it your understanding that your suspension was
13 ordered to continue at that hearing?
14   A.   Yes, sir.
15   Q.   Was that hearing on January 29th, 2013 as
16 best you recollect?
17   A.   Hold on. Date of January 29, sir, that's
18 correct.
19   Q.   Based on your recollection, is it your
20 understanding that the order to continue your
21 suspension was given by Deputy Commissioner John
22 Skinner?

Page 167

1    A.   Is it -- is that what the paper states,
2 sir?
3    Q.   You can read the paper, and if it
4 refreshes your recollection as to anything, the
5 paper speaks for itself.
6    A.   It actually says signed Colonel Green.
7    Q.   Is there a signature below that?
8    A.   Yeah. It was -- it was approved by John
9 P. Skinner at the bottom after Garnell Green,
10 Colonel Green signed it.
11   Q.   Do you remember being told at the hearing
12 whether your suspension is being maintained or
13 ended?
14   A.   Yes, sir.
15   Q.   Who told you what?
16   A.   I was told during the hearing that -- at
17 the end, based on the circumstances around this
18 incident, the undersigned -- that -- that I would
19 still continue as suspension.
20   Q.   Who told you that, if you remember?
21   A.   I don't recall, sir, exactly who said
22 that to me at the hearing.

Page 168

1    Q.   Do you have any reason to believe that
2 the decision of whoever made that decision to
3 continue your suspension was the result of an
4 improper illegal motive?
5    A.   Yes, sir.
6         MR. NACHTMAN: Object -- objection. You
7 can answer.
8    A.   Sorry. Yes, sir.
9    Q.   What reason do you have for believing
10 that whoever the commander was that made that -- or
11 the decision was improperly or illegally motivated?
12   A.   So, when I first got downtown that day at
13 headquarters, and I was standing by on the floor
14 with my attorney, Captain Burrus walked in and began
15 hugging Lieutenant Colonel Robert Booker as they
16 were best friends. Like they hugged each other and
17 start talking all excited like seeing each other.
18 So, I believe there was a connection there.
19         He's -- lieutenant colonel is the highest
20 ranking individual in my -- my hearing. And I
21 believe he has to -- the -- he has to speak to
22 Colonel Green or to Skinner to advise them what

Page 169

1 occurred on -- on what -- what circumstances.
2         They accused me of -- or found to --
3 found to move my vehicle, which is untrue. Then my
4 lawyer states in there that this is an internal
5 matter where I requested to leave the district to
6 prevent any of this actions to occur, any further
7 actions.
8         And my lawyer states that we were short
9 of officers. That the Commissioner was in the
10 process of reinstating other officers' powers
11 because of the shortage on minor internal
12 infractions.
13        And that he recommends that I go back and
14 work because I already was given a -- a fit for
15 duty, that I was already approved through the
16 department to be -- work full duty because I was
17 given a fit for duty test prior to showing up to
18 this hearing, and stated that I was able to work
19 full duty and nothing would prevent me from working
20 full duty.
21   Q.   You were subsequently reinstated of your
22 police powers?

Page 170

1    A.   Yes, sir.

2    Q.   Do you remember who ordered your police

3  powers reinstated?

4    A.   Yes, sir.

5    Q.   Who was it?

6    A.   I got a phone call from Lt. Windel prior

7  to me going into work saying, make sure you bring

8  your uniform today because you're getting

9  reinstated.

10   Q.   Do you remember what day that was?

11   A.   Based on my recollection right now, I

12  don't recall the exact date.

13   Q.   I'm showing you a document. We'll have

14  it marked Exhibit 19.

15        (Whereupon Angelini Deposition Exhibit 19

16   was marked.)

17   Q.   This document is two pages. The document

18  is two pages. Do you recognize those two pages?

19   A.   May I take a look, sir?

20   Q.   Yes.

21   A.   (Complies.) Yes, sir, I -- I recall

22  this.

Page 171

1    Q.   This documents says -- well, stop.

2  Strike that.

3        Does this document memorialize the return

4  of your police powers? Is that what you understand

5  this to be?

6    A.   Yes, sir. That's what -- the

7  second page appears to be that I am reinstated.

8  Hold on, I'm sorry. Effective date, duty status

9  changes, 2/2/'13. Yes.

10   Q.   Does -- where it says effective date of

11  duty status change February 2nd, 2013, is that

12  consistent with your recollection, if any, as to

13  when you returned to work, or when you had your

14  police powers returned to you?

15   A.   Best of my recollection, that's around

16  the time that I was told by Lt. Windel that I can

17  return to work full duty.

18   Q.   All right. Let's turn back in Exhibit 2

19  to Paragraph 25 of the Complaint.

20   A.   Exhibit 25, sir?

21   Q.   Paragraph 25, Page 6.

22   A.   Yes, sir.

Page 172

1    Q.   Do you see Paragraph 25?

2    A.   Yes, sir.

3    Q.   This paragraph references a random drug

4  and alcohol test and psychological screening.

5  Please -- what exactly happened on January 25th that

6  you're referring to in this paragraph?

7    A.   Based on the circumstances that -- that I

8  recall, I was told to give a urine test, a random

9  urine test for drug and alcohol, and told me to go

10  to psychological screening.

11   Q.   Where was the psychological screening

12  conducted?

13   A.   I'm not sure if this was a time that --

14  no, I -- I'm not sure exactly, sir. I'm sorry, I

15  don't recall exactly which location I went to at

16  this time.

17   Q.   The Complaint states that this caused

18  severe embarrassment and anxiety for you. Could you

19  please explain what you mean by that?

20        MR. NACHTMAN: Objection to --

21   Q.   You can answer.

22        MR. NACHTMAN: -- to the phrase --

Page 173

1  phrasing.

2    Q.   I'm just reading from the Complaint.

3  Were you severely embarrassed and anxious based on

4  the events described in Paragraph 25?

5    A.   Yes, sir.

6    Q.   Why were you embarrassed by it?

7    A.   Because, sir, every time that you are

8  sent to psychological screenings or you're sent to

9  random -- or for fit for duty, this all goes on your

10  record, sir. It's a embarrassment to my reputation

11  as a great officer as I am that I put my hard work

12  in for. And --

13   Q.   Were you anxious?

14   A.   I was very anxious.

15   Q.   Why were you anxious?

16   A.   The anxious part comes from being

17  retaliated against. This all stems from

18  retaliation. And I could only take so much of it

19  and I became anxious.

20   Q.   How were you notified about this testing

21  and screening?

22   A.   I don't recall, sir, at this time.

Page 174

1    Q.   In Paragraph 25 it says, this
2  retaliation -- this was retaliation for the EEOC
3  Complaint filed in October 2012 as to all of the
4  items that -- as all of the items have been
5  orchestrated by Sgt. Brickus.
6        Do you see that portion?
7    A.   Yes, sir.
8    Q.   Do you have any reason to believe that
9  Sgt. Brickus had the authority to order a drug and
10  alcohol screen or psychological testing?
11    A.   Yes, sir.
12    Q.   What reason do you have to believe that
13  she had the authority to do that?
14    A.   Any sergeant can -- can recommend that an
15  officer go get evaluated.
16    Q.   You say recommend. Do you mean --
17    A.   Order.
18    Q.   -- she could order it?
19    A.   Yes, sir.
20    Q.   Are you aware of a particular general
21  order that creates such an authority?
22        MR. NACHTMAN: Objection.

Page 175

1    Q.   You can answer.
2    A.   Based on general orders that I read and
3  the way I interpret it, the general order itself,
4  being so broad, it gives the authority to a sergeant
5  to send an officer for a fit for duty for evaluation
6  based upon the safety of the BPD members, the
7  citizens at any time for safety.
8    Q.   Do you have any reason to believe that
9  Sgt. Brickus actually ordered the drug and alcohol
10  screen and psychological testing?
11        MR. NACHTMAN: Objection. You can
12  answer.
13    Q.   You can answer.
14        MR. NACHTMAN: If you know.
15    A.   She caused it. Do I actually know she
16  actually filled out the paperwork? No, sir.
17    Q.   Did anyone ever tell you that
18  Sgt. Brickus ordered it?
19        MR. NACHTMAN: Objection.
20    A.   No, sir.
21    Q.   Have you ever seen any paperwork
22  indicating that Sgt. Brickus ordered it?

Page 176

1        MR. NACHTMAN: Objection.
2    A.   I'm --
3    Q.   You can answer.
4    A.   I'm not privy to that information, sir.
5    Q.   After your police powers were restored,
6  did you continue working as a police officer?
7    A.   Yes, sir.
8    Q.   Did Sgt. Brickus remain -- well, strike
9  that.
10        Was Sgt. Brickus your supervisor?
11    A.   No, sir.
12    Q.   Did you have any other issues with her
13  during February 2013?
14    A.   February 13th to --
15    Q.   I'm sorry, February of 2013, after you
16  returned from having your police powers reinstated.
17    A.   There wasn't much -- no, because much --
18  not much longer I was moved to another shift.
19    Q.   Showing you a document marked Exhibit --
20    A.   That I recall.
21    Q.   -- 20.
22        (Whereupon Angelini Deposition Exhibit 20

Page 177

1  was marked.)
2    Q.   Do you recognize this document as being
3  written by you?
4    A.   Yes, sir.
5    Q.   Why did you write this document?
6    A.   Can you give me one second to read over
7  it, sir?
8    Q.   You can.
9    A.   Thank you. (Complies.) All right, sir.
10  I'm sorry, what was your question again?
11    Q.   Did you -- strike that.
12        Did you ever receive any response to this
13  document?
14    A.   No, sir.
15    Q.   To the best of your recollection, are all
16  the statements in this document correct?
17    A.   Yes, sir.
18    Q.   Showing you a document marked Exhibit 21.
19        (Whereupon Angelini Deposition Exhibit 21
20  was marked.)
21    Q.   Do you recognize this document?
22    A.   Yes, sir.

Page 178

1  Q.   What is it?

2  A.   It's a 70 transfer, sir.

3  Q.   Is this a request to transfer to the

4  Southern District by you?

5  A.   Oh, yes, sir.

6  Q.   Are you the author of this document, at

7  least the portion at the top?

8  A.   Yes, sir.

9  Q.   What did you do with this document after

10 you filled it out?

11 A.   I handed it to my command, my -- my

12 rank -- the next rank in file.

13 Q.   It says in the document, I'm in a hostile

14 work environment and fear that I will be retaliated

15 against again.

16     Do you see that?

17 A.   Yes, sir.

18 Q.   Is that referencing anything beyond the

19 matters we've already discussed?

20 A.   Can you rephrase that question, please?

21 Q.   Strike the question. Is it your

22 understanding that your transfer request was

Page 179

1  approved by Sgt. Brickus?

2  A.   According to this paperwork I have here,

3  and I have one that -- that looks similar to this

4  with another signature -- well, actually this is --

5  this is the same one I've seen before on my -- yes.

6  It was approved by Sgt. Brickus on 2/18 -- is it

7  2/18/'13? Yes.

8  Q.   Is that the same day you turned it in?

9  A.   That is the same day I turned it in, sir,

10 yes, sir.

11 Q.   Does it show further down that your

12 commanding officer at your assignment of origin,

13 meaning Southeast District, also approved the

14 transfer?

15 A.   Yes, sir.

16 Q.   Do you recognize that signature in that

17 block?

18 A.   Yes, sir, I do recognize it.

19 Q.   Do -- do you know who that is? Who is

20 that?

21 A.   That's Major Davis, sir.

22 Q.   Why do you think Sgt. Brickus approved

Page 180

1  this transfer request? Did you have any idea?

2  A.   Sir, I can't speak on her behalf at this

3  time. I don't know why.

4  Q.   Did she ever speak to you about approving

5  the transfer request?

6  A.   Never, sir.

7  Q.   Did you speak to her about the transfer

8  request?

9  A.   No -- no, sir.

10 Q.   Did Major Davis ever speak to you about

11 this transfer request?

12 A.   No, sir.

13 Q.   Were you ultimately transferred as a

14 result of this request?

15 A.   I was transferred -- well, this 2/18/'13,

16 I wasn't transferred until almost -- I believe it

17 was July or August 2013.

18 Q.   So, in February of 2013, although these

19 signatures appear here, you were not transferred in

20 2013, in February of 2013?

21 A.   I was not Feb -- I was not transferred in

22 February 2013, no.

Page 181

1  Q.   Do you know why you weren't transferred

2  in February 2013 given that your commanding officer

3  had approved the transfer?

4  A.   I had asked -- I had asked numerous times

5  through EEOC. And I had asked like my -- my

6  supervisor, and they were telling me that because I

7  didn't write what they wanted in the box, that I

8  wasn't being transferred.

9  Q.   Well, I'm asking specifically about this

10 transfer request. We'll get to those conversations

11 later.

12     Do you believe that there -- there was

13 any particular reason that you know of why you

14 weren't transferred based on this request which was

15 approved by Major Davis and Sgt. Brickus? Do you

16 know where it got hung up and didn't get

17 transferred?

18 A.   Sir, I have -- I can't speak on behalf of

19 what Sgt. Brickus or Major Davis did with this

20 paperwork after their signature.

21 Q.   Do you have any reason to believe that

22 although Sgt. Brickus and Major Davis signed this,

Page 182

1 **the reason you were not transferred was retaliation?**
2     MR. NACHTMAN: Objection.
3  **Q.   You can answer.**
4  A.   Can you repeat that question, I'm sorry?
5  **Q.   Do you believe that the reason you were**
6  **not transferred as a result of this request was**
7  **retaliation?**
8  A.   I believe that they were denying my 70s
9  because they didn't want the -- the title marked
10 as -- written the way I wrote it.
11 **Q.   You don't --**
12 A.   That's my -- that's my belief.
13 **Q.   So, when you say they, who is the they in**
14 **regards to this particular transfer?**
15 A.   Command -- I mean, my -- my rank,
16 supervisors and above, I was told by numerous
17 different supervisors that it was inappropriate for
18 writing reason for request in there.  That's my
19 opinion, but -- and I'm giving you statements of
20 facts from supervisors personally that told me that
21 this is not going no where unless I change the title
22 of the -- of the reasoning.

Page 183

1  **Q.   So, other than that, you're not aware of**
2  **any other reason why this transfer did not go**
3  **through after it was approved by Major Davis?**
4  A.   Sir, I have no reason, sir.
5  **Q.   Showing you a document called Exhibit 22.**
6     (Whereupon Angelini Deposition Exhibit 22
7  was marked.)
8  **Q.   This document is four pages long.  Do you**
9  **recognize this document?  You don't need to read the**
10 **entire document.**
11 A.   Yes, sir.  Yes, sir.
12 **Q.   Are you the author of this document?**
13 A.   Let's look at the signature part and make
14 sure.  Yes, sir.
15 **Q.   What did you do with this document after**
16 **writing it?**
17 A.   I gave it to the -- to my super -- my
18 rank and supervisor or OIC, and I also gave a copy
19 to the departmental EEOC.
20 **Q.   To the best --**
21 A.   I'm sorry, EDOS (sic), my apologies.
22 **Q.   When did you give it to ED -- EODS?**

Page 184

1  A.   The best of my recollection, around this
2  timeframe.  So, 3/13/'13.
3  **Q.   In approximately March, the middle of**
4  **March, you provided a copy of this to EODS?**
5  A.   Yeah.  Around that timeframe, yes.  I'm
6  not going to say that exact date.  I'm not sure.
7  **Q.   I understand.  To the best of your**
8  **recollection, are all the statements in this**
9  **document correct?**
10 A.   If this is the same document that I have
11 written and not -- has not been altered with,
12 coming -- not saying that you would alter it.  If
13 this is the same document that I provided to
14 discovery, then, yes, it is accurate.
15     Now you're handing me a document, do I
16 know if any changes are done without reading it?
17 **Q.   Bearing with that, I think there are a**
18 **couple of copies of this that have gone back and**
19 **forth in discovery.  Assuming no changes have been**
20 **made --**
21 A.   Yes, sir.
22 **Q.   -- as you wrote it, you understood it to**

Page 185

1  **be correct?**
2  A.   Correct, yes.
3  **Q.   All right.  Do you remember receiving a**
4  **phone call on January 18th, 2013 from a lieutenant**
5  **at EODS?**
6  A.   Yes, I do.
7  **Q.   Do you remember who that lieutenant was?**
8  A.   Lieutenant Michael Norris.
9  **Q.   Do you remember what happened on that**
10 **call?**
11 A.   He had contacted me because I requested
12 someone down at EEOD please call me back regarding
13 my complaints and continued retaliation that I --
14 that I have documented.  And want to inform them
15 that -- what was still going on.  And he had called
16 me back.
17 **Q.   Did you describe to the lieutenant, Lt.**
18 **Norris the parking spot issue that occurred the day**
19 **before?**
20 A.   Yes, I did explain to him that I was
21 suspended over a parking spot.  Yes, I did.
22 **Q.   Did he tell you that you were in the**

Page 186

1  wrong for parking in a spot assigned to another
2  officer?
3     A.   He had stated that he called Captain
4  Burrus, spoke to her and read the blue team and that
5  I was guilty and that I deserved -- deserved what
6  happened, and I was wrong.
7     Q.   On the third page, this is very minor,
8  you reference the, quote, sergeant at SED command
9  investigations. Would that have been Sgt. Kenneth
10 Williams?
11    A.   I'm sorry, sir. Third page, how far
12 down?
13    Q.   I'll find it for you. Yes, it's one very
14 large paragraph so --
15    A.   Yeah, sorry. I should have broke them up
16 for you.
17    Q.   Approximately the middle, the first line
18 is, including the FOP attorney.
19    A.   FOP attorney --
20         THE REPORTER: To yourself.
21    Q.   Are you having trouble finding the spot?
22    A.   Yes. Yes, sir.

Page 187

1     Q.   Let me show you. Right there.
2     A.   Including the attorney -- I found it.
3  Including FOP attorney and the Southeast sergeant.
4  Okay.
5     Q.   Is that sergeant that you're referencing
6  Sgt. Kenneth Williams?
7     A.   Give me a second to read this -- read
8  this quick paragraph.
9     Q.   Uh-huh.
10    A.   (Complies.) Yes, sir.
11    Q.   At that -- at that same point, you write
12 that Sgt. Williams was going to be responsible for
13 handling this matter until I pointed out that he is
14 in a romantic relationship with Sgt. Drennon.
15         Do you see that where it continues?
16    A.   Yes, sir.
17    Q.   How did you know that Sgt. Williams was
18 going to handle this matter? Did he tell you that?
19         MR. NACHTMAN: Objection to the form.
20    Q.   The question is: Did Sgt. Williams tell
21 you that he was going to be handling this matter?
22    A.   Yes. And I specifically remember when.

Page 188

1     Q.   What did he tell you?
2     A.   We were in the elevator after our
3  hearing. I'm sorry, we were -- we were in the
4  elevator coming down from my hearing, suspension
5  hearing.
6     Q.   Your suspension hearing in late January?
7     A.   Yes. We were in the -- in the elevator,
8  just me and him on the way down. He says to me that
9  he's going to be handling this investigation.
10    Q.   And what happened then?
11    A.   And that he just told me he was handling
12 it. That's it. That he's going to be handling that
13 district level and he will be handling it.
14    Q.   Did you say anything to him?
15    A.   I didn't say nothing to him, no, sir. I
16 didn't respond anything back to him, no.
17    Q.   Did you tell him anything about his
18 relationship with Sgt. Drennon relating there was a
19 conflict of any kind?
20    A.   Never said nothing to his face, no.
21    Q.   Did you ever say that to anyone else?
22    A.   No, sir. I just reported it on a 95.

Page 189

1     Q.   You reported it in this document?
2     A.   I reported it in this document and -- and
3  may have reported it specifically in one 95 that was
4  possibly turned over that I believe that I wrote on
5  there that he's in an intimate relationship with
6  Sgt. Drennon.
7          But it might have been written somewhere
8  else before this as well. This was just a complete
9  overall to why I was going out on the outside agency
10 with a EEOC, down to EEOC.
11    Q.   To your knowledge, did Sgt. Williams ever
12 have any involvement in that investigation?
13    A.   Yes.
14    Q.   What involvement did he have?
15    A.   He called up Northeast District. I was
16 told by Sgt. Rutkowski that he called up the
17 Southeast District and told them that I was on a
18 30-day punishment watch.
19    Q.   Hold on. We'll get to that. But in
20 January of 2013, did Sgt. Williams to your knowledge
21 ever have any role in the investigation into the
22 parking incident?

Plaintiff Exhibit 37

Page 190

1  A.  Yes.

2  Q.  What role did he have into the parking

3  incident?

4  A.  He was at my suspension hearing. And he

5  wrote the 95 up -- I mean, he wrote the charging

6  documents up saying that I refused to move my

7  vehicle. He said -- and he gave a statement at the

8  hearing.

9  Q.  On March 28th, 2013, were you involved in

10  a police involved shooting?

11  A.  Yes, sir.

12  Q.  As best as you could describe briefly,

13  who was present at that event?

14  A.  Initially it was my Sgt. Leof -- Derek

15  Leoffler, Officer Quaranto, Officer Steve Williams.

16  Later after the fact, Internal Affairs showed up and

17  homicide showed up. And the crime lab and everyone

18  that's responsible. Sgt. Ferguson drove me down to

19  headquarters. Then I was called back.

20  Q.  During that incident, did you shoot a

21  criminal suspect?

22  A.  In defense, yes, I did.

Page 191

1  Q.  Did the department ultimately recover a

2  number of firearms in that incident?

3  A.  Yes, sir.

4  Q.  Is it customary for any BPD officer who

5  recovers a gun in the City of Baltimore to receive a

6  commendation?

7  A.  Yes.

8  Q.  What makes you say that?

9  A.  Every gun, if you notice in the past that

10  I received, that always got a commendation for

11  recovering guns with -- with a body. And what I

12  mean with a body means an arrest. That's what we

13  use as a short term with an arrest. You get

14  commended for it.

15      We -- they put your name on a wall. In

16  the Southeast, that's what they did. They put --

17  there was a board called a gun board. It was put up

18  by Major Davis in the hallway. And every time that

19  an officer got a gun with a body on it, as I

20  explained, your name goes up on the wall with a

21  picture of a gun.

22      It's a picture -- it's a actual cutout of

Page 192

1  a gun with your name on it as recognition. And then

2  you'll get a District coin as well.

3  Q.  Was that practice followed in some cases,

4  most cases or in every case?

5  A.  With -- with me, sir, every gun that I

6  recovered, I would get recognized either by my

7  sergeant or BPD. Now, I can't -- I can't speak on

8  behalf of other officers if they hadn't received

9  anything. I can't speak on their behalf.

10  Q.  Who makes the decisions on whether to

11  issue a commendation?

12  A.  I -- I can't answer that. So, I don't

13  know who makes the decision. But based on me

14  working at Southeast, Major Davis was the one that

15  issued -- issued the -- the coin and the -- putting

16  the gun up on the wall.

17  Q.  Did you receive a commendation for this

18  incident?

19  A.  I received my name on the wall with

20  another officer that was -- that showed up after the

21  fact. But I never -- and I never received a coin

22  for it though and -- and a letter of commendation of

Page 193

1  great work.

2  Q.  Did that bother you?

3  A.  Yes, sir.

4  Q.  Why did it bother you?

5  A.  I believe that shooting that took place

6  was a great job, great police work. No other -- no

7  other civilians were hurt. They'd been shooting

8  from the house for a long time. Officers been

9  called to the house. Nothing was ever done.

10      I show up along with Officer Quaranto.

11  The way we conducted ourselves was awesome. It

12  should be recognized in the department as a video to

13  show to other officers how to interact in a

14  shooting.

15  Q.  Were you --

16  A.  I only fired one time. I didn't have

17  to -- I never had to fire no more than that. The

18  front was down. Quaranto didn't shoot -- shoot. He

19  didn't do contagious fire. We covered.

20      We took both -- we took him into custody

21  and recovered another gun from his waistband.

22  Recovered two other rifles, high powered rifles that

Page 194

1  were being fired out the window.

2      No injured -- officers injured -- no

3  officers were injured. Suspect ultimately survived

4  that incident initially.

5  **Q.  Did he ultimately succumb to his wounds**

6  **and die later?**

7  A.  Yes. I was told that he died of a

8  overdose.

9  **Q.  Did you come to work the next day,**

10 **March 29th, 2013?**

11 A.  No, sir.

12 **Q.  Were you personally present for roll call**

13 **that day?**

14 A.  No, sir.

15 **Q.  I'm going to refer you in the Complaint**

16 **to Paragraph 32. Do you see Paragraph 32 at the**

17 **bottom of Page 7 and continuing onto Page 8?**

18 A.  I'm sorry, we're -- which exhibit?

19 **Q.  Exhibit 2, the Complaint. The one**

20 **document I told you to hold onto.**

21     MR. NACHTMAN: Put them over there. Keep

22     them all in order.

Page 195

1  **Q.  Page 67.**

2  A.  Yes, sir.

3  **Q.  Do you see Paragraph 32 on Page 7?**

4  A.  Yes, sir. Yes, sir.

5  **Q.  All right. What is your basis for making**

6  **the statement you made in Paragraph 32 about**

7  **Sgt. Brickus commenting on the shooting incident?**

8  A.  Could I have a few seconds just to read

9  that paragraph over, sir?

10 **Q.  Read the paragraph, go ahead.**

11 A.  (Complies.) I remember the next day,

12 sir, receiving a phone call from an officer. Can't

13 specifically remember who -- who -- who exactly told

14 me, but I was told that Sgt. Brickus specifically

15 said on the stand at roll call that my shooting was

16 bad. And the reason it was bad was because I didn't

17 say red fire or blue fire.

18 **Q.  What does that mean?**

19 A.  Red fire means that an officer is

20 shooting -- I mean a suspect is shooting. Blue fire

21 means that a police is shooting. What she was

22 referring to was -- in reference to a search

Page 196

1  warrant.

2      We were always taught in a search warrant

3  that if a shooting happened or occurs, the officer

4  should scream either red fire or blue fire so we can

5  determine who is shooting.

6      So, if it was a suspect shooting in a

7  house, we could determine that -- to take guard.

8  Take -- take cover. But if it was a police officer,

9  we're known that a officer is engaging fire because

10 he's come in contact with a suspect.

11     But on any other shootings, I was never

12 told to use red fire or blue fire. But she's

13 claiming -- telling everyone in roll call that it

14 was a bad shooting because I didn't say blue fire,

15 red fire. That I just said shots fired.

16 **Q.  Other than your failure, as you say she**

17 **said, to say red fire or blue fire, did she have any**

18 **other criticisms of your conduct that day?**

19     MR. NACHTMAN: Objection.

20 A.  I wasn't there for the rest of it, sir.

21 So, I was just specifically told that, she said my

22 shooting was a bad shooting.

Page 197

1  **Q.  Do you believe she was wrong about the**

2  **policy regarding red fire and blue fire?**

3  A.  100 percent wrong.

4  **Q.  Do you believe it was wrong for her to**

5  **comment on the shooting in general regardless of**

6  **whether she was right or wrong about the policy?**

7  A.  Me personally my belief, I believe it was

8  wrong for her to comment on the shooting. She

9  wasn't present. If she knew the facts of the

10 shooting, she should have said -- maybe -- if she

11 didn't know the facts or didn't know how the

12 shooting went because she wasn't present, maybe she

13 shouldn't have commented at all or to anyone about

14 the -- because it's still an ongoing investigation.

15 She could do -- she could hurt the investigation by

16 stating anything about it.

17 **Q.  Does the supervisor need to have personal**

18 **firsthand knowledge of matters of interest in the**

19 **district in order to discuss them with the other**

20 **officers in the district?**

21     MR. NACHTMAN: Objection.

22 A.  There's no --

Page 198

1     MR. NACHTMAN: You can answer.

2     A.    There's not -- I'm not sure if there's a

3 policy on it, but --

4     **Q.    If a supervisor receives information from**

5 **other officers, is the supervisor allowed to talk**

6 **about whatever that information is with other**

7 **officers?**

8     A.    Can you give me --

9          MR. NACHTMAN: Objection.

10    A.    -- a specific like situation?  I don't

11 under -- I don't understand the question, sir.  I'm

12 sorry.

13    **Q.    Do you know what, if any, sources of**

14 **information Sgt. Brickus had about your performance**

15 **on March 28th?**

16    A.    I know she was an acting supervisor that

17 night.  She showed up.  That's the only thing I know

18 she did.

19    **Q.    Do you know if she spoke to any of the**

20 **homicide detectives?**

21    A.    I'm not -- I'm not sure, sir.  I'm not --

22 I don't -- I don't know, sir.

Page 199

1     **Q.    Do you know if she spoke to any -- anyone**

2 **else who was present at the time?**

3     A.    I'm not sure, sir.  I'm not sure.

4     **Q.    Showing you one exhibit, I'll call it 23.**

5          (Whereupon Angelini Deposition Exhibit 23

6 was marked.)

7     **Q.    Do you recognize this document?**

8     A.    Yeah, I do recognize this document.

9     **Q.    Are you the author of this document?**

10    A.    Can you give me a second to read it,

11 please?

12    **Q.    Yes.**

13    A.    (Complies.)  Yes, sir, I did write this.

14    **Q.    At the top -- well, at the top of the**

15 **body of the message it says, the reason I took the**

16 **gun down.**

17          **Do you see that?**

18    A.    Yes, sir.

19    **Q.    What is -- what are you referring to when**

20 **it says the reason I took the gun down?**

21    A.    So, remember how I was telling you

22 earlier that there was a cutout of a gun and gun

Page 200

1 board.  The gun was -- and the gun with my name and

2 Officer Lufadaju's name is inaccurate.  And I

3 felt -- I felt bad about it.

4     **Q.    Because --**

5     A.    I felt terrible.

6     **Q.    You felt terrible because Officer**

7 **Lufadaju's wasn't there?**

8     A.    Correct, sir.

9          MR. GLYNN: Okay.  This sounds like a

10 good time to take a break.  Let's go for lunch.

11 Kurt, how long do you think you're going to

12 need since --

13          THE WITNESS: Whatever you want to take.

14          MR. NACHTMAN: I don't know what's

15 nearby.  It's far from my office.

16          THE WITNESS: We can walk over and cut

17 through --

18          THE VIDEOGRAPHER: Going off the record,

19 the time is 1:14 p.m.

20          (Whereupon a lunch recess was taken,

21 after which the following was heard:

22          THE VIDEOGRAPHER: We're back on the

Page 201

1 record.  The time is 2:14 p.m.

2     Q.    Thank you, Mr. Angelini.  I'm going to

3 show you another document.  I'll call this

4 Document 23.

5          THE REPORTER: 24.

6          (Whereupon Angelini Deposition Exhibit 24

7 was marked.)

8          MR. GLYNN: Oh, are we at 24?  Sorry, 24.

9     **Q.    Do you recognize this document?**

10    A.    Yes.

11    **Q.    Are you the author of this document?**

12    A.    Yes.

13    **Q.    This document references being removed**

14 **from your post car and assigned to a different**

15 **sector.  What exactly happened that you're referring**

16 **to here?**

17    A.    The document also states the comment --

18    **Q.    I understand, but just look at the post**

19 **car.**

20    A.    Okay.  So, what happened was,

21 Sgt. Drennon was being removed from neighborhood

22 services.  This is what Lt. Windel told me, that

Page 202

1  Sgt. Drennon wanted Sector 3 on my shift. And told
2  Lt. Windel that she did not want me in her squad.
3  That she wanted Sector 3 and wanted me removed and
4  moved.
5       So, therefore, Lt. Windel approached me,
6  told me that I was being kicked out of Sector 3 and
7  being put in Sector 2, at which time I lost my post
8  car that I earned and respectfully earned through my
9  hard work and dedication.
10      And I made -- I made really good progress
11 with the community that I worked in, the area that I
12 worked in where I would get reports for like --
13 anonymously like in -- individuals will come up to
14 me and tell me if this person was doing a crime or
15 this person committed a crime.
16      And as a post car, that was your main
17 goal was to -- is to relate to the community and
18 help the community that you serve. And I was upset.
19 **Q.   I got you. When you say your post car**
20 **was taken away from you, is that just the**
21 **consequence of a move to another sector because the**
22 **post cars in that other sector were assigned to**

Page 203

1  **other officers?**
2  A.   So, when I was moved to Sector 2,
3  unfortunately all the post cars were already taken
4  because officers were already assigned those post
5  cars.
6  **Q.   That's what I wanted to know.**
7       MR. NACHTMAN:  Did you have anything else
8  you wanted to add, Mr. Angelini?  Were you
9  finished -- you were -- is that your complete
10 answer to that question?
11 A.   Well, I was on -- I was about to continue
12 to go on about how it was -- I worked in Sector 2
13 and I didn't want to be back working in Sector 2.
14      And also, that there was rookies below me
15 that got to have post cars not based on merit, just
16 because they were in Sector 2 longer than me. And I
17 would get loaned out if I was not having a post car.
18 And that's why a lot of officers earned their post
19 cars.
20 **Q.   Okay. Did you file this report through**
21 **channels? It says official channels on there. Did**
22 **you --**

Page 204

1  A.   Yes.  If I -- if I -- if it says official
2  channels, then this is a document, yes.  Yes.
3  **Q.   After filing this report, did you speak**
4  **with Captain Kimberly Burrus?**
5  A.   Well, when I had written this, yes, I
6  immediately got a notification to respond to her
7  office.
8  **Q.   What happened there?**
9  A.   She had -- she pulled me in and she told
10 me that I was not going anywhere.  That the -- the
11 suspension showing her one side of the story, and
12 she apologized to me in that room and stating that
13 she only heard one side of the story.  Let's forget
14 about what happened there.
15      I don't -- you're not leaving the
16 district.  No matter what I was doing, I was not
17 leaving the district on two reasons.  One, I'm not
18 changing my saying on the 70.  And the second was
19 that I was too good of an officer to lose and that
20 she wasn't letting me go.
21      So, I either had a choice to stay where I
22 was or go to the other shift.  And I didn't want to

Page 205

1  stay in Sector 2.  So, I said, I asked her if I went
2  to Sector 3, can I have -- can I have my post car
3  back?  It's the 32 car.
4       And she promised me that when I went to
5  the other shift, that I was going to have a -- my
6  post car back, 32 car back.
7  **Q.   I'm showing you another document. Call**
8  **this Exhibit 25.**
9       (Whereupon Angelini Deposition Exhibit 25
10 was marked.)
11 **Q.   Do you recognize this document?**
12 A.   Give me a second, sir?
13 **Q.   Yes.**
14 A.   (Complies.)  Yes, sir, I do recognize
15 this document.
16 **Q.   Did you author this document?**
17 A.   Yes, sir.
18 **Q.   As best you recall, are all the**
19 **statements made in this document correct?**
20 A.   From what I recall, yes.
21 **Q.   Did you ask to be assigned to Sector 3**
22 **midnight shift?**

Page 206

1   A.   Yes. I -- I asked to be -- because I did
2   not want that Sector 2 on that same shift with
3   Sgt. Drennon. So, at that time when I was told to
4   leave, I -- I wrote this up because I did not want
5   to work on that shift.
6        And then I've handed in numerous 70s. I
7   was never told nothing. I was being told that I
8   wasn't being moved. Had no other choice. So, I
9   said, I'm just going to go to midnights. So, I put
10  in for midnights.
11  Q.   I'll show you some documents we'll call
12  Exhibit 26.
13       (Whereupon Angelini Deposition Exhibit 26
14  was marked.)
15  Q.   Can you quickly skim through that and
16  tell me, do you recognize those documents?
17  A.   (Complies.) Yes, sir, I do recognize
18  them.
19  Q.   Are you the author of those documents?
20  A.   Yes, sir.
21  Q.   Are they transfer requests that you
22  filed?

Page 207

1   A.   Yes, sir.
2   Q.   Could you turn to the page with the
3   numeral 8 in the top right corner? It's the second
4   to last page.
5   A.   Yes, sir.
6   Q.   It reads in part, per the major, I was
7   told to fill out additional Form 70s specifying my
8   choices.
9        Do you see where it says that?
10  A.   Yes, sir.
11  Q.   Did you have communications with the
12  major?
13  A.   I had communications with the major at
14  this point when I had put this 95 in for midnights.
15  At some point he approached me in the parking lot
16  and told me that you're not -- if your 70 -- your
17  70s are not being -- basically that I'm putting in
18  too many 70s, and that me choosing, I would have to
19  put multiple different districts on there because
20  you're not going to get your first choice. So, he
21  told me to put in ones for multiple different
22  choices.

Page 208

1   Q.   He told you how to fill out the 70s and
2   to fill out a bunch of them?
3   A.   He just told me to choose different
4   districts. So, I just -- I went ahead and filled
5   the -- filled out ones with three choices.
6   Q.   Did he tell you that he would approve
7   those transfers?
8   A.   No -- nothing was said about approving
9   or -- he just told me that I would have to put in
10  for different multiple districts. That's all he
11  said to me. I figured at that point he was upset
12  with me.
13  Q.   Why did you think he was upset with you?
14  A.   Because his demeanor changed toward me.
15  I was his -- I was his little go-to -- go-to guy.
16  He loved me. He would call me in his office, ask me
17  different -- different information on different
18  stuff like, what can we do to make this better.
19  What can we do this better.
20       Ever since I filed that complaint, he
21  basically stopped speaking to me. He wouldn't even
22  say a word to me. He -- he loved me like a child.

Page 209

1   And then ever since I filed that complaint, he
2   despised me. Wouldn't even look my way.
3   Q.   Which complaint, the four-page complaint
4   that we saw earlier?
5   A.   The -- when I went down to EOD, the day
6   that I filed the complaint with EOD -- excuse me,
7   EDOS (sic), and -- and it went downtown, the major
8   really didn't want to have anything to do with me
9   after that anymore.
10  Q.   All right. I'm showing you another
11  document. We'll it Document 26.
12       THE REPORTER: 27.
13       (Whereupon Angelini Deposition Exhibit 27
14  was marked.)
15  Q.   This document is two pages. They are
16  seemingly the same document, but the one has
17  handwriting on the front. Do you recognize these
18  documents?
19  A.   Give me one second, sir.
20  Q.   Yes.
21  A.   (Complies.) Yes, I do remember this,
22  sir.

Page 210

1  Q.  Are you the author of -- let's say the
2  second page. Are you the author of that
3  second page?
4  A.  Yes, sir.
5  Q.  Is that a Form 95 that you submitted
6  through official channels?
7  A.  Yes. That I was ordered to submit, yes.
8  Q.  On the first page there's some
9  handwriting. Do you see that?
10  A.  Yes.
11  Q.  Do you know whose handwriting that is?
12  A.  That's my wife Jessica's handwriting.
13  Q.  What was the outcome of that request?
14  A.  So, that was the meeting that we had with
15  Captain Burrus --
16  Q.  Uh-huh.
17  A.  -- who told me that I was definitely not
18  leaving. She wouldn't let me leave. That I would
19  have to write a 95 if I wanted to at least go to
20  another shift instead of staying in Sector 2, and
21  put -- she basically told me what to put in this 95.
22       That's why if you notice where it says I

Page 211

1  feel comfortable and happy to work in the Southeast
2  District, that was forced upon me by her. And I
3  didn't feel comfortable doing it, but I was being
4  picked on and harassed and -- and I was just -- I --
5  I gave in and did it.
6  Q.  Were you reassigned to a different shift
7  as a result of that request?
8  A.  Yes.
9  Q.  What shift was that?
10  A.  That was the other -- opposite shift of
11  my swing shift.
12  Q.  Was your sector also changed?
13  A.  No. I was in Sector -- going back to
14  Sector 3 where she promised me.
15  Q.  Who was your supervisor going to be under
16  the new shift?
17  A.  Sgt. Jackson.
18  Q.  Is that Derwin Jackson?
19  A.  Yes, sir.
20  Q.  Do you remember when that change went
21  into effect?
22  A.  Sometime after I wrote this Exhibit 27,

Page 212

1  which was on April 23rd, 2013.
2  Q.  Other than that, do you have any specific
3  recollection as to the time?
4  A.  I don't recall offhand exactly the day
5  that I was switched over to Sector 3 on the opposite
6  shift.
7  Q.  Showing you another document, Exhibit 28.
8       (Whereupon Angelini Deposition Exhibit 28
9  was marked.)
10  Q.  Do you recognize this document as a
11  report that you filed?
12  A.  Yes, sir.
13  Q.  Subsequent -- briefly before I get back
14  to that, subsequent to that reassignment, did you
15  have any further interactions with Sgt. Ettice
16  Brickus in the Southeast District?
17  A.  No, sir. I -- not that I recall, no.
18  That -- at this time, I don't recall if -- if we had
19  any face-to-face contact. I don't recall offhand.
20  Q.  Do you have any recollections of any
21  further interactions with Sgt. Drennon in the
22  Southeast District?

Page 213

1  A.  Not that -- like do you -- can you
2  specify? Like do you mean like conversations or
3  like -- what do you mean by interactions? I'm
4  not --
5  Q.  Conversations.
6  A.  You know, I do remember one. When I was
7  on -- when I was on -- I went to the new shift, I
8  remember I had to -- I came in late for one of
9  the -- one of the calls and I had to hand in a
10  report.
11       And we were on Baker shift. And
12  Sgt. Brickus' shift was on Charley shift, which was
13  on the afternoon shift. And I remember handing in
14  the report to the other shift.
15       And I was given back the report because
16  that individual told me -- it was an OIC told me
17  that Sgt. Brickus did not want any of your reports
18  on this shift. And she's not signing off on it
19  because she wasn't on my shift.
20  Q.  Do you remember the day of that?
21  A.  It was sometime in April. The last week
22  of April, I remember that. Some -- around that time

Page 214

1 or beginning of May.
2  Q.  Is that after you had changed shifts?
3  A.  Yes. The only inter -- of the action
4 that I recall right now that -- that stood -- stands
5 out to me. But I was like -- I couldn't understand
6 why she was -- wouldn't accept any of my reports
7 even though, you know, I'm still a police officer.
8  Q.  So, let's turn to Sgt. Jackson. When you
9 were assigned to work under Sgt. Jackson, had you
10 previously worked with him before?
11  A.  I do recall he was on our shift for a
12 little bit in 2011, if I'm correct. I do remember
13 him on a call. The reason I'm saying this is
14 because I do remember him on a call when we had a
15 robbery in Sector 2 when I was working for
16 Sgt. Williams. We had a robbery.
17       We were at Baltimore Street and the
18 corner of -- I can't remember exactly the corner,
19 but we had a robbery. An individual robbed a
20 Hispanic male. I caught the suspect with a gun and
21 the individual's money.
22  Q.  All right.

Page 215

1  A.  Within minutes.
2  Q.  So, that's a yes?
3  A.  Can I finish my -- can I finish?
4  Q.  I asked you a yes or no question, and
5 you're telling me a story.
6  A.  I know because I'm not 100 percent sure
7 if he was loaned out or if he was working overtime
8 or he was on our shift.
9  Q.  I understand. Did you have any problems
10 with Sgt. Jackson prior to being assigned to work
11 under him in 2013?
12  A.  Prior to 2013?
13  Q.  Prior to being assigned to work with him.
14  A.  No. We rarely never had a relationship.
15  Q.  This document, Exhibit 28, that I just
16 showed you, that's a report that you filed?
17  A.  Yes, sir.
18  Q.  Are all of the statements contained in
19 that report true to the best of your recollection?
20  A.  Yes.
21  Q.  Did you request new equipment that was
22 damaged in accordance with the story in that report?

Page 216

1  A.  Yes.
2  Q.  Showing you another document, Exhibit 29.
3       (Whereupon Angelini Deposition Exhibit 29
4 was marked.)
5  Q.  Do you recognize -- actually before I get
6 to that, let me finish one question as to the
7 previous one. Did you believe that the equipment
8 that was damaged in the incident described in that
9 document would malfunction?
10  A.  Yes, sir.
11  Q.  Did you ever receive a response to filing
12 that administrative report?
13  A.  They -- I handed it in. I was expecting
14 it to be signed so I can get new equipment. It
15 never -- it was never returned to me to get new
16 equipment. And I asked about it, and they told me
17 that it's been going through the chain of command.
18 I never heard anything else.
19  Q.  Who did you ask it to?
20  A.  Sgt. Jackson.
21  Q.  Did you ever speak with anyone from
22 the -- strike that.

Page 217

1       Is there a unit in the BPD called the
2 quartermaster unit that handles equipment issuance
3 to officers?
4  A.  Yes, sir.
5  Q.  Did you ever speak to anyone at the
6 quartermaster unit about getting new equipment.
7  A.  The reason -- you have to have --
8  Q.  It's a yes or no question. Yes or no,
9 did you do it?
10  A.  No.
11  Q.  Did you ever have contact with anyone --
12 well, strike that.
13       Why didn't you contact anyone at the
14 quartermaster unit?
15  A.  You can't get no equipment unless you
16 have a report, a 95 from your commander, especially
17 when you have a sufficient amount of damage to your
18 equipment, meaning like a lot of your equipment.
19 You cannot get -- you have to ask permission from
20 your command staff to get new equipment and they
21 have to approve it.
22  Q.  In the five years since writing this

Page 218

1 letter, have you ever received replacement
2 **equipment?**
3   A.  Yes, I have.
4   **Q.  When did that happen?**
5   A.  We got new flashlights through the
6 department. The old ones were no good. And I
7 wanted to replace my flashlight and got a new LED
8 flashlight. I don't know when, exact times, but --
9   **Q.  Was it after leaving the Southeast**
10 **District?**
11   A.  Yes. And we were told by our command
12 staff that we have new -- command in Northeast we
13 have new flashlights.
14   **Q.  All right. Let's turn to Exhibit 29,**
15 **which I just showed you, which is the handwritten**
16 **document in front of you. Do you recognize this**
17 **document as a document that you authored?**
18   A.  Yes, sir.
19   **Q.  Is that your handwriting?**
20   A.  Yes, sir.
21   **Q.  What is this document?**
22   A.  This is requesting a meeting with my

Page 219

1 major, my captain and my lieutenant on my new shift.
2   **Q.  Was such a meeting agreed to?**
3   A.  I was told at a later time by
4 Lt. Williams that my major refused to have a meeting
5 with me.
6   **Q.  Who told you that?**
7   A.  My Lt. Williams told me that.
8   **Q.  What was Lt. Williams' first name?**
9   A.  Lt. Charles Williams.
10   MR. NACHTMAN: Do me a favor. Anytime
11 you're referring to someone with a surname
12 Williams, please use their first and last
13 names.
14   THE WITNESS: Sorry about that.
15   MR. NACHTMAN: There are several Williams
16 in this hearing. All right?
17   THE WITNESS: I will.
18   MR. NACHTMAN: Thank you.
19   THE WITNESS: You're welcome.
20   **Q.  Do you believe that you were assigned to**
21 **unpleasant or problematic details around this time**
22 **period, June 2013?**

Page 220

1   A.  Yes, sir.
2   **Q.  What was unusually unpleasant or**
3 **unreasonable about them?**
4   A.  I was told that I was being detailed to
5 the 4th of July event downtown.
6   **Q.  Anything else other than that event?**
7   A.  That I would not -- that I wasn't getting
8 a post car and Sgt. Jackson should -- because I
9 didn't earn it, even though the captain promised me
10 that I would.
11   **Q.  The details. Only a question about the**
12 **details.**
13   A.  That's considered a detail when you get
14 detailed out of sectors. Like you get loaned out.
15 Do you understand what loaned out means?
16   **Q.  Okay. So, continue your answer.**
17   A.  So, I was ordered to work 4th of July,
18 which I had seniority on, and I wouldn't have had to
19 do that detail if I had a post car. And the reason
20 why officers try to get post cars and earn post cars
21 is to prevent you from being detailed and your shift
22 being -- hours changing.

Page 221

1   So, for instance, the 4th of July detail
2 is usually at nighttime because of the event. I was
3 on Baker shift. If I had my post car, I would not
4 be working that detail and my shift wouldn't be
5 altered. So, that's punishment basically or a
6 rookie's job, new jobs to be detailed downtown.
7   And I was being put in a predicament
8 where my hours changed now, and I was now working
9 4th of July at nighttime when I was supposed to be
10 off at 3:00, but now I'm not getting off until 3:00
11 in the morning.
12   **Q.  Let's fast forward to June 29th, 2013.**
13 **Did you have an issue with exhaustion and/or**
14 **dehydration around that time?**
15   A.  Yes, sir.
16   **Q.  Did you faint at work?**
17   A.  Yes, sir.
18   **Q.  Was that on June 29th, 2013, if you**
19 **remember?**
20   A.  Best of my recollection, it was around
21 that time.
22   **Q.  Did you go to the hospital?**

Page 222

1  A.  Yes, sir.

2  Q.  How did you get to the hospital?

3  A.  Medics picked me up at the hospital -- I

4  mean at the district and took me to the hospital.

5  Q.  When you got to the hospital, were you

6  diagnosed with any condition?

7  A.  Yes, sir.

8  Q.  What was that?

9  A.  Heat exhaustion.

10  Q.  I'm showing you a document marked as

11  Exhibit 30 now.  Do you recognize this document?

12        (Whereupon Angelini Deposition Exhibit 30

13  was marked.)

14  A.  Yes, I do.

15  Q.  That document has some handwritten notes

16  at the top.  Do you know whose handwriting that is?

17  A.  That's my wife Jessica's.

18  Q.  Other than the handwritten notes at the

19  top, did you receive this notice at the beginning of

20  the Summer in 2013?

21  A.  I don't know if it was in the beginning,

22  but it was at a time where it was really, really hot

Page 223

1  outside.  Really hot.

2  Q.  In addition to this notice, did you

3  receive any guidance from supervisors about managing

4  heat that Summer?

5  A.  No.

6  Q.  On hot days at work, would you typically

7  drink water regularly to stay hydrated?

8  A.  Water or other fluids.  Not specifically

9  water.  I'm not a big water person.

10  Q.  What did you like to drink?

11  A.  Honestly, I'll be honest with you, I like

12  to drink Diet Coke and -- and either Mountain Dew or

13  sometimes Gatorade.

14  Q.  On June 29th, 2013, do you remember if

15  you had regularly consumed fluids?

16  A.  Yes.  I always drank fluids.  Always had

17  a cup of -- from 7/Eleven with me in the car.

18  Q.  I'm showing you a document that will be

19  marked Exhibit 31.

20        (Whereupon Angelini Deposition Exhibit 31

21  was marked.)

22  Q.  There were a lot of medical records

Page 224

1  exchanged in this case.  I'll represent to you that

2  this is a -- these are medical records kept by Mercy

3  Hos -- Medical Center for this -- from this incident

4  that we're just describing.

5        There are a number of paragraphs

6  beginning with capital letters as you see on the

7  left.  I want you to look at the one that says

8  review of systems, which I'll point to you on my

9  copy.

10  A.  I see it, sir, right here.

11  Q.  Right there.

12  A.  Yeah.

13  Q.  You see there it says, the remaining

14  systems are normal.  Of note, the patient only had

15  two drinks throughout the entire day for hydration.

16        Do you see that?

17  A.  Yes, sir.

18  Q.  Did you tell that to any of the

19  diagnosing individuals at Mercy Hospital?

20  A.  I don't recall what I told them, but if

21  it's on here, I would have to assume that I told

22  them two large Big Gulp drinks.

Page 225

1  Q.  A Big Gulp drink is what?  Is it soda?

2  Or what is it?

3  A.  Depending on -- I'm not sure that day

4  exactly.  Depending -- sometimes I got vitamin water

5  out of the machine.  Sometimes I got Mountain Dew.

6  Sometimes I got Diet Coke.  I can't specifically

7  tell you exactly what I had that day.

8  Q.  On hot days at work, would you wear light

9  weight, light colored, loose fitting clothing?

10  A.  Just a --

11  Q.  And just to tell you, I'm looking at

12  Exhibit 30 and it says, light weight, light colored,

13  loose fitting clothing.  That's why I'm asking.

14  A.  Light weight.  Can you rephrase that

15  question?  We have -- we're issued a uniform.

16  Q.  Did you wear your uniform?

17  A.  Yes.

18  Q.  Would you characterize the uniform that

19  you would wear in the Summers as light weight?

20  A.  No, sir.

21  Q.  How would you characterize its weight?

22  A.  I wore -- I wore a short sleeved shirt.

Page 226

1 It was still a little thick because of the uniform
2 brand. But I was given authorization from the major
3 that I could wear an arm band to cover up my tattoo.
4      So, I would not have to wear the long
5 sleeves in that heat exhaustion that we were in. I
6 wore it back in 2000 -- since 2011 when Major --
7 Major Williams said I could wear a arm band. He
8 gave me the order that I can wear an arm band.
9      Q.   So, let's break that down. In 2011, did
10 you speak with Major Williams and he gave you an
11 authorization to wear an arm band in place of the
12 long sleeved shirt?
13      A.   Yes, sir, 100 percent.
14      Q.   Was the -- absent that order, was a long
15 sleeved shirt required to cover up arm tattoos
16 during that time?
17      A.   It was at that time, but it was given
18 this discretion on the -- this -- the major if I
19 could wear the arm band or not. And actually the
20 general order states that you can use makeup or
21 something to cover up the tattoos.
22      So, the major thought that the band would

Page 227

1 be considered like makeup because it blended in with
2 my -- my -- my skin color.
3      Q.   You said Major Williams. What was
4 Major --
5      A.   Not -- not Major -- yeah, Major
6 Williams -- no, not Major Williams. Major Davis, I
7 apologize. William Davis. That's why I'm saying
8 Williams.
9      Q.   So, it's still the same William Davis --
10     A.   Yeah, I'm sorry.
11     Q.   -- who was in charge in 2013?
12     A.   Yes.
13     Q.   Did he give you that order orally or in
14 writing?
15     A.   So, I had such close contact with Major
16 Davis, which kind of made the supervisor upset
17 because it wasn't my fault. But Major Davis
18 personally called me in his office all the time.
19 And he told me verbatim in the -- in the office that
20 I was allowed to wear that arm band.
21      So, if I would have any issues if -- and
22 the supervisor approached me, I would tell them

Page 228

1 Major Davis gave me -- gave me permission. So, I'm
2 sure they would go back and ask Major Davis.
3      Q.   Did you have an issue in the Summer of
4 2013 with wearing the arm band?
5      A.   Yes, sir, I did.
6      Q.   What happened that caused you an issue?
7      A.   This was the first time ever I been
8 approached in my career at the Southeast District,
9 was ordered not to wear that arm band, that I can't
10 wear short sleeves anymore.
11     Q.   Who did that?
12     A.   Specifically I can remember that day. I
13 was at the funeral home. Got a call for a fight
14 between two girls at a funeral home. The guy that
15 died was a young kid. Approximately in his 20s, I
16 believe, of an overdose. The fight was between the
17 girlfriend and the ex-girlfriend. It was a big
18 fight.
19      I remember sitting in the car, was
20 pouring down sweat. No air conditioner. Pouring
21 down sweat. Even my report was soaking wet. And I
22 was sitting there.

Page 229

1      All of a sudden, Sgt. Brokus,
2 Lt. Williams pull up to my car as I was sitting
3 there writing my report. They walk up to my car,
4 and they scream at me, why am I -- why am I not
5 wearing long sleeves. Sir, with all due respect,
6 it's hot out here.
7      Q.   Were you wearing the sleeves that you had
8 described earlier you were told by Major Davis you
9 could wear?
10     A.   I had my -- I had my band on. It was
11 actually slipping down a little bit because it
12 was -- my arms were so sweaty. And I was -- then I
13 pulled it back up. It continued to fall down. It
14 was so sweaty. They ordered me not to wear it ever
15 again.
16     Q.   Did you speak with Major Davis about that
17 subsequently?
18     A.   No, I didn't.
19     Q.   Did you speak with any other commander in
20 the Southeast District about that issue?
21     A.   No, but I told them that Major Davis gave
22 me permission.

Plaintiff Exhibit 37

Page 230

1 Q. Turning back to your visit to the
2 hospital on June 29th, were you given any medical
3 instructions?
4 A. Yeah. I was put on light duty, sir.
5 Nonenforcement until the 10th of July. And seek
6 medical attention from PSI, my infirmary.
7 Q. I'm showing you a document that will be
8 marked Exhibit 31.
9 MR. NACHTMAN: 32.
10 Q. 32.
11 (Whereupon Angelini Deposition Exhibit 32
12 was marked.)
13 Q. There are several pages to that document.
14 Do you recognize these doc -- these pages on these
15 documents, if you flip through them?
16 A. Yes, sir. Give me a brief second to look
17 through.
18 Q. Take a moment and look through them.
19 A. (Complies.) Yes, sir.
20 Q. Are these the discharge instructions you
21 received from the hospital on that day?
22 A. Yes, sir.

Page 231

1 Q. On the first page, I'm pointing to it so
2 you see where I'm referring to, see where I am?
3 A. Oh, I'm sorry, sir. Yes, I see it, sir.
4 Q. It says, anticipated date of return to
5 work July 1st, 2013. Do you see that?
6 A. Yes, sir.
7 Q. Was it your understanding that you were
8 to return to work on July 1st, 2013 after this
9 incident?
10 A. That's incorrect, sir.
11 Q. Incorrect?
12 A. Correct.
13 Q. What did you understand?
14 A. I would have to return to PSI on that day
15 to get put back to work.
16 Q. So, you would -- how would that work?
17 Would you have to go to PSI for authorization and
18 then go back to work or what would happen?
19 A. Yes, I went to the hospital. And, so,
20 if the hospital -- so, if it's a Saturday or Sunday
21 or late Friday afternoon when PSI is closed, the
22 hospital has to put you out of duty until you seek

Page 232

1 medical attention from the infirmary, PSI infirmary.
2 PFI -- PSI infirmary is the only person
3 allowed to send you back to work or keep you out of
4 work except from a weekend -- the weekend incident.
5 But -- so, this means I would have to see
6 PSI first thing business day opening of PSI, and
7 then they go from there and they either put you out
8 or put you back to work.
9 Q. Do you remember going to see PSI on
10 July 1st, 2013?
11 A. Sometime -- sometime either the 1st or
12 the 2nd, and I'm not sure. I'm not 100 percent
13 sure. Just approximately around that day, yes, it
14 was the 1st or the 2nd.
15 Q. Do you remember being given a date on
16 when you could return to work?
17 A. I was turned -- I was told that I could
18 return back to work when I went to PSI, that I would
19 be on light duty until the 10th. PSI -- when I went
20 to PSI, which I think -- you see, the 29th was a
21 Friday, I believe. So, the 30th would be Saturday.
22 The 1st would be a Sunday. So, this -- I

Page 233

1 believe this might have been a mistake by the
2 hospital. Because then I would see PSI on the 2nd,
3 which was the Monday, first business day.
4 Q. Were your police powers suspended
5 medically at that time?
6 A. No, sir.
7 Q. So, when you said light duty, I'm just
8 trying to understand exactly what happened.
9 A. So, I'm out until the first business day.
10 I'll be home the first business -- I would be home
11 until the first business day until PSI reopens. And
12 then when PSI reopens Monday morning, I would go see
13 them, and they would make the determination whether
14 I would be put on light duty or back to full duty.
15 Q. I'm showing you a document which is
16 marked Exhibit 33.
17 (Whereupon Angelini Deposition Exhibit 33
18 was marked.)
19 Q. Do you recognize this document?
20 A. Yes, sir.
21 Q. Are these discharge instructions from a
22 visit to PSI on June 2nd, 2013?

Plaintiff Exhibit 37

Page 234

1    A.   That's correct, sir.

2    Q.   Was this the time when you were told to

3    remain on light duty until June 10th -- or

4    July 10th, I'm sorry?

5    A.   So, this would be the first time I saw

6    PSI after the hospital. I went July 2nd. And they

7    told me -- I seen -- medical treatment there at the

8    infirmary, and they told me to be out on light duty

9    until July -- July 10th. And then return to see

10   them on July 10th at 10:00 a.m.

11   Q.   It says, able to work with following

12   limitations. Right around the middle it says, no

13   enforcement duties. Do you see that?

14   A.   Yes, sir.

15   Q.   Is that consistent with your

16   understanding of what happened?

17   A.   That's how I was put on light duty, yes.

18   Q.   Based on the circumstances, did you

19   consider your June 29th heat issues a work-related

20   injury?

21   A.   Yes.

22   Q.   Did you file a workers' compensation

Page 235

1    claim over the June 29th heating issue?

2    A.   No.

3    Q.   Did you file a workers' compensation

4    claim based on fainting at work on June 29th, 2013?

5    A.   No, sir.

6    Q.   I'm going to show you another exhibit,

7    Exhibit 34.

8         (Whereupon Angelini Deposition Exhibit 34

9    was marked.)

10   Q.   There's several pages to this exhibit.

11   Do you recognize these pages?

12   A.   Give me a second, sir. (Complies.) Yes,

13   sir.

14   Q.   These documents were produced by your

15   counsel in this case. Did you personally take these

16   photographs?

17   A.   I took -- yes, I took photographs of

18   these, yes.

19   Q.   Are these the records of the schedule for

20   certain shifts and sectors from June 30th until

21   July 27th, 2013?

22   A.   This was my -- my -- my schedule for work

Page 236

1    in my squad for Sector 3.

2    Q.   You'll bear with me. I think several of

3    the pages are duplicate photos, I assume taken to

4    insure that someone could be able to read a copy.

5    Is that right?

6    A.   No, this -- hold on. I think the third

7    page is different, sir.

8    Q.   Yes. The third page is different. But

9    other than that, are they all just different copies

10   of different pictures of the same thing, at least

11   the first few?

12   A.   Yeah. It appears that way, sir, that you

13   have -- the third page is different.

14   Q.   And maybe the fourth page, but I think

15   the last two pages, are they the same picture?

16   A.   The last two -- the first one and the

17   last two look smeared. I can't even read it.

18   Q.   Fair enough. Can you read the first

19   page? Are you able to read that?

20   A.   Yes, sir.

21   Q.   Now, some of these appear to be

22   handwritten. Do you know why some of the entries

Page 237

1    would have been handwritten?

2    A.   Yes.

3    Q.   Why would some of them be handwritten?

4    A.   The supervisor changing -- changing them.

5    Q.   Who maintained these records?

6    A.   Supervisors. And we had access to them.

7    Q.   What does an H mean where -- if you look

8    at your schedule, there's Hs under the first column

9    next to your name.

10   A.   Uh-huh.

11   Q.   First two columns, what does that mean?

12   A.   It means -- H day means that's your day

13   off.

14   Q.   And what does the 33 next to that mean?

15   A.   That's the post cars.

16   Q.   And the one next to that, that 34 is also

17   a post car?

18   A.   Yes. Notice how it's different every day

19   I didn't have my post car.

20   Q.   If you look to the right of the 34, can

21   you make out on any of the different pictures, some

22   of which are the same, this first one, what that

Plaintiff Exhibit 37

Page 238

1 reads in that next column?

2   A.   4th of July.

3   Q.   Yeah. What does that say?

4   A.   Sic. S-I-C, sic.

5   Q.   And then the next two days, there are

6 handwritten Vs. Do you see that?

7   A.   Yes, sir.

8   Q.   What do those indicate?

9   A.   Vacation days.

10   Q.   So, you had mentioned before, were you

11 assigned a special detail to work on the 4th of

12 July?

13   A.   Yeah. I was supposed to work 4th of July

14 night if I was in -- either -- if I was full duty, I

15 would have -- if I was full duty, I would have to

16 work the event down at the Harbor. But I was on

17 light duty; so, I was supposed to work my regular

18 shift at the front desk.

19   Q.   When were you told that you had to work

20 on July 4th?

21   A.   I don't know the exact date, but it was

22 like two or three weeks before this.

Page 239

1   Q.   Do you remember who told you?

2   A.   Yes, Sgt. Brokus.

3   Q.   Why would St. Brokus have been the one to

4 tell you that?

5   A.   He's a sergeant and I have no idea, sir.

6 I won't -- I couldn't tell you why he told me, but I

7 have no idea.

8   Q.   Was that in addition to your regular

9 hours? Was this an additional detail or just during

10 your regular hours?

11   A.   No. Meaning that my -- my shift got

12 changed from -- that I would not work or report to

13 work at 7:00 a.m. -- at 6:39 to 3:00 p.m., that

14 since I was being detailed to the 4th of July, I

15 would have to come in at night, 7:00 at night to

16 3:00 a.m.

17   Q.   Instead of working the earlier shift?

18   A.   Yes. And that would have interfered with

19 my vacation. And I explained that to the sergeant

20 when he first told me that. I said it's not fair

21 because now you're ruining my vacation because I

22 planned on leaving at 3:00 o'clock on that Friday

Page 240

1 when I made my vacation up on that -- until 4th of

2 July.

3       But now you're purposely changing my

4 schedule so I would have to work until 3:00 in the

5 morning and then miss my vacation because I was

6 supposed to leave at 3:00 o'clock in the afternoon.

7 But you purposely changed my schedule and I'm being

8 retaliated against.

9   Q.   Is the 4th of July detail a detail you

10 had worked before ever?

11   A.   The only time I worked it when I was a

12 rookie when I walked -- actually, honestly, I can't

13 sit here and tell you that I ever worked it. I got

14 a post car right away in the Northwest because I

15 worked so hard.

16   Q.   Do officers with post cars not work the

17 4th of July detail?

18   A.   They do not.

19   Q.   Do you know who assigned you to the

20 detail? I know you said Sgt. Brokus told you. Do

21 you know who assigned you?

22   A.   I was told by Sgt. Brokus that the

Page 241

1 captain did it.

2   Q.   Were you unhappy about being assigned to

3 that detail?

4   A.   I was upset because my vacation was

5 ruined that I had planned for a long time.

6   Q.   How would the detail have interfered with

7 your vacation?

8   A.   Like I explained to you earlier, sir.

9 So, I was supposed to work my regular shift, would

10 have been day shift. You notice 7:00 a.m. to

11 3:00 p.m. is a --

12   Q.   You expected to get off work at

13 3:00 p.m.?

14   A.   3:00 p.m., and then leave for va -- my

15 in-laws lived in Ocean City. And I was going to

16 leave to go to Ocean City right after work at

17 3:00 p.m. Get settled down there. And for the

18 first -- you know, for the first time being out

19 there on vacation right after the 4th of July like

20 that and enjoy my 4th of July with my family. And

21 then they ruined it for me. They purposely ruined

22 it for me.

Page 242

1  Q.  Were you able to go visit your in-laws
2  at all that weekend?
3  A.  No.
4  Q.  Did -- hold on.  I'm showing you several
5  documents which together are marked as Exhibit 35.
6        (Whereupon Angelini Deposition Exhibit 35
7  was marked.)
8  Q.  There are three pages to that.  Do you
9  recognize -- do you recognize these documents?
10  A.  Yes, sir.
11  Q.  What are they?
12  A.  It's a text message that Sgt. Brokus text
13  to himself -- that e-mailed it to himself.  It's a
14  text message I sent to Sgt. Brokus that Sgt. Brokus
15  e-mailed to himself on numerous different times on
16  the wrong -- on 7/6/2013.
17  Q.  On the next -- the second page, is that
18  the same text message?
19  A.  Yeah, this is the same text message.
20  Q.  Is that a text message to Sgt. Brokus or
21  someone else in terms of this particular message
22  that we're looking at?

Page 243

1  A.  This is a text message I sent to
2  Sgt. Brokus on 6/26.
3  Q.  Where it says at the bottom, this is what
4  I sent to Sgt. Brokus.  Were you forwarding this
5  message to someone else?
6  A.  No.  This is a -- this right here, sir?
7  Q.  Well, right here at the bottom it says,
8  this is what -- on the last line.
9        MR. NACHTMAN:  Can you specify what we're
10  looking at for the record, please?
11  A.  Oh, I sent this --
12        MR. NACHTMAN:  I'm sorry.
13        MR. GLYNN:  It's the second page.
14        MR. NACHTMAN:  The second page of Exhibit
15  No. 35?
16  A.  Yes.  So, the second page of Exhibit 35
17  is a screenshot that I took and I sent to my wife
18  that's stating, this is what I sent to Sgt. Brokus
19  that -- because I was explaining to her how I'm
20  being retaliated again for the billionth time, and
21  I'm exaggerating about billionth time.
22        But the numerous times I'm being

Page 244

1  retaliated -- in continued retaliation of how now
2  they're changing my shift schedule and I'm being
3  detailed to the -- to the thing.
4        And now I'm explaining to Sgt. Brokus
5  that, look, you're ruining my vacation.  And I sent
6  it to my wife to show him because my wife was like,
7  it's not fair.  Try to talk to them.  Let them know
8  that we have this vacation planned.
9        And this is what I sent to -- I showed my
10  wife that I attempted to talk to Brokus,
11  Sgt. Brokus.
12  Q.  On the second and third page, there's
13  some handwritten notes.  Do you know whose
14  handwriting that is?
15  A.  My beautiful wife Jessica.
16  Q.  There are other messages on the third
17  page.  Are those also messages that you sent to
18  Sgt. Brokus, or what are those?
19  A.  The third page?
20  Q.  The third page.
21  A.  Yes.  This is -- this is another text
22  message, yeah, I sent to Sgt. Brokus.

Page 245

1  Q.  I'm showing you another selection of
2  documents which I'll call them Exhibit 36.
3        (Whereupon Angelini Deposition Exhibit 36
4  was marked.)
5  Q.  Take a moment and quickly review those
6  pages.  I'm sorry, there are several of them.
7  A.  (Complies.)  I'm reading, sir.
8  Q.  Do you recognize those documents?
9  A.  Yes, sir.
10  Q.  Let's turn to the last page first.  Do
11  you recognize this message?
12  A.  Yes, I do.
13  Q.  Is this a message that you sent to your
14  wife -- or from your wife's cell phone to
15  Sgt. Brokus?  I'm sorry, not about that first part.
16  A.  It's not an e-mail.  Just a text message
17  I sent.
18  Q.  And then if you turn to the previous
19  page, is that a message recorded -- an e-mail sent
20  by Sgt. Brokus -- is that a message that
21  Sgt. Borkus sent to you?
22  A.  Sgt. Brokus sent me a message saying,

Page 246

1  report to Mercy Hospital.
2      Q.  And then on the page before that, is that
3  another message that Sgt. Brokus sent to you
4  recorded as an e-mail?
5      A.  Sgt. -- Sgt. Brokus sent me a text
6  message on the 4th of July stating that Sgt. Januck
7  is on the way to your place to take you to Mercy
8  Hospital.
9      Q.  And then on the prev -- the next page, I
10 guess we'll call it the previous page, is that a
11 message that you sent to Sgt. Brokus?
12     A.  I sent in on July 4th, text message.
13 Sir, with all due respect, please hand in my 70 that
14 I filled out already so I can get out of here as
15 soon as possible. Thank you.
16     Q.  The page before that is a duplicate, I'm
17 sorry. The previous page where it says call
18 lieutenant, is that a message that Sgt. Brokus sent
19 to you on July 4th?
20     A.  Yes.
21     Q.  Another duplicate, I'm sorry. The
22 previous page to that where it begins, sir, is this

Page 247

1  my tour of duty for tonight, is that a message that
2  you sent to Sgt. Brokus that day?
3      A.  Yes, sir.
4      Q.  The previous page to that, is that a
5  message that Sgt. Brokus sent to you on the 4th of
6  July?
7      A.  Yes. Sgt. Brokus sent that to me, text
8  message July 4th.
9      Q.  The page before that, is that a message
10 that you sent to Sgt. Brokus?
11     A.  Yes, sir.
12     Q.  On the page before that, is that another
13 message that you sent to Sgt. Brokus on the 4th of
14 July?
15     A.  Yes, sir.
16     Q.  On the page before that, is that another
17 message that you sent to Sgt. Brokus on the 4th of
18 July?
19     A.  Yes, sir.
20     Q.  Were you -- where you write, wow, you
21 guys didn't believe me I was going to the hospital
22 on my own, what did you mean by that?

Page 248

1      A.  So, as per policy being on light duty,
2  that I called out sick, he wasn't supposed to come
3  pick me up.
4      Q.  I'm sorry, say that again?
5      A.  As per policy, BPD policy, Sgt. Brokus
6  had no right to pick me up. He purposely picked me
7  up at my house with a police car. Put me in the
8  back of it and forced me to the hospital when I
9  explained to him that I would go to the hospital
10 later, at a later time throughout the day. If I
11 didn't want to go to the hospital, I didn't have to.
12 But I wanted to let him know that I'll go at my
13 convenience.
14         He retaliated. He sent Sgt. Januck to
15 pick me up. Put me in the back of the police car.
16 My daughter cried thinking I was going to jail.
17 Going to jail. Pick me up, took me to the hospital,
18 dropped me off. Didn't even have anyone stand by
19 with me, against BPD policy.
20         They put me on duty by picking me up
21 because if we would have got in a car accident, that
22 would have counted as work related. I went to the

Page 249

1  hospital. Stood there for hours and hours by myself
2  on the 4th of July. And I took -- sent them
3  pictures hoping he would feel bad for me.
4      Q.  When you say pictures, the three pages in
5  front of that -- or at least the page in front of
6  that, is that a picture that you took and sent to
7  Sgt. Brokus?
8      A.  That sure is.
9      Q.  A clock --
10     A.  Yes, it is.
11     Q.  -- or whatever that is. And then before
12 that, is that another message beginning, just in
13 case anyone cares, that you sent to Sgt. Brokus?
14     A.  Yes, sir.
15     Q.  And the first two pages also are those
16 images that you took with a camera or phone and sent
17 to Sgt. Brickus?
18     A.  Yes, sir.
19     Q.  Or Brokus, I'm sorry. Not Brickus. I'm
20 showing you another document marked 37.
21         (Whereupon Angelini Deposition Exhibit 37
22 was marked.)

Page 250

1 Q. Can you tell me if you recognize those

2 documents?

3 A. Give me a minute, sir.

4 Q. Yes.

5 A. (Complies.) Yes, sir.

6 Q. Were you diagnosed during that visit on

7 July 4th with kidney stones?

8 A. No, sir.

9 Q. Where the documents says, your exam shows

10 you have -- had a kidney stone, I'm sorry. Were you

11 diagnosed as having had a kidney stone?

12 A. I had -- they were aware that I had

13 kidney stones in the past, yes.

14 Q. Based on the second page, were you also

15 diagnosed as having a possible urinary tract

16 infection?

17 A. Yes.

18 Q. Did you receive medical care based on

19 those diagnoses?

20 A. Yes, sir.

21 Q. What care did you receive?

22 A. I was given the care of IV fluid through

Page 251

1 my veins. I had to lay there by myself on the 4th

2 of July.

3 Q. I'm going to refer you to Paragraph 40 of

4 Exhibit 2, the Complaint. Not that document.

5 A. 42.

6 Q. Page 9.

7 A. Page 9, sir, 40?

8 Q. Yes. Do you see Paragraph 40?

9 A. Yes, sir.

10 Q. It says, drove him to Mercy Medical

11 Center to re-review his records. Do you see

12 where I'm referring to?

13 A. So, 40.

14 Q. The middle of that -- it's like one big

15 sentence which is -- that's the part that I'm going

16 to ask you about.

17 A. Okay, sir, go ahead.

18 Q. When you say that Sgt. Januck drove you

19 to Mercy Medical Center to re-review your records,

20 what exactly are you referring to?

21 MR. NACHTMAN: Objection to the form and

22 the characterization that Officer Angelini

Page 252

1 wrote this document.

2 MR. GLYNN: Your objection is noted.

3 MR. NACHTMAN: You can answer.

4 Q. You can answer.

5 A. So, I'm sorry, what is your question

6 though?

7 Q. Did you re-review your medical records on

8 July 4th, 2013 at Mercy Medical?

9 MR. NACHTMAN: Same objection.

10 A. Did I review -- you're asking me if I

11 reviewed my records?

12 Q. Yes.

13 A. I was never provided any records at --

14 the only record I was provided was this kidney stone

15 record here, stating that I had kidney stones in the

16 past.

17 Q. Okay. Did you end up working on July 4th

18 at all other than the --

19 A. Yes.

20 Q. Yes. What shift did you work on

21 July 4th?

22 A. Hospital shift.

Page 253

1 Q. Does that mean you were at work, but you

2 were at the hospital?

3 A. Yes, and never paid.

4 Q. You're saying you were not paid for the

5 shift that you spent at the hospital?

6 A. I had to use up a sick day. Even though

7 I was supposed to be paid for being put on duty, I

8 still had to -- they still kept it as a sick day and

9 lost vacation leave because of that.

10 Q. I'm showing you a document that we'll

11 call Exhibit 30 -- what number is that?

12 THE REPORTER: 38.

13 Q. -- 38.

14 (Whereupon Angelini Deposition Exhibit 38

15 was marked.)

16 Q. Do you recognize this document as

17 something you wrote?

18 A. Yes, sir.

19 Q. Is this a 95 that you wrote to Major

20 William Davis on July 25th, 2013?

21 A. Yes, sir.

22 Q. Did you file another transfer request on

Page 254

1 July 4th, 2013?

2 A. Yes, sir.

3 Q. I'm showing you documents marked

4 Exhibit 39.

5 (Whereupon Angelini Deposition Exhibit 39

6 was marked.)

7 Q. There are four pages. Do you see those

8 four pages?

9 A. Yes, sir.

10 Q. Do you recognize those documents?

11 A. Yes, sir.

12 Q. Are there two copies each of two specific

13 documents here, one clean and one with marks through

14 it for each?

15 A. So, the first two -- yes. I'm sorry,

16 what was your question again? Sir, repeat that.

17 Q. Are the third and fourth pages the same

18 as the first two pages except that they appear to be

19 defaced?

20 A. So, the first page is -- yes, I see --

21 so, they're both cop -- it's copies of -- of the --

22 the first page.

Page 255

1 Q. The first two pages, are those copies

2 that you made and kept before turning in these

3 transfer requests?

4 A. Yeah, the -- so, I handed them in. I --

5 I -- so, I wrote the 70s out. I made a copy for

6 myself and then handed them in. Handed in the

7 original. And then I received the originals back

8 torn up.

9 Q. Why did you make copies before you turned

10 them in?

11 A. To prove that I turned in a 70. All

12 officers are told to do that.

13 Q. You generally make copies of reports

14 before you turn them in?

15 A. Yes, I do. So, a lot of things get

16 misplaced in the Baltimore Police Department because

17 of it's out-aged (sic) technology.

18 Q. Is it your impression that officers

19 keeping copies of reports is a common practice at

20 BPD?

21 A. Yes. It's common practice that officers

22 do make copies of -- of their 70s.

Page 256

1 Q. Were either of these two requests

2 granted?

3 A. No. They were torn up.

4 Q. When you say they were torn up, were they

5 torn up when they were given back to you?

6 A. Yes, sir. They were torn up in pieces

7 when they were returned back to me as a slap in the

8 face.

9 Q. Do you know who tore them?

10 A. I was told by -- I was told that it was

11 Captain Burrus that tore them up.

12 Q. Who told you that Captain Burrus tore

13 them?

14 A. OIC Nagle.

15 Q. What's OIC Nagle's first name?

16 A. First name. Give me a second to think of

17 his first name. I can't -- at this time, I cannot

18 recall OIC Nagle's first name.

19 Q. Did you speak with any other -- any

20 supervisors about these particular transfer requests

21 at that time?

22 A. July 4th. I had asked OIC Nagle why were

Page 257

1 they ripped up? He's like -- he said to me

2 specifically that the captain ripped them up. That

3 the -- someone -- the command -- Lt. Williams gave

4 it to him for me to hand to me. Or was

5 it Lt. Williams or sergeant. I can't remember.

6 Actually I want to strike that. I can't

7 remember exactly who told him that day, but he was

8 OIC. I re -- I exactly recall this day as I'm

9 sitting here right now. I'm seated in the Sector 3

10 in the back of the room. I'm sitting there prior to

11 roll call.

12 Officer Nagle is our OIC that day. He

13 walks in. I'm sitting at the last -- end of the

14 table. He comes in and tosses them on my desk. I

15 look at it. It's ripped up 70s. I said, what is

16 going on with this? He says, the captain ripped

17 them up. Don't hand any more in. And that was the

18 end of it.

19 Q. Did you ever speak with Lieutenant

20 Charles Williams about these transfer requests?

21 A. Later on.

22 Q. But not at the time?

Page 258

1 A.   Not that I -- not that I specifically
2 recall at this time and this moment. I might have
3 written a 95 about it, but I'm not sure if I spoke
4 to anyone at this time.
5      Q.   Did you speak with Captain Kimberly
6 Burrus about these transfer requests?
7 A.   I requested a meeting. They refused to
8 have one with me.
9      Q.   Did Captain Burrus refuse to speak with
10 you about the transfer requests entirely?
11 A.   Yes.
12     Q.   Did you ever speak with Captain Burrus
13 about these transfer requests?
14 A.   No, because she left not short -- shortly
15 after this, I believe. She got promoted to major.
16     Q.   Were you ever told that the transfer
17 requests were being denied?
18 A.   Yes.
19     Q.   Other than them being torn up, has anyone
20 told -- told you that they were denied?
21 A.   Yes. I was told they were denied.
22     Q.   Who told you that?

Page 259

1 A.   I was told by Lt. Williams that they're
2 being denied. I was told by Lt. Windel, stop
3 handing 70s in. They're just laying in my desk
4 drawer. Pulls out the desk drawer and says, look,
5 they're all sitting right here. That's what he
6 specifically said to me.
7      As I indicated on a 95 administrative
8 report, he pulled his desk drawer open. I'm sick of
9 you handing in 70s. Stop. They're -- all they're
10 doing is filling my desk. Shuts it closed.
11     Q.   I'm showing you another document we'll
12 mark as Exhibit 40.
13     (Whereupon Angelini Deposition Exhibit 40
14 was marked.)
15     Q.   Do you recognize this document as a
16 report you authored?
17 A.   Yes, sir, I do.
18     Q.   I'm showing you another document marked
19 Exhibit 41.
20     (Whereupon Angelini Deposition Exhibit 41
21 was marked.)
22     Q.   Do you recognize this document as a

Page 260

1 letter you authored?
2 A.   May -- can I take a look at it, sir?
3      Q.   Yes.
4 A.   (Complies.) What was your question, sir?
5      Q.   Are you the author of this letter?
6 A.   No, sir.
7      Q.   Who is the author of this letter?
8 A.   This is my wife's.
9      Q.   Did your wife -- strike that.
10     Did you ever send this letter to anyone?
11 A.   To the best of my recollection -- take a
12 moment.
13     MR. NACHTMAN: Sorry about that. I don't
14 know what that is.
15 A.   To the best of my recollection --
16 recollection, I did not send this to anyone. The
17 best of my recollection, no.
18     Q.   Did your wife write this letter, but it
19 never went anywhere?
20 A.   Just in our files.
21     Q.   As a police officer after participating
22 in police activity such as an arrest or responding

Page 261

1 to a call for service, are you supposed to write a
2 report?
3 A.   Can you say that again, I'm sorry?
4      Q.   As a police officer when you participate
5 in an arrest or respond to a call for service, do
6 you generally write a report?
7 A.   Not always, sir.
8      Q.   When you are going to write a report,
9 what are you supposed to do with it after you finish
10 writing it?
11 A.   After I'm done, it all depends if the
12 supervisor gets on the air and requests if anyone
13 has reports, if they're done their reports. Or if
14 they're not done the reports, at the end of the day
15 when you come in, there's a checklist.
16     And the supervisor goes over the
17 checklist. And usually if you have a report, he'll
18 say, hey, Angelini, do you have your report? You
19 owe me a report, and then I'll give him my report.
20     Q.   If you have a report to turn in, are you
21 supposed to give it to your sergeant if they're
22 available?

Page 262

1    A.   If your supervisor -- your next chain of
2  command is either your OIC or your supervisor,
3  that's correct.
4    **Q.   If neither the OIC or the supervisor is**
5  **present, are you allowed to give it to another**
6  **sergeant or OIC on the -- on your shift or whatever**
7  **shift is working at that time?**
8    A.   If someone is working on your shift that
9  is in rank or is acting OIC, yes, you're supposed to
10  give it to somebody on your shift.
11    **Q.   If you can't locate anyone who fits that**
12  **description and you are finished with a report, is**
13  **there a place where you're allowed to leave reports**
14  **at the end of your shift so that your supervisor can**
15  **find them when they come in?**
16    A.   There's no specific area to put your
17  reports. It's common practice that you would leave
18  them on the desk. But if it's a Part 1 crime, you
19  can't leave it on the desk.
20    **Q.   When you say a Part 1 crime, what's a**
21  **Part 1 crime?**
22    A.   A serious crime as in -- I'll give you

Page 263

1  some examples. Like a larceny from auto. A
2  homicide. A rape. A -- a first degree assault that
3  is. Then you have other -- other reports that are
4  not considered priority cause -- or reports like the
5  report that I generated was called a police
6  information report.
7        Basically I just -- police information
8  report is a catchall report to cover you yourself,
9  that you're documenting an incident because you
10  believe that a crime actually did not occur, but
11  you're documenting it so later on if anything else
12  occurs or further -- further review by a supervisor
13  could deem it a -- a crime, then you can also
14  rewrite the report.
15    **Q.   Do you remember whether you worked on**
16  **July 25th, 2013?**
17    A.   Could you be more specific of any kind
18  of -- like, is there a reason -- like listen to what
19  I'm saying, is that a -- is there a incident that
20  occurred on that date that -- that you're asking me
21  because I don't --
22    **Q.   Yes.**

Page 264

1    A.   July 25th, I don't have the schedule in
2  front of me.
3    **Q.   Here's what I'm going to ask you about to**
4  **refresh your recollection about this. The incident**
5  **you described in your complaint about involving**
6  **James Brokus alleged to have taken place on**
7  **July 28th, 2013 involving a police report written on**
8  **July 25th.**
9        **Does that refresh your recollection as**
10  **to what I'm talking about?**
11    A.   Yes, sir. Yes, sir.
12    **Q.   Do you remember working on -- on or about**
13  **July 25th?**
14    A.   Yes, sir.
15    **Q.   Do you remember a report that you**
16  **authored on July 25th for a call you handled that**
17  **was not finished at the end of the shift?**
18    A.   Actually the report was finished on my
19  drive. When I got back to station, I didn't see
20  anyone from my shift there. So, I didn't print it
21  out. I still kept it on my drive.
22        And like I told you before in the last

Page 265

1  few statements a time ago, I couldn't leave it with
2  anybody. Sgt. Brickus was on the other shift. She
3  told me she wouldn't accept any of my reports.
4  There's a common practice of reports getting lost,
5  and I didn't want to leave it anywhere and get lost.
6  So -- or just leave it around anywhere.
7        And, so, I just never turned it in that
8  day because I didn't see anyone present. No one
9  asked me for the report as usually they do. And I
10  just didn't.
11    **Q.   Did you see any other sergeants when you**
12  **got back to the station?**
13    A.   I saw no one -- no other sergeants, no.
14    **Q.   Were you off work the next two days?**
15    A.   Yes, sir.
16    **Q.   Do you know when you got back --**
17        MR. GLYNN: Can we go off the record for
18  a moment?
19        MR. NACHTMAN: Yeah, go off the record
20  for a moment.
21        THE VIDEOGRAPHER: We're going off the
22  record, the time is 3:24 p.m.

Page 266

1        (Whereupon a brief recess was taken,
2   after which the following was heard:
3        THE VIDEOGRAPHER:  We are back on the
4   record.  The time is 3:30 p.m.
5   Q.   All right, Officer Angelini, I'm showing
6   you an exhibit marked 42.
7        (Whereupon Angelini Deposition Exhibit 42
8   was marked.)
9   **Q.   Do you recognize that document as a 95**
10  **authored by you?**
11  A.   Give me a second, sir, to read, please.
12  (Complies)  Yes, sir.
13  **Q.   Does this report recount the incident we**
14  **just described?**
15  A.   Yes, sir.
16  **Q.   Did you file that report through**
17  **channels?**
18  A.   Yes, sir.
19  **Q.   Referring to that report, that document**
20  **it says, I didn't want to leave the report on the**
21  **Sector 3 supervisor's desk because I feared it would**
22  **be misplaced as some reports have been in the past.**

Page 267

1        **Do you see that?**
2   A.   Yes, sir.
3   **Q.   Who was the Sector 3 supervisor?**
4   A.   I believe -- I'm not -- I'm not sure at
5   this time of my recollection of who the supervisor
6   was that day.
7   **Q.   Do you have a specific recollection of**
8   **other reports being misplaced in the past?**
9   A.   I can't specifically tell you a date or
10  time or exact dates of when reports have been
11  missing, but I can tell you this.  That the report I
12  handed in after Sgt. Jackson berated me about and
13  blue teamed me about and made fun of me about, a
14  year -- almost a couple months later, I was in the
15  Northeast.  I received a stinger for saying that I
16  never turned it in even though I gave him the -- the
17  new titled report that same day the incident
18  happened.
19  **Q.   I'm showing you another exhibit.  We'll**
20  **call this 43.**
21       (Whereupon Angelini Deposition Exhibit 43
22  was marked.)

Page 268

1   **Q.   When you have a moment, could you take a**
2   **look at that and let me know whether you recognize**
3   **it as a report authored by you?**
4   A.   (Complies.)  Yes, sir, this is, sir.
5   **Q.   Why did you write two reports about this**
6   **incident?**
7   A.   Mind if I look at the other one, sir?
8   **Q.   Go ahead, sure.**
9   A.   At this time, I can't -- best of my
10  recollection, I cannot tell you the reason that I
11  wrote two reports.  Usually I type up my reports.  I
12  believe that Sgt. Jackson wanted a 95 immediately.
13       What I mean immediately, at that point
14  when he found out -- when he found me in the cubicle
15  looking at my e-mails which he told me to get off of
16  and refusing to let me watch and look for, told me I
17  do that on my off time.
18       He told me he wanted a re -- handed --
19  threw me a -- this -- this specific form right now,
20  this one.  I guess if this is a copy then, this is
21  not the exact one.  But he threw me a --
22  **Q.   Which exhibit number is that?**

Page 269

1   A.   Exhibit 43.  He -- I don't think it's the
2   exact piece of paper, but he threw me a 95 report,
3   blank one, and said, fill this out while you didn't
4   turn your report in.
5        So -- and he basically stood over me
6   watching me write one up.  And then I wrote one
7   later myself because he took it from me, and I
8   couldn't remember exactly what I wrote.
9        So, I rewrote it again and thought -- and
10  handed one in, another one in typed up because I
11  liked them typed up because my handwriting is not
12  the best.  If you notice, it's scratched out, and I
13  think it's unprofessional, but he forced me to write
14  one right there and then.
15  **Q.   So, that brings us to the actual date of**
16  **July 28th.  Do you remember having a conversation**
17  **with Sgt. Jackson about your e-mails and your**
18  **application to the SWAT team?**
19  A.   Yes, that's a -- yes, that's -- yes, sir.
20  **Q.   What were you trying to accomplish that**
21  **day with regard to you -- a -- with regard to the**
22  **SWAT team?**

Page 270

1  A.  I was trying to become a SWAT member.

2  **Q.  How does one become a SWAT member?**

3  A.  So, I put in a request for SWAT.

4  **Q.  When you say a request, was that a**

5  **transfer request or was it a different kind of**

6  **request?**

7  A.  So, it was -- I received an e-mail

8  through the department that SWAT tryouts were being

9  held. And I requested through that sergeant who put

10 the e-mail out or maybe officer if I could -- if I

11 was able to go to training on the specific date that

12 he offers the -- there were several different days

13 that he offered. And he said I could. Just write a

14 95 to your command requesting to go to training.

15      So, I handed in a 95 requesting that I go

16 to SWAT training on a specific date because I picked

17 that date because it was the best date for me. And

18 that was a couple weeks -- or maybe -- I don't know

19 exactly when.

20      That was before this day that we're

21 speaking of, 7/28, that I put the 95 in to go to

22 training. And then I knew training was the next day

Page 271

1  on the 29th of July, and I was trying to find out

2  information to see if a detail order came out saying

3  that I was detailed to the SWAT tryouts.

4      But Sgt. Jackson abruptly turned me down

5  the morning of the 28th when I asked him if he had

6  heard anything about me and tryouts or got any

7  e-mails about me through the department that I was

8  detailed tomorrow for tryouts.

9  **Q.  What time in the morning was this, or**

10 **whatever time of day it was, however you want to**

11 **characterize it? Do you remember what time of it**

12 **was?**

13 A.  I know specifically when it was, sir.

14 **Q.  Was it the beginning of your shift?**

15 A.  It was at -- right at roll call when I

16 approached him. He was sitting down on the chair at

17 the end of Sector 3 cubicle just like this. His

18 head back like this. And I walked up to him. I

19 said, sergeant, sir, can I speak to you?

20      What do you want? I said, sir, I have

21 tryouts tomorrow. Did you get -- receive an e-mail

22 about me trying out? I'm not worried about you and

Page 272

1  your e-mails. No, I don't know anything. And

2  shoved me off. Pretty much I felt that he didn't

3  care. I walked away and I sat back down for roll

4  call.

5  **Q.  So, that conversation occurred before**

6  **roll call?**

7  A.  Right before roll call started, maybe

8  seconds or -- before roll call started, before the

9  lieutenant walked in and gave roll call.

10 **Q.  After roll call, did you try to check**

11 **your e-mails? Is that when that happened?**

12 A.  Yes, sir.

13 **Q.  What happened when you tried to check**

14 **your e-mails after roll call?**

15 A.  Sgt. Jackson came in the roll -- into the

16 cubicle, the processing room where I was on the

17 e-mails, departmental e-mails looking for any detail

18 orders for my SWAT tryouts today that I -- that I

19 might have received.

20 **Q.  What happened then?**

21 A.  Then Sgt. Brokus questioned me about the

22 re -- why is there a report sitting on my desk now

Page 273

1  that was supposed to be turned in on the 25th? And

2  I attempted to explain to him what happened and what

3  occurred today that -- that day that I came in a

4  little later than expected because I got held up out

5  on the street. And when I got back, that no one was

6  in the station to give the report to. I didn't see

7  anyone.

8  **Q.  Did you tell that story first to**

9  **Sgt. Jackson or first to Sgt. Brokus?**

10 A.  Sgt. Jackson.

11 **Q.  Do you know if Sgt. Jackson then spoke to**

12 **Sgt. Brokus about that before Sgt. Brokus talked to**

13 **you?**

14 A.  Yes, sir. I exactly remember what

15 happened, yes.

16 **Q.  What happened?**

17 A.  So, Sgt. Jackson had told me -- because I

18 told him when he was speaking to me, that I don't

19 appreciate the way -- the way he speaks to me.

20 Again, for -- maybe for the second time again.

21 Brought me in O-9's office. Told me to come in

22 O-9's office.

Page 274

1    And me, the O-9 which is Lt. Williams,
2 had a discussion about why the report was handed in
3 late. Lt. Williams says to me, Officer Angelini,
4 just make sure next time you just turn the report on
5 -- report in the same day. And that was the end of
6 it.
7        And Sgt. Jackson then tells me, I needed
8 to go fix my report that I wrote for that day
9 because it's not a police information no longer,
10 it's actually a assault by threat. And I need to
11 change the heading and the Complainant's -- and the
12 Complainant's name.
13       So, I walked back to the cubicle, the
14 processing room. Began fixing my report when I
15 overheard Sgt. Brokus and Sgt. Jackson speaking next
16 to the Sector 2 cubicle.
17       As I was sitting inside the cubicle, I
18 heard Sgt. Jackson tell Sgt. Brokus, Angelini is
19 accusing you of leaving early. He said that you
20 left early. That's the reason why he didn't hand in
21 the report.
22       And then I heard Sgt. Brokus scream

Page 275

1 loudly, and I don't want to cuss on camera in front
2 of you guys, but he said, F that mother F'er. He's
3 a F'ing liar. The time -- turned my recording on my
4 phone on. I'm not sure if I put it on my camera or
5 I put it on recording, just recording.
6        But I had a point that -- I believe that
7 I was going to have interaction with Sgt. Brokus and
8 approach him and tell him that I didn't appreciate
9 it. So, when I turned it on, I stood up.
10 Sgt. Brokus walked across. I said, excuse me, sir,
11 I don't appreciate you speaking -- speaking saying F
12 you about me, sir. Just like that, sir.
13       I said, I don't appreciate you speaking
14 to -- speaking about me like that, sir. That's the
15 time he became irate. Got in my face with his
16 finger. And he began berating me, screamed at and
17 yelling at me.
18       I was -- and F -- and then purposely I
19 recorded this because I feared. I had a feeling
20 that a crime might happen. Like he is going to
21 assault me or become irate because of his demeanor.
22 His demeanor, he's very hostile, Sgt. Brokus.

Page 276

1        And the way Sgt. Brokus was screaming to
2 Sgt. Jackson, F me, F me, I could tell -- I can hear
3 the -- like the anger in his voice. And I told
4 myself, that I knew myself, that I better record
5 this because no one is going to believe in the
6 district because all this was retaliation. And it
7 was so loud and irate.
8        So, I hit record. Told him that I didn't
9 appreciate it. He became -- got in my face, yelled
10 at me, screamed at me. I said, stop assaulting me,
11 stop assaulting me because he came -- kept on coming
12 closer to me with his finger, which time I leaned up
13 and I hit the wall by then.
14       And I -- from then on, I was just -- I
15 needed -- I needed -- I just -- basically my blood
16 pressure came up. Had so much anxiety. I was
17 scared. And Lt. Williams came from the O-9's office
18 and came and got us and brought us into the office.
19 He ordered me to be suspended.
20       Brokus says -- well, Sgt. Brokus went in
21 there and said that he had a special folder on me.
22 Basically that he had a folder that he was putting

Page 277

1 all this stuff in that I didn't know about, which is
2 against general order and policy and libor rights.
3        Told me I can go F'ing anywhere I wanted
4 to go. I started so much trouble up over here.
5 That I'm a F'ing liar. I -- that he never left
6 early. And I tried to explain to him that I never
7 said he left early. That this was being made up by
8 Sgt. Jackson to stir trouble up for no reason. When
9 I never ever said, never said that he left early.
10 That was uncalled for by Sgt. Jackson for him to say
11 that I told Brokus that he left early.
12       And I was just taken to the hospital
13 again. My blood pressure was real high, 152 like
14 over something. Don't quote me on it. It was in
15 the 150s, and the 105s, I believe, the lower number.
16 I was scared. Scared, really scared. And couldn't
17 take it anymore.
18       Just the retaliation was just getting out
19 of hand now. And no one followed me to the hospital
20 again. No one cared. Medics took me. Per policy,
21 an officer is supposed to follow another officer. I
22 was sent down there, left alone again, didn't care,

Page 278

1 didn't check on me.

2 **Q.   Are you ready?**

3 A.   Uh-huh.

4 **Q.   Do you believe that Sgt. Jackson misled**

5 **Sgt. Brokus about what you had said to Sgt. Jackson**

6 **with regard to why your report was turned in when it**

7 **was?**

8         MR. NACHTMAN: Objection. You can

9 answer.

10 A.   He purposely misled Sgt. Brokus to start

11 more trouble up. To have Brokus come after me.

12 **Q.   Why did you believe Sgt. Jackson did that**

13 **purposely?**

14 A.   Because he was accusing --

15         MR. NACHTMAN: Objection. You can

16 answer.

17 A.   So, Sgt. Jackson purposely told

18 Sgt. Brokus, knowing that Sgt. Brokus would get mad,

19 get upset, and come after me or retaliate against me

20 and make up a lie to stir more trouble up and to

21 have more people come after me.

22         Because Sgt. Jackson and Sgt. Brickus

Page 279

1 were best -- were good friends. And everyone was

2 spreading rumors about me, and they wanted everyone

3 against me. And it worked out. Sgt. Brokus fell

4 for it, and he attacked me.

5 **Q.   I'm showing you a document marked as**

6 **Exhibit 44.**

7         (Whereupon Angelini Deposition Exhibit 44

8 was marked.)

9 **Q.   Could you take a look at that, and let me**

10 **know if you recognize it as a report authored by**

11 **you?**

12 A.   Yes, sir. If you give me a minute,

13 please?

14 **Q.   Take your time.**

15 A.   (Complies.) Yes, I did author this, sir.

16 **Q.   Did Lt. Williams medically sus -- I'm**

17 **sorry, Lt. Charles Williams medically suspend you as**

18 **a result of your request at the end of that**

19 **incident?**

20 A.   Yes. I -- well, I asked -- I told him

21 that I was stressed out, yes.

22 **Q.   Did you request to go on stress medical?**

Page 280

1 A.   I did state -- that I recall I did say --

2 state something to the effect that I can't take it

3 anymore, I need to go out on stress medical.

4 **Q.   What is stress medical?**

5 A.   Where an officer is stressed out because

6 of a -- because of work.

7 **Q.   Is that a classification for putting an**

8 **officer on medical suspension based on stress?**

9 A.   Yes.

10 **Q.   Were you cleared to return to duty the**

11 **next day?**

12 A.   The best of my recollection, I believe

13 so. Was it the next day? Yes, sir.

14 **Q.   Subsequent to that incident, did you have**

15 **issues with your other co-workers, the regular**

16 **officers in the Southeast? I'll prompt you. I'm**

17 **showing you an exhibit marked Exhibit 45.**

18         (Whereupon Angelini Deposition Exhibit 45

19 was marked.)

20 **Q.   Do you recognize that document as a**

21 **report authored by you?**

22 A.   Yes, sir.

Page 281

1 **Q.   Have you had a chance to read the**

2 **document?**

3 A.   Yes. I wrote it, sir. I memorized this

4 whole incident and all these retaliations by heart.

5 **Q.   Did you send that document to Major Davis**

6 **through channels?**

7 A.   Yes, sir.

8 **Q.   Did you receive any response?**

9 A.   I received a response from EEOD (sic).

10 **Q.   The report seemingly made it to EEO --**

11 **EODS you mean?**

12 A.   Yes. EEDOS (sic).

13 **Q.   What --**

14 A.   I believe, best of my recollection.

15 **Q.   What was that response that you got from**

16 **EODS? Do you remember when that was?**

17 A.   I'm trying -- can you give me a second?

18 I'm trying to --

19 **Q.   Take your time.**

20 A.   I'm not exactly sure as far as the -- the

21 call from EDOS (sic), when it was. But shortly

22 after I was transferred out of the district.

Page 282

1   Q.   We'll get to that. All right. So, I'm
2   going to show you another exhibit marked Exhibit 46.
3        (Whereupon Angelini Deposition Exhibit 46
4   was marked.)
5   Q.   Do you recognize this document?
6   A.   Yes, sir.
7   Q.   What is it?
8   A.   It is a copy that I provided to the
9   Baltimore Police Department discovery and my
10  attorney. And the Baltimore Police Department, when
11  it happened, that an officer from the other shift
12  that I used to work on found out that Sgt. Brokus
13  attacked me and I was sent to the hospital.
14       Like everything else happens in this
15  department, they talk about -- about me. And the
16  other shift found out. And this officer who was on
17  the other shift that I used to work on sends a
18  fun -- tries to send a joke to me saying that Brokus
19  is looking for you, implying that Brokus is coming
20  after you.
21  Q.   Who is Buzz Grossnickel?
22  A.   He's an officer on the other shift that I

Page 283

1   used to work on, the wagon man.
2   Q.   Is that his proper name, Buzz
3   Grossnickel?
4   A.   I know his last name is Grossnickel. His
5   first name, I'm not sure if it's his -- Buzz or if
6   it's a short name for his first real name.
7   Q.   Did you consider him to be a friend?
8   A.   He was a friend on Facebook, yes. And a
9   friend like a -- like a hi, bye friend, yes, at
10  work, yes.
11  Q.   A work friend?
12  A.   Yes.
13  Q.   Were you on good terms with Buzz?
14  A.   Yes, I was.
15  Q.   Are you still on good terms with him?
16  A.   I don't speak to Buzz. He retired and I
17  haven't spoke to him in a long time.
18  Q.   Is this the message referenced in the
19  report we just looked at? You can look at the
20  previous exhibit.
21  A.   I'm sorry, this is -- what was the
22  question again, I apologize?

Page 284

1   Q.   If you look at the previous exhibit --
2   A.   45. Yes, sir.
3   Q.   -- it mentions receiving a Facebook
4   message from a co-worker.
5   A.   Uh-huh.
6   Q.   Is that the same message that's
7   referenced in this report?
8   A.   Yes, sir.
9   Q.   Did you consider this message to have
10  been harassment or mean spirited by Buzz
11  Grossnickel?
12  A.   No. I did not feel it was Buzz
13  Grossnickel himself. But he found it to be funny
14  and he had the knowledge of what occurred between --
15  between us. So, that mean -- had to mean that since
16  it was so loud and so -- incident was being -- the
17  incident was held at the district, and now in front
18  of several officers and supervisors.
19       And someone is talking about me behind my
20  back as usual, and that's continued retaliation
21  because now that's being spread that Sgt. Brokus
22  attacked me, and it's -- everyone thinks it's funny

Page 285

1   and that I was stressed out.
2        He indicated that I -- I heard you were
3   stressed out. And the only time I said I was
4   stressed out was when -- when I was in the office.
5   So -- but it -- I believe the door was still left
6   open. So, maybe an officer could have heard it, but
7   the only one was in -- in the room with us was
8   Sgt. Brokus, Lt. Williams and Sgt. Jackson.
9   Q.   Did you file another transfer request on
10  July 28th, 2013?
11  A.   Best of -- best of my recollection, I
12  most likely did.
13  Q.   I'm going to show you a document. This
14  will be Exhibit 47.
15       (Whereupon Angelini Deposition Exhibit 47
16  was marked.)
17  Q.   Take a look at that and let me know if
18  you recognize that as a transfer request you filed
19  on July 28th, 2013.
20  A.   Yes, sir.
21  Q.   Is that your signature at the top under
22  member's signature?

Page 286

1   A.   Yes, that's my signature.

2   Q.   And does it show that the supervisor's

3   recommendation is approved by two different

4   supervisors? I can't recognize the signatures, but

5   maybe you can.

6   A.   I know the second one looks like Lt.

7   Charles Williams, which makes sense now because he's

8   the one that told me that the best thing to write is

9   that you need a change. That's one way you're going

10  to get out of this district.

11  Q.   So, what exact conversation did you have

12  with Charles Williams where he said that?

13  A.   So, he had told me that -- that the only

14  way that I would get out of here and my 70s would be

15  taken serious is if I put the following that I need

16  a change. So, it was at that point I gave up and

17  just wrote what they wanted me to write. Because I

18  had a feeling that my -- all my 70s weren't going

19  anywhere.

20       Because now looking back, the major

21  didn't want -- the captain didn't want to go

22  downtown because now she was getting promoted to

Page 287

1   major, and it would look bad on her part if my -- if

2   my words were left on there as a retaliation. So, I

3   just followed his directions and finally it

4   happened.

5   Q.   Was this transfer request ultimately

6   granted?

7   A.   It was ultimately granted, but it did say

8   disapproved by commanding officer recommendation. I

9   don't know who -- what captain that is.

10  Q.   That's on the assignment requested side?

11  Is that what you're looking at?

12  A.   Yeah. And then I see that the bureau

13  chief approved it, his signature. Looks it like may

14  have -- finally made it downtown, yes, it did. It

15  finally made it through -- past the Southeast. If

16  you notice on every other 70, it doesn't have

17  disapproved or approved on any of them other than

18  this one.

19  Q.   Is it your understanding that this is the

20  70 that ultimately resulted in you being transferred

21  out of the Southeast?

22  A.   Yes, sir.

Page 288

1   Q.   Where were you transferred to?

2   A.   Northeast District.

3   Q.   Did you want to go to the Northeast?

4   A.   That was my second choice, sir.

5   Q.   Were you happy when you found out that

6   you were being transferred to the Northeast?

7   A.   Yes, sir. Yes, sir.

8   Q.   I'm going to refer back to Exhibit 2.

9   Let's turn to Page 11. Let me know when you're

10  there.

11  A.   I'm sorry, sir, Page 2 what?

12  Q.   11. Page 11.

13  A.   Oh, Page 11. Yes, sir.

14  Q.   Do you see on Paragraph 49 it says, you

15  were given the worst shifts. Do you see that?

16  A.   I was given the worst shifts, yes.

17  Q.   Do you believe you were given the worst

18  shifts? Shifts.

19  A.   Shifts. Yes. Once -- once I made the

20  complaint, I was taken out of my post car like I

21  explained before. Given the worst working condition

22  vehicles. The worst shifts as far as being brought

Page 289

1   down to the lowest totem pole seniority-wise and

2   getting detailed and getting pushed around every

3   different sector.

4   Q.   When you say the worst shifts, are you

5   referring to the fact that because you didn't have a

6   post car, you sometimes got assigned around to

7   different places? Is that what you mean?

8   A.   Yes. Like that's -- that's pretty mean,

9   worst shifts. And then sometimes my hours would be

10  shifted as well.

11  Q.   Is that a consequence of not having a

12  post car anymore, or is that something else?

13  A.   Consequence of both the -- not having a

14  post car and retaliation from the department at

15  Southeast District.

16  Q.   It says here that you received a post car

17  without working HVAC. Do you see that same

18  paragraph?

19  A.   Yes, sir.

20  Q.   What was the situation with air

21  conditioning in post cars in the Southeast District?

22  A.   I'll explain. So, the newer cars that

Page 290

1 were coming out had all working ACs in them.

2 Usually the way it works is, seniority officers and

3 post car officers have air conditioner -- have new

4 cars and they all have the air conditioner that work

5 in there.

6        We still have older cars that are still

7 in the -- in the fleet. So, since I wasn't good

8 enough officer anymore to them, that they gave me

9 keys to the worst cars. Purposely knowing that I

10 had long sleeves on because they -- now they made me

11 wear long sleeves to sweat, and be given the worst

12 working conditions in the hottest parts of the

13 Summer.

14        And usually the rookies will get the --

15 the older cars if there's not enough, but they were

16 giving them to me purposely without computers in

17 them.

18    Q.   Were there more than one car in the

19 Southeast that didn't have air conditioning?

20    A.   I can't definitely tell you that. But I

21 know that I attempted to down the vehicles for --

22 because ACs didn't work, which we were told to do

Page 291

1 so. But Sgt. Jackson refused me -- refused to let

2 me down the vehicle.

3    Q.   When you say down the vehicle, what do

4 you mean exactly?

5    A.   Fill out a sheet, a down vehicle sheet

6 and state on there that the AC needs to be fixed.

7    Q.   Like a repair work order?

8    A.   Repair order. Hang the keys up and the

9 car will sit in the district, maintenance district.

10 We have an officer that does all the mail runs and

11 all the deals with fix -- having the vehicles fixed.

12        And he would take care and take that

13 vehicle to get fixed. But Sgt. Jackson wouldn't

14 allow me to down it and told me to deal with it and

15 hit the streets.

16    Q.   Did he tell you why he wasn't going to do

17 that?

18    A.   No. He didn't specifically tell me why.

19    Q.   In 2013 and previously, were you

20 accustomed to wearing a personal camera on your body

21 while at work?

22    A.   Yes, sir.

Page 292

1    Q.   How did you come to do that?

2    A.   I was watching the movie End Of Watch

3 that came out sometime in 2011, 2012. They were

4 wearing body cameras in that movie. I thought to

5 myself, yeah, which better way can I protect myself

6 against this department, who was looking to come

7 after me for anything?

8        So, I said, I'm going to read Maryland

9 law. I read Maryland law. Noticed that anywhere in

10 the public, a recording can be conducted without

11 consent as long as it was in public.

12        Two party could say -- there's a two

13 party cassette rule in the State of Maryland if

14 you're in private. For instance, if I had to go in

15 someone's house for a call, I would have to ask if

16 they -- if I could record them because the

17 department didn't have any rules or regulations at

18 the time.

19        And there was no stipulation in Maryland

20 law that stated that officers didn't have to ask for

21 consent when recorded. Because time -- times has

22 changed now. But I was ahead of times. I was -- I

Page 293

1 took the initiative. I spent my own money to buy

2 the camera to vindicate myself because I knew how

3 individuals loved to lie when officers make up lies.

4        So, what I did was, I went and bought a

5 camera through Amazon. And I would wear it on

6 calls. Car stops mainly because I like to do

7 traffic stops. I know officers would get accused of

8 being violent or being inappropriate. So, what was

9 the best way to protect myself was with a camera.

10    Q.   Did you --

11    A.   I remem -- I remember one day Major

12 Worley saw the camera on me. Not Major Worley,

13 strike that. Major Davis. We were -- I was

14 standing outside on the ramp next to the door.

15        This is when Major Davis liked me. He

16 said, what's that, Angelini? I said it was a

17 camera, like the movie End Of Watch. What do you do

18 with it? I said I record interactions with the

19 public, when it's public. What a great idea. What

20 a great idea. We should all get them.

21        At a later date, I was told not to wear

22 it anymore after the incident with Sgt. Brokus. And

Page 294

1  I complied with it.

2    **Q.   Specifically the order not to wear your**

3  **camera at work, do you remember when that was?**

4    A.   That was in the Northeast District when I

5  vindicated myself on a complaint where an individual

6  claimed that I illegally stopped him, harassed him.

7  Which come to find out end up being a lie because of

8  my camera, which saved the Baltimore City Police

9  Department law office from a civil lawsuit.

10        Where the department wouldn't have

11 believed me, would have believed the individual over

12 me because I had no documentation.  But I was

13 ordered by command staff, by Rodriguez and Rodney

14 Hill not to wear a camera.

15   **Q.   So, I want to bring you back and show you**

16 **a document we'll call Exhibit 48.**

17        (Whereupon Angelini Deposition Exhibit 48

18 was marked.)

19   **Q.   Do you recognize this document?**

20   A.   Yes, sir.

21   **Q.   There are a couple different copies of**

22 **it, and then there's an additional page.  I'm not**

Page 295

1  **sure how this ended up doing this, but do you**

2  **remember writing these reports?**

3    A.   It has my signature on it.  I believe I

4  wrote this report, yes.

5    **Q.   I note that the first page and the second**

6  **and third page appear to be similar, but are not**

7  **exactly the same.  Did you write both of those?**

8  **It's different versions of the same report?**

9    A.   They might -- they might be the -- so,

10 the last one and the first one are exactly the same.

11 Now, sometimes when I type up reports, I'll have my

12 wife doublecheck my grammar, or I'll have another

13 officer, usually Quaranto have -- check my grammar.

14 I'm not the best at grammar.  The punctuations.

15       So, it appeared maybe one was a older one

16 that I just left in my file and one that I handed

17 in.

18   **Q.   So, did you file either the first one or**

19 **the second one?**

20   A.   I filed at least one of these -- one of

21 these papers that was the correct one where my

22 punctuation was most likely on point and corrected

Page 296

1  by a person.  And I kept the rest usually in my

2  file.

3    **Q.   Now, you mentioned a subsequent order**

4  **about your body camera involving Deputy Commissioner**

5  **Rodriguez.  What happened in that case?**

6    A.   It was -- what I explained to you

7  earlier, that I was accused by an individual, and I

8  was about to be either arrested by Baltimore Police

9  Department or -- I was told that I was being brought

10 down to Internal Affairs by Sgt. Rutkowski with

11 possible chances that there would be charges placed

12 on me for an assault.

13   **Q.   Based on a complaint by a citizen?**

14   A.   By a citizen.  The citizen accused me of

15 illegally stopping him without any probable --

16 without reasonable suspicion and probable cause.

17 And there's document in the discovery about it.

18        And that I explained to Sgt. Rutkowski,

19 before we go down to Internal Affairs, can I show

20 you and the major something?  He was like, what is

21 that?  I said, I have a camera of -- I have a -- I

22 have a video of the incident.  It's a lie.

Page 297

1         He says, you have a video?  I said, yes,

2  sir.  I said, I recorded my audio in recordings.  I

3  mean, I recorded my -- my interaction with the

4  public.

5         So, we went back to the NSU spot where I

6  was -- Northeast NSU office where I was working at

7  with my Sgt. Circus and Major Worley and

8  Sgt. Rutkowski.  We -- I put the video in.  They

9  watched it.  They're like, wow, that's a lie.

10 That's a lie.

11        So, Major Worley contacted downtown and

12 informed them that I had a camera and it was a lie.

13 And they retaliated back by saying, charge him

14 anyway.  Put him in blue team.

15   **Q.   When you say they, who is they?**

16   A.   Rodney Hill in Internal Affairs.  Ian

17 Dabrow -- I believe it was Ian Dabrowski at IAD.

18 And Jerry Rodriguez was a deputy commissioner at the

19 time.  They were all upset, not that I saved the

20 department from a false lawsuit, and not only that I

21 was ahead of time and that I did good, but they

22 berated me and told me not to wear the camera ever

**Plaintiff Exhibit 37**

Page 298

1 again.

2 **Q. Were you ever disciplined as a result of**
3 **that?**

4 A. No, but my -- I was given an order not to
5 wear -- the order of 95 that I had to sign saying
6 that I'll never wear one again without permission
7 from the major. And that -- that e-mail that was
8 sent out amongst each other was pretty much talking
9 bad about me again.

10 **Q. I'm sorry, what e-mail was sent out?**

11 A. Between the major, the -- Ian Dabrowski,
12 Rodney Hill and Jerry Rodriguez pretty much saying
13 who -- who this officer thinks he is going and
14 wearing a camera. There was no rule and regulation
15 from the department about wearing cameras at the
16 time. And I was just doing my best to prevent any
17 false accusations against me.

18 **Q. Let's turn to Paragraph 46, which is**
19 **Page 10 in Exhibit 2. Let me know when you're**
20 **there.**

21 A. I'm sorry, what was the page again?

22 **Q. Page 10, Paragraph 46. Let me know when**

Page 299

1 **you're there.**

2 A. (Complies.) Yes, sir.

3 **Q. I'm going to ask you about the part in**
4 **the paragraph referring to the sergeant ride with**
5 **you. Do you remember an incident matching that**
6 **description?**

7 A. Give me one second, sir, to read this.

8 (Complies.) Yes, sir, I do remember that incident.

9 **Q. So, let's go through that. It says, SED**
10 **commanders had already contacted Northeast District**
11 **commanders and Plaintiff was required to have a**
12 **sergeant ride with him for the first three weeks on**
13 **the job in the Northeast District.**

14 **Do you have personal knowledge of whether**
15 **Southeast District commanders contacted Northeast**
16 **District commanders?**

17 A. I have personal knowledge from the person
18 who told me they received a phone call.

19 **Q. Who was that person?**

20 A. Sgt. Rutkowski.

21 **Q. What did Sgt. Rutkowski tell you?**

22 A. Told me that I -- he was the admin

Page 300

1 sergeant. He told me that I was on a 30-day watch
2 from the Southeast as a punishment. And I tried to
3 get more information from him, but he wouldn't tell
4 me, other than all he knows is that he was ordered
5 to put me on a 30-day watch.

6 **Q. Do you remember when that was?**

7 A. Approximately my first -- first week or
8 second week there when I was in his office. When he
9 called me in there, I think first or second. So,
10 I'm not exactly sure. It was sometime in August
11 when I first got there because he pulled me into his
12 admin office.

13      He was in charge of all our -- all our
14 folders. He has -- he's in charge of all our
15 personnel folders at the district. He's in charge
16 of all officers, pretty much all their -- their
17 training and all that.

18      So, he -- he wanted to gain some
19 information from me. And I had to fill out a sheet,
20 a personnel sheet, updated personnel sheet. And
21 that's when he told me that I was on a 30-day watch
22 from the Northeast -- from the Southeast District.

Page 301

1      And I couldn't understand why because --
2 for what? What did I do? Why did I need to be on
3 30-day watch when I'm the one who asked for the
4 transfer?

5 **Q. Did he tell you anything else?**

6 A. That's the only thing he told me. He
7 couldn't -- he said he couldn't me tell me much.
8 But then later on he came -- sometime when I was in
9 the neighborhood services unit, I did -- we did a
10 funeral together where I drove him to a funeral.

11      And he went on to state to me, he
12 couldn't understand why I was put on 30-day watch
13 from the command. That I was a great officer. That
14 he couldn't see why I was treated like that over
15 there. That was a conversation between me and him.

16 **Q. Do you remember when that funeral was?**

17 A. I don't know exactly when, but it was a
18 friend of his who was a retired County officer
19 because the County was there with us. The -- we
20 left from Conklin and -- Conklin Street and Eastern
21 Avenue where the fun -- where there's a church.

22      And we met Baltimore County there. And

Page 302

1  we did a escort out to the County. And he rode with
2  me in my assigned truck that I got for being in the
3  neighborhood services in the Northeast unit. And we
4  had a long discussion while we were in the
5  procession. Don't recall the exact date and time.
6      Q.  So, what were the consequences, if any,
7  of this 30-day watch to you?
8      A.  Bad reputation already started. I didn't
9  get a fresh start at the Northeast District. I was
10  labeled a troubled officer. That -- I was told --
11  I -- that they were already told about my behavior
12  before I even got to the North -- Northeast. So, my
13  reputation was ruined already.
14      I was expecting a fresh start at the
15  Northeast District in which Major Worley, I give it
16  to him, he did tell me that he was going to give me
17  a fresh start. But they already were warned about
18  me. Detrimental to my -- my -- my work experience
19  and my hard work in this department and my
20  reputation.
21      Q.  Once you got to the Northeast District,
22  do you believe you were treated fairly by the

Page 303

1  officers in the Northeast District?
2      A.  Yes, sir.
3      Q.  Do you believe you were treated fairly by
4  Major Worley?
5      A.  Yes, sir.
6      Q.  Were you subsequently interviewed by BPD
7  EODS about the matters at issue in this case?
8      A.  Yes, sir.
9      Q.  I'm showing you a document we'll call
10  Exhibit 49.
11      (Whereupon Angelini Deposition Exhibit 49
12  was marked.)
13      Q.  Do you remember an interview on
14  October 21st, 2013 with Detective Carlos Feliciano
15  at EODS?
16      A.  I remember going down there and giving a
17  statement, yes.
18      Q.  Have you seen this transcript before?
19  And it's quite long, I don't want you to read
20  through the entire thing. But have you seen this
21  before and reviewed this at all in preparation for
22  today?

Page 304

1      A.  No, I never read through this, sir.
2      Q.  Have you ever been shown a copy of a
3  transcript from that day?
4      A.  No, sir.
5      Q.  But you do remember the interview?
6      A.  I do remember giving an interview down at
7  EDOS (sic) two different times.
8      Q.  Speaking of which, I have another
9  exhibit, Exhibit 50.
10      (Whereupon Angelini Deposition Exhibit 50
11  was marked.)
12      Q.  You said you were interviewed a second
13  time. Do you remember if that was April 14th, 2014?
14      A.  I -- I can't give you the exact date,
15  sir. I don't re -- the best of my recollection, I
16  don't remember the exact date.
17      Q.  Have you ever seen a copy of this
18  transcript or prepared for it in anticipation of
19  this deposition for this case?
20      A.  No, sir. This is the first time I'm
21  seeing this.
22      Q.  All right. Let's turn back to Exhibit 2,

Page 305

1  turn to Paragraph 51. That's on Page 11. Are you
2  there?
3      A.  (Complies.) Yes, sir.
4      Q.  In this lawsuit, are you alleging sexual
5  harassment?
6          MR. NACHTMAN:  Ob -- objection to the
7  requirement that he's making a legal analysis
8  and conclusion.
9      Q.  The objection is fine, but you can
10  answer.
11      A.  Okay.
12          MR. NACHTMAN:  You can answer if you
13  know.
14      A.  Plaintiff --
15          MR. NACHTMAN:  What paragraph were you
16  referring to in Exhibit 2?
17          MR. GLYNN:  I pointed him to 51, which is
18  the beginning of Count 1 where it says sexual
19  harassment.
20          MR. NACHTMAN:  I would object that that's
21  not even -- I mean, it's a legal statement.
22          MR. GLYNN:  Your objection is noted.

Page 306

1        MR. NACHTMAN: You can answer.

2    Q.   Do you believe you've been sexually

3 harassed?

4    A.   Yes.

5    Q.   Do you believe that the graffiti issue in

6 2012 was sexual harassment?

7        MR. NACHTMAN: Objection. Same basis.

8 Go ahead and answer.

9    A.   I -- I believe the comments made by

10 Sgt. Brickus was sexual harassment. The comments

11 were derogatory. I'm not a legal expert. I'm not

12 even sure exactly what it falls under as far --

13   Q.   I'm not asking for a legal answer.

14 Just -- you can answer as best you can.

15   A.   So, sexual harassment was from

16 Sgt. Brickus, the comments made about my pecs and

17 my -- and my -- my body. And your second question,

18 was what, the -- the wall? I'm sorry, can you

19 repeat your second question, sir?

20   Q.   Are there any other incidents that we've

21 described or that we haven't talked about that you

22 believe were sexual harassment that you suffered?

Page 307

1    A.   I believe the stall was a sexual

2 harassment as well as far as my sexual --

3    Q.   Did you say stall?

4    A.   The bathroom -- comments in the bathroom

5 stall was a sexual comment made towards me, yes.

6    Q.   Was there anything else?

7    A.   The retaliation in itself that I got from

8 the department was detrimental to my life. That I

9 suffered a lot of pain and suffering.

10   Q.   All right. I'm showing you a document to

11 be marked Exhibit 51.

12       (Whereupon Angelini Deposition Exhibit 51

13 was marked.)

14   Q.   Do you recognize this document?

15   A.   Give me a second, sir.

16   Q.   Take your time.

17       MR. NACHTMAN: Can we go off real quick?

18       THE VIDEOGRAPHER: Going off the record,

19 the time is 4:21 p.m.

20       MR. NACHTMAN: Can you just do me a favor

21 and step out really fast without the mike?

22       MR. GLYNN: Can you close the door?

Page 308

1        MR. NACHTMAN: Just stand there. Don't

2 walk far.

3        MR. NACHTMAN: I didn't page number this.

4 I didn't page number this. I'm asking because

5 I don't know. I'm assuming this is --

6        MR. GLYNN: This is just a printout of

7 what you sent me.

8        MR. NACHTMAN: Okay. I just didn't page

9 number it like a schmuck.

10       MR. GLYNN: That's all right. We'll --

11       MR. NACHTMAN: Just have him look at the

12 signature so we're not here for like seven more

13 hours on this question.

14       MR. GLYNN: Yeah. We can stop him and

15 just bring him back and say, is this your

16 signature and we'll just go with that.

17       MR. NACHTMAN: All right.

18       MR. GLYNN: I don't need to worry about

19 him authenticating every answer. There are a

20 limited number of things I'm going to ask him

21 about.

22       MR. NACHTMAN: I'm like --

Page 309

1        MR. GLYNN: That's okay, doesn't matter.

2 Don't worry about it.

3        MR. NACHTMAN: Come on back in.

4        (Discussion off the record.)

5        THE VIDEOGRAPHER: We're back on the

6 record. The time is 4:22 p.m.

7    Q.   Mr. Angelini, I'm going to spare you of

8 having to read this immense document and think about

9 it too hard. Just turn to the last page.

10   A.   (Complies.) Yes, sir.

11   Q.   Can you read what it says at the top of

12 the last page and tell me if that is your signature.

13   A.   Yes, sir, it's my signature.

14   Q.   All right. Let us turn to -- we're going

15 to count. There's no page numbers on this. And I

16 will show you pages that I want to make sure we're

17 on the same page. One, two, three, four -- the

18 fifth page, going by the names.

19   A.   Yes, sir.

20   Q.   All right. This page contains a list of

21 individuals that you have identified as likely to

22 have personal knowledge of the events or of any fact

Page 310
1 alleged in there concerning the Complaint. And this
2 is your Answer to this Interrogatory as prepared by
3 you and your attorney. I'll just -- just as a
4 preface.
5        What relevant information to your
6 knowledge is known by Martin Bartness in this case?
7    A.   Sir, he was -- he was listed in the
8 e-mail with the body recording claiming that he
9 wanted -- I should be charged. When I was in the
10 Northeast District, he was part of command staff at
11 which time I -- now knowing after all the discovery
12 you gave me, that when Sgt. Brokus and Sgt. Williams
13 went to Internal Affairs, that they influenced other
14 people to spread rumors about me, that influenced a
15 lot of decisionmaking on the behalf of the trial
16 board hearings, the trial board personnel that
17 review any trial board matters, whether I should get
18 charged or not.
19        The e-mail that Major Worley put out
20 about me said that I was an embarrassment to the
21 department. That I was kicked out of Southeast.
22 That was sent to the Commissioner. All my hard work

Page 311
1 that I put in for this place and the Commissioner,
2 he e-mails the Commissioner and command staff down
3 below.
4        So, that means everyone knows my
5 business. Everyone knows my business. From
6 Detective Feliciano to have him contact with
7 Internal Affairs about my private matters at EODS.
8 My private matters that I -- I expected that EOD
9 EDOS (sic) was private. That's what they promised
10 me. They promised me that.
11        Detective Feliciano goes behind my back
12 and has a conversation with Stern down at Internal
13 Affairs about my behavior, about my complaints. I
14 had faith in this department. I had faith. I have
15 no faith in this department as far as going to EEOD
16 anymore. I regret it. I wish I would have never
17 filed this complaint. I have nothing but a
18 nightmare now.
19        I'm labeled a piece of crap in this
20 department because of what happened. Because my dad
21 is gay. I'm sorry. My dad is gay, I apologize.
22 I'm sorry. Okay. I worked really hard for my

Page 312
1 reputation, and now they -- all these people know.
2 All these people know about me.
3        Sorry that I get upset. Sorry. I'll
4 calm down. I apologize, but I worked hard. And I'm
5 labeled -- labeled as a terrible person all because
6 my dad is gay.
7    Q.   Do you know of any other involvement or
8 knowledge that Martin Bartness might have in this
9 case?
10   A.   Yes.
11   Q.   What's that?
12   A.   That he was on the trial board committee
13 of all my -- of all my -- any cases that were filed
14 against me.
15   Q.   Meaning a trial board committee?
16   A.   Trial board committee?
17   Q.   Yeah. What are you referring to?
18   A.   Trial board committee where charges go --
19 where charges are -- Martin -- Martin was a part of
20 Internal Affairs. Internal Affairs was involved in
21 my -- in my suspension with Sgt. Brickus. I'm sure
22 he's aware of what took place with Sgt. Brickus.

Page 313
1 Sgt. Williams worked down there with him. I'm sure
2 he is aware about me, about what's going on.
3        I was told by Detective Cornejo, one day
4 he was watching a body camera footage on his
5 computer of an incident of mine where I chased a
6 suspect. Sgt. Brokus and Sgt. Eames began watching
7 the video. Told Sgt. Robert Cornejo, they hate my
8 fucking guts. That I'm a troublemaker.
9        Later on, Sgt. Eames puts me on an early
10 intervention, second phase early intervention, when
11 I never even got first phase intervention, while I'm
12 in the Northeast District for insubordination from a
13 sergeant in the Northeast District -- I mean the
14 Southeast District.
15        Almost a year and a half later, he sends
16 an e-mail out to everyone in command staff. Not
17 everyone -- best of my recollection, can't name
18 everyone. But he sends it out and says that -- to
19 let you know that this officer is on early
20 intervention. I was never notified I was on early
21 intervention. Behind my back I was.
22   Q.   What is early intervention?

Page 314

1    A.    Back in 2014 when I first got my -- or
2  first early intervention from Sgt. Eames that I
3  wasn't aware about. Early intervention wasn't a big
4  deal. It became a big deal when Major -- excuse me,
5  Commissioner Davis came in. He really in -- he
6  really in -- implemented early intervention. But in
7  '14, it wasn't -- it wasn't a phase. It was nothing
8  there.
9         It was a back door thing where they --
10 they did behind officers' backs. So, in 2016, I was
11 again given early intervention and I skipped to
12 Phase 2 instead of 1. Never got a chance to rebut
13 Phase 1.
14    Q.    Is early intervention a disciplinary
15 measure?
16    A.    They claim it's not disciplinary measure,
17 but it is disciplinary. They sit there in a room,
18 you and sergeant. They bring up all the charges on
19 your IAD file, even ones that are not founded. Ones
20 that been deemed unfounded or exonerated.
21         And they berate you. For instance, I
22 stop a car. Complainant is upset because I took a

Page 315

1  photograph of her tag where she had a tag blocker on
2  it. I took photographs because of evidence to bring
3  to court with me.
4         She was upset that I took a photograph of
5  her tag. She calls and files a complaint on me.
6  Unfounded. Northeast District. But I'm berated at
7  early intervention.
8     Q.    By who?
9     A.    Sgt. Eames. Vernon -- Vernon?
10    Q.    Vernon Herron?
11    A.    Herron. Berates me. Tells me that I can
12 be a better officer, that I shouldn't be getting all
13 these complaints.
14    Q.    When you say berates, what exactly was
15 said to you?
16    A.    He said that there's better ways to
17 handle situations. And that he used to be a State
18 Trooper, that he stopped a lot -- a lot of cars as
19 well. I stopped a lot of cars. I had more
20 interactions with this public than a lot of other
21 officers do because of my proactiveness.
22         I went out and spent an extra $1,800

Page 316

1  myself to buy e-Tickets. I bought a machine that
2  prints out e-Tickets. Took the time and went to
3  training myself in Maryland State Police on my off
4  day. I print out tickets now. Everything is
5  documented.
6         Not every officer in the department has
7  it, but every officer should have it. Gives you
8  statistics on every stop. It prints out e-Tickets.
9  It prints out a warning. It documents every stop.
10        I went out and did that myself. And he's
11 claims that I should be able to handle and talk to
12 people differently on traffic stops. And he's
13 trying to tell me the best way to do it.
14    Q.    What information related to this
15 complaint do you think Anthony Batts has?
16    A.    I e-mailed the Commissioner. He said it
17 was an open door policy. I e-mailed him. Jerry
18 Rodriguez sends an e-mail to Laura. She answers,
19 let's strategize. Laura, come meet me.
20        Know how I took that? Let's strategize
21 on how to get Angelini. Just turn this around on
22 Angelini. Make him look like a bad officer. Let's

Page 317

1  charge him for everything.
2         Every little minor thing that comes up,
3  even if the complaint doesn't make it down to
4  Internal Affairs. Let's just pick up on it. Let's
5  pile everything on top of him. So, when this
6  lawsuit comes in effect, he's a bad officer. Let's
7  portray him as a bad officer.
8         I've never been in trouble. Never been
9  in trouble before I filed this complaint. Never.
10 What I mean never, my record is clear. I have one
11 FTA that I mistakenly missed. One FTA while I
12 working Northwest District. I was new. I didn't
13 know I had to attend. That was the only punishment
14 I had. As soon as I filed the complaint, that was
15 it.
16    Q.    What relevant information do you think is
17 known by Lakeshia Blue?
18    A.    Works down Internal Affairs around
19 Sgt. Brokus and Sgt. Williams.
20    Q.    Other than that, do you think she has any
21 involvement in this?
22    A.    Yes.

Plaintiff Exhibit 37

Page 318

1   Q.   What's that?

2   A.   Same exact thing. They all talk down

3 there, spread rumors.

4   Q.   How about Danitta Boyd?

5   A.   Danitta Boyd. She -- the only thing she

6 knows about this case is that -- she works in --

7 she's my lieutenant in Northeast. She has a lot of

8 respect for me, knows I'm hard worker.

9        And she notices that I get -- I got upset

10 one day because I got a supervisor complaint on me

11 that was closed out by my supervisor and then

12 reopened by IAD.

13       And she wanted to have a talk with me,

14 and told me to have faith in the system. And I

15 explained to her, I don't have faith in the system.

16 That's how she knows.

17   Q.   How about Roberto Cornejo?

18   A.   Roberto Cornejo, sir, like I explained to

19 you earlier, he told me on the telephone call that

20 my wife even heard, that one day they -- Sgt. Eames

21 and Sgt. Brokus said they fucking hate my guts, that

22 I am a problem in this department.

Page 319

1   Q.   Anything else?

2   A.   And as well as he can't -- the day that I

3 got interviewed for the supervisor's complaint by

4 Sgt. Walford, he was frustrated because he couldn't

5 understand why I was getting questioned about this

6 when it was already handled by my sergeant.

7   Q.   You mean Walford was getting frustrated?

8   A.   No.

9   Q.   Cornejo was getting frustrated?

10   A.   Cornejo was because he was giving -- he

11 was questioning me, and he didn't -- he was just

12 frustrated. He had -- said he had a headache and

13 frustrated with this.

14   Q.   Anything else?

15   A.   He had said to me before that it appears

16 to be that -- that they don't like me. The

17 department doesn't like me and they're after me.

18   Q.   What exactly did he say?

19   A.   So, he -- his father-in-law lives across

20 the street from me. One day I walked outside, I

21 don't remember the exact date, he says -- I said,

22 Rob, what's going on with -- why am I getting

Page 320

1 charged? He says, I don't know. What -- what did

2 you do to you -- what did you do to this place, man?

3 They're after you.

4   Q.   Is that -- that's something Cornejo said

5 to you?

6   A.   Yeah. Yes, he did.

7   Q.   Did he say anything else on that topic?

8   A.   No. He wouldn't -- he wouldn't talk

9 about it after that.

10   Q.   What about Yvette Dewgard, does she know

11 anything about this case?

12   A.   Yes.

13   Q.   What does she know?

14   A.   She was privy to a statement that I gave

15 to Baltimore County on a private matter that I never

16 gave authorization for them to give to Internal

17 Affairs. When I filed a complaint on Baltimore

18 County officer -- filed a complaint on a Baltimore

19 County officer, I gave a statement to them, and she

20 goes and gets the statement from Baltimore County.

21   Q.   When was this?

22   A.   For a Baltimore County incident where I

Page 321

1 was removed from a class because of a medical

2 condition, because I had kidney stones. I was

3 draining blood and getting up and going to class --

4 getting out of class and going to the bathroom.

5   Q.   When was this?

6   A.   2016 or '15. I'm facing trial board

7 coming up soon for that.

8   Q.   Does she have any other knowledge other

9 than that incident?

10   A.   She has knowledge that I'm an

11 embarrassment to this department, that --

12   Q.   What do you mean?

13   A.   -- that I got kicked out of Southeast.

14   Q.   What about Julius Dockett, what does he

15 know?

16   A.   He was in my -- he was at my early

17 intervention.

18   Q.   Does he work in early intervention?

19   A.   No. He was my sergeant. He stood up and

20 told the truth and said that I was a great officer.

21 I was a very knowledgeable officer. That he didn't

22 understand why I was being brought down to early

Plaintiff Exhibit 37

Page 322

1  intervention.
2  Q.  Anything else?
3  A.  That's it.
4  Q.  How about Ian Dombroski?  Is that the
5  same answer that you would give before for Martin
6  Bartness, or is there additional information?
7  A.  That he sent me to a fit-for-duty to a
8  psychologic -- to a psychiatrist believing --
9  Q.  Do you --
10  A.  -- believing I was not all there.
11  Q.  Do you remember when that was?
12  A.  After Baltimore County incident.
13  Q.  Anything else?
14  A.  And he's just part of Internal Affairs
15  and was privy to Sgt. Brokus and Sgt. Williams.
16  Q.  When you say privy, you mean around them?
17  A.  Around them, yes, I believe so.  They
18  work under him down at Internal Affairs.
19  Q.  How about Gregory Eames, other than the
20  thing you just mentioned, is there anything else
21  that Gregory Eames knows about this case?
22  A.  He knows, he's aware.  The same reason

Page 323

1  that I was given early intervention.  He -- just
2  like the rest of them in Internal Affairs.  He
3  worked in Internal Affairs, and he's the one that
4  stated that I was a -- he hates me because he was
5  friends with -- good friends with Sgt. Swinton down
6  at ECU.
7        And she must have bad mouthed me to
8  Sgt. Eames because I didn't even know the guy until
9  Sergeant -- until Rob Cornejo told me that he said
10  he hated me and I was a troublemaker.  I was a
11  instigator.
12        And I even -- I never met Sgt. Eames,
13  Gregory Eames.  I never knew who he was until Rob
14  Cornejo told him and Brokus went behind -- were
15  behind him talking about me.
16  Q.  How about Laverne Ellis?  Is that a
17  woman?
18  A.  Yes.  She is a sergeant down Internal
19  Affairs.  Friends with Sgt. -- Sgt. Williams and
20  Sgt. Brokus.  She was a sergeant in Northwest
21  District when I was originally in Northwest
22  District.  And then she went down Internal Affairs,

Page 324

1  and she's privy to all the information that
2  Sgt. Williams and Sgt. Brokus provided.
3  Q.  Does she have any independent knowledge
4  do you believe of other things besides that?
5        MR. NACHTMAN:  Objection to -- to what
6  other things, when other things, how other
7  things.
8        MR. GLYNN:  If you object to the -- if
9  you object to the form of the question, that's
10  fine.  He can answer as best he can.
11        MR. NACHTMAN:  He can answer.
12        MR. GLYNN:  And if he wants me to
13  clarify, he can ask me to do that.
14  A.  Can you clarify it for me?
15  Q.  Other than being in Internal Affairs and
16  knowing you in the Northwest, does Laverne Ellis
17  likely know anything about the facts of this case?
18  A.  Which case are you referring to?
19  Q.  Your case, this case that we're here for.
20  A.  I'm sorry?
21  Q.  The case that we're here for, all of the
22  events that we've described today, does Laverne

Page 325

1  Ellis come into the picture anywhere?
2  A.  I believe she -- she knows the events of
3  what occurred in the Southeast District, yes.
4  Q.  Secondhand?
5  A.  From Sgt. Williams and Sgt. Brokus.
6  Q.  How about Alexis Emmanuelli, what does he
7  know?
8  A.  He was a detective involved -- that he's
9  down Internal Affairs.  He's privy to all the
10  information that Sgt. Williams and Sgt. Brokus
11  knows.
12  Q.  How about Aaron Ferguson, what does he
13  know?
14  A.  He was a Southeast District officer --
15  sergeant who liked me at first until Sgt. Brickus
16  began telling everybody about me and spreading
17  rumors about me.
18  Q.  Is he a witness to any of the events we
19  described today?
20  A.  Yes.
21  Q.  Which events --
22  A.  Actually we --

Plaintiff Exhibit 37

Page 326

1  Q.  -- is he a witness to?

2  A.  We didn't get to describe that. Oh, we

3  did. We did describe that. I'm sorry, strike that.

4  That was when Sgt. Ettice Brickus was out to lunch

5  with Officer Richberg. And Sgt. Ferguson was

6  present with McQuade, and they were -- came --

7  decided to speak about Officer Angelini.

8  Q.  Were you present for that?

9  A.  I was not present there.

10  Q.  Were you told that he was present?

11  A.  I was told by McQuade that he was

12  present. And Sgt. Brickus on the e-mail -- on the

13  voicemail.

14  Q.  Other than that incident, was Aaron

15  Ferguson a witness to any of the events we talked

16  about today?

17  A.  Yes.

18  Q.  Which events?

19  A.  My shooting.

20  Q.  Anything else?

21  A.  Not that I recall at this time.

22  Q.  How about Rocco Fusillo, what is Rocco

Page 327

1  Fusillo a witness to or know about?

2  A.  He handled a few of my cases down

3  Internal Affairs where I provided him video footage

4  of an incident down at ECU. He was privy to

5  Sgt. Williams and Sgt. Brokus' rumor mill.

6  Q.  Anything else?

7  A.  Not that I know at this time.

8  Q.  How about Vernon Herron, who you

9  mentioned before working in early intervention, does

10  he know anything else other than what you described

11  before?

12  A.  Yes. He's on the trial board committee.

13  Q.  When you say the trial board committee,

14  do you mean the charging committee?

15  A.  Charging committee, I apologize.

16  Q.  Disciplinary review committee?

17  A.  Yes. That's what I mean. He's on there.

18  Q.  How do you know that?

19  A.  He told me. And he made me call him in

20  the -- when I was in the Northeast. And I was --

21  after my hear -- after my early intervention. And

22  then I asked him on the telephone -- well, I asked

Page 328

1  him how fair it was and why -- why would I be -- why

2  would I be brought up on charges when a sergeant

3  already closed out a case? And he said -- I think

4  he and the committee decided that there should be

5  more charges brought against me.

6  Q.  How about Rodney Hill, what does he know

7  about?

8  A.  He knew this because of Laura Giantris

9  wasn't confidential like she was supposed to be.

10  And she went to Rodney Hill, disclosed all my

11  information because they had to strategize against

12  me.

13  Q.  Anything else?

14  A.  She handled my complaint. That's it.

15  Q.  How about Deandra Jones, what does she

16  know?

17  A.  Internal Affairs, Baltimore County.

18  Privy to Sgt. Jackson -- Sgt. Williams and

19  Sgt. Brokus' working down Internal Affairs.

20  Q.  How about Derek Loeffler, what does he

21  know?

22  A.  He worked for the Commissioner's office.

Page 329

1  He was there during my shooting. He's my sergeant.

2  He can verify that I -- I had my own post car and I

3  was a great officer.

4  Q.  Is he a witness to any of the other

5  events we described today?

6  A.  Yes.

7  Q.  Which other events did he witness?

8  A.  He was notified by Sgt. Brickus that I

9  was suspended because he was my sergeant.

10  Q.  Anything else?

11  A.  Not that I recall at this time.

12  Q.  How about Adriel Nunez?

13  A.  He's just an officer at the Baltimore

14  County training with me. I had texted him while at

15  training when I went to the bathroom, and let me

16  know just in case you guys went to lunch, to let me

17  know if missed it.

18      Because I didn't want to actually

19  disclose to him the -- what kind of medical problems

20  I was having, that I just went to the bathroom. And

21  he was a witness to Internal Affairs. And that's

22  it.

Page 330

1    Q.    Natalie Preston?
2    A.    She's my captain at this moment in
3 Northeast District. She's friends with Captain --
4 Major Burrus. Friends with Sgt. -- Captain Ettice
5 Brickus. And she's -- she's aware of my -- my
6 incident in the Southeast.
7    Q.    **Is she a witness other than through**
8 **secondhand knowledge to any of the events we**
9 **described today?**
10   A.    She's a witness due to friends with
11 Sgt. Brick -- I mean Ettice Brickus and Burrus.
12         MR. NACHTMAN: Can we go off again?
13         MR. GLYNN: Let's take a five-minute
14 break.
15         THE VIDEOGRAPHER: We're going off the
16 record, the time is 4:46 p.m.
17         (Whereupon a brief break was taken, after
18 which the following was heard:
19         THE VIDEOGRAPHER: We're back on the
20 record. The time is 4:52 p.m.
21   Q.    Mr. Angelini, I think we are now at
22 Daniel Quaranto. Other than the things we've

Page 331

1 already talked about, does Mr. Quaranto have any
2 knowledge of --
3         MR. NACHTMAN: Before we go back, can you
4 just clarify the last response you had to
5 Captain Preston?
6    A.    Yes. So, Captain Preston, like she's my
7 captain and like -- so, she knows. Like only -- I
8 speculate she knows. So, I have no -- there's no
9 issue with her. I don't know 100 percent if she has
10 knowledge or not.
11         She hasn't treated me any different or
12 done anything bad to me that -- but she's just my
13 captain. That's the reason I have her on here. And
14 she's friends with Burrus.
15   Q.    **So, what was the additional portion that**
16 **was a part of that?**
17   A.    Additional? I can't remember.
18         MR. NACHTMAN: Is there anything else you
19 wanted to add to your response?
20   A.    Yeah. All I said was that -- that I
21 speculate she knows about secondhand knowledge of
22 my -- my incident. You know what I'm saying, like I

Page 332

1 don't know --
2    Q.    **You don't have personal knowledge.**
3 **You're just --**
4    A.    Right, right.
5    Q.    **That's fine. Okay.**
6    A.    And that's -- like they personally
7 never -- she never personally told me that she
8 knows. You know what I mean? But if you're friends
9 with somebody --
10   Q.    **But you have a reason to think she might**
11 **have knowledge?**
12   A.    Right.
13   Q.    **That's what this is about. All right.**
14 **So, Daniel Quaranto, other than the things that we**
15 **specifically talked about or he's come up, is there**
16 **anything where Daniel Quaranto is likely to be a**
17 **witness or have personal knowledge related to the**
18 **facts of this case?**
19   A.    Yeah. He's a witness to -- he is going
20 to be a witness at my trial board as far as
21 Baltimore County as well -- he witnessed the
22 Baltimore County officer make fun of me and treat me

Page 333

1 and made a statement in class that -- tried to put
2 me down in front of everyone.
3    Q.    **Anything else?**
4    A.    And he's a witness to all -- the -- you
5 know, basically this case. He knows all about this
6 case because he's been called in by the City. And
7 as a wit -- as being -- by Laura Giantris and
8 everybody.
9         But he was a friend of mine as well, and
10 he don't speak to me anymore. I have no idea why.
11 Ever since he got a call from the City, he won't
12 speak to me anymore for the second time.
13   Q.    **How about Jerry Rodriguez, what do you**
14 **think Jerry Rodriguez might know about in this case?**
15   A.    I know that he wanted me fired. That's
16 what Mike Davies told me, my attorney for the FOP.
17   Q.    **When was that?**
18   A.    When I was brought charged for the ECU
19 incident. And Mike Davies told me that if I don't
20 take the -- the discourteous -- that I take it to
21 trial, that I will be fired because Jerry has a
22 reason to fire me.

Page 334

1    He believes because he won't -- exact --
2 he's gunning after me, and it all stemmed from me
3 contacting the Commissioner, I believe, and also the
4 body camera incident. And him knowing that I
5 e-mailed the Commissioner about the whole incident
6 that happened at the Southeast District.
7    **Q.  And that's all things that you were told**
8 **by your lawyer, or were those -- some of those**
9 **things things that you inferred?**
10    A.  Discovery. And then things that I heard.
11 And then things that he e-mailed.
12    **Q.  How about Jeffrey Shorter, is Jerry**
13 **Shorter likely to know anything about this case?**
14    A.  Not this specific case that he knows that
15 I had, that -- that I was charged in Baltimore --
16 for the Baltimore County incident and told me I
17 should fight it because it's bull.
18        He literally told me it was bullshit,
19 that I -- that I should fight it. That he can't
20 understand why the -- wanted -- the egregious amount
21 of punishment they wanted from me.
22    **Q.  Does he have any other knowledge of facts**

Page 335

1 **relating to this case do you think?**
2    A.  Other -- other than being part of
3 command, no.
4    **Q.  How about Patty Silvers, is Patty Silvers**
5 **likely to have any knowledge about facts relating to**
6 **this case?**
7    A.  She knows that -- about the Baltimore --
8 unfortunately she's passed away.
9    **Q.  Well, we don't need to speculate about**
10 **what she knows then.**
11        **How about Milton Snead, is he likely to**
12 **know anything about this case?**
13    A.  He knows -- he's in command. He was my
14 command at Northeast District. I believe he was
15 privy to know that I was probably -- what Major
16 Worley thought that I was kicked out of Southeast
17 District.
18        That he -- he told me that I wasn't being
19 charged for Baltimore County incident, that it was
20 squashed. But then all of a sudden, I'm now being
21 charged. So, that's pretty much.
22    **Q.  How about Kimberly Swinton, does she have**

Page 336

1 **any knowledge of relevant facts in this case do you**
2 **know?**
3    A.  Yes.
4    **Q.  What are those?**
5    A.  So, she's friends with Sgt. Warren.
6 She's the one that I charged on blue team. She
7 charged me for an incident down ECU. She's friends
8 with Sgt. Eames, really good friends with
9 Sgt. Eames. They --
10    **Q.  How do you know that?**
11    A.  I was told by Sgt. Dockett.
12    **Q.  What's Sgt. Dockett's first name?**
13    A.  It's on here, Sgt. Dockett.
14    **Q.  All right.**
15    A.  Julius Dockett.
16    **Q.  Julius Dockett, that's the same one.**
17    A.  They're best friends. And Sgt. Walford
18 told me that Sgt. Eames likes to speak to other
19 officers and other command staff about people's IAD
20 complaints. They're supposed to be confidential,
21 that he likes to speak outside of IAD about other
22 people's cases.

Page 337

1    **Q.  What about Christopher Warren, what is he**
2 **likely to know about?**
3    A.  He was my LPR. Supervisor sergeant.
4    **Q.  What does that mean?**
5    A.  License plate reader. I was chosen by
6 the Commissioner to be on the license plate reader
7 unit. Sgt. Warren told me that he was told by
8 Sgt. Rutkowski that he had to -- that he had to
9 watch me for 30 days as well for what happened in
10 the Southeast District. That he never heard of
11 that, but he told me that he has to do it because of
12 my punishment from the Southeast District.
13    **Q.  Do you remember when you were in the**
14 **license plate read -- reader unit?**
15    A.  Sometime in April 2015, I believe. Don't
16 quote me.
17    **Q.  April 2015 you think, but you're not**
18 **sure?**
19    A.  I believe LPR was 2000 -- 2000 --
20    **Q.  Was that part of the Northeast District**
21 **while you were there? Is that just a unit in the**
22 **Northeast, or is that a separate unit?**

Page 338

1    A.   Separate unit. I was detailed there for
2  a little bit and then came back to the Northeast. I
3  believe it was '15, sir. I believe so.
4    Q.   How about Richard Worley, what is he
5  likely to know that's relevant to this case?
6    A.   He was a witness and he was deposed in
7  this case. He wrote the e-mail about me. That was
8  it a mass e-mail sent to all command staff that I
9  was kicked out of Southeast District. That I was an
10 embarrassment to the police department and that I'm
11 an idiot.
12   Q.   What about James Wynne, what's he likely
13 to know about?
14   A.   He just is a witness in the Baltimore
15 County incident. And he spoke to -- he gave a
16 statement to IAD. And I just have him down here
17 because this is all retal -- continued retaliation
18 from Internal Affairs against me.
19   Q.   How about Frank Enko, what is he likely
20 to know about?
21   A.   Not this case, about Baltimore County.
22 He's a witness in the Baltimore County incident.

Page 339

1  He's an instructor in Baltimore County.
2    Q.   How about Jason Grant?
3    A.   Jason -- Jason Grant? I'm not sure
4  who -- Jason Grant. Where do you see that at?
5    Q.   Am I reading it wrong?
6    A.   I believe he --
7    Q.   The bottom of the next page, Officer
8  Jason Grant.
9    A.   I believe he's a witness to the Baltimore
10 County incident.
11   Q.   How about Jimmy Keller, Detective Jimmy
12 Keller?
13   A.   I believe he was a IID detective with
14 Baltimore County when I filed a complaint against
15 the County officer.
16   Q.   How about Evelyn Waites?
17   A.   Same thing. She was a -- the statement I
18 gave to Baltimore County, she was the one that
19 questioned me related to that incident when I filed
20 a complaint on the County officers.
21   Q.   Let's turn to -- not the page that says
22 Interrogatory No. 2, but begins with Detective

Page 340

1  Evelyn Waites. Turn to the next page after that
2  that says Interrogatory 3. Do you see that?
3    A.   Yes, sir.
4    Q.   A little down on the page it says you
5  took the sergeant's test in 2014. Do you see that
6  part?
7    A.   Yes, sir.
8    Q.   What happened in 2014 related to the
9  sergeant's test?
10   A.   What happened? Is that what your
11 question is, sir?
12   Q.   Yeah. If you wrote it here, what
13 happened in 2014 with regard to the sergeant's test?
14   A.   I failed it and didn't have time to
15 study. And I really want -- I'm sorry, but I had a
16 lot of things going on in my life as far as what
17 happened from this -- all this retaliation. And I
18 couldn't focus. That was one of my goals to become
19 sergeant. I couldn't focus and study the work to
20 become -- and I failed.
21   Q.   Is there -- there's a written test for --
22 to become a sergeant?

Page 341

1    A.   Yes, sir.
2    Q.   Did you take the written test and not get
3  a passing score? Is that what happened?
4    A.   That's correct, sir.
5    Q.   And then on the next page there are a few
6  other things referenced as items that you were
7  denied. So, let's go through some of them. It
8  says you were denied work groups initiated by the
9  Police Commissioner.
10        This is a very large page. So, I'm just
11 going to ask you about it, but you can see it if you
12 want. Do you remember being denied work groups
13 initiated by the Police Commissioner?
14   A.   Yes, sir.
15   Q.   Could you tell me what happened in that?
16   A.   So, there would be e-mails put out for --
17 where officers would have the opportunity to join a
18 group where we'd get to picture uniforms, get shoes,
19 try shoes given by an armorer.
20        Or be part of a group where you go and
21 meet up every month and give your advice on how to
22 help the department get better. There was groups

Page 342

1 asked to take part in the Commissioner's -- how
2 would I put it. Round table and give their point of
3 views on new com -- technology to get and become
4 part of a group.
5    Q.   Were you denied participation in these
6 work groups?
7    A.   Yes. I put in for it. I was very
8 qualified, and they did not choose me.
9    Q.   So, were there, to the best of your
10 knowledge, multiple applicants and you were not
11 selected from among those applicants to be on the
12 work groups?
13   A.   I don't know the amount of applicants
14 that were applied.
15   Q.   Right. But however many there were, you
16 were not selected from among the applicants?
17   A.   I was not selected. Never selected. One
18 time I was selected for a secondary if someone
19 didn't show up.
20   Q.   Were you denied the opportunity to be a
21 field training officer?
22   A.   Yes.

Page 343

1    Q.   When was that and how did that happen?
2    A.   I put in for -- I believe when I was in
3 the Northeast District, I was given a recommendation
4 from my -- my district. And I had an interview with
5 a sergeant at the Academy, and it went great. And I
6 never received anything back saying that I was
7 accepted, denied.
8        And I see people that have way less time
9 than me, less knowledge than me get chosen. Just
10 graduated a year later and get to become FTO. And I
11 have all this time on and I don't get it. It just
12 doesn't make -- doesn't make sense.
13   Q.   Were you denied being assigned OIC at
14 some point? When I say OIC, officer in charge and
15 acting supervisor?
16   A.   I was never given an opportunity in the
17 Southeast to do it when I had the chance -- when
18 I -- I was qualified for it. When I was in
19 Northeast, Sgt. Walford gave me an opportunity to
20 become OIC.
21        There was times where sarge would have
22 come work overtime in the Northeast District, and

Page 344

1 then tell me to do all the work as a OIC while she
2 sat in the office and shopped. And I did all the
3 work for her, but she -- I didn't get paid as an
4 OIC.
5    Q.   Does an OIC get paid more?
6    A.   Yes.
7    Q.   Does an OIC get paid at the sergeant
8 rate?
9    A.   They get extra $14 at that time of day.
10 And you have OIC -- you have experience as becoming
11 a sergeant.
12   Q.   Were you denied attending an awards
13 ceremony?
14   A.   Yes, sir.
15   Q.   What awards ceremony were you denied the
16 right to attend?
17   A.   I was in Northeast District. I was part
18 of NSU, neighborhood services unit. And I see that
19 Monica and Joe Banks. Monica, I can't remember her
20 last name, Monica Jones was one of my partners. Joe
21 Banks was one of my partners.
22        They -- they said, are you going to the

Page 345

1 awards ceremony tomorrow? I said, no, I don't know
2 nothing about a awards ceremony. I asked the
3 sergeant. The sergeant said, yeah, them two are
4 going. You're not going. But you're getting an
5 award, but you don't -- you're not -- you don't have
6 to be -- you're not going there. Them two -- them
7 two are going. You just go out and do traffic. And
8 I wasn't allowed to go.
9        And then later on, I was given a
10 certificate which was handed out to both of them in
11 front of the community, which would have been great
12 recognition for me because I worked hard for it.
13 They received it from the community and get
14 applauded.
15        And that didn't hap -- they didn't let me
16 go. And they just gave me a certificate at the
17 district in a yellow envelope. And then they asked
18 me to command -- the leaders from the -- the
19 neighborhood associations asked me why I didn't show
20 up. I said I wasn't invited.
21   Q.   Were you denied being assigned to the
22 mounted unit?

Page 346

1  A.  Yes, sir.

2  Q.  **What happened there?**

3  A.  I took the interview.

4  Q.  **When was this?**

5  A.  2000 -- sometime between 2013 and 2014.

6  Q.  **Was this while you were in the Southeast**

7  **District?**

8  A.  I definitely cannot recall this offhand.

9  Best of my recollection, I'm not 100 percent sure.

10 But I applied and with my experiences writing

11 traffic tickets, what they deal with. And other

12 applicants that they chose over me, I had way more

13 experience and knowledge than those officers. And I

14 wasn't chosen.

15 Q.  **Were you denied vacation leave?**

16 A.  Yes, I was denied vacation leave.

17 Q.  **In what instance?**

18 A.  Sgt. Jackson. When I got switched over,

19 he told me that I couldn't use the vacation that

20 I -- all the vacation that I took in the -- on their

21 shift because their seniority officers had off on

22 those days. And he couldn't give me those days,

Page 347

1  which they were already approved from my other shift

2  when I got switched. And those -- those days were

3  lost, couldn't use them.

4         P days that we get, we have to use within

5  a timeframe. P days we have, we have usually

6  between 14 to 15 P days every year we get to use.

7  You have to use a certain P day within a -- within

8  the holiday, 30 days after or 30 days before.

9  Q.  **So, did you work additional days that you**

10 **wouldn't have otherwise worked?  Is that what you're**

11 **saying?**

12 A.  No, sir. So, you have to use a P day

13 with this -- those 30 days before or 30 days after.

14 So, when I used -- when I did my vacation and I put

15 the P day -- when I want to use that P day because I

16 looked at the timeframe, I put it in, say, for July,

17 sometime in July. And I'm just giving you a -- an

18 approx -- a date just to explain to you how this

19 works.

20         I -- so, when I just -- I put it in

21 following my -- my schedule on that shift. Then

22 when I got switched over to the other shift, they

Page 348

1  didn't fall in place or they didn't -- couldn't give

2  me that day because they didn't have enough people

3  working on that shift. So, I couldn't use it. Do

4  you understand what I'm trying to say?

5  Q.  **Further down it says, you have suffered**

6  **an injury to credit standing including filing for**

7  **bankruptcy in 2015.**

8         **Does that -- what exactly happened that**

9  **you're referring to?**

10 A.  Just a couple things. So, the first

11 thing is that, when I got injured on the -- injured

12 at Sgt. Brokus attacking me, some reason, I don't

13 know if they didn't file the paperwork, I was

14 getting medical bills.

15         And my insurance won't cover it because

16 it was -- they -- I told them it happened at work.

17 And I got bills that went on my credit report. And

18 I didn't pay it out of my pocket.

19         And then after everything happened to me

20 in the Southeast, I always felt that like -- it was

21 my dream to be a cop, and I became that cop, and I

22 became a great cop, and I was up there.

Page 349

1         And then when I got pushed down by what

2  happened in the Southeast and continued to be

3  berated and retaliated against, I felt down on

4  myself. I went home -- out every day. Went on the

5  Internet. When I was down, I didn't want to go

6  anywhere.

7         Just sat on the computer and I started

8  shopping, shopping police equipment, police

9  equipment, police equipment. I started throwing

10 everything on my charge card because I was sad and

11 miserable and felt like I wasn't this great cop as I

12 was.

13         And I let the depart -- I let the

14 Southeast beat me down. And the spending got out of

15 hand, and before you know it, I couldn't pay my --

16 couldn't the bills, and I had to file bankruptcy.

17 Q.  **The insurance question that you raised**

18 **before, how did that ever get worked out?  What was**

19 **the result?**

20 A.  I declared bankruptcy.

21 Q.  **Was that medical bill one of the things**

22 **that was wiped out in the bankruptcy?**

Page 350

1  A.  It would -- I believe so.
2      MR. NACHTMAN:  You have to answer
3  verbally.
4  A.  I apologize.  It's been a long day, sir,
5  I'm sorry.  So, I believe -- best of my
6  recollection, I believe my lawyer added that on
7  the -- not Kurt Nachtman, my lawyer, but --
8  **Q.  Your bankruptcy lawyer?**
9  A.  -- my bankruptcy lawyer, yes, sir.
10 **Q.  When did your financial issues begin to**
11 **develop?**
12 A.  2014, 2000 -- 2000 -- started 2013.
13 2014.  By the time 2015 hit, I was -- reached my
14 limits on my credit cards.  I spent so much money on
15 police equipment that -- to make myself feel better.
16 I just was out of control.  I didn't know what else
17 to do at home other than shop on the computer, buy
18 police equipment to make me feel better.
19 **Q.  Do you still have issues with that?**
20 A.  Actually my credit has actually got
21 better.  After since the bankruptcy, gotten better.
22 And seeking -- with help through my doctor at

Page 351

1  Rosedale PsychiatricS, psychological I believe it's
2  called, he's helped me try to deal with my habits of
3  shopping just because I'm down on myself.  Find
4  other ways to do stuff.
5  **Q.  Further down it says, quote, you had**
6  **negative matters in your personnel file without my**
7  **knowledge, no ability to rebut it, no due process.**
8      **What negative matters in your personnel**
9  **file were there that weren't with your knowledge?**
10 A.  That I was suspended, never had due
11 process for alleged insubordination by Sgt. Brickus
12 and the parking spot incident.
13     I had in there insubordination by
14 Sgt. Swinton when I took -- ended up having to plea
15 out because I was told I was going to be fired by
16 Rodriguez to -- discourteous.  And it's still in
17 there as a insubordination.
18     I had Sgt. Brokus put in there that I was
19 late.  He had someone there -- he had -- either him
20 or Sgt. Jackson had a OI -- OIC document that I was
21 late one day and reprimanded for it, which I was
22 never reprimanded.  They never told me they even put

Page 352

1  it in blue team.  Or that -- you know, that I
2  shouldn't be late anymore.
3      They never reprimanded me.  I was late.
4  I said I was -- I overslept, told the truth because
5  my daughter having issues with what was going on.
6  The main issue was me put in the back of the police
7  car.  She thought I was arrested.  I overslept
8  because I had to calm her down and lay with her.
9  And my alarm clock was in the other room.  One time,
10 and he blue teams me.
11     And then Sgt. Jackson blue teams me.  And
12 this -- they keep it in there as tracking, tracking,
13 tracking, tracking, and I was never aware of it.
14 And, so, they had separate folders on me.  And
15 Sgt. Jackson was a blue team that was medically
16 suspended.  And that I failed to turn a report in.
17 Made fun of my grammar, which I never seen before.
18 Made fun of my -- the way I wrote the report even
19 though the report was titled correctly.  When I
20 wrote the police information report, it was titled
21 correctly.
22     He purposely wrote in blue team that it

Page 353

1  was -- that I wrote the complainant in the wrong
2  spot.  That's not true.  It is true when I rewrote
3  the report that the complainant had to go in there,
4  but I'm the complainant on the police information.
5  Not -- not -- so, he made up stuff and put it in
6  blue team without me even knowing.  And then kept it
7  as tracking.
8      So, my first offense that came up was the
9  -- the ECU incident, and I'm being charged with a
10 high category offense for discourteous when I never
11 been in trouble before.  And they're giving me a C
12 category.  And ADP offered 15 days suspension and a
13 severe letter of reprimand for my first time ever
14 getting in trouble for -- for discourteous.
15     And it's outrageous.  I never heard of
16 that.  And they used -- I was told by Rob that they
17 looked at my prior history, and they noticed
18 everything what happened in the Southwest and they
19 used it against me.  They used -- that's what Rob
20 told me, because of my prior history.
21 **Q.  Cornejo?**
22 A.  Yes.  That I was up to a level of -- a

Plaintiff Exhibit 37

Page 354

1 Level C now to a high category. I never had due

2 process.

3    **Q.   Has this -- have the matters that we**

4 **discussed today caused a significant strain in your**

5 **marriage?**

6    A.   Yes, sir.

7    **Q.   How has it affected your marriage?**

8    A.   I'll be honest with you, sir, my sex

9 drive is down. I don't even have sex that much

10 anymore. My wife gets upset. I have no joy of life

11 of going to watch my soc -- my daughter plays

12 soccer. I sit home while they go to games.

13         I used to be in shape. I gained almost

14 40 pounds. No desire to work out anymore. I have

15 no desire to work out. I used to be a gym fanatic.

16 Used to run. I don't feel like doing that anymore.

17 Down on myself.

18         I feel like because I filed a complaint,

19 I made the biggest mistake of my life, that I should

20 have just not even filed a complaint, and I would

21 have had a whole different life right now.

22         I don't want to go anywhere. I don't

Page 356

1 see a doctor for it. It's an embarrassment.

2         Like I'm 30 -- 38 years old. I should be

3 in the prime of my life right now. And it's not

4 there anymore.

5    **Q.   Let's turn one page, two pages -- until**

6 **we see the words Interrogatory No. 6. It's going to**

7 **look like this. Turn to that --**

8    A.   I see it.

9    **Q.   -- and then turn one more page. I want**

10 **you to look at Answer to Interrogatory No. 6.**

11    A.   (Complies.)

12    **Q.   The answer begins, sometime in 2011 to**

13 **2012. Do you see there? It's the right spot. Are**

14 **you there?**

15    A.   Yes, sir.

16    **Q.   All right. In the -- in that Answer,**

17 **which is quite long and you don't need to read it**

18 **because I'll just ask you about the Answer, did**

19 **someone draw in the dust on your police car at one**

20 **point?**

21    A.   Yes, sir, unfortunately they did.

22    **Q.   When exactly was that, if you remember?**

Page 355

1 want to go on vacation. I don't really want -- I'm

2 forced to go on -- I just went on vacation with my

3 wife recently for four days in Maimi. She wanted to

4 stay longer, but I'm like, no, I don't really want

5 to go. She made me go, and I was miserable down

6 there.

7         Don't want to do anything no more. I

8 just sit home, and I feel bad because my daughter

9 yesterday, she wanted to go kick the ball around.

10 No, babe, I got to sit here. I got to -- I got to

11 go over some stuff. I got things tomorrow I got to

12 take care of. Sorry, I can't.

13         This -- it's destroyed me. It's put me

14 down. It's -- I've never been like this kind of

15 person before. I was a up going, excited person,

16 totally different person. Now like I just -- I feel

17 like the world's beating me down.

18         And the -- my wife is very disappointed.

19 And she even says that I -- I'm a different person

20 now. She gets on me about not having sex with her.

21 She thinks that I've -- that I have no sex drive.

22 It's an embarrassment. She actually told me to go

Page 357

1    A.   Sometime between 2011 and 2012.

2    **Q.   What exactly --**

3    A.   The best of my recollection.

4    **Q.   What exactly happened like -- that you**

5 **saw?**

6    A.   So, me and Officer Quaranto had the same

7 car every day because we were in the initiative car

8 together. And we were assigned a car.

9    **Q.   Is this back when you were at -- partners**

10 **with Sgt. -- or Officer Quaranto?**

11    A.   Yeah. And --

12    **Q.   In the unit that you said you were in**

13 **with him?**

14    A.   Yeah. We were. And then we continued

15 that unit for -- into -- I believe January we

16 stopped. Late January I believe it was, the best of

17 my recollection of 2013. Or 2012, I believe. It

18 was 2012.

19         And I would -- we saw a penis with balls

20 and it said Baby Dick on it in the dirt in the front

21 of the hood of the car.

22    **Q.   Where were you when you saw it?**

Page 358

1   A.   I don't remember. I believe it was at
2   the district. I remember seeing it. And at that
3   time, I didn't really think of anything. But now
4   after everything that happened, everyone -- people
5   knew it was our car, put two and two together.
6       Q.   Did anyone else use that car during
7   shifts when you weren't using it? Do you know?
8       A.   I can't recall, sir. I can't recall
9   that.
10      Q.   Further down, we're going to turn, there
11  are numbered paragraphs. Keep turning until you see
12  numbered Paragraph 11. Do you see numbered
13  Paragraph 11 right above the page where it says
14  Interrogatory No. 7?
15      A.   Yes, sir.
16      Q.   You make allegations of systematic
17  discrimination and harassment of LGBT officers and
18  LGBT family members. Do you see that in
19  Paragraph 11?
20      A.   Yes, sir.
21      Q.   What exactly are you referring to there?
22      A.   That the department knew my dad was gay.

Page 360

1   Southeast. Best place to work because the best
2   places -- best area to work. Best food places to
3   eat. Less call volume. Everyone knows that in the
4   department.
5       Southeast is the most district out -- I'm
6   sorry, I don't -- it's been a long day. The
7   officers, if they had a choice, Southeast would be
8   their No. 1 pick because of the geo -- geographic
9   areas and the -- the bars and the clubs in there.
10      And anybody would have switched with me
11  for any other district when I put my 70 in. And it
12  could -- it could have been switched fast. Any
13  district, and it didn't happen. They didn't let me.
14  They kept me at the district.
15      Q.   Let's keep turning until you see two
16  pages, until you see paragraph numbered 10. You see
17  the one that says No. 10?
18      A.   Yes, sir.
19      Q.   The reference, receiving a letter of good
20  standing so that you could obtain a carry permit.
21  Do you see that?
22      A.   Yes, sir.

Page 359

1   And then later time I find discrim -- discriminatory
2   pictures on the bathroom stall. My vehicle. It's
3   not that -- as they portray to the news and the --
4   to the citizens of Baltimore that they're LGBT
5   friendly, they're not behind closed doors.
6       Q.   All right. Let's turn to your Answers to
7   Interrogatory No. 7. These are also numbered very
8   conveniently for us. Let's go to No. 4, which is on
9   the same page we were just on. You write that the
10  Southeast District was the most sought after
11  district while Northeast District was one of the
12  least sought after.
13      What makes you say that the Southeast
14  District was the most sought after district?
15      A.   Upon speaking to lot of officers that are
16  coming out of the Academy or field training, working
17  along with them on the street, I was never FTO, but
18  going on calls.
19      Q.   When you say FTO, you mean field training
20  officer?
21      A.   Field training officer. Everybody says,
22  I want to go to Southeast. I want to go to

Page 361

1       Q.   What significance do you attach to the
2   fact that the BPD issued you a letter of good
3   standing? What does it -- what does it mean?
4       A.   It means that I was in good standings
5   with the department as far as I had nothing in my
6   record that would prevent me from getting a gun
7   permit. It's not a gun permit. That's a --
8   that's a -- that's a misunderstanding. What I mean
9   by a gun per -- gun carry permit, meaning is I can
10  purchase a gun the same day.
11      The Maryland stall -- Maryland State law
12  requires that when you buy a handgun, you have to
13  wait seven days for it, even as a police officer.
14  But if you obtain a letter from the -- your
15  department stating that you're in good standing as
16  an officer, they will waive that and give you the
17  gun the same day.
18      So, Lt. Pearson gave me that letter
19  stating -- and I got the gun same day. And he gave
20  me that letter saying that I was in great standing.
21  That I had no disciplinary actions that -- that
22  would permit me from getting a gun the same day.

Page 362

1    Q.   Bear with me. We covered some of these
2 things, and I don't want to duplicate our time.
3         Under Heading 21, you reference the
4 kidney problems that we briefly talked about
5 earlier. Do you remember that?
6    A.   Yes, sir.
7    Q.   Do you have continuing kidney problems?
8    A.   Yes, sir.
9    Q.   Do you believe your kidney problems were
10 caused by any of the issues we described today?
11   A.   Yes, sir.
12   Q.   Have you ever received a medical
13 diagnosis to that effect?
14        MR. NACHTMAN: Objection.
15   A.   No, sir.
16        MR. NACHTMAN: I'll object to the extent
17 that expert discovery is deferred.
18        MR. GLYNN: We have --
19        MR. NACHTMAN: You can answer.
20   Q.   You can answer that question. We'll deal
21 with the expert subsequently if we ever get there.
22   A.   I believe what had -- what happened back

Page 363

1 in the Southeast, that was documented medically that
2 I continue to get kidney stones. As my doctor says,
3 I produce them like crazy. Like I produce them so
4 much that they get -- and they get so big and they
5 get stuck.
6         That I had procedures within the past
7 couple years up until last year where I had to get
8 stents put in into my kidney to my bladder to
9 release my kidney from getting backed up. My
10 kidneys get backed up with urine because of the
11 kidney stones that get stuck in my urethra.
12 Urethra, I'm saying it right.
13        And I probably since then had about four
14 to five surgery procedures where I get stents put
15 in. And -- and the -- they go up through my urethra
16 and I have surgery and they attempt to get the
17 kidney stone out. And the pain is tremendous. The
18 worst thing.
19   Q.   If you can turn to the next page,
20 Paragraph 22. Do you see that?
21   A.   22, yes, sir.
22   Q.   You state that Sgt. Eric Januck and

Page 364

1 Officer Adam Long stated they disagreed with what
2 they were being ordered to do by Captain Kimberly
3 Burrus and Sgt. James Brokus?
4    A.   Yes, sir.
5    Q.   What exactly happened that you remember?
6    A.   They pulled -- when they pulled up in the
7 police car at my house in Baltimore County --
8    Q.   I just mean, what their statements. We
9 already talked about this.
10   A.   They said, sorry we're doing this to you,
11 but it's not us. It's Sgt. Brokus is ordering us to
12 do this. We apologize and don't take it out on me,
13 don't take it out on Officer Long. Our order is to
14 drop you off down at Mercy Hospital.
15   Q.   Did they mention Captain Kim Burrus at
16 the time?
17   A.   They mentioned that Brokus received a
18 message from Captain Burrus ordering him to pick --
19 for him to pick me up, but they sent Sgt. Ja -- he
20 sent Sgt. Januck and Officer Long out to me. Not
21 him -- not James Brokus came out. Officer Long did
22 and Officer -- Sgt. Januck did.

Page 365

1    Q.   So, my understanding that they told you
2 Captain Burrus ordered --
3    A.   Sgt. Brokus.
4    Q.   -- Sgt. Brokus to send them?
5    A.   Yes. Yes, for the record, sorry.
6    Q.   Turn to numbered Paragraph 30, it's like
7 two pages away.
8    A.   Yes, sir.
9    Q.   You already there?
10   A.   Yes, sir.
11   Q.   You make a statement about a DOA in
12 Sector 1. What -- what are you talking about here?
13   A.   So, when I first assigned to Northeast
14 after I left Southeast, I go to a call and back up
15 an officer in Sector 1 of the Northeast District for
16 a DOA. Upon my arrival, I find a woman in her
17 fifties -- between 50, 60 years old.
18        I began CPR on her. She wasn't
19 breathing. The daughter was crying crazy. Medics
20 arrived. Primary officer arrived. Primary officer
21 followed the medic to the hospital.
22        I cleared the call. I was no longer on

Page 366

1  that call anymore. The primary officer over --
2  primary officer took over that call. Followed the
3  medic to the hospital. He was a fairly new guy.
4  So, he had left the hospital. And the Southeast
5  gets a call at the Bayview Hospital where the lady
6  was taken for a DOA. She had passed away a few
7  hours later.
8       So, Southeast finds out that the lady
9  came from the Northeast. Either Sgt. Jackson or
10 Sgt. Brokus noticed that my name was on the call.
11 They get on the air. And they pretty much say that
12 I neglected to do my job. That I need to come over
13 to the Southeast District and handle this call.
14      Sgt. Hardy gets on the air and says,
15 negative. Let me contact the officer that
16 responded. He calls me. I explain to Sgt. Hardy,
17 Sgt. Hardy, I'm not the primary on there. If you
18 look on there, the primary is this officer at the
19 time. I'm not sure -- I can't recall his name now.
20      But I said, the Southeast is accusing me
21 of being neglect -- neglecting my duties, but it
22 wasn't me. But remember, Sgt. Jackson, Sgt. Brokus

Page 367

1  shift, I know for a fact that they don't like me.
2  They're looking to file -- continue to harass me and
3  get me in trouble. So, they purposely went over the
4  air trying to say I neglected my duties.
5       What they failed to realize, I wasn't the
6  primary officer. It was the other primary -- I was
7  the secondary officer, and I was cleared the call
8  and the primary officer went to the hospital.
9       And come to find out, long story short,
10 Sgt. Hardy said that if -- that he had come to find
11 out that officer was told by the -- the nurse that
12 she was going to survive.
13      So, that's why he left. So, there was no
14 need to run a DOA because this -- the nurse told her
15 she was going to be fine. She was going to make it.
16 So, he left and coded the call out. I didn't know
17 because I left the call. It wasn't my job anymore.
18 I backed the officer up and left.
19      So, South -- the whole point of that is,
20 Southeast was trying to claim I neglected my duties.
21 And Sgt. Hardy -- I explained to him how there's a
22 little -- little hard feelings on Sgt. Jackson and

Page 368

1  Sgt. Brokus with me, and they're going to try to put
2  the blame on me.
3       And he contacted them and said, no, we
4  didn't do anything wrong. You write your report,
5  and that was end of it. But I'm explaining more
6  interactions that's occurring when I leave the
7  district that's going on with the Southeast.
8  Q.  Under matter -- Paragraph 31, you
9  reference a matter regarding ECU. Is that the
10 evidence control unit?
11 A.  31, sir?
12 Q.  31.
13 A.  31, yes. I was told --
14 Q.  Were you disciplinarily charged for
15 conduct that you engaged in on that day?
16 A.  Yes, sir.
17 Q.  Do you know who made the decision to
18 charge you, if you know?
19 A.  Sgt. Swinton charged me. That's all I
20 know.
21 Q.  When you say Sgt. Swinton charged you, do
22 you mean Sgt. Swinton filed blue team or a

Page 369

1  disciplinary complaint against you or that she --
2  A.  Yes. I filed a complaint against her.
3  She filed a complaint against me. And we were both
4  seen by ranking officers that day. And I didn't --
5  she was in plainclothes. I didn't know who she was.
6  Q.  Do you know who actually issued the
7  disciplinary charges out of the charging committee?
8  A.  Internal -- Internal Affairs conducted an
9  investigation. It was then sent to the trial
10 board -- I mean, the hearing. What is that called,
11 I'm sorry?
12 Q.  I can't answer questions. But are you
13 referring to --
14 A.  The committee, the committee.
15 Q.  -- the charging committee?
16 A.  Charging committee.
17 Q.  Disciplinary review committee?
18 A.  Yes. And ultimately brought up on
19 charges.
20 Q.  I'm showing you --
21      THE REPORTER: 52.
22 Q.  -- Exhibit 52.

Page 370

1    (Whereupon Angelini Deposition Exhibit 52
2    was marked.)
3    Q.   Are these the charges that were issued in
4    that incident? Take a moment to look at them.
5    A.   Sure. (Complies.) Yes, sir.
6    Q.   Did you subsequently agree to accept
7    punishment in that case?
8    A.   I was forced to, yes, sir.
9    Q.   When you say forced to, tell me what you
10   mean.
11   A.   My lawyer -- my lawyer at the FOP told me
12   that if I didn't take the agreement that he made
13   with the City lawyer with me accepting -- what was
14   the charge?
15         MR. NACHTMAN: Do you have the signed --
16   there was a signed version of this in the
17   discovery.
18         MR. GLYNN: It might be.
19         MR. NACHTMAN: Okay.
20         MR. GLYNN: This is the version I printed
21   out right now.
22   A.   Dis -- if I would not take discourteous,

Page 371

1    that if I went -- took a trial board, I was going to
2    be fired by Jerry Rodriguez ul -- ultimately. I was
3    going to be fired by Jerry Rodriguez. Because I
4    told my lawyer I wanted a trial board, but he warned
5    me that Jerry Rodriguez is out to get me.
6    Q.   Did you accept a middle letter of
7    reprimand and four days suspension without pay? Do
8    you remember if that's what the settlement was?
9    A.   Yes. For discourteous, yes.
10   Q.   Did you have an opportunity to consult
11   with legal counsel of your choice before settling
12   that case?
13   A.   Yes. I couldn't understand why the
14   charge was so high for a first time offense of any
15   offense in the Baltimore City Police Department.
16   Q.   Under 32, you relay a story about a
17   conversation with Mark Rutkowski which we touched on
18   earlier. Do you see that?
19   A.   Yes. Yes, sir.
20   Q.   Were you present in this case for the
21   deposition of Mark Rutkowski?
22   A.   No, sir.

Page 372

1    Q.   Under Paragraph 33, you make a statement
2    about Sgt. Kimberly Swinton tells Sgt. Christopher
3    Warren, why did he choose me to be in his LPR unit
4    when I'm a mental case?
5         Do you re -- what exactly happened that
6    you know of that made you write that?
7    A.   I decided to leave the LPR unit and go
8    back to Northeast patrol. Sgt. Warren wasn't too
9    happy that I decided to do that. When I left the
10   unit, Sgt. Quaranto phone -- phone called me and
11   told me that Sgt. Walford told him specifically that
12   Sgt. Swinton and him had a conversation, that she
13   could not -- she saw the detail order that
14   Sgt. Warren -- I was under Sgt. Warren.
15         And that she would smack him in the face
16   next time she saw him that she took me -- he -- that
17   he took me into his unit because I was a mental
18   case.
19   Q.   Do you remember when that was?
20   A.   That was sometime after I left the LPR
21   unit in April, April 2000 -- March. I'm not even
22   sure, sir. I can't -- best of my recollection, it

Page 373

1    was like sometime when I left the LPR unit and went
2    back to the Northeast in 2015, I believe. Don't
3    quote me though. I'm not exactly sure 100 percent.
4    Q.   We briefly touched on this before. Under
5    Heading No. 34, you describe the incident we talked
6    about before involving your personal body camera.
7    Do you see that in Paragraph No. 34?
8    A.   Yes, sir.
9    Q.   Do you believe that Jerry Rodriguez,
10   Rodney Hill and Martin Bartness wanted to charge you
11   with misconduct?
12         MR. NACHTMAN: Objection. You can
13   answer.
14   A.   Yes.
15   Q.   What makes you say that?
16   A.   An e-mail that was -- I found between
17   Major Worley, Jerry Rodriguez, Martin Bartness that
18   stated -- that Chief Rodney Hill, that they wanted
19   me entered in blue team and charged for wearing a
20   body camera.
21   Q.   Were you ever charged with misconduct for
22   wearing a body camera?

Page 374

1   A.   I was told by Major Worley that he
2   couldn't charge me because there was no rule on it.
3   And he -- he referred back to Martin Bartness and
4   advised him there's no rule on it, that he couldn't
5   charge me.
6   **Q.   Do you believe that any concerns the BPD**
7   **command staff had with you using your own personal**
8   **body camera were unjustified?**
9   A.   Can you rephrase that question?
10  **Q.   If as you said they wanted to discipline**
11  **you, but there was no policy, do you believe that**
12  **they were justified in being concerned about your**
13  **use of a personal body camera?**
14  A.   My belief, I believe there's no concern
15  on the behalf of the department. I saved them a
16  lawsuit and -- a false lawsuit. And any trouble, a
17  waste of time, that they would have to investigate
18  that case.
19  **Q.   Do you believe they should have permitted**
20  **you to continue using your body camera at work?**
21  A.   Yes. And Freddie Gray wouldn't have
22  happened with -- and they would have had cameras

Page 375

1   that day. Remember, this is a week prior to Freddie
2   Gray.
3   **Q.   Under Paragraph 36 on the next page, you**
4   **describe an incident involving a juvenile. Do you**
5   **see that?**
6   A.   Yes, sir.
7   **Q.   What exactly happened in that incident?**
8   A.   We were given a BOLO out that morning in
9   roll call for an individual wanted for stabbing a
10  90-year old man for a robbery. An officer spotted
11  him on Belair Road and Glenmore, in that vicinity.
12      I went up there. The officer lost sight
13  on him -- sight of him. I found him. Began a foot
14  chase. Later apprehended him. I stated on camera
15  to the suspect that he was being charged with --
16  additionally charged with destruction of property.
17  Because while he ran away, he destroyed a few cars
18  in the parking lot of a dealership.
19      He stated back to me, I don't give a F.
20  And I said, you think you're hard, you think you're
21  tough. Thereafter, he was being put in the wagon.
22  And I turned around and said to one of my fellow

Page 376

1   officers that he's going to end up being a career
2   criminal. He doesn't care.
3   **Q.   Were you subsequently disciplinarily**
4   **charged for your conduct that day?**
5   A.   Yes.
6   **Q.   Now, you mention in your Answer under**
7   **Paragraph 36 that you were served with by IAD**
8   **because ASA, I assume that's Assistant State's**
9   **Attorney, Sandra Goldthorpe felt it was offensive.**
10  **Do I have -- do I understand that correctly?**
11  A.   Yes.
12  **Q.   What makes you say that you were served**
13  **by IAD because of what Assistant State's Attorney**
14  **Sandra Goldthorpe felt?**
15  A.   I was told by the detective that was
16  investigating it that IID's -- excuse me, that --
17  that the State's Attorney's office, approximately a
18  few months later, lost a body camera. And Sandra
19  Goldthorpe felt offended that I stated that the
20  juvenile would be -- end up being a career criminal.
21      I was later -- that charge later dropped
22  when I disclosed to the department during my

Page 377

1   investigation that the department uses the words
2   career criminal. They have a career criminal
3   policy. They have -- the State's Attorney's Office
4   uses career criminal. The Federal Government
5   uses -- State's Attorney uses career criminal all
6   the time.
7       And it was later dropped. And that --
8   that's what started the investigation. Then later
9   on, I was charged for other -- two other things.
10  **Q.   I'm showing you Exhibit 53.**
11      (Whereupon Angelini Deposition Exhibit 53
12  was marked.)
13  **Q.   We're almost done. Is this a copy of the**
14  **charges that were issued against you in that**
15  **incident, if you recall?**
16  A.   Yes, sir.
17  **Q.   Did you subsequently proceed to a hearing**
18  **board of your fellow officers in that case?**
19  A.   Yes, sir.
20  **Q.   Did the hearing board find you guilty of**
21  **misconduct?**
22  A.   They did find me guilty of misconduct

Page 378

1 as --
2    Q.  Do you remember what they found you
3 guilty of?
4    A.  They found me guilty of discourteous. I
5 believe so. Hold on. Yes, discourteous comments.
6    Q.  Under Paragraph 37, you refer to an
7 incident in Baltimore County. Do you see that under
8 Paragraph 37? We're back on that.
9    A.  This --
10    Q.  This is Exhibit 51. We're back at 51.
11    A.  Yeah, I'm sorry. I put that away. What
12 was the question?
13    Q.  37. Paragraph 37 which is near the end.
14 It's like -- it looks like this.
15    A.  Yes, I see it, sir.
16       MR. NACHTMAN: Did you say 57?
17       MR. GLYNN: 37.
18       MR. NACHTMAN: Okay.
19    Q.  So, you mentioned a Baltimore County
20 incident earlier. Were you subsequently
21 disciplinarily charged for your conduct on that
22 incident in Baltimore County?

Page 379

1    A.  Yes, sir.
2    Q.  I'm showing you Exhibit 54.
3       (Whereupon Angelini Deposition Exhibit 54
4 was marked.)
5    Q.  Are these the charges that were issued
6 against you in that incident?
7    A.  Yes, sir.
8       MR. NACHTMAN: I'm going to object to 53
9 and 54 insomuch as they are unsigned documents.
10    Q.  Are you currently awaiting a hearing on
11 those charges?
12    A.  Yes, sir.
13    Q.  Do you believe that the BPD's handling of
14 that incident has been motivated by retaliatory
15 animus?
16    A.  100 percent, yes.
17    Q.  Under -- the heading under Paragraph 38,
18 you refer to a citizen complaining about a traffic
19 ticket. Do you see that?
20    A.  Yes, sir.
21    Q.  Were you subsequently disciplinarily
22 charged for your conduct that day?

Page 380

1    A.  Yes. Twice.
2    Q.  I'm showing you Exhibit 55.
3       (Whereupon Angelini Deposition Exhibit 55
4 was marked.)
5    Q.  There -- this copy is not signed. Are
6 these the charges that were issued in that case?
7    A.  Yes.
8    Q.  Are you currently awaiting a hearing
9 board on that -- on those charges?
10    A.  Yes.
11    Q.  Do you believe the BPD's handling of that
12 incident has been motivated by retaliatory animus?
13    A.  100 percent, yes.
14    Q.  Under Heading No. 39, you refer to other
15 citizen complaints against you. What other citizen
16 complaints -- what other citizen complaints are you
17 referring to here that were not sustained?
18    A.  Sir, like I explained you to earlier, the
19 one where the lady stated she felt that it was
20 inappropriate for me to take pictures of evidence of
21 her -- of her car.
22       But then there was another one where an

Page 381

1 individual claims that he was a State Trooper, and
2 that he deserved immunity and I still gave him a
3 ticket. That was not sustained, and they're still
4 left on my record.
5    Q.  Under Paragraph 40, you refer to
6 receiving notice of investigations and sustained
7 findings. Do you see that?
8    A.  Yes, sir.
9    Q.  Are you referring to the two cases we
10 just discussed, the Baltimore County one and the one
11 involving the traffic stop?
12    A.  Give me a second to read this please,
13 sir.
14    Q.  Sure.
15    A.  (Complies.) I'm sorry, you said 41
16 again, sir?
17    Q.  I'm sorry, 40.
18    A.  40. Discloses about the EIU -- or IID.
19 Yes, yes. The answer is yes, sir.
20       MR. NACHTMAN: I'll object to 40 to the
21 extent that it does include settlement
22 negotiations which would otherwise be

Page 382

1  inadmissible in a subsequent court proceeding.
2  I think you were just referring to it.
3      MR. GLYNN: I'm referring to what it says
4  here.
5      MR. NACHTMAN: And it's been marked as an
6  exhibit. So, in the event that this is played
7  later, this portion will need to be redacted
8  for any reference thereto.
9      MR. GLYNN: We'll deal with that.
10  **Q.  Under Heading No. 41, you refer to an**
11  **incident involving a body camera being turned on --**
12  **not turned on. Do you see that?**
13  A.  Yes, sir.
14  **Q.  What exactly happened in this incident?**
15  A.  I received a -- I was one of the first
16  that received the body cameras, the new -- the body
17  cameras issued by the department. When we first
18  originally got them, they were having issues with
19  the charging dock at the districts. So, I would
20  wear it all day.
21      At the end of the shift, come in, place
22  it in a dock. It would light up saying that it was

Page 383

1  being docked, but it wasn't charging. So, when I
2  came in the next day to use it, the cameras, I would
3  take it off, it appeared that it was charged.
4      I would put it on, go on the street, turn
5  it on, it would have zero percent, and it wouldn't
6  allow me to record. We had to document that. At
7  that time, there was a new rule saying that we would
8  have to go down to ECU and get a new one. They were
9  just told -- we had to write a 95, go dock your --
10  your -- your camera on a new charging docket --
11  dock -- on a new charging dock and let it charge.
12      Just write a 95, give it to your
13  sergeant. Thank god I made a copy of my 95.
14  Approximately, I don't even know, I'll say about a
15  year, year and a half later, just for -- not too
16  long ago actually I would say, I was brought in for
17  an investigation.
18      I was being -- being brought up on
19  charges for not turning my camera on that date that
20  I wrote a 95 stating that my camera did not work.
21  She said to me, don't -- just sign -- just sign it.
22  It's only a simple letter warning. Just sign it.

Page 384

1  No big deal. You were in the wrong.
2      You should have brought it down to ECU.
3  I mean ECU and get a new one. I said, ma'am, you're
4  incorrect. I said, at that time, there was no rule.
5  And we're not told to go down and go get a new one
6  at ECU. I said, here's my 95 stating that I wrote
7  it, that I wasn't equipped that day because of the
8  charging dock.
9      And I'm not accepting anything. I will
10  accept a trial -- I will take a trial board before I
11  would accept anything. She goes, we'll get back to
12  you. You're correct about the -- the timing on
13  the -- going down to ECU. That wasn't implemented
14  yet. I never heard back.
15  **Q.  Have you ever been disciplined in any way**
16  **for that?**
17  A.  I never heard back yet. I'm not sure
18  it's closed or -- I know it was open, but they never
19  told me it was -- if it was closed or found not
20  sustained, sustained, nothing.
21  **Q.  Do you remember the IAD detective's name?**
22  A.  Yes.

Page 385

1  **Q.  What was the name?**
2  A.  So, the detective's name was -- what is
3  her name? Kimberly. She was a -- she used to be a
4  police -- that she retired. So, she's a contractor
5  down there now. But she was out sick.
6      And there was another female that took
7  her place for that day and had to serve me with the
8  notice of an investigation. And I informed her that
9  I have evidence that -- before I signed. She's
10  like, what evidence? And I explained to you that
11  already. And she's like, all right, don't sign
12  anything yet. Just bring back down the evidence and
13  I'll give it to Kimberly.
14      I can't remember her last name. She
15  worked out of Northwest District. That's how I knew
16  her and she retired. Kimberly Parks. That's her
17  name.
18      And she was off that day, but another
19  officer -- a female officer was serving me with the
20  paperwork of a notice of investigation for not
21  turning my camera on. And she's the one that told
22  me that I should take the punishment because I'm in

Page 386

1 the wrong.

2      But when I explained to her that's not

3 true, that she said that she would pass on to

4 Kimberly Parks that I had more evidence. But later

5 that day, I brought her a 95. I came back and

6 brought her the 95 that I wrote and saved. Thank

7 god I did.

8  Q.  Who is Samantha Watts?

9  A.  IID detective in Baltimore County.

10  Q.  Did we talk about her before?

11  A.  We believe we brought up Watts.

12  Q.  Is that -- are there two Watts?

13      MR. NACHTMAN: I'd answer the question,

14 but I can't talk.

15  A.  It's been a long day, sir.

16      MR. NACHTMAN: It's unfortunately not.

17  Q.  Who is Bruce Kagan?

18  A.  These are witnesses at Baltimore County,

19 I believe, sir, to the best of my recollection.

20  Q.  Did you ever discuss this case with Bruce

21 Kagan?

22  A.  Bruce Kagan. It doesn't even come to my

Page 387

1 memory at all at this time, sir. Bruce Kagan.

2      MR. GLYNN: All right. Well, I don't

3 have any further questions at this time. I'll

4 keep whatever minute I have left. Hold my

5 deposition open. Kurt, if you have any

6 questions, the ball is in your court.

7      MR. NACHTMAN: I do.

8           EXAMINATION

9 BY MR. NACHTMAN:

10  Q.  All right. You've had lot of documents.

11 Do you need a break?

12  A.  Sir, how long are you going to be?

13  Q.  I mean, I have a lot of clean-up. So --

14  A.  Okay. Let's take a two-minute break,

15 please.

16      MR. NACHTMAN: I do. I'm not going to

17 lie.

18      THE VIDEOGRAPHER: We're going off the

19 record. The time is 5:59 p.m.

20      (Whereupon a brief recess was taken,

21 after which the following was heard:

22      THE VIDEOGRAPHER: We're back on the

Page 388

1 record. The time is 6:03 p.m.

2  Q.  All right, Officer Angelini. Now is my

3 opportunity to ask you a series of follow-up

4 questions. Okay?

5  A.  Yes, sir.

6  Q.  All right. So, there were a series of

7 questions that were directed to your subsequent

8 disciplinary history kind of after 2013.

9      What is your understanding of what the

10 Internal Affairs, and 1 -- we said IAD, Internal

11 Affairs. For these purposes, we're referring to the

12 centralized unit at -- that is Internal Affairs

13 Division for the entire Baltimore City Police

14 Department.

15      What -- what is your understanding of

16 what process they go through in order to determine

17 whether or not there are charges and then what

18 happens when charges are issued?

19  A.  So, when they're brought to their

20 attention that an officer conducted any -- anything

21 that violates the policy, the -- it's either sent to

22 the -- to the detective to investigate. The

Page 389

1 detective then serves -- they're supposed to serve

2 the officer of notice of investigation. They over

3 look any evidence. Look at every evidence. They

4 call the officer in to give a statement.

5      Then they're -- after that, if they

6 believe there's enough evidence, they will issue

7 what's called ADP. A punishment that you accept

8 before it goes to the committee.

9  Q.  Okay.

10  A.  And then if you don't accept that

11 punishment --

12  Q.  And who determines what that initial

13 punishment, the ADP? Do you know what that acronym

14 means? Start with that, do you know what that

15 acronym means, ADP?

16  A.  I don't know the exact wording what it

17 means --

18  Q.  Okay.

19  A.  -- but I know what it stands -- like what

20 it stands for.

21  Q.  Who determines that initial offer of

22 punishment?

Page 390

1    A.    Internal Affairs supervisor does.

2    Q.    Do you know which supervisor?

3    A.    Whichever supervisor that officer that --

4    detective that's investigating works for.

5    Q.    It would be a sergeant then?

6    A.    It would be a sergeant, yes.

7    Q.    Okay. And what do -- is there any idea

8    or is there any guidance as to what the punishment

9    is supposed to be?

10    A.    Yes. They're supposed to follow a matrix

11    through the Baltimore Police Department's policies.

12    According to the matrix, depending on your prior

13    history, how many times you been charged for that

14    incident, they can either make it A, B, C, D, E, and

15    then F is termination. And they use your prior

16    history to give out punishments on the ADP.

17    Q.    Okay. So, if you don't accept the ADP,

18    what happens as an officer?

19    A.    They use that --

20    Q.    Who is they?

21    A.    IAD uses that as a bargaining agreement.

22    That if you don't take it, there are going to be

Page 391

1    more consequences from the trial board committee.

2    Because they're going to raise your -- your

3    punishment to a higher level, a higher amount of

4    days loss of leave and higher letter because you did

5    not accept their first one at ADP.

6         And you're going to make them do work.

7    And now you're going to have to have interviews

8    conducted and more investigation done. And the City

9    lawyers are going to have to deal with it then.

10    Q.    Okay. So, the City Solicitor's Office or

11    the Baltimore Police Department's legal team doesn't

12    get involved at that stage, to your knowledge?

13    A.    To my knowledge, not -- not until the

14    actual paperwork gets passed to committee.

15    Q.    Okay. And when you say committee,

16    because we've said committee a couple times, what is

17    your understanding of what this committee is?

18    A.    Consist of members of the Baltimore

19    Police Department. And I believe it's members from

20    the City lawyers office is involved as well. It's a

21    team that sits there.

22         What I'm picturing is a team that's

Page 392

1    supposed to be sitting there deciding whether or not

2    that officer deserves -- how much punishment that

3    officer deserves. And if whether or not that

4    officer needs to go -- needs to be punished for that

5    action.

6    Q.    Whatever the allegation is?

7    A.    The allegation is, yes.

8    Q.    Okay.

9    A.    And they use the IID evidence, I'm

10    guessing.

11    Q.    What is your understanding of how they

12    determine an appropriate punishment once they meet

13    as a committee?

14    A.    That they use the matrix. Is the same of

15    the Baltimore Police Department's policy.

16    Q.    Is the matrix supposed to consist of

17    facts sustained to your knowledge?

18    A.    Facts sustained?

19    Q.    Like sustained allegations, allegations

20    where there -- there -- were agreed to, either

21    submitted to, or is it unsubstantiated allegations

22    included in any punishment decision?

Page 393

1    A.    Yes. There's unsustained -- like un --

2    there's -- there's charges that you haven't been

3    actually been found guilty of that they recommend

4    punishment on, yes.

5    Q.    And that's in the matrix information

6    pursuant to Baltimore City Police Department?

7    A.    No.

8    Q.    No?

9    A.    Like -- I don't know if I'm understanding

10    the question like basically.

11    Q.    Okay.

12    A.    I don't understand what --

13    Q.    So, let me try to rephrase the question.

14    So, when it goes to the charging committee, how --

15    what does the charging committee look at in order to

16    determine what their punishment offer is when they

17    levy the charges against the officer?

18    A.    They look like -- they look at prior

19    history.

20    Q.    Okay. What does that prior history

21    consist of? What is your understanding of what that

22    prior history consists of?

Plaintiff Exhibit 37

Page 394

1  A.  Your record on blue teams and punishments
2  received in the past.
3  Q.  Okay. So, let me ask you a question.
4  If -- are you eligible to expunge items from your
5  record?
6  A.  Yes.
7  Q.  Okay. If you don't know about things
8  that are on your disciplinary record, can you
9  expunge them? It's not a trick question.
10  A.  No.
11  Q.  All right. So, in 2014 when you received
12  your first set of charges from the Baltimore City
13  Police Department, did you -- were you aware of
14  anything on your Internal Affairs record?
15  A.  I was not aware of anything on my record
16  that -- no, I was not aware of anything on my
17  record.
18  Q.  Okay. Did you ever review your
19  disciplinary record prior to that January 4th, 2014
20  ECU incident?
21  A.  No.
22  Q.  Was the Baltimore City Police Department

Page 395

1  in January 2014 conducting an internal EEOC
2  investigation into your time at the Southeast
3  District?
4  A.  Yes.
5  Q.  And at that point, did you believe they
6  were taking your allegations seriously?
7  A.  No.
8  Q.  Okay. Do -- do you now know that they
9  were actually conducting interviews, or did you at
10  the time know that -- strike that.
11        Did you at the time know that they were
12  conducting interviews?
13  A.  I knew of one interview.
14  Q.  Okay.
15  A.  Sgt. Cornejo.
16  Q.  Do you now know that they conducted a
17  series of interviews?
18  A.  Yes.
19  Q.  So, in January 2014, who would have been
20  the supervisor of the EEOC unit, the -- who would
21  have been the highest ranking officer involved in
22  the Baltimore City Police Department?

Page 396

1  A.  Down at E -- EEOC?
2  Q.  Uh-huh. The highest ranking Baltimore
3  City Police officer, brass.
4  A.  Lt. Michael Norris.
5  Q.  Would it have been -- would it -- would
6  that -- would Lt. Norris have reported to Rodriguez,
7  then --
8  A.  Yes.
9  Q.  -- then Deputy Commissioner Rodriguez?
10  A.  Yes.
11  Q.  Okay. Would Internal Affairs to your
12  knowledge in 2014 also report to Commissioner
13  Rodriguez?
14  A.  Yes.
15  Q.  Okay. When -- do you recall when you got
16  charged with the ECU incident?
17  A.  Best of my recollection, when I was in
18  Northeast District acting as a OIC acting sergeant.
19  Sometime in -- I believe between January, February
20  and March of 2014. No, no, no. It was before that,
21  I believe.
22  Q.  Well, it couldn't have been before

Page 397

1  January 9th; right? Because that's when the
2  incident occurred?
3  A.  Right. Right.
4  Q.  Okay. So, it's after January?
5  A.  Yes. After January 9th.
6  Q.  Do you think it's before April 2014 when
7  you were invited to met with Laura Giantris, the
8  head of Baltimore City Policy Department EEOC?
9  A.  Yes, sir.
10  Q.  All right. And when I say EEOC, I am
11  referring to the internal Baltimore City Police
12  Department EEOC. Now, you testified a few minutes
13  ago that your attorney told you that Jerry
14  Rodriguez, the then Deputy Commissioner of the
15  Police Department wanted you fired?
16  A.  Yes, that's correct.
17  Q.  Do you recall reviewing an e-mail from
18  Laura Giantris and Jerry Rodriguez also in the
19  timeframe of early Winter or Spring 2014 wanting to
20  strategize about your EEOC case?
21  A.  Yes, sir.
22  Q.  Okay. So, do you recall anything about

Page 398

1 the contents of that e-mail, like who said what to
2 whom?
3      A.   I do recall, the best of my recollection,
4 that the Commissioner -- after I e-mailed the
5 Commissioner what took place and what was going on
6 in the Southeast District, that he contacted Laura
7 Giantris and Rod -- Jerry Rodriguez and Rodney Hill
8 to inform them that they need to take care of this
9 matter.
10          And I observed on the e-mail that Jerry
11 Rodriguez told Laura Giantris to meet her in his
12 office and come up with a strategy.
13     Q.   Could the strategy have included firing
14 you because of the January 2014 incident?
15     A.   Yes.
16     Q.   All right. I'm going to take you way
17 back, okay, to -- sorry, bear with me. You had
18 mentioned that the officer who spoke with you on the
19 district parking lot was an Officer Michael
20 Kamberger?
21     A.   Yes, sir.
22     Q.   Has his name come up to your knowledge

Page 399

1 anywhere else in this case?
2      A.   Can you rephrase the question?
3      Q.   Is Officer Kamberger friends with
4 Sgt. Brokus?
5      A.   Yes, they're best friends.
6      Q.   On Exhibit No. 8, which is the
7 photographs of the -- the bathroom stalls, who took
8 those photographs?
9      A.   Best recollection at this time, I did.
10     Q.   Okay. And what was Southeast District
11 Internal Affairs' solution to resolving your
12 concerns about the graffiti?
13     A.   Scratch them out with a marker.
14     Q.   Okay. They never painted it over?
15     A.   No, sir.
16     Q.   Is it still there today, if you know?
17     A.   I haven't been there since I left in
18 2013.
19     Q.   Was it there when you left in 2013, if
20 you know?
21     A.   Yes. When I left, it was still scratched
22 out.

Page 400

1      Q.   Exhibit No. 9, can you take a look at
2 that for me?
3      A.   Yes. I'm sorry, No. 9 you said? I got
4 it. I got it right here.
5      Q.   When did you write Exhibit No. 9?
6      A.   I wrote it approximately around 11:00,
7 midnight of October 2nd going into October 3rd.
8      Q.   It says on there, also the reason I
9 didn't write this 95 immediately was because I
10 feared that I would be retaliated against. What
11 made you write that?
12     A.   Based on the history of the police
13 department of retaliation on officers filing
14 complaints, especially one with Joe Crystal. I
15 feared that I could be possibly like him.
16     Q.   Did you know Joe Crystal?
17     A.   Yes, I knew Joe Crystal.
18     Q.   Have you talked to Joe Crystal? Were you
19 friends with him?
20     A.   We were pretty decent acquaintances, yes.
21     Q.   What happened to Joe Crystal --
22     A.   He was ultimately --

Page 401

1      Q.   -- if you know?
2      A.   He was ultimately retaliated against for
3 filing a complaint on a officer that conducted
4 inappropriate behavior on a arrestee, and he
5 reported it. And they retaliated against him by
6 throwing a rat on his car.
7          And other conduct, like showing -- not
8 showing up for backup on calls. That later
9 consequently he either resigned or left the
10 department because of the nature of his
11 circumstances.
12     Q.   Officer Toddman, what happened to her?
13     A.   Sad situation. She shot and killed
14 herself.
15     Q.   With her service weapon?
16     A.   That's correct.
17     Q.   Were you friends with her as well?
18     A.   Yes.
19     Q.   Do you have any idea why?
20     A.   She was forced back to come -- forced to
21 come back to work as -- as an officer. She was
22 going through a lot in her life. And told the

Page 402

1 department that she wasn't ready, but they forced
2 her back.
3    Q.  What do you mean?
4    A.  Told her if she didn't come back to work,
5 that they were going to retire her out and that she
6 needed to come back to full duty. And subsequently
7 committed suicide with her service weapon.
8    Q.  I'm going to direct your -- oh,
9 Exhibit 13. Exhibit 13. I'll show you my copy just
10 we can --
11   A.  Sorry.
12   Q.  Okay. When did you see this document?
13   A.  I didn't see this -- this document. I
14 did not see this document until discovery was given
15 to my attorney, you, in discovery. And you sent it
16 to -- like I looked through documents and that's the
17 only time --
18   Q.  So, no one ever told you that the case --
19 that your complaint was closed out by, I'll say EEOC
20 internal through the Baltimore City Police
21 Department?
22   A.  Never. They were never -- they never

Page 403

1 told me.
2    Q.  Okay. Is there any mention on there of a
3 complaint about Sgt. Brickus? On Exhibit 13.
4    A.  No, sir. None whatsoever.
5    Q.  Did you mention Sgt. Brickus when you
6 went to EEOC internal or EODS?
7    A.  Yes, I did.
8    Q.  Okay. Do you have -- was there
9 communication from Baltimore City internal EEOC to
10 the Southeast District per this report?
11   A.  Yes. It says that the investigation by
12 Sgt. Williams was marked over to prevent further
13 unpleasant incidents. And then it says, back--
14 based on lack of evidence and witness testimony, the
15 investigator was unable to acquire information and
16 could establish responsible -- who was the person
17 responsible for this violation.
18   Q.  Okay. Did they talk -- to your
19 knowledge, did they talk to Sgt. Kenneth Williams
20 about this?
21   A.  I'm not sure if Sgt. Kenneth Williams was
22 notified. I -- I can't -- I can't speak to his

Page 404

1 knowledge. I --
2    Q.  Well, how else would they know that the
3 photograph was marked over?
4        MR. GLYNN: Objection to form.
5    A.  Oh, because Ser -- they claim that
6 Sgt. -- Sgt. Williams conducted an investigation
7 like we spoke about earlier in testimony.
8    Q.  Did you tell Sgt. Brickus that you had
9 also complained about her to Baltimore City internal
10 EEOC and/or EODS, whatever you want to call it?
11   A.  Yes. The day that I came back from the
12 EED -- the Internal Affairs at Baltimore City and I
13 went --
14   Q.  Well, let's not -- let's -- let's make
15 sure we're -- are you speaking about Internal
16 Affairs or are you speaking about EEOC?
17   A.  I'm sorry, E -- EDOS (sic) as he
18 mentioned earlier. E -- slash EEOC Baltimore City.
19   Q.  Okay.
20   A.  When I went back to her -- the report to
21 her to show her that I was back in clothes, and we
22 had a discussion and she wanted to know the reason

Page 405

1 why I filed a complaint. And why it offended me.
2        And she claimed that -- that she was
3 joking around. I informed her that I filed a
4 complaint on her as well, and she became upset and
5 said she was just -- like she said, she was just
6 joking around.
7    Q.  I'm going to direct your attention to
8 January 2013. Were you -- there's a lot of
9 discussion as to what occurred and the sequence of
10 events. When you -- you had -- I believe you -- in
11 your statement in your previous testimony, you
12 testified that you had almost bumped into
13 Sgt. Drennon. When you almost bumped into
14 Sgt. Drennon, where were you going?
15   A.  I was moving my -- I was going to go move
16 my car.
17   Q.  Why is the -- what time did you get
18 suspended on January 17th, 2013?
19   A.  2300 hours at the end of my shift.
20   Q.  Can you speak in English for us and not
21 police talk?
22   A.  Oh, I'm sorry. At 11:00 p.m., at the end

Page 406

1 of tour of my duty.
2    Q.  When did your shift start that day?
3    A.  At 2:39 p.m.
4    Q.  Okay.  Why is it significant that you
5 were suspended at that time?
6    A.  So, at approximately 2020 hours, I had
7 gone to the district to go hand my 95 out from the
8 processing room.  Sgt. Brickus was in there, and she
9 observed me and said, hey, let me talk to you.  I
10 said, ma'am, I don't want to talk to you about
11 anything.
12       She says, I just want to talk to you
13 about what happened earlier.  I don't have a problem
14 with you.  I said, ma'am, I do not want to speak to
15 you.  I'm going back down to EEOC on you.  Please
16 leave me alone.
17    Q.  Is it only after that that you got
18 suspended?
19    A.  Yes.  That's when I had walked out and --
20 and I -- I walked out of the district.  And at which
21 time I got in my patrol vehicle.  And I remember
22 Sgt. Brickus getting on the phone outside.  And that

Page 407

1 was the end of it.
2    Q.  Who would -- well, now, have you come to
3 know who she was on the phone with?
4    A.  I believe so.
5    Q.  Who was she on the phone with?
6    A.  With Captain Burrus.
7    Q.  Look, you had an opportunity to sit
8 through a number of these depositions.  Did you sit
9 in Captain Burrus -- or now Major Burrus'
10 deposition?
11    A.  Yes.
12    Q.  Did she say that she received a phone
13 call from Sgt. Brickus at approximately 11:00 p m.
14 or at some time that evening?
15    A.  She said evening.
16    Q.  Okay.  Who was Sgt. Brickus' commanding
17 officer that night?
18    A.  Lt. Windel.
19    Q.  Who, based upon your interpretation of
20 Baltimore City Police Department general orders,
21 should Sgt. Brickus have directed her complaints to?
22    A.  Lt. Windel.

Page 408

1    Q.  I'm going to direct your attention to
2 Exhibit No. 17, Page 2.
3    A.  Yes.
4    Q.  Who authored that report?
5    A.  Lt. John Windel.
6    Q.  What exactly does that first line say?
7    A.  Pursuant to directions from Captain
8 Burrus, I suspended Officer Angelini from duty for
9 insubordinate behavior.
10    Q.  All right.  While we're talking about
11 parking, now is a good time to show you some
12 parking.  I don't have a stapler.  It's probably
13 easier just to do one exhibit so we don't have 10
14 more pictures.
15       THE REPORTER:  56.
16       (Whereupon Angelini Deposition Exhibit 56
17 was marked.)
18       MR. NACHTMAN:  56.  I'm going to show you
19 a packet of photographs.  Let me count them.
20 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11.  It's 11
21 photographs.
22       Looking at Photograph No. 1 -- oh, first

Page 409

1 of all, can you take a look through all the
2 photographs?
3    A.  (Complies.)  Yes.
4    Q.  Are those photographs fair and accurate
5 depictions of what is contained in them?
6    A.  Yes.
7    Q.  Did you take those photographs yourself?
8    A.  Yes, I did.
9    Q.  All right.  So, let's take a look at that
10 first one.  What -- what are we looking at here at
11 the first photograph on the top of Exhibit No. 56?
12    A.  These are the -- the signs that were
13 removed.  The neighborhood services spots that were
14 removed after my incident.
15    Q.  Okay.  So, when did you take this
16 photograph?
17    A.  2/21/'13.
18    Q.  Okay.
19    A.  At 5:31 hours.
20    Q.  When you say hours, what does that
21 mean, a.m. or p.m.?
22    A.  That would be -- that would be a.m.

Page 410

1 Approximately. I would just use approximately 5:31
2 hours.
3     Q.    All right. And let's take a look at the
4 second photograph, please. What are we looking at
5 here?
6     A.    This is a spot labeled as NSU sign that
7 was put up by Sgt. Brickus -- I mean Sgt. Drennon.
8 And her vehicle parked in that spot, her personal
9 vehicle parked in that spot.
10    Q.    Let me ask you: So, these spots that
11 have particular signs, were they for personal
12 vehicles or for something else?
13    A.    They were for patrol vehicles,
14 specifically for sergeants. For instance, NSU
15 sergeant has a NSU sergeant vehicle that be -- that
16 parks there. And just to let you know, I see
17 another vehicle that's parked to the right, the red
18 one who her -- she's not admin sergeant.
19    Q.    Who is she?
20    A.    She's a -- not a police officer. She is
21 a hired personnel as a secretary who decided to park
22 in a admin spot, admin sergeant spot.

Page 411

1     Q.    Okay. So, do you know that person's
2 name? Or how do you know whose vehicle that is?
3     A.    I see the individual driving the car
4 every day at the district and see when they park and
5 get out. And I notice who the car belongs to.
6     Q.    Okay. Is that why you took this
7 photograph?
8     A.    Yes.
9     Q.    All right. Do you know if any
10 disciplinary action was taken against the civilian
11 owner of this red car that's parked in a labeled
12 spot?
13    A.    There was no discipline actions taken.
14    Q.    Okay. Who is parked -- whose vehicle
15 again is parked in the NSU spot?
16    A.    Sgt. Drennon's veh -- personal vehicle.
17    Q.    How do you know that that's
18 Sgt. Drennon's personal vehicle?
19    A.    I would see her drive the vehicle.
20    Q.    Okay. Let's take a look at this other
21 photograph, please. What are -- what are we looking
22 at here?

Page 412

1     A.    A picture of Officer Davis' -- I believe
2 it was Officer Davis' vehicle double parked at the
3 station lot on January 30th, 2013.
4     Q.    To your knowledge, was Officer Davis
5 disciplined as a result of his parking job?
6     A.    No, he wasn't.
7     Q.    Was there -- this was in direct violation
8 of a memorandum that we had reviewed, and I don't --
9 I apologize, I don't know the exhibit number -- I
10 don't know the exhibit number. Oh, Exhibit No. 15.
11           Did people regularly violate the parking
12 orders from Southeast District direct command staff?
13    A.    Yes, sir, all the time. If you notice,
14 there's two vehicles in the middle that are double
15 parked, and as well as the NSU van that's double
16 parked to the left in -- blocking any vehicles from
17 passage to get through here.
18           And back to my recollection, I believe
19 that's Officer Davis. I didn't run the tag. Just
20 my recollection of seeing Officer Davis drive a
21 similar van to that. That's why I believe it was
22 Officer Davis'.

Page 413

1     Q.    Okay. Let's take a look at the next
2 photo, please. What are we looking at here?
3     A.    Officer Tom -- Thomas Uskey's truck
4 parked in the -- I believe that spot was the
5 operations lieutenant spot.
6     Q.    And was he supposed to park in that spot?
7     A.    No, he was not.
8     Q.    When -- when was that photograph taken?
9     A.    It was taken 1/30/2013 at 1645 hours.
10    Q.    To your knowledge, was Officer Thomas
11 Uskey disciplined as a result of this?
12    A.    No, sir. And let me correct myself on
13 that. That was a chief clerk spot.
14    Q.    What's a chief clerk?
15    A.    That would have been Officer Yvette's
16 spot that works -- she's a chief clerk of -- does
17 payroll. They gave her -- gave her a spot.
18    Q.    Okay. Take a look at the next photo,
19 please. What are we looking at here?
20    A.    Officer April Jones from midnight shift,
21 permanent midnight shift's vehicle parked on 2 --
22 February 18th, 2013 at 6:57 a.m. Parked in a

Plaintiff Exhibit 37

Page 414

1 lieutenant administrative spot with her personal
2 vehicle.
3    Q.   Was a personal vehicle supposed to be in
4 this spot?
5    A.   No, sir. No, sir.
6    Q.   Okay. Do you -- to your knowledge, was
7 April Jones disciplined as a result of her parking
8 in this spot?
9    A.   No, she was not.
10    Q.   Okay. What are we looking at in the next
11 photograph?
12    A.   This is Sgt. Ettice Brickus' vehicle
13 parked in the Sector 3 supervisor's spot, her
14 personal vehicle.
15    Q.   How do you know that this is her personal
16 vehicle?
17    A.   I seen her drive it to work and get out
18 of it.
19    Q.   Is she parked in one spot or two?
20    A.   She's taking up two spots in the Sector 3
21 spot preventing anyone -- for causing a parking spot
22 issue going on to the -- the left of her.

Page 415

1    Q.   Okay. To your knowledge, was she the
2 Sector 3 supervisor that day?
3    A.   I can't recall if she was the Sector 3
4 supervisor, but that's her personal vehicle. That
5 should be for the patrol vehicle.
6    Q.   Okay.
7    A.   And just for the record, I took that
8 picture on 2/22/'13 at 0705 hours, which is
9 7:05 a.m. Excuse me. 2/20 -- yeah, that's the
10 first picture. I took numerous pictures. So,
11 that's why I'm not exactly sure.
12    Q.   I'll direct your attention to the next
13 photograph.
14    A.   Uh-huh.
15    Q.   What are we looking at here?
16    A.   Sgt. Ettice Brickus parked in -- personal
17 vehicle parked in administrative lieutenant's spot
18 with her personal vehicle on 2/22/2013 at around
19 7:00 a.m., 7:05 a.m.
20    Q.   How far before shift change was that if
21 it was at 7:05 a.m.?
22    A.   That was after shift change.

Page 416

1    Q.   Okay. So, should she have moved her
2 vehicle by that point if she was only parking there
3 for shift change?
4    A.   Yes.
5    Q.   Is that a spot that's designated for a
6 patrol vehicle?
7    A.   That's definitely a spot for patrol
8 vehicles.
9    Q.   Was she a lieutenant at that time, if you
10 know?
11    A.   She was definitely not administrative
12 lieutenant, no.
13    Q.   All right. Direct your attention to the
14 next photograph, please.
15    A.   Yes, sir.
16    Q.   What are we looking at here?
17    A.   We're looking at Sgt. Drennon's personal
18 vehicle parked in the admin -- reserved admin
19 sergeant spot.
20    Q.   What does that mean, the reserved admin
21 sergeant's spot? I don't understand what that
22 means. Explain it to me.

Page 417

1    A.   So, the admin sergeant has a reserved
2 spot for himself as far as the patrol vehicle. And
3 she's not an admin sergeant whatsoever. She was
4 either a NSU sergeant or patrol off -- patrol
5 officer. And that spot is for the admin sergeant of
6 the district patrol vehicle to be parked.
7 Specifically for admin sergeant.
8    Q.   Okay. The next --
9    A.   For the record, that was taken on
10 3/1/'13.
11    Q.   Thank you. At what time?
12    A.   1124 hours.
13    Q.   Was that during a shift change?
14    A.   No. That was not during shift change.
15    Q.   So, to your knowledge, was Sgt. Drennon
16 ever disciplined for parking in that spot?
17    A.   No.
18    Q.   Okay. What are we looking at with this
19 next photograph?
20    A.   Sgt. Ettice Brickus' personal vehicle
21 parked in the Sector 3 supervisor spot. That
22 picture was taken 4/21/'13 at 0927 hours, which was

Page 418

1  at 8:27 a.m. She again is parked in the reserved
2  spot for the supervisor of Sector 3's patrol
3  vehicle.
4  **Q.  Okay.**
5  A.  So, for instance, if the other shift was
6  coming in with the patrol vehicle, the sergeant, he
7  would have no -- have no where to park at, sir,
8  because the spot is taken.
9  **Q.  Okay. What's the next photograph?**
10  A.  Next photograph is the homosexual --
11  homophobic sexual comment made about me on the
12  bathroom stall that I took.
13  **Q.  And what is the next photograph?**
14  A.  This appears to be the water rescue under
15  the bridge.
16  **Q.  That's when your equipment was damaged?**
17  A.  The best of my recollection, yes.
18  **Q.  Okay. Did you take that photo yourself?**
19  A.  Yes, sir.
20  **Q.  Why did you take that photo?**
21  A.  To -- to show that -- prove that there
22  was a big water -- because no one else came to back

Page 419

1  me up that night when that happened, and no one --
2  no one helped me out. And I wanted to --
3  **Q.  So --**
4  A.  I wanted to show people --
5  **Q.  What was --**
6  A.  -- that my equipment -- my equipment was
7  messed up.
8  **Q.  What was the call that came out for that**
9  **water rescue?**
10  A.  There was a vehicle submerged in water
11  under the bridge.
12  **Q.  Okay. And what does that mean -- what --**
13  **what kind of priority does that call receive, if you**
14  **know?**
15  A.  Priority 1.
16  **Q.  It's a Priority 1 call. So, normally on**
17  **a Priority 1 call, how many officers respond?**
18  A.  Usually two officers are dispatched. One
19  as primary, second one as a backup.
20  **Q.  What is it -- did you answer the call**
21  **over the radio?**
22  A.  Yes, sir.

Page 420

1  **Q.  How does that work when you answer a**
2  **call?**
3  A.  Dispatch. 911 receives a call. 911
4  types it in. Dis -- sends it over to dispatch.
5  Dispatch then dispatches a primary officer to the
6  call.
7  **Q.  Was that your post that night?**
8  A.  Best of my recollection, yes.
9       THE REPORTER: Pardon?
10  A.  Best of my recollection, it most likely
11  was my post if it was given to me.
12  **Q.  So, on a Priority 1 call, does someone**
13  **normally come and back you up?**
14  A.  Yes.
15  **Q.  Did it often happen in the Spring of 2013**
16  **that you did not have backup on calls?**
17  A.  Yes.
18  **Q.  Why do you think that is?**
19  A.  Because of the -- the bad rep that I got
20  from everyone talking about me at the district. And
21  filing a complaint. Everyone wanted to stay away
22  from me. I was labeled as a bad job -- bad officer.

Page 421

1  **Q.  I'm going to show you one other thing.**
2  **Exhibit 17. I'll just show you my copy so we don't**
3  **have to dig through that whole pile. I'm going to**
4  **ask you to turn to the last three pages. The last**
5  **three pages. The last three physical pages.**
6  A.  Yeah. One -- right here.
7  **Q.  The last three pages.**
8  A.  Yes.
9  **Q.  Can you take a look at those for me?**
10  A.  (Complies.) Yes.
11  **Q.  What -- what is that?**
12  A.  This is --
13  **Q.  What are those three pages?**
14  A.  They're e-mails, confirmation e-mails
15  sent to Sgt. Kenneth Williams of the Southeast
16  command investigation.
17  **Q.  I'm sorry. Are they -- are they e-mails**
18  **or something else? It's 1997, remember. Are**
19  **those --**
20  A.  I'm sorry.
21  **Q.  -- fax cover sheets?**
22  A.  My apologies, my apologies. I was just

Page 422

1 looking -- they were fax con -- faxed confirmations
2 sent.
3    **Q. From whom and to whom?**
4    A.   To send it Sgt. Kenneth Williams of the
5 Southeast command investigations from Sgt. Cumbo.
6 The date says January 18th, 2013.
7       The next one says, fax destination, phone
8 number 410.396.2465. Message to Sgt. Cumbo, EEOC.
9 Message from Sgt. Kenneth Williams, Southeast,
10 slash, CIU. Number of pages, five. And then it has
11 BPD fax number 396.2172.
12    **Q. Do you know to whom that fax number**
13 **belongs?**
14    A.   From reading this and the way the sheet
15 is, that appears that this fax number, 410.396.2465
16 belongs to EEO -- EEOC.
17    **Q. Okay. What's that last page that's in**
18 **Exhibit 17?**
19    A.   This one says, fax destination phone
20 number, 410.396.2465. Message to Sgt. Cumbo, EEOC.
21 Message from Sgt. Williams Southeast, slash, CIU.
22 Number of pages, two. Then goes on to state date

Page 423

1 1/18/2013. Corrected suspension face sheet. Please
2 put this face sheet with packet.
3    **Q. Let me ask you a question: Are you --**
4 **were you told that any complaints that were made to**
5 **Baltimore City internal EEOC were confidential?**
6    A.   I was told in in-service every year
7 through EEOC itself, that any EEOC complaint is
8 confidential. I was told when I filed the
9 complaint, that it would be kept confidential.
10       I was told by Laura Giantris that it
11 would be kept confidential. I was told by numerous
12 detectives during this investigation that the E --
13 EEOC department, Baltimore City EEOC, that it would
14 be kept confidential.
15    **Q. What purpose would Sgt. Kenneth Williams**
16 **have to communicate at all with EEOC, if you know?**
17    A.   I have no good reason.
18    **Q. Okay.**
19    A.   No. I have no reason why. He's a CIU
20 detective.
21    **Q. What -- if you recall, what did Lt.**
22 **Norris say to you in Jan -- on the telephone in**

Page 424

1 **January of 2013?**
2    A.   I can repeat it again, like I stated it
3 to City's attorneys, that I was -- that he contacted
4 and spoke to Captain Burrus. That he read my blue
5 team of the incident of the parking spot. That I
6 was guilty. That I created -- I created this, and I
7 deserve what I got. And this is not an EEOC matter.
8 And hung -- hung up on me.
9    **Q. To your knowledge, is Lt. Norris an**
10 **attorney?**
11    A.   No, he's not. He's a lieutenant.
12    **Q. Okay. Has -- does -- to your knowledge,**
13 **does he -- to your knowledge, where did Lt. Norris**
14 **end up transferring after he was at EEOC internal**
15 **for Baltimore City?**
16    A.   He went to Internal Affairs Division
17 downtown.
18    **Q. I'm going to show you what's been marked**
19 **as Exhibit 25. Let me get this one back.**
20    A.   That's your copy.
21    **Q. Let's not goof this up anymore than it**
22 **already is.**

Page 425

1       **When you wrote that Form 95, did you**
2 **write that in a freely and voluntary fashion? Did**
3 **you feel coerced?**
4    A.   Yes.
5    **Q. There was some questions about your gun**
6 **belt accessory -- oh, let me -- let me pause you and**
7 **just take a little step back.**
8       **Between -- there was a question on**
9 **examination by the attorney for the Baltimore Police**
10 **Department in that did you have any encounters**
11 **between February and April 2013 with**
12 **Sgt. Brickus. Did you have a situation occur with a**
13 **flat tire on to your vehicle?**
14    A.   Yes. I got a flat tire while on duty.
15 And I called on the air to notify dispatch that I
16 have a tire. If anyone had a extra tire. The one
17 back in my back was flat and my spare tire was flat.
18       And Sgt. Brickus got on the air and said
19 that I deserved getting a flat tire. I deserved it.
20    **Q. Is that a violation of Baltimore City**
21 **general orders?**
22    A.   Yes. Undermining any -- any officer for

Page 426

1 making comments to the effect.

2  Q.  **Wasn't it also true that you're supposed**
3 **to keep personal chatter off the police recorded**
4 **radio?**

5  A.  That's correct.

6  Q.  **So, there were questions about your gun**
7 **belt and other equipment malfunctioning.  How long**
8 **did it take you to get your equipment replaced?**

9  A.  Approximately between six months to a
10 year.

11  Q.  **So, how did you do that?**

12  A.  When I was at Northeast District, I would
13 advise my sergeant that I needed new equipment, and
14 he would -- I would tell him why and he would allow
15 me to go to the quartermaster with administrative
16 paperwork stating that I need that -- that new
17 equipment.

18  Q.  **There were some questions about a**
19 **conversation that former Baltimore Police Officer**
20 **McQuade had with -- over breakfast with**
21 **Sgt. Brickus.  How would -- what was that comment --**
22 **what was that commentary?**

Page 427

1  A.  So, Michael --

2  Q.  **If you know.**

3  A.  Michael McQuade approached me sometime on
4 that day that I wrote that administrative paperwork
5 and stated that Sgt. Ferguson took him to breakfast
6 along with Sgt. Brickus and Officer Richberg.
7 Sometime during their breakfast, my name was brought
8 up by Officer Richberg and Sgt. Brickus.

9      At some point during that conversation,
10 Sgt. Brickus stated that she wanted me to make a
11 false statement so she could fire me, had reason to
12 fire me.  That I was making up accusations against
13 everyone in the police department at Southeast
14 District.

15      So, Michael McQuade felt that it was
16 inappropriate what she was saying.  And he was
17 leaving the department that day.  And he told me to
18 please do not write -- do not hand in anything until
19 he left that day because he feared retaliation.

20      That since it was his last day handed in
21 as when I leave.  And the time I handed it in when
22 he left that day, he was done with the police

Page 428

1 department.  And then at a later time, he got a
2 voicemail by Sgt. Brickus.

3  Q.  **How would Sgt. Brickus have found out**
4 **about this particular report that you wrote on**
5 **April 21st, 2013?**

6  A.  Like my other 95s, I handed them through
7 the chain of command.  And I believe that's when
8 Captain Burrus called me up because she got a hold
9 of it.

10  Q.  **How long have you been a police officer?**

11  A.  In my 13th year.

12  Q.  **Can you describe the environment in a**
13 **police station?**

14  A.  Can you be more specific like --

15  Q.  **What -- what -- what is -- how is the --**
16 **how hard -- how difficult, if at all, is it to keep**
17 **a private matter private in a police station?**

18  A.  Pretty hard.

19  Q.  **What -- strike that.**

20      **Since you were diagnosed with dehydration**
21 **back in June of 2013, what type of health issues**
22 **have you had?**

Page 429

1  A.  I've had -- I sustain high blood
2 pressure.  My blood pressure was perfectly fine
3 before that.  Sustained weight, a lot of weight
4 gain.  Numerous amounts of kidney stone surgeries.
5 Lack of energy.  Desire not to work out anymore.
6 Can't fit in my clothes anymore.  I have no desire
7 to do anything.

8  Q.  **Were you aware that kidney issues can**
9 **result from prolonged heat exposure?**

10  A.  I was not aware --

11      MR. GLYNN: Objection.  Form.  You can
12 answer.

13  A.  Oh, I was not -- I wasn't aware
14 specifically of that, no.

15  Q.  **I'm going to direct your attention to**
16 **July 28th, 2013.**

17  A.  Uh-huh.

18  Q.  **And specifically I just want to ask you a**
19 **couple questions about the report, the -- the in --**
20 **police information that was some subject to**
21 **questioning earlier.  Did you ultimately turn that**
22 **report in?**

Page 430

1  A.  Yes.
2  Q.  Who did -- to whom did you turn that
3 report in?
4  A.  Sgt. Jackson.
5  Q.  Did Sgt. Jackson ever submit that report
6 to your knowledge?
7  A.  Not to my knowledge because --
8  Q.  Why do you know that?
9  A.  I know that because I received a stinger
10 in the Northeast District saying that I never turned
11 that report in.
12  Q.  What is a stinger?
13  A.  A stinger is generated from RMS downtown
14 that is delivered to the district stating that the
15 officer never completed a report and needs to be
16 taken care of.
17  Q.  So, what did you do once you received
18 that stinger one year later?
19  A.  I made a photocopy of it and informed my
20 sergeant that I'm getting a stinger from the
21 Southeast, and I don't know why.
22  Q.  Do you think that was purposeful on

Page 431

1 Sgt. Jackson's part?
2  A.  Yes.
3  Q.  Why?
4  A.  Because I didn't -- because I -- because
5 of everything of what happened that evening, he
6 purposely didn't hand it in. And I would have the
7 consequences of -- now when I left that district to
8 be responsible for that report.
9  Q.  When officers get detailed within the
10 Baltimore City Police Department to different
11 places, 4th of July, special training, you know, you
12 name it, what is the notification process to
13 supervisors?
14  A.  Usually a detail order is sent through
15 chain of command and sent to sergeants advising them
16 that their officers will be detailed that day or the
17 fol -- upcoming days.
18  Q.  And how far in advance do they get
19 notice?
20  A.  If I had to estimate, usually they give
21 the sergeant a good -- at least two, three weeks
22 notice.

Page 432

1  Q.  Okay. Did you -- you were looking on
2 July 28th, 2013 for some information regarding a
3 detail to SWAT tryouts; is that right?
4  A.  Yes, sir.
5  Q.  Did you ever obtain information about
6 whether or not you were detailed to SWAT tryouts?
7  A.  Later on during discovery, I found out
8 that I was detailed to SWAT after the fact.
9  Q.  When were you detailed to SWAT?
10  A.  The 29th.
11  Q.  The very next day?
12  A.  Yes.
13  Q.  So, let me ask you: Would -- should
14 Sgt. Jackson, Derwin Jackson or the OIC Sgt. Brokus
15 have been given your detail orders?
16  A.  Yes.
17  Q.  Why do you think you weren't notified?
18  A.  Part of retaliation. So, I would miss
19 the date because of me filing a complaint, the EEOC
20 complaint.
21  Q.  Well, let me ask you about that. Why do
22 you think that -- I mean, Sgt. Brokus and

Page 433

1 Sgt. Jackson aren't on the same shift as Sgt.
2 Brickus; right?
3  A.  No.
4  Q.  Why do you think that they're involved in
5 the retaliation?
6  A.  Sgt. Brickus and Sgt. Jackson are
7 friends. They spoke about me. And they warned
8 everybody on the other shift and talked bad about
9 me. Started a bad reputation about me and told them
10 that I was a troublemaker and everything else. To
11 keep an eye on me. And -- and I believe Sgt. Brokus
12 then started a private folder on me.
13  Q.  How do you know that?
14  A.  Sgt. Brokus purposely stated to me during
15 the incident of July 28th that he kept a personal
16 case folder on me.
17  Q.  And how do you know that rumors -- I'll
18 just direct your attention to Exhibit 46. It's a
19 Facebook message.
20  A.  I'm sorry, what was your question?
21  Q.  There's no question right now. I was
22 directing your attention to Exhibit 46. What --

Page 434

1  what does Exhibit -- what does that mean to you?
2  What -- what does that message mean to you?
3     A.  It means that rumors spread fast within
4  the department about what takes place, and there's
5  no confidentiality whatsoever, even within
6  sergeants.
7     Q.  I'm going to show you what's been marked
8  Exhibit 47.  That is your approved transfer order
9  moving you out of the Southeast District; is that
10 right?
11    A.  Yes.
12    Q.  There is a disapproved signature on
13 there?
14    A.  Yes.
15    Q.  Is that disapproved by Osborn Robinson,
16 Captain Osborn Robinson?
17    A.  It appears to be his signature, yeah.
18    Q.  Does that mean anything to you?
19    A.  It means a lot to me.
20    Q.  What does that mean?
21    A.  That Osborn Robinson was part of my
22 retaliation because -- then to Sgt. -- Osborn

Page 435

1  Robinson and Captain Burrus had a relationship.
2     Q.  How do you know that?
3     A.  It's public information through the news.
4  And it was discussed throughout the department that
5  Sgt. -- excuse me. Lieutenant Burrus, the husband,
6  found Osborn Robinson in bed with his wife.
7         And then later on, there was a criminal
8  matter and a civil matter and domestic matters
9  amongst the news.
10    Q.  So, you've seen it in Baltimore Sun
11 articles that Osborn Robinson had an extramarital
12 affair with Captain Burrus?
13    A.  Correct.
14    Q.  Did you look at the timeframe of when
15 their affair was ongoing?
16    A.  It would be around the time that I was
17 trying to get approved for this and all the
18 retaliation was going on.
19    Q.  So -- and he disapproved your transfer
20 order, at least that's what it looks like based upon
21 the signature?
22    A.  Correct. From -- based upon his

Page 436

1  signature, it looks like it.
2     Q.  Okay.  Why -- there was some reference to
3  an e-mail from, and he's Lieutenant Colonel Worley
4  now, through the chain of command that you had
5  reviewed in discovery, and I believe you quoted
6  directly from it.
7         Why is that significant to you?
8     A.  As I said earlier, I worked hard for my
9  reputation, and the facts -- the statement what he
10 said wasn't true, that I was kicked out of Northeast
11 District.  And he spread rumors again on that e-mail
12 up to the highest commands of the police department.
13    Q.  Rumors of what?
14    A.  That I was kicked out of Southeast, sent
15 to him for discipline.  And that I was a --
16    Q.  How -- how -- go ahead, I'm sorry.
17    A.  I'm sorry.  That I was a trouble -- that
18 I was an embarrassment to the police department and
19 a -- I forgot the first part of the -- of the e-mail
20 that he was accusing me to be right now.  It's been
21 a long day.
22    Q.  How would he have known that you got --

Page 437

1  did you tell him you got kicked out of the
2  Southeast?
3     A.  No. I never told him that I got kicked
4  out.  I actually told him that I got -- I
5  transferred to -- to him when I first met him.
6     Q.  So, who would have told him that?
7     A.  It would had to be someone from the
8  Southeast.
9     Q.  So, did you get kicked out on the first
10 Form 70 that you submitted to request a transfer?
11    A.  No.
12    Q.  Did you get kicked out on the second Form
13 70 that you submitted for a transfer?
14    A.  No.
15    Q.  So, it wasn't until like the ninth
16 request for a transfer that you got proverbially
17 kicked out?
18    A.  It was until I changed the wording they
19 wanted me to put on there.
20    Q.  Yeah.  The wording on your first request,
21 does it have retaliation in there anywhere?  Let's
22 see.  That's exhibit -- I'll get it.  That's Exhibit

Page 438

1 No. 10. Does that have retaliation in there
2 anywhere?
3    A.   No, it does not.
4    Q.   Does that have hostile work environment
5 in there?
6    A.   No, sir.
7    Q.   Okay. I'm going to show you an approved
8 Form 70. That's Exhibit No. 21. Was that form
9 approved?
10   A.   Yes. It was approved by Sgt. Brickus,
11 shift supervisor, and approved by Major Worley, who
12 was the major of the district.
13   Q.   You're sure it was Major Worley?
14   A.   I'm sorry, I apologize. It's been a long
15 day. Major William Davis. Sorry for the mistake.
16   Q.   So, what does that one say?
17   A.   That one says on -- dated on 2/18/2013,
18 I'm in a hostile work environment and feared I would
19 be retaliated against again. This is the second
20 request for transfer, and it was approved.
21   Q.   So, that one does say hostile work
22 environment?

Page 439

1    A.   Yes.
2    Q.   Okay. I'm going to reference you to the
3 January 4th, 2014 ECU incident where you elected not
4 to take a trial board. At the time did you
5 understand -- did you have a full and knowing
6 understanding of what your disciplinary history was
7 as reflected by the records in Internal Affairs?
8    A.   No. But I remember my lawyer telling me
9 that they're basing this off of my prior history,
10 and I couldn't understand where he was coming up
11 with that. That I had never been in trouble before.
12 And said that I needed to take this four days or I
13 would be fired by Lieutenant Rodriguez -- I mean,
14 excuse me, Deputy Commissioner Rodriguez.
15   Q.   Who was involved in determining an
16 appropriate punishment level for you at that
17 January 9th, 2014 ECU incident, if you know?
18   A.   Can you just repeat the question one more
19 time?
20   Q.   Yeah. Who was involved in determining on
21 the -- on the police department side, who was
22 involved in determining the appropriate punishment

Page 440

1 level for you?
2    A.   The committee for -- for the Baltimore
3 Police Department. The trial committee, what you
4 call the committee. Excuse me for a second. I'm
5 having a --
6    Q.   Let me ask you question: Was there --
7 was BPD legal involved?
8    A.   Yes. They're involved in the committee
9 on basing punishments for officers.
10   Q.   Okay. With regard to this particular
11 issue, Mike Davies is your attorney -- was your
12 attorney?
13   A.   He's the attorney afforded to me by the
14 FOP. Not chosen.
15   Q.   Is he your attorney with your pending
16 Internal Affairs matters?
17   A.   Yes.
18   Q.   Okay. Do you believe that those pending
19 Internal Affairs matters are relevant to this case?
20   A.   Yes, they are.
21   Q.   Oh. Where did Sgt. Kenneth Williams
22 transfer after he was in the Southeast District?

Page 441

1    A.   Internal Affairs Division.
2    Q.   Where did Sgt. James Brokus transfer
3 after he was in Southeast District?
4    A.   Internal Affairs Division.
5         MR. NACHTMAN: All right. That's all
6 I've got.
7         FURTHER EXAMINATION
8 BY MR. GLYNN:
9    Q.   Officer Angelini, you were asked some
10 questions and gave some answers about the internal
11 processes of Internal Affairs and the charging
12 process and the discipline process generally. Do
13 you remember those questions?
14   A.   Yes.
15   Q.   Were your answers for those questions
16 based on things that other people told you?
17   A.   It's just from rules that I've read on my
18 own and the way I understand the rules and
19 regulations of the Baltimore Police Department. On
20 their broadness, on how ADP works and what happens
21 after ADP.
22   Q.   Are those procedures set out in general

Page 442

1 orders and other rules to your knowledge?

2    A.    They are mentioned in policies, how ADP

3 is supposed to work.

4    Q.    Policies.  The department has now

5 switched to policies?

6    A.    Yes, policies.

7    Q.    Are the rules that you're describing and

8 the procedures set out in what are now policies?

9    A.    They are.

10        MR. GLYNN:  I have no other questions.

11        MR. NACHTMAN:  Oh, we'll read and sign.

12 Sorry.

13        THE VIDEOGRAPHER:  We're going off the

14 record, the time is 7:09 p.m.

15        (Whereupon at 7:09 the deposition

16 concluded.)

17

18

19

20

21

22

Page 444

1              ACKNOWLEDGEMENT OF DEPONENT

2

3  I, OFFICER STEVEN U. ANGELINI, acknowledge that I

4  have read and examined the foregoing testimony, and

5  the same is a true, correct and complete

6  transcription of the testimony given by me, and any

7  corrections appear on the attached errata sheet

8  signed by me.

9

10  _____        _____

11

12     (Signature)                    (Date)

13

14

15

16

17

18

19

20

21

22

Page 443

1 STATE OF MARYLAND

2 COUNTY OF HOWARD SS:

3         I, Susan Farrell Smith, Notary Public of

4 the State of Maryland, do hereby certify that

5 OFFICER STEVEN U. ANGELINI personally appeared

6 before me at the time and place herein set out, and,

7 after having been duly sworn by me, was examined by

8 counsel.

9         I certify the examination was recorded

10 stenographically by me and that this transcript is a

11 true record of the proceedings.  I further certify

12 that I am not of counsel to any of the parties, nor

13 an employee of counsel, nor related to any of the

14 parties, nor in any way interested in the outcome of

15 this action.

16         As witness my hand and notarial seal this

17 26th day of September, 2018.

18

19 _____

20              Susan Farrell Smith

21              Notary Public

22 (My Commission expires February 8, 2020)

Page 445

1              E R R A T A   S H E E T

2 IN RE:  Angelini v. BPD

3 RETURN BY: _____

4 PAGE     LINE     CORRECTION AND REASON

5 _____    _____    _____

6 _____    _____    _____

7 _____    _____    _____

8 _____    _____    _____

9 _____    _____    _____

10 _____    _____    _____

11 _____    _____    _____

12 _____    _____    _____

13 _____    _____    _____

14 _____    _____    _____

15 _____    _____    _____

16 _____    _____    _____

17 _____    _____    _____

18 _____    _____    _____

19 _____    _____    _____

20 _____    _____    _____

21 _____    _____    _____

22 _____    _____    _____

```
                                                    Page 446
1                  E R R A T A   S H E E T
2  IN RE:  Angelini v. BPD
3  RETURN BY: _____
4  PAGE     LINE    CORRECTION AND REASON
5  _____    _____   _____
6  _____    _____   _____
7  _____    _____   _____
8  _____    _____   _____
9  _____    _____   _____
10 _____    _____   _____
11 _____    _____   _____
12 _____    _____   _____
13 _____    _____   _____
14 _____    _____   _____
15 _____    _____   _____
16 _____    _____   _____
17 _____    _____   _____
18 _____    _____   _____
19 _____    _____   _____
20 _____    _____   _____
21 _____    _____   _____
22 _____    _____   _____
```

Plaintiff Exhibit 37