IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN ANGELINI,
*Plaintiff*

    v.                                     Civil Action No. ELH-17-2354

BALTIMORE POLICE
DEPARTMENT,
*Defendant.*

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Steven Angelini, a police officer with the

Baltimore City Police Department ("BPD") since 2006, has sued his employer, claiming that he

has experienced a sustained campaign of harassment and retaliation that began after he reported a

homophobic incident in October 2012. ECF 1.[1]  The Second Amended Complaint (ECF 49),

which is the operative complaint, contains two counts: "Sexual Harassment, Sex Discrimination

and Retaliation," in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended,

42 U.S.C. § 2000e *et seq.* (Count One); and invasion of privacy (Count Two).  In the text of Count

One, plaintiff asserts:  "Plaintiff's sex and his complaints of sexual harassment and retaliation were

motivating factors in Defendants' decision to treat Plaintiff differently and subject him to a hostile

work environment."  ECF 49, ¶ 103.

Following discovery, the BPD moved for summary judgment, pursuant to Fed. R. Civ. P.

56.  ECF 66.  The motion is supported by a memorandum of law (ECF 66-1) (collectively, the

"Motion"), and thirty exhibits.  ECF 66-4 to ECF 66-35.[2]  Angelini has abandoned his claims for

---

[1] Plaintiff also sued Kevin Davis in his official capacity as Commissioner of the BPD.
Davis is no longer the Commissioner, however.  Plaintiff dismissed Davis from the suit in
November 2017.  ECF 8.

sex discrimination and invasion of privacy, but he opposes summary judgment as to his hostile work environment and retaliation claims. *See* ECF 77 (Opposition); ECF 77-1 (Memorandum) (collectively, the "Opposition").  Plaintiff has also submitted forty exhibits.  ECF 77-3 to ECF 77-40.  The BPD has replied.  ECF 81 ("Reply").

The Motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

## I.     Background[3]

### A.  Factual Contentions[4]

Plaintiff was born in Baltimore City and raised by his parents, Salvatrice and Nello Angelini. *See* ECF 77-39 (Angelini Deposition) at 4, Tr. 14, 16-17.  Today, Angelini resides in Baltimore County with his wife and teenage daughter. *Id.* at 4, Tr. 14-15.  He identifies as heterosexual. *Id.* at 16, Tr. 64.

In 2006, Angelini joined the BPD as a Police Officer Trainee. *See* ECF 78-2 (Redacted BPD Personnel Kardex).  Shortly after completing his training, plaintiff was assigned to the "Northwestern District." *Id.*  He served there from June 2007 until November 2008, when he was transferred to the "Violent Crimes Impact Division" ("VCID"), where he conducted covert counter-narcotics operations. *See id.*; ECF 77-39 at 7, Tr. 26-29.  Although plaintiff enjoyed

---

[2] Per the Court's Order of January 17, 2020 (ECF 80), exhibits ECF 66-26, ECF 66-27, ECF 66-29, ECF 66-30, and ECF 66-31 are sealed.

[3] As discussed, *infra*, in considering a motion for summary judgment, the court "view[s] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *see Pryor v. United Air Lines, Inc*., 791 F.3d 488, 495 (4th Cir. 2015); *News & Observer Publ'g Co. v. Raleigh–Durham Airport Auth*., 597 F.3d 570, 576 (4th Cir. 2010).

[4] The Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the submissions.

working at VCID, he began to feel "burnt out."  ECF 77-39 at 8, Tr. 32.  Plaintiff requested a transfer and was moved to the "Southeastern District" (the "SED") in February 2010.  *See* ECF 78-2; ECF 77-39 at 8, Tr. 30-33.  It is undisputed that, prior to plaintiff's transfer to the SED, he had no workplace issues.  *See* ECF 67-1 at 2; ECF 77-1 at 2.

Sometime in 2011, Major William Davis asked Angelini to select a fellow officer to serve in a specialized unit within the SED.  ECF 77-39 at 9, Tr. 36.  Plaintiff selected Officer Daniel Quaranto.  *Id.*; *see* ECF 77-3 (Quaranto Deposition) at 3, Tr. 7-9.  From the work in that specialized unit, plaintiff received several commendations, including Officer of the Month and Baltimore Ravens NFL game tickets.  *See id.* at 5, Tr. 14.  During this assignment, which lasted approximately one year, plaintiff was directly supervised by Sergeant Kenneth Williams.  ECF 77-39 at 9-10, Tr. 37-38; *see* ECF 77-3 at 6, Tr. 18.

In January 2012, Angelini discovered that his father was bisexual and was having an extramarital affair with another man.  *See* ECF 77-39 at 11, Tr. 41-45.  As Angelini recounted at his deposition, he would often visit his parents while on patrol because they lived in the SED.  *Id.* at 11, Tr. 44.  One day, while plaintiff was at the front door of his parents' house, he peered through a window and saw his father engaging in oral sex with another man.  *Id.* at 11, Tr. 45; *see also* ECF 77-3 at 5, Tr. 16-17.  Plaintiff was "devastated" to learn of the affair and was "shocked" and "hurt" by what he observed.  ECF 77-39 at 11, Tr. 45.

The parties dispute the extent to which the sexuality of plaintiff's father became a topic of conversation among BPD officers serving in the SED.  Plaintiff maintains that his father's ex-boyfriend began to stalk and harass his father, resulting in the police being called to the Angelini

household "multiple times."  ECF 77-39 at 13, Tr. 52; *see* ECF 77-1 at 3 n.2.[5]  Angelini testified

that shortly after the police were called to his parents' house, he was approached by a BPD officer

in the station parking lot, who asked if his parents lived in the area.  ECF 77-39 at 13, Tr. 51.  The

officer allegedly "said that [his] mom and dad ha[d] a[n] issue going on," and plaintiff responded

that he did not want to discuss the matter.  *Id.* at 13, Tr. 53.  Angelini maintains that his father's

sexuality was a topic of water cooler conversation.  *See id.* at 14, Tr. 54-55.

Other BPD officers acknowledged knowing of incidents involving Angelini's father.

Officer Quaranto testified that he responded to the Angelini family household and created a police

report detailing damage to the vehicle belonging to plaintiff's father.  ECF 77-3 at 5, Tr. 15-16.

Sergeant Ettice Brickus, who served in the SED at the relevant time, recalled overhearing officers

discussing a domestic disturbance involving Angelini's father and another man.  ECF 77-38

(Brickus Deposition) at 6, Tr. 18.  And, Sergeant Derwin Jackson, who also served in the SED,

testified that he had heard that Angelini's father was gay or bisexual.  ECF 77-23 (Jackson

Deposition) at 49.

With the exception of the interaction in the station parking lot, plaintiff could not recall a

BPD officer mentioning his father.  ECF 77-39 at 14, Tr. 54.  In the same vein, Officer Quaranto

testified that he never overheard other officers discussing Angelini's family.  ECF 77-3 at 5, Tr.

17.  And, although Sergeant Brickus heard other officers discuss a domestic disturbance, she

clarified that the officers were discussing the day's service calls and there was "nothing unusual"

about the conversation.  ECF 77-38 at 15, Tr. 57.

Plaintiff claims, however, that he became the subject of sexually offensive ridicule.  *See*

---

[5] Plaintiff's counsel avers that the paramour was convicted in Maryland court for conduct involving Angelini's father.  ECF 77-1 at 3 n.2.  However, because the individual's record was later expunged, plaintiff's counsel did not submit exhibits pertaining to the paramour.  *Id.*

ECF 49, ¶ 15.  Plaintiff testified that "sometime between 2011 and 2012" a penis and balls along with the words "Baby Dick" were drawn in the dust covering the front hood of the police vehicle that he shared with Officer Quaranto.  ECF 77-39 at 89, Tr. 356-57.  Then, on October 2, 2012, one of the bathroom stalls in the men's locker room in the SED station was marked with graffiti that said "Angelini + Quaranto R HOMO'S!!"  *See id.* at 15, Tr. 59-61; *see* ECF 67-4 (Graffiti image); ECF 67-5 (10/2/2012 Command Investigation Report); ECF 66-7 (10/3/2012 Complaint).  Upon seeing the image, plaintiff went "straight to" Sergeant Williams and "immediately" reported that he was disturbed.  ECF 77-39 at 15, Tr. 60.

Sergeant Williams opened an investigation concerning the graffiti.  *See* ECF 67-5.  In a "Command Investigations Report" dated October 4, 2012, Sergeant Williams wrote that after receiving Angelini's complaint, he went to the bathroom, photographed the graffiti, and then colored over it with a marker.  *Id.*; *see* ECF 67-6 (Crossed-out graffiti).  Sergeant Williams further reported that Officer Angelini "stated he did not want to write . . . an administrative report and he felt this action was childish on the behalf of the person who composed it."  *Id.*

Plaintiff acknowledges that he initially told Sergeant Williams that there was no need to investigate the incident.  ECF 77-39 at 16, Tr. 63; *see* ECF 77-7 (Angelini Affidavit), ¶ 5.  He recalls that Sergeant Williams told him that the graffiti was "not a big deal" and  "just guys doing what they do."  ECF 77-39 at 15, Tr. 60; *see id.* at 16, Tr. 63.  In response, Angelini told Sergeant Williams: "[Y]ou know what sir, don't even worry about it. Don't even—don't even—don't worry about it. Don't worry about it. I'm—I don't care anymore. Don't worry about it. Don't do an investigation. Don't do nothing."  *Id.* at 16, Tr. 63.  Angelini explained that he hesitated to pursue the incident because he feared retaliation.  ECF 77-39, at 17, Tr. 66-68.

However, the next day, October 3, 2012, Angelini completed a "Form 95" documenting

the incident.  *See* ECF 67-7 (10/3/2012 Form 95).  According to plaintiff, a Form 95 is simply a means to record an event and can be created "for any reason."  ECF 77-39 at 35, Tr. 140-41.  In the Form 95, Angelini stated that he "didn't want to write a 95 because [he] didn't want to make a big ordeal out it" and "because [he] feared that [he] would be retaliated against."  ECF 67-7.  However, plaintiff felt that the graffiti was "offensive."  He wrote: "The comment 'homo' effects [sic] me personally."  *Id.*

In the Form 95, plaintiff requested a transfer to another district pending the investigation. *Id.*  The same day, plaintiff completed a "Request for Transfer Form 70" (a "Form 70").  *See* ECF 77-4 at 1.  Plaintiff explained that he made the request because he "didn't feel welcome at Southeast anymore."  ECF 77-39 at 17, Tr. 68-69.

BPD's Equal Opportunity & Diversity Section ("EODS") investigated plaintiff's complaint, which culminated in a report issued on November 21, 2012.  ECF 67-9 (11/21/2012 EODS Report).  According to the Report, an EODS investigator spoke with Officers Angelini and Quaranto and Sergeant Williams but could not ascertain who was responsible for the graffiti.  ECF 67-9 at 1.  Therefore, "[b]ased on the lack of evidence and witness testimony," EODS closed the case.  *Id.*  However, the EODS investigator recommended that EEO policies "be reiterated during roll call training to prevent further calamity."  *Id.*

Plaintiff maintains that he never received a copy of the Report, and he "adamantly disputes that an investigation was actually conducted . . . ."  ECF 77-1 at 4.  Plaintiff testified, ECF 79-37 at 27, Tr. 108: "EOD[S] never came out to the district and did an investigation and asked people. I've seen other investigations done before. They never came out and spoke to anyone. They never came out and asked individuals to write 95s anonymously. They never went upstairs to the bathroom stall to get a good look at what happened. How can Sgt. Williams just put a cross over

6

it, a magic marker? Why not take time to paint it, a comment like that?"

In addition to filing a Form 95, Angelini arranged to meet with an EODS investigator.  The meeting was scheduled to take place at BPD headquarters on October 5, 2012, at approximately 3:30 pm.  *See id.* at 16, Tr. 63-65; *see id*. at 18, Tr. 70-71.  Plaintiff, who was on light desk duty at the time, was scheduled to work from 3:00 p.m. to 11:00 p.m. that day.  *Id.* at 18, Tr. 72.  Angelini arrived at the SED station in time for roll call, which occurred at approximately 2:30 p.m.  *Id*.

Following roll call, Sergeant Brickus approached Angelini and asked him "why [he] was not dressed."  *Id.* at 21, Tr. 82; *see* ECF 77-38 at 16, Tr. 59-60.  Because Angelini was on desk duty, he was required to dress in "court attire," *i.e*., dress pants and a dress shirt or polo shirt.  *Id.* at 21, Tr. 72, 82-83; *see* ECF 77-38 at 16, Tr. 60.  Plaintiff does not remember what he was wearing on October 5, 2012, but does not dispute that his shirt did not qualify as court attire.  *Id.* at 21, Tr. 83-84.  Sergeant Brickus recalls that Angelini was wearing a "very small T-shirt."  ECF 77-38 at 16, Tr. 60.

In response to Sergeant Brickus's question, plaintiff stated that he had an appointment with EODS and that he might be immediately transferred to a different district.  ECF 77-39 at 21, Tr. 85.  At that point, according to plaintiff, Sergeant Brickus commented that the shirt he was wearing was "showing of [his] pecs," *id*., which Angelini took to mean that he was "showing off [his] muscles."  *Id.* at 22, Tr. 87.  Although plaintiff was bothered by the comment, he did not say anything to Sergeant Brickus.  *Id*. at 22, Tr. 87-88.  Sergeant Brickus instructed Angelini to report to her after his EODS appointment, and plaintiff replied that if he was sent back to the SED he would change into his uniform to work the front desk.  *See id.* at 21, Tr. 86; *id.* at 23, Tr. 92-93.

Sergeant Brickus does not dispute that she commented on Angelini's shirt.  ECF 77-38 at 16, Tr. 60.  But, according to Sergeant Brickus, her comment "had nothing to do with [Angelini]

going to [EODS]." *Id.* at 7, Tr. 22.  She testified, *id.*: "He was inappropriately dressed for work and I did make a joke with him about the way he was dressed, and we had joked together in the past so I didn't think it was anything wrong, of course, at the time to make that type of joke about his shirt being too small."  Sergeant Brickus testified that she did not think her comments were offensive because she and Angelini had "shared and engaged in jokes . . . in the past" and had "often cut up and would share laughs." *Id.* at 16, Tr. 61.  She recalled that plaintiff had laughed at the joke, and she said: "[T]here was nothing that led me to believe that, you know, there were any issues or that he had an issue with the joke." *Id.* at 16-17, Tr. 61-62.

Plaintiff then left the station and headed to the parking lot to hitch a ride to BPD headquarters for his EODS appointment.  ECF 77-39 at 24, Tr. 94.  As he exited the building, Angelini passed by Sergeant Brickus and several other fellow officers, one of whom said, "I like your shirt." *Id.*  Plaintiff testified: "And then people started laughing. And I continue walking. And I hear [Sergeant] Brickus say, comment to me, oh, Angelini is going down to [EODS] to go show off his muscles down there. And everybody starts laughing" *Id.* at 24, Tr. 94-95.

Angelini testified that Sergeant Brickus's comment made him feel like a "snitch" because she "pretty much told everybody I was going down" to EODS. *Id.*  Plaintiff then heard Sergeant Brickus say, "oh, I better be careful he's going to file a complaint on me down there," which prompted laughing among the other officers. *Id.*

Plaintiff proceeded to meet with "Sergeant Cumbo," an EODS investigator. *Id.* at 24, Tr. 96.  While there, plaintiff completed a "Discrimination Complaint Form," identifying "offensive writing of sexual orientation" as the basis for his complaint.  ECF 67-10 (Form 210).  According to plaintiff, he also recounted Sergeant Brickus's comments to Sergeant Cumbo, telling Sergeant Cumbo that Sergeant Brickus put him "on blast" and "made fun of my pecs . . . ."  ECF 77-39 at

24, Tr. 97.  Despite plaintiff's request for a transfer, Sergeant Cumbo informed plaintiff that he had to return to work at the SED.  *Id.* at 25, Tr. 98-99.

When plaintiff returned to the SED, he changed clothes and then went to see Sergeant Brickus.  *Id.* at 25, Tr. 99.  According to plaintiff, Sergeant Brickus asked him why he felt that the graffiti was offensive and why he was "making a big deal" out of the incident.  *Id.* at 25, Tr. 99-100.  When Angelini responded that it was "not her business," she replied: "The major doesn't want this downtown. I can't believe you met -- went downtown with it. You could have kept it in-house."  *Id.* at 25, Tr. 100.  Plaintiff told Sergeant Brickus that her comments were "offensive" and she mocked him in front of his "peers."  *Id.* at 100-01.  She responded that she was only joking. *Id.* at 101.

Plaintiff claims that after lodging his complaint with EODS, he was singled out for retaliatory discipline by his supervisors.  *See* ECF 77-1 at 7-16; ECF 77-7, ¶ 13.  Plaintiff avers that Sergeant Brickus began to "pick on" him about his clothing while he was on light duty from October  to December 2012.  ECF 77-39 at 31, Tr. 122.  For instance, plaintiff recalled that Sergeant Brickus once observed that his pants were wrinkled and asked him if he had "ever heard of an iron?"  *Id.*

The next alleged act of retaliation centers around a parking space at the police station.  *See* ECF 49, ¶¶ 23-26.   It is undisputed that parking at the SED station was difficult.  *See* 77-3 at 10, Tr. 35 (Quaranto agreeing that parking was difficult); ECF 77-23 at 50 (Jackson characterizing the parking as "inadequate"); ECF 77-37 (Brokus Deposition) at 10, Tr. 35 (Brokus agreeing that parking can be terrible); ECF 77-38 at 8, Tr. 28 (Brickus describing "issues" with parking).  A memorandum addressed to BPD personnel in the SED, dated November 8, 2012, directed staff not to park in marked spaces unless authorized.  ECF 67-13.  However, plaintiff maintains that officers

routinely parked in marked spaces, without incident.  *See* ECF 77-7, ¶ 24; *see* ECF 77-10 (images of vehicles in the SED parking lot).

On January 17, 2013, plaintiff parked his vehicle in a space designated for the Neighborhood Services Unit ("NSU") of the SED.  ECF 77-39 at 31-32, Tr. 124-26.  Although Angelini was not assigned to NSU, plaintiff parked in the space because he could not find another parking space.  *See id.* at 34, Tr. 134.  Shortly after plaintiff entered the station and before roll call, Sergeant Brickus approached him and instructed him to move his vehicle immediately and then complete a Form 95, explaining why he parked in the space reserved for Sergeant Venera Drennon.  *Id.* at 34, Tr. 135.

Sergeant Brickus testified that Sergeant Drennon approached her that morning and was "upset" because Angelini had previously parked in her designated space and Sergeant Drennon had spoken with him about it.  ECF 77-38 at 8, Tr. 26-27.  She told Sergeant Drennon that she would have Angelini move his vehicle, and Sergeant Drennon asked her to have Angelini author a report as to why he parked in a marked space after being asked not to do so.  *Id.* at 8, Tr. 27.

Upon being ordered to move his vehicle, plaintiff asked Sergeant Brickus if she was serious.  ECF 77-39 at 34, Tr. 135.  When it became apparent that she was, Angelini told her that he would move his vehicle, but that if he had to write an administrative report, then he would like to be "formally charged through the department for parking [his] vehicle there."  *Id.*  According to Angelini, Sergeant Brickus "became irate," and he walked away from her because he was "tired of being picked on."  *Id.*  Sergeant Brickus followed Angelini and ordered him to report to the shift commander's office.  *Id.* at 34, Tr. 137; *see* ECF 77-38 at 8, Tr. 28.  When he arrived, Sergeant Drennon, Sergeant Brickus, and the shift commander, Sergeant James Brokus, "shut the door on [him]."  ECF 77-39 at 34, Tr. 137.  Plaintiff asked them why he was being picked on.  *Id.*  Plaintiff

recalls that they replied that he wasn't being singled out and told him to move his car. *Id.* at 34-35, Tr. 137-38.

Angelini stated during his deposition that he was upset because he felt like Sergeant Brickus was "[p]icking" on him. *Id*. at 37, Tr. 146. He believes that the directive to write a Form 95 "was personal" because he had "never seen [Sergeant Brickus] ask anyone else that parked int those spots to write a 95 or heard of anybody writing a 95 for parking in an inappropriate spot." *Id.* at 36, Tr. 144. Yet, when asked why he sought to be formally charged with misconduct, Angelini testified that he thought it might get the attention of "downtown" and result in his transfer to another district. *Id.* at 36-37, Tr. 145-46.

Plaintiff does not remember raising his voice. *Id.* at 37, Tr. 37. But, he acknowledges that he "speak[s] loud" and that "[s]ome people take offense to that." *Id.* at 37, Tr. 147. In contrast, Sergeant Brickus testified that when she asked Angelini to move his car, plaintiff "raised his voice, banged the table, he was just very aggressive even the way that he spoke." ECF 77-38 at 18, Tr. 67. According to Sergeant Brickus, Angelini continued this behavior during and after she ordered him to move his vehicle, and then proceeded to engage in a "heated argument" with Sergeant Drennon in which he was "very aggressive . . . . disrespectful and unprofessional" to her. *Id.* at 10, Tr. 36.

Following the incident, Sergeant Brokus filed a Form 95, detailing his interaction with Angelini. *See* ECF 67-15 (1/18/2013 Brokus Form 95). In the Report, he stated that when Sergeants Drennon and Brickus instructed Angelini not to park in the NSU parking space, he replied "Charge Me" because they were out to get him. *Id.* at 1. Sergeants Brickus and Drennon filed a Command Investigations Report, in which they wrote that after Sergeant Brickus instructed Angelini to move his car, he "began to scream 'Charge me! Charge me then!'" ECF 67-14

11

(1/17/2013 Report).  In the Report, they characterized Angelini's behavior as "disrespectful and insubordinate."  *Id.*

Angelini, too, filed a Form 95 detailing the incident.  He wrote: "I feel that Sgt Drennon along with Sgt. Brickus do not like me and are out to get me."  ECF 67-18 (1/17/2013 Angelini Form 95) at 1.  He asserted that Sergeant Drennon did not like him because she once told plaintiff he was a "sneaky" officer and should not apply to the NSU, and because he once wrote a Form 95 against Sergeant Williams, who was dating Sergeant Drennon.  *Id.*; *see also* ECF 77-3, at 33, Tr. 130.  As for Sergeant Brickus, plaintiff explained that she "made an inappropriate comment to [him] about going to EEOC in front of [his] peers," specifically: "'Hey Angelini nice shirt! Are you going to [EODS] to show off your pecs?'"  ECF 67-18 at 2.

The next day, January 18, 2013, Captain Kimberly Burrus suspended Angelini's police powers and placed him on administrative duty.  *See* ECF 67-16.  Plaintiff testified that he used vacation days to stay home and avoid working the front desk.  ECF 77-39 at 39, Tr. 157.  A "suspension hearing" was held on January 29, 2013, after which it was decided that plaintiff should remain on administrative duty.  *See* ECF 67-17 at 2.  Plaintiff was reinstated to full duty on February 2, 2013.  *See* ECF 77-39 at 43, Tr. 171.  On February 18, 2013, plaintiff filed a Form 70 to transfer to another district, listing "hostile work environment and fear of retaliation" as the basis for his request.  ECF 77-4 at 2; *see id.* at 3.

Next, plaintiff complains that Sergeant Brickus retaliated against him by not publicly recognizing him for seizing several firearms.  *See* ECF 49, ¶¶ 30-34; ECF 77-1 at 9-10.  While on patrol in March 2013, plaintiff and Officer Quaranto were dispatched to a call for "someone shooting a shotgun in their backyard."  ECF 77-3 at 11, Tr. 39; ECF 77-39 at 48, Tr. 190.  The officers encountered an armed suspect and ordered him to drop his gun.  When the suspect did not

12

respond, Angelini fired at the suspect, killing him.  Angelini and Officer Quaranto recovered drugs, a shotgun, a handgun, and two assault rifles from the suspect.  ECF 77-3 at 11, Tr. 39.

According to plaintiff, when a BPD officer recovers guns, the officer customarily receives public praise.  ECF 77-39 at 48, Tr. 191.  For instance, the officer's name is put on "a board called a gun board" that hung in the station's hallway, or the officer might receive a service coin or letter of commendation.  *Id.* at 48, Tr. 191-92.  After the shooting, Angelini's name was placed on the "gun board," but he did not receive a letter or any awards.  *Id.*  Further, plaintiff claims that he later learned that Sergeant Brickus made a comment at roll call that his "shooting was bad."  *Id.* at 49, Tr. 195; *see* ECF 77-7, ¶ 31.  When asked about this, Officer Quaranto commented that the receipt of awards at BPD was "hit or miss" and that it was "common" for good police work to go unrecognized.  ECF 77-3 at 12, Tr. 44.

Plaintiff renewed his request to transfer to another district on April 23, 2013.  ECF 77-4 at 4.  The request was denied, but plaintiff was moved to a different shift in the SED.  *See* ECF 77-39 at 63, Tr. 211.  Sergeant Derwin Jackson became plaintiff's supervisor.  *Id.*  Angelini hoped that the new shift would allow for a "new start."  ECF 77-7, ¶ 36.  But, he alleges that the retaliation continued.  *See* ECF 49, ¶ 38.

On June 29, 2013, plaintiff fainted from heat exhaustion.  According to plaintiff, Major Davis personally gave him permission to wear a short-sleeve uniform and to cover his arm tattoos with skin-colored arm bands.  ECF 77-39 at 57, Tr. 228.  While on patrol on June 29, 2013, Sergeant Brokus encountered plaintiff wearing a short-sleeve shirt and ordered him to change into a long-sleeve uniform.  *Id.* at 57, Tr. 229; *see* ECF 77-37 at 12, Tr. 43.  Although it is unclear from the record, it appears that plaintiff complied.  Plaintiff believes that this order was an act of retaliation.  ECF 49, ¶ 41; ECF 77-5, ¶ 38.  Later that day, plaintiff overheated and was taken to

the hospital.  *See* ECF 77-16 (6/29/2013 Mercy Medical Center Records).

Plaintiff was placed on light duty.  ECF 77-39 at 58, Tr. 231-33.  And, he requested vacation for the afternoon of July 4, 2013.  *Id.* at 60, Tr. 238.  However, Sergeant Brokus told plaintiff that his schedule had changed and he should expect to work into the evening on July 4 duty.  *See id.* at 60, Tr. 239.  When plaintiff pushed back, he claims that Sergeant Brokus sent a squad car to his house and had the officer transport Angelini to Mercy Hospital for a medical evaluation.  *Id.* at 62, Tr. 248.  As a result, plaintiff spent the holiday waiting in the emergency room at Mercy Hospital. *See id.* at 60, Tr. 249.  The same day, Angelini completed another Form 70, asking "to be transferred ASAP due to my hostile work environment" and alleging that he was being "harassed for some unknown reason."  ECF 77-4 at 9.

According to Sergeant Brokus, he directed another officer to go to plaintiff's home on July 4th and transport him to the hospital "because it sounded like he was sick . . . ."  ECF 77-37 at 13, Tr. 53.  Sergeant Brokus maintained at his deposition that he had an officer transport Angelini because he did not want Angelini to "hurt himself on the way over to the hospital."  *Id.* at 13, Tr. 52.

Plaintiff completed yet another Form 70 on July 4, 2013.  ECF 77-4 at 9.  However, plaintiff avers that his request was torn up by Captain Burrus.  *See id.* at 10.  Captain Burrus does not dispute that she tore up some of Angelini's transfer requests.  ECF 77-12 (Burrus Deposition) at 10, Tr. 36-37.

The next purported incident of discrimination is rooted in plaintiff's failure to turn in a police report in a timely manner.  *See* ECF 49, ¶ 46.  On July 25, 2013, Angelini responded to a call for service and thereafter authored a police report about the incident.  ECF 77-39 at 66, Tr. 264-65.  Although the report was complete, Angelini did not turn in the report at the end of his

14

shift because when he arrived at the station, he did not see anyone from his shift who would receive the report. *Id.* Instead, plaintiff kept the police report on his thumb drive. *Id.*

According to the BPD, Angelini's actions were contrary to protocol, which requires officers to leave completed police reports either with an immediate supervisor, another member of the officer's shift, or on the shift supervisor's desk. *See id.* at 65-66, Tr. 261-62. Angelini maintains that he did not submit the report on July 25 because he only saw Sergeant Brickus and she had made clear that she would not accept his reports. *Id.* at 66, Tr. 265. Further, plaintiff testified that he did not leave the report unattended because he "feared it would be misplaced as some reports have been in the past." *Id.*; *see also* ECF 67-19 (7/28/2013 Angelini Form 95). That said, Angelini was unable to recall a time when one of his reports was misplaced. ECF 77-39 at 67, Tr. 267.

Plaintiff was off from work for the next two days. When plaintiff returned to work on July 28, 2013, he asked Sergeant Jackson if he had received any emails about plaintiff's application to join the BPD's specialized weapons and tactics team (the "SWAT" team). *Id.* at 67, Tr. 269; *see also* ECF 77-24 (7/31/2013 Angelini Form 95). Sergeant Jackson rebuffed his request, saying that he did not monitor Angelini's emails. ECF 77-39 at 68, Tr. 271-72. When Angelini was checking his emails following roll call, Sergeant Jackson asked why there was an unfiled police report on his desk dated July 25. *See* ECF 77-24 at 1; *see also* ECF 77-39 at 68, Tr. 272-73.

Sergeant Jackson then told plaintiff to report to Lieutenant Charles Williams's office to discuss the tardy report. *See* ECF 77-24 at 1. According to plaintiff, Lieutenant Williams told him to make sure that, in the future, his reports were turned in the same day. *Id.*; *see* ECF 77-39 at 69, Tr. 274. At the direction of Sergeant Jackson, plaintiff returned to his cubicle to edit and submit the report. While doing so, plaintiff overheard Sergeant Jackson tell Sergeant Brokus that

Angelini had accused him of leaving the station early on July 25. ECF 77-39 at 69, Tr. 274-75. Plaintiff maintains that he never said this and that Sergeant Jackson lied to Sergeant Brokus in order to "start more trouble." *Id.* at 70, at 278. At that point, Sergeant Brokus responded to Sergeant Jackson: "'F∗ck that mother F∗cker. He's a F∗cking liar.'" ECF 77-24 at 3.

Sergeant Brokus then walked past Angelini, at which point plaintiff told Sergeant Brokus that his comment was not appreciated. *Id.* Plaintiff testified that Sergeant Brokus then "[g]ot in [his] face with his finger" and "began berating me, screamed at and yelling at me." ECF 77-39 at 69, Tr. 275; *see also* ECF 77-24 (7/31/2013 Angelini Form 95) (describing Sergeant Brokus as "very angry and hostile").

Sergeant Jackson recalled Sergeant Brokus cursing at Angelini. *See* ECF 77-23 at 89. And, Sergeant Brokus acknowledged during his deposition that he and Angelini got into an argument, during which he pointed at Angelini and called him a "f∗cking liar." ECF 77-37 at 18, Tr. 67. But, he maintains that he was "about 12 feet" away from Angelini. *Id.* Sergeant Brokus recounted that after he called Angelini a liar, Angelini "started to hold his [own] chest" and "kept saying, Stop assaulting me" and "I can't breathe . . . ." *Id.*

Plaintiff began to hyperventilate. *Id.* at 69, Tr. 276. Lieutenant Williams then emerged from his office and told plaintiff that he was being put on medical leave. *Id.*; *see* ECF 77-37 at 18, Tr. 67-68. An ambulance was called, and Angelini was transported to the hospital for an evaluation. *See* ECF 77-39 at 69, Tr. 277; ECF 77-25 (7/28/2013 BCFD Incident Report). Following this incident, Angelini was placed on medical suspension for one day. *See* ECF 77-39 at 70, Tr. 279; *see* ECF 66-22 (7/28/2013 Suspension Form). Plaintiff completed yet another Form 70 on July 28, 2013. *See* ECF 77-4 at 12.

As further evidence of retaliation, plaintiff claims that his BPD supervisors concealed that

16

he was selected for SWAT tryouts. *See* ECF 49, ¶ 49; ECF 77-1 at 29. The SWAT team is a selective unit which hosts practice tryouts, actual tryouts, and then SWAT school for candidates who pass the tryout. *See* ECF 77-19 (Coughlin Deposition) at 3, Tr. 8. Only a quarter of the candidates who try out for SWAT earn a spot on the SWAT team. *Id.* at 3, Tr. 9. To participate in the SWAT tryout, an officer must attend a day-long training event. *Id.* And, an officer must obtain permission from his supervisors before trying out for the SWAT team. *Id.* at 4, Tr. 13.

On June 14, 213, plaintiff requested to participate in the tryouts scheduled for July 29, 2013. *See* ECF 77-20 (7/2013 Emails). And, on July 1, 2013, Lieutenant Mark Howe, the Commanding Officer of BPD's SWAT team, issued a memorandum to the Deputy Commissioner of the Neighborhood Patrol Bureau requesting that selected individuals, including Angelini, participate in SWAT tryouts. *See* ECF 77-21. However, plaintiff did not receive the order detailing him to the SWAT team tryout for July 29. *See* ECF 77-39 at 108, Tr. 432. As a result, plaintiff did not attend and was marked absent. *See* ECF 77-22.

According to Sergeant Brokus, the order would have been addressed to plaintiff's immediate supervisor, who was Sergeant Jackson at the time. ECF 77-37 at 19, Tr. 72. When asked if he received a communication concerning Angelini's SWAT tryout, Sergeant Jackson stated, ECF 77-23 at 70: "I do not have any recollection of any notification as it pertains to Officer Angelini of any SWAT tryouts."

On August 8, 2013, plaintiff was transferred to the "Northeastern District" (the "NED"). ECF 78-2; *see* ECF 77-39 at 72, Tr. 287-88. Plaintiff contends that his superiors in the SED sought to sully his reputation in his new district. He claims that Sergeant Mark Rutkowski, his first supervisor at the NED, told him that his previous supervisors had recommended that he be supervised for 30 days. *See id.* at 75, Tr. 299-300. Sergeant Rutkowski confirmed at his deposition

that when Angelini was transferred his paperwork contained a notation recommending "early intervention," including monitoring. ECF 77 at 27 at 4, Tr. 10. According to Sergeant Rutkowski, this notification is "nothing punitive" and can be triggered for being involved in several accidents in one year or failing to appear for court. *Id.* Further, plaintiff points out that Major Richard Worley, who was stationed in the NED at the time, testified that hat he was told by someone "that [Angelini] got kicked out of the Southeast District." ECF 77-5 at 9, Tr. 30. It is undisputed that plaintiff was never placed on probation while at the NED.

Although plaintiff had relocated to a new district, he maintains that he has continued to face retaliation from his former supervisors from the SED. *See* ECF 49, ¶ 54; EF 77-1 at 16-18. Specifically, plaintiff claims that he has been repeatedly targeted by the BPDs' Internal Affairs Department ("IAD") for discipline. ECF 49, ¶¶ 58, 64-66.

On December 10, 2014, IAD charged plaintiff with violating the BPD code of conduct for being "rude and/or discourteous" while processing evidence at the BPD's Evidence Control Unit on January 9, 2014. ECF 67-23 at 2. Following a hearing held on May 12, 2015, Angelini, who was represented by counsel throughout the administrative process, agreed to accept the recommended punishment of a four-day suspension without pay. *Id.* at 8.

Plaintiff was again disciplined in August 2017 for his behavior during the pursuit of a juvenile. In September 2016, Sandra Goldthorpe, the Chief of the Evidence Review Unit for the State's Attorney's Office for Baltimore City, contacted IAD, requesting that it review footage from a body worn camera capturing Angelini making inappropriate comments to a juvenile defendant during an arrest that occurred on August 3, 2016. *See* ECF 67-24 at 2. The IAD subsequently charged plaintiff in February 2017 with violating the BPD's conduct of conduct. *Id.* at 6-9. Following a hearing, plaintiff was issued a letter of reprimand and ordered to attend de-escalation

training.  *Id.* at 19-20, 23.

In June 2017, IAD charged plaintiff with being discourteous to a civilian during a traffic stop on May 26, 2017.  *See* ECF 67-27 (Sealed) at 28.  For his conduct, the BPD issued Angelini a letter of reprimand.  Following an IAD investigation, the charges were sustained on January 23, 2018.  *See id.* at 18-24.

In January 2018, Angelini was charged by IAD with engaging in inappropriate behavior while attending Level 1 Crash Investigation School between March 6 and 10, 2017.  *See* ECF 67-26 (Sealed) at 1-12.  In particular, plaintiff was accused of making rude comments, missing blocks of instruction, and texting during class.  *See id.*  Plaintiff elected to proceed to a hearing board, and the case is still pending.  *See* ECF 77-39 at 95, Tr. 379.

Further, plaintiff claims that he was harassed by BPD's former counsel in this litigation, Assistant City Solicitor Colin Glynn.  ECF 49, ¶ 80; ECF 77-1 at 21.[6]  On April 5, 2018, Glynn sent materials exchanged during discovery, including the depositions of Angelini and his wife, to IAD regarding possible misconduct by Angelini.  *See* ECF 77-34 (4/5/2018 Emails) at 2; ECF 67-28.  Specifically, the investigation concerned whether Angelini improperly disclosed sensitive law enforcement information during the course of this litigation.  Sergeant Williams was included on the email.  *Id.*  Ultimately, the charges were not sustained and the IAD closed the case on April 2, 2019.  *See* ECF 67-28.

Plaintiff is "100 percent" convinced that these investigations constitute retaliation.  *See id.* at 95, Tr. 379-80.  He posits that these investigations were directed or influenced by Sergeants Williams and Brokus, who transferred to the IAD sometime in 2015 or 2016.  *See* ECF 77-1 at 16-

---

[6] Plaintiff asserts in ECF 49, ¶ 80 that Glynn is a former Assistant City Solicitor.  Glynn moved to withdraw as the BPD's counsel on January 2, 2019.  ECF 37.  The Court granted the motion the same day.  ECF 38.

17; ECF 77-37 at 21, Tr. 78-81.  Plaintiff points out that in 2016, Sergeant Williams supervised

IAD Detective Robert Cornejo, who investigated one of plaintiff's cases.  *See* ECF 77-28 at 5, Tr.

15.  Detective Cornejo testified that he was unaware that Sergeant Williams previously supervised

Angelini.  *Id.* at 5, Tr. 16.  However, Detective Cornejo also testified that Sergeant Williams "did

not add or remove any information" that Cornejo "put in through [his] investigation."  *Id.* at 5, Tr.

15.

## B.  Procedural History

On April 24, 2014, plaintiff filed a Charge of Discrimination (the "Charge") with the

Baltimore Community Relations Commission and the Equal Employment Opportunity

Commission ("EEOC").  ECF 67-1 (4/24/2014 Charge) at 5.  Plaintiff checked the boxes for

"Retaliation" and "Continuing Action," and he identified October 3, 2012, as the start of his

discrimination.  *Id.*  In the narrative portion of the Charge, plaintiff stated, *id.* at 5-6:

> I began working for the above employer on May 4, 2006, as a Police Officer.
> I have been sexually harassed in October 3, 2012, from an incident that occurred at
> a family member's home. I have received sexually [sic] graffiti written in the men's
> restroom about me [and] another officer and some had been written on my official
> service vehicle. I reported it to Internal Affairs on October 3, 2012 and I filed an
> internal EEO complaint. No one has responded to my complaints. I have also
> requested on several occasions to be transferred to another district starting from
> October 2012 and my requests were denied due to the hostile work environment.
> On February 18, 2013, my transfer request was approved but no one informed of
> the approval. On April 21, 2013, I submitted several more requested [sic] because
> of the harassment had gotten worst [sic], in the form of suspensions, hostile work
> environment, not receiving awards or citations for outstanding work and my
> requests for a transfer were not being acknowledge [sic] without any reason given.
> In April 2013, I was switched to a new section and placed on a different shift for
> safety purposes. On June 26, 2013, I requested a meeting with upper management
> to discuss the events that were happening to me and my request was denied without
> a reason given. Finally, on July 28, 2013, I submitted another request for a transfer
> and rewrote my reason for transferring and it was granted. I was transferred to a
> new district in March 2014, and I feel that because of my past complaints, my work
> environment there has become hostile and unfair. I found out that there were several
> statements in my file for insubordination from my old district, which I did not know
> about until I got to my new district.

On March 21, 2016, plaintiff, through attorney Jack Ryan Terziu and the Law Offices of Terziu & Bennett, filed a Voluntary Petition for Bankruptcy Protection under Chapter 7, in the Bankruptcy Court for the District of Maryland.  ECF 67-32 (the "Petition"); ECF 67-33 (History).  At the time, plaintiff's complaint with the EEOC was pending.  Of relevance here, plaintiff did not disclose his pending EEOC Charge as an asset in the Petition.  Instead, plaintiff marked "no" in response to the question included in the Petition as to whether he had any "claims against third parties, whether or not you have filed a lawsuit or made a demand for payment."  *Id.* at 14.  The bankruptcy court issued an Order of Discharge on June 29, 2016.  *Id.* at 62.

On May 18, 2017, plaintiff received a right-to-sue letter from the EEOC.  ECF 1-1.  This suit followed on August 16, 2017.  ECF 1.

Additional facts are included, *infra*.

## II.    Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

 "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v.*

*Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

## B.  Title VII Generally

The Second Amended Complaint contains claims for sex discrimination, hostile work environment, and retaliation, based on Title VII.  ECF 49, ¶¶ 99-106.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2.  The Supreme Court has referred to discrimination based on one of these five characteristics as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e–3; *see e.g.*, *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).  The purpose of Title VII's antiretaliation provision is to "[m]aintain[] unfettered access to statutory remedial mechanisms" for employees who fear reprisal.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Thus, an employer violates Title VII by taking an adverse employment action against an employee because that employee exercised his rights under Title VII.

In addition to prohibiting discrete acts of discrimination, Title VII prohibits "the creation or perpetuation of a discriminatory work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 426 (2013). An actionable hostile work environment exists when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer–Liberto*, 786 F.3d at 298 (citation omitted).

Before filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*,

425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Transp.*, 662 F. App'x 221, 224 (4th Cir. 2016).  To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e–5(e)(1); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004).  This period is extended to 300 days in a deferral state, such as Maryland. *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4, n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc*., 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F. App'x 256 (4th Cir. 2008).

However, exhaustion under Title VII is not jurisdictional.  *See Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019).  Rather, it is a "claim-processing rule[] that must be timely raised to come into play." *Id.* at 1846.

In general, *at trial* a plaintiff may establish discrimination or retaliation under Title VII through two avenues of proof.  *See Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (discussing discrimination), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005) (discussing retaliation).  The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

As indicated, these avenues of proof pertain to trial.  At this juncture, reference to these methodologies merely serves to inform a court's evaluation of a motion for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the framework established in *McDonnell Douglas Corp*); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  Under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

If the plaintiff chooses to proceed *at trial* under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination."  *Burdine*, 450

26

U.S. at 253.

To establish a prima facie claim of discrimination under *McDonnell Douglas*, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc*., *Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (citation omitted); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019). Similarly, to establish a prima facie case of retaliation under *McDonnell Douglas*, a plaintiff must present facts that establish "(1) that [he] engaged in a protected activity; (2) that [his] employer took an adverse employment action against [him]; and (3) that there was a causal link between the two events." *Navy Fed. Credit Union*, 424 F.3d at 405-06; *see also Boyer-Liberto*, 786 F.3d at 281.

If a plaintiff establishes a prima facie case of unlawful discrimination or retaliation, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was

pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens . . . is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

## III.   Discussion

At the outset, the BPD raises a host of threshold defenses to plaintiff's suit, including judicial estoppel, statute of limitations, administrative exhaustion, and state sovereign immunity. ECF 66-1 at 20-27.  In particular, defendant argues that Angelini's failure to disclose his EEOC Charge during his bankruptcy proceedings precludes him from pursuing Title VII claims against the BPD.  *See id.* at 20-23.  The BPD also argues that plaintiff's suit is untimely because it is predicated on the October 2012 graffiti incident, but he did not file his EEOC Charge until April 2014.  *Id.* at 23-26.  And, the BPD contends that plaintiff has not exhausted his sexual harassment claim, because it is not within the scope of his Charge.  *Id.* at 26-27.  Further, the BPD maintains

that state sovereign immunity bars plaintiff's claim for invasion of privacy. *Id.* at 33-35.

On the merits, the BPD argues that Angelini cannot establish a claim for sex discrimination. *See id.* at 27-28. In addition, defendant asserts that there are no triable issues as to plaintiff's hostile work environment because he has not shown that he was subject to unwelcome conduct or that such conduct was based on his membership in a protected class. *Id.* at 28-30. The BPD also maintains that there is no genuine issue of material fact regarding Angelini's retaliation claim because he has, at most, adduced evidence of petty slights and annoyances, not actionable adverse actions. *See id.* at 30-33.

Plaintiff failed to respond to defendant's challenges to his sex discrimination claim. Thus, he has abandoned that claim. *See, e.g., Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 641 (D. Md. 2015); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997). And, plaintiff expressly jettisons his invasion of privacy claim. ECF 77-1 at 2. However, plaintiff strenuously argues that his hostile work environment and retaliation claims are viable and that he has raised triable issues of fact as to these claims, so as to preclude summary judgment. *Id.* at 24-34.

### A. Affidavits

As a preliminary matter, in its Reply the BPD urges the Court to disregard Angelini's Affidavit of January 5, 2020 (ECF 77-7) as a sham affidavit. ECF 81 at 3. In this regard, the BDP argues that the Angelini Affidavit is "riddled with contradictions" and "flatly contradicts" plaintiff's earlier sworn testimony. *Id.* Further, the BPD asserts that the Court should strike the affidavits of Ed Gordon (ECF 77-35), a retired BPD police officer who served with plaintiff, and Francis Charles Davidson (ECF 77-30), a retired BPD officer who does not know anyone in the case, on the ground that these witnesses were not previously disclosed and lack "first-hand

knowledge as to the allegations at issue in this case." ECF 81 at 7. I turn first to Angelini's Affidavit.

The "sham affidavit rule" was articulated by the Second Circuit in *Perma Rsch. & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). There, the court considered an affidavit in which Perma's president averred that a representative of Singer had told him that Singer never had any intention of performing on the contract at issue in the case. *See id.* at 577. At summary judgment, Perma advanced the affidavit, recounting this conversation as evidence of Singer's fraud. However, Perma's president had not previously mentioned the alleged conversation in four days of deposition testimony, even though he had been directly questioned as to any evidence he possessed of Singer's intention not to perform the contract. *Id.* The Second Circuit affirmed the trial court's award of summary judgment to the defendant, stating that the trial court "could properly conclude that the statement made in the affidavit was less reliable than the contradictory statements in the deposition, and that it did not raise a triable issue of fraud." *Id.* (internal citation omitted). It reasoned: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 578.

The Fourth Circuit adopted the rationale of *Perma* in *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984), reasoning that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Later, in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), the Supreme Court provided the following formulation of the sham affidavit rule, stating, *id.* at 806: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by

contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."

The Fourth Circuit has since reaffirmed that a party "may not avoid summary judgment by submitting contradictory evidence" with regard to earlier assertions. *Williams v. Genex Servs., LLC*, 809 F.3d 103, 110 (4th Cir. 2015). It reiterated that allowing a party to do so would "'greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Id.* (citing *Barwick*, 736 F.2d at 960).

Notably, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255). In order to avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact. What the Ninth Circuit said in *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009) (internal citation and quotation marks omitted), is salient:

> [T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.

Defendant has not identified any irreconcilable conflicts between the Angelini Affidavit and plaintiff's deposition testimony. To the extent that the BPD argues that the Affidavit "relies heavily on rumors and lacks any personal knowledge," *see* ECF 81 at 4, these purported flaws bear on the admissibility of the averments. But, hearsay does not implicate the sham affidavit rule.

31

The only conflict that the BPD identifies between the Affidavit and plaintiff's deposition concerns whether plaintiff had personal knowledge that anyone at the BPD knew of his father's sexuality.  *Id.* at 3.  In the Affidavit, plaintiff states: "I struggled with making the complaint because my family's history had become fodder for the rumor mill of the SED and because I feared retaliation from BPD."  ECF 77-7, ¶ 4.  According to defendant, this averment clashes with the following deposition testimony, ECF 77-39 at 13-14, Tr. 53-54:

> Mr. Glynn (BPD counsel): Did Officer Kamberger indicate to you that he had any knowledge about your father's sexual orientation at that time?
>
> Angelini: He just basically said that your mom and dad has a [sic] issue going on. And at that time, I stopped him and said I didn't want to speak to him anymore about it.· It's a private matter.
>
> Glynn: Are you aware of any other involvement between the Southeast District police officers and your parents other than the two – the one incident you just described with Sgt. Kamberger – or Officer Kamberger, I'm sorry?
>
> Angelini: The best of my recollection at this time, I don't – I don't know if they called any other times without my knowledge. I don't know.
>
> Glynn: Other than Officer Kamberger, did any other officers ever approach you in 2012 to speak to you about your parents?
>
> Angelini: No, sir.
>
> Glynn: Did any other officers ever approach you and speak to you about your father's sexuality?
>
> Angelini: No, sir.
>
> Glynn: Did you personally over – observe or overhear communications by other BPD employees about your father's sexuality?
>
> Angelini: No, sir.
>
> Glynn: Were you told by other people that other BPD employees were discussing your father's sexuality?
>
> Angelini: No, sir.

But, this testimony reveals that at least one officer, Officer Kamberger, knew about Angelini's family issues.  Further, the BPD overlooks other deposition testimony that aligns with plaintiff's Affidavit.  Plaintiff testified that his family's history was well known because "the police were called multiple times" to his parents' house.  ECF 77-39 at 13, Tr. 52.  And, Angelini testified that he "observed things" that led him to believe that his family's circumstances were the subject of office gossip.  *Id.*, Tr. 55.

Many of the concerns identified by the BPD could provide fertile ground for cross-examination of Angelini.  Ultimately, a jury may not find plaintiff's testimony credible.  But, the statements with which defendant takes issue are not so in tension with plaintiff's deposition as to warrant application of the sham affidavit rule.

In contrast, in assessing the Motion, I shall not consider the Gordon Affidavit and the Davidson Affidavit.  As noted, Gordon is a retired police officer who served with Angelini in the SED.  ECF 77-35.  In his Affidavit, Gordon recalls that supervisors were "critical" of the quality of Angelini's shooting in March 2013, and that during his time at the BPD he "heard" various rumors concerning Angelini.  *Id.*  Davidson, who served in the BPD from 1996 through 2015, describes the culture of the BPD in his Affidavit.  ECF 77-30.

Defendant moved to strike the Gordon Affidavit on the ground that plaintiff did not disclose his identity during discovery.  ECF 81 at 6.  To be sure, the failure to disclose a witness may preclude the consideration of an affidavit at summary judgment.  Fed. R. Civ. P. 37(c)(1); *see So. States Rack & Fixture, Inc. v. Sherwin-Williams Co*., 318 F.3d 592, 596 (4th Cir. 2003).  However, the BPD has not provided the Court with plaintiff's answers to its interrogatories, and the Court cannot rely on the BPD's word that Gordon was never disclosed.

However, the BPD also asserts that the Court should disregard the Gordon Affidavit because it is predicated on hearsay.  ECF 81 at 6.  "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  A review of the information contained in the Gordon Affidavit reveals many averments that constitute hearsay.  For example, Gordon states that although he "did not know of any allegations in the South District . . . [he] did hear Angelini was the subject of various rumors."  ECF 77-35, ¶ 5.  And, he states that he "heard an additional rumor about Angelini after [he] transferred to Internal Affairs."  *Id.* ¶ 9.  But, other averments are based on Gordon's personal knowledge, such as his statement that he knew Angelini and believed him to be "a good, hard working police officer."  *See, e.g.*, *id.* ¶ 8.  As such, the Court will not strike the entire Gordon Affidavit, but it will disregard those statements premised on impermissible hearsay.  *See, e.g.*, *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

I shall disregard the Davidson Affidavit, albeit for  a different reason.  Davidson, who worked as a BPD officer from 1996 to 2015, acknowledges that he "do[es] not personally know any of the persons involved in the above captioned case."  ECF 77-30, ¶ 9.  Rather, Davidson's averments concern BPD's policies, specifically "the inconsistent application of departmental policies and procedures pertaining to the issuing, investigating and/or resolving of internally generated grievances or complaints."  *Id.* ¶ 17.  Such opinion testimony is premature at this juncture, however.  Pursuant to the Court's Scheduling Order, expert discovery was deferred until after the resolution of dispositive motions.  ECF 44 at 2.  Therefore, I shall disregard the Davidson Affidavit as improper expert testimony.

## B.  Judicial Estoppel

The BPD invokes the doctrine of judicial estoppel.  It contends that because plaintiff did not disclose his EEOC Charge during his bankruptcy proceedings, he is foreclosed from pursuing Title VII claims against the BPD.  ECF 66-1 at 20-23.

"'Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation.'" *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 457 (4th Cir. 2017) (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28 (4th Cir. 1995)); *see Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019); *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007).  An equitable doctrine, judicial estoppel is "designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Martineau*, 934 F.3d at 393 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)); *see Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998) (observing that judicial estoppel "exists to prevent litigants from playing 'fast and loose' with the courts").

Given its equitable nature, judicial estoppel should be applied cautiously.  *See Faggert & Frieden*, 65 F.3d at 29 (instructing that "courts must apply the doctrine with caution"); *accord Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 639 (E.D. Va. 2016) (observing that judicial estoppel is an "'extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice'") (citation omitted).  In the Fourth Circuit, judicial estoppel is appropriate only where: "(1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position sought to be estopped must be one of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have

intentionally misled the court to gain unfair advantage." *Minnieland*, 867 F.3d at 458 (internal quotation marks and citation omitted); *see Martineau*, 934 F.3d at 393. This is a fact-intensive inquiry. *See Martineau*, 934 F.3d at 394. In the context of this case, the inquiry intersects with bankruptcy law.

To initiate the federal bankruptcy process, the debtor must disclose in his bankruptcy petition a "schedule of assets and liabilities." 11 U.S.C. §§ 521(a)(1)(B)(i), 541(a)(1); *see also Thomas*, 193 F. Supp. 3d at 639. The petition requires a debtor to list "all personal property of the debtor of whatever kind," and property of a bankruptcy estate compromises "all legal or equitable interests of the debtor in property as of commencement of the case." 11 U.S.C. § 541(a)(1). This definition has "'uniformly been interpreted to include causes of action,'" including those not yet filed. *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 512 (4th Cir. 2005) (citation omitted); *see Martineau*, 934 F.3d at 388; *Calafiore v. Werner Enters., Inc.*, 418 F. Supp. 2d 795, 797 (D. Md. 2006) (observing that courts have interpreted § 541(a)(1) to include causes of action that could be brought by the debtor).

Therefore, a debtor has an obligation to reveal all potential legal claims upon the initiation of bankruptcy proceedings. *See Thomas*, 193 F. Supp. 3d at 639; *Calafiore*, 418 F. Supp. 2d at 797; *In re USinternetworking, Inc.*, 310 B.R. 274, 282 (Bankr. D. Md. 2004). Further, the debtor's duty to disclose his property is a continuing one, meaning the debtor is required to disclose all potential causes of action throughout the duration of the bankruptcy proceedings. *See Martineau*, 934 F.3d at 397; *Thomas*, 193 F. Supp. 3d at 639; *Calafiore*, 418 F. Supp. 2d at 797; *USinternetworking*, 310 B.R. at 282; *see also* 11 U.S.C. § 1306(a)(1).

"Judicial estoppel has often been applied to bar a civil law suit brought by a plaintiff who concealed the existence of the legal claim from creditors by omitting the lawsuit from his

36

bankruptcy petition." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 241 (4th Cir. 2010), *abrogated on other grounds by Vance*, 570 U.S. 421; *see also Martineau*, 934 F.3d at 393-94 (expounding on judicial estoppel in the context of a lawsuit following bankruptcy); *Calafiore*, 418 F. Supp. 2d at 797 (same). Indeed, "where a debtor fails to list a potential claim in a bankruptcy petition—or fails to amend that petition when the claim becomes known—the doctrine of judicial estoppel could potentially bar the debtor from bringing that claim in a later proceeding." *Calafiore*, 418 F. Supp. 2d at 797.

Of relevance here, courts in the Fourth Circuit have found that failure to disclose a pending EEOC charge during bankruptcy proceedings may estop a plaintiff from asserting a Title VII claim against an employer. *See Smith v. Bishop Gadsden Episcopal Ret. Cmty.*, 2017 WL No. 2:16-cv-03113-DCN, 4923733 (D.S.C. Oct. 31, 2017); *Robertson v. Flowers Baking Co. of Lynchburg, LLC*, No. 6:11-cv-00013, 2012 WL 830097 (W.D. Va. Mar. 6, 2012), *aff'd*, 474 F. App'x 242 (4th Cir. 2012); *Vanderheyden v. Peninsula Airport Comm'n*, No. 4:12cv46, 2013 WL 30065 (E.D. Va. Jan. 2, 2013); *Brockington v. Jones*, No. 4:05-cv-3267, 2007 WL 4812205 (D.S.C. Nov. 28, 2007); *Thomas v. Palmetto*, No. 3:05-cv-17, 2006 WL 2623917 (D.S.C. Sept. 11, 2006), *aff'd*, 234 F. App'x 166 (4th Cir. 2007).

There is no genuine dispute that the first three factors of the Fourth Circuit's judicial estoppel test are satisfied here. Although plaintiff filed his Charge with the EEOC on April 14, 2014, he did not mention it in his bankruptcy petition, filed on March 21, 2016. *See* ECF 67-32 (Sealed) at 14. Indeed, plaintiff concedes in his Affidavit that he never mentioned the EEOC Charge during his bankruptcy proceedings. ECF 77-7, ¶ 86 ("When filing my bankruptcy petition, I did speak with my attorney about this case and he advised that it should not be included.").

Therefore, the only question is whether plaintiff omitted the potential claim from his bankruptcy petition in order to manipulate the legal process. *See Calafiore*, 418 F. Supp. 2d at 798.

As noted, "judicial estoppel applies only when 'the party who is alleged to be estopped *intentionally* misled the court to gain unfair advantage,' and not when 'a party's prior position was based on inadvertence or mistake.'" *Martineau*, 934 F.3d at 393 (emphasis in *Martineau*) (quoting *Faggert & Frieden*, 65 F.3d at 29); *see also King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196-97 (4th Cir. 1998). Notably, the Fourth Circuit recently admonished against a presumption of bad faith merely because the debtor had knowledge of the potential claim but did not disclose it. *Martineau*, 934 F.3d at 394. Such a presumption could "'give the civil defendant a windfall.'" *Id.* (citation omitted). Rather, the Court instructed that the applicability of judicial estoppel "depends on the 'specific factual context[]' of a case, rather than 'any general formulation' or 'inflexible' rule or standard." *Id.* (bracket in original and citation omitted). In other words, the analysis is case-specific and knowledge of a potential undisclosed claim is not synonymous with intent to manipulate the judicial system. *Id.*

Angelini acknowledges that he knew his Charge was not listed as an asset on his Petition. ECF 77-1 at 27. But, he maintains that the omission does not indicate bad faith because he had no motive to conceal the Charge. That is so, plaintiff contends, because damages for personal injuries are shielded from creditors under Maryland law. *Id.* Specifically, plaintiff cites to Md. Code, § 11-504(b)(2) of the Courts and Judicial Proceedings Article ("C.J."). ECF 77-1 at 27. It provides that "money payable on the event of sickness, accident, injury or death of any person, including compensation for loss of future earnings . . . ."

Judge Blake addressed this issue in *Calafiore*, 418 F. Supp. 2d 795. There, the plaintiff, who was injured in an automobile accident in 2001, filed a negligence suit against the driver and

his employer in 2004.  *Id.* at 796.  In response, the defendants asserted that the plaintiff's claims were barred by judicial estoppel because he failed to disclose the potential claim as an asset during bankruptcy proceedings that took place in 2003.  *Id.*  As is the case here, the plaintiff in *Calafiore* admitted that he discussed the potential claim with his bankruptcy counsel, but he argued that judicial estoppel was inapplicable because he lacked motive to conceal his negligence claim.  *Id.* at 799.

Judge Blake agreed with the plaintiff, "but only partially."  *Id.*  She observed that the federal bankruptcy code permits states to opt out of the federal exemption schedule and that Maryland had done so by specifically exempting from a creditor's reach money recovered for injuries.  *See id.* (citing C.J. § 11-504(b)(2)).  Canvassing case law on Maryland's personal injury exemption, Judge Blake concluded that courts distinguish between damages for pain and suffering and loss of future earnings, which are exempt under C.J. § 11–504(b)(2), and damages for lost wages, prepetition medical expenses, injuries to property, and punitive damages, which are not exempt.  *See id.* at 799-801.

Given Maryland's special exemption, Judge Blake deemed it appropriate to adopt a Solomonic approach.  *See id.* at 800 n.8 (acknowledging that judicial estoppel can bar an entire claim but finding "no reason why the doctrine cannot be used to bar the plaintiff from seeking some forms of money damages but not others").  She reasoned: "To the extent any aspects of the plaintiff's plea for damages fall into nonexempt categories, he did have a motive to conceal. Accordingly, it would be reasonable to find [the plaintiff] judicially estopped from seeking nonexempt forms of damages for his personal benefit, but permit him to seek those items of damages that would have been exempt under § 11-504(b)(2)."  *Id.* at 799-800.  Ultimately, "because the exact nature of the plaintiff's damages claim has not been presented to the court,"

39

Judge Blake denied the defendants' motion without prejudice to the right to assert the defense at a later stage in the litigation. *Id.* at 802.

I am persuaded by Judge Blake's reasoning in *Calafiore*. Applied here, Angelini may be estopped from recovering certain damages. For instance, in his answers to defendant's interrogatories, Angelini claimed that his damages included "an injury to credit standing, including filing for bankruptcy in 2015" as well as the loss of vacation and the loss of earnings. *See* ECF 67-31 (Sealed) at 3. Because these damages are nonexempt, plaintiff may have had a motive to conceal them. But, plaintiff also identified damages that may fall within Maryland's injury exemption, including "Mental anguish," "Loss of enjoyment of life," and "nightmares, night terrors & insomnia." *Id.* at 2-3. It follows that judicial estoppel, an equitable tool designed to prevent gross abuses of the judicial process, does not sanction the wholesale dismissal of plaintiff's suit.

Moreover, applying the totality-of-circumstances inquiry that *Martineau* demands, the Court cannot conclude at this juncture that Angelini acted with bad faith. The BPD contends that plaintiff acted with bad faith because he did not disclose his pending EEOC Charge at the time of his bankruptcy and now counts his bankruptcy as part of the damages for which he seeks recovery in this case. And, unlike in *Martineau*, Angelini never moved to reopen his bankruptcy proceedings to amend his Petition following the initiation of this case. *Compare Martineau*, 934 F.3d at 396. On the other hand, plaintiff avers that his counsel informed him that he did not have to disclose his Charge and that his damages would be exempt from creditors under Maryland law. Accordingly, because there is a genuine dispute of material fact as to plaintiff's mental state, the Court cannot dismiss plaintiff's suit based on judicial estoppel.

### C.  Statute of Limitations

In addition to judicial estoppel, the BPD posits that plaintiff's suit is time-barred. According to the BPD, plaintiff's suit rests entirely on his father's homosexual incident and the graffiti incident, both of which occurred in 2012.  ECF 66-1 at 23.  According to the BPD, any incident that occurred before June 28, 2013, falls outside of Title VII's 300-day limitations period, because plaintiff did not file his Charge until April 24, 2014.  *Id.* at 25.  Therefore, the BPD asserts that because "the 2012 incidents *were never properly administratively exhausted in the first place*, Plaintiff's retaliation claims which 'relate back' to these 2012 claims must be dismissed."  *Id.* at 26 (emphasis in original).

In response, plaintiff counters that events that occurred prior to June 28, 2013, can support plaintiff's hostile environment claim under the continuing violation doctrine.  ECF 77-1 at 28-29. And, plaintiff contends that the Court can consider untimely retaliatory acts as context when evaluating his retaliation claim.  *Id.* at 30.

A court may only consider Title VII claims that fall within the applicable limitations period. Therefore, I begin with the issue of administrative exhaustion.  *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007).  As noted, as a prerequisite to filing suit, plaintiff was required to file a charge of discrimination with the EEOC or the comparable fair employment practices agency in Maryland, within 300 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e–5(e)(1); *see Gilbert v. Freshbikes, LLC,* 32 F. Supp. 3d 594, 605 (D. Md. 2014).

The Fourth Circuit has admonished that the exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  Rather, administrative exhaustion

advances the complementary goals "of protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks and alterations omitted); *see also Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406-07 (4th Cir. 2013).

"Any discrete acts of discrimination that occurred prior to the applicable period are procedurally barred and cannot be used as a basis for recovery." *Gilliam*, 474 F.3d at 139. This includes discrete acts that are related to acts alleged in timely filed charges. *See id.* In contrast, under the continuing violation doctrine, a Title VII plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as another act fell within the limitations period and the acts are part of an ongoing pattern of discrimination. *See id.* at 140; *see also Guessous*, 828 F.3d at 222; *Agolli v. Office Depot, Inc*., 548 F. App'x 871, 874-75 (4th Cir. 2013).

The Supreme Court clarified the applicability of the continuing violation doctrine to Title VII claims in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In *Morgan*, the plaintiff sued Amtrak under Title VII, alleging that he had been subjected to various discrete discriminatory and retaliatory acts, and had additionally experienced a racially hostile work environment throughout his employment. *Id.* at 104. Plaintiff filed a charge with the EEOC, alleging that he was "'consistently harassed and disciplined more harshly than other employees on account of his race.'" *Id.* at 105. However, many of the alleged discriminatory events that plaintiff complained of took place outside of Title VII's 300-day time period for filing a charge with the EEOC. *Id.* at 106. Amtrak filed a motion for summary judgment as to all of the events that took place outside of the filing period, which the district court granted. *Id*.

The Ninth Circuit reversed, applying the continuing violation doctrine. *Id*. at 106-07. That court determined that a plaintiff may sue on claims that were filed with the EEOC outside of the

period established by Title VII if the claims were part of a series of related acts; some of the acts took place within the limitations period; and the plaintiff shows that there is a systematic policy or practice of discrimination, part of which operated within the limitations period. *Id.* at 107. The Ninth Circuit determined that each of plaintiff's three Title VII claims (*i.e.*, discrimination, hostile work environment, and retaliation) was sufficiently related to the post-limitations conduct to establish a continuing violation.  *Id*. at 107-08.

The Supreme Court reversed the Ninth Circuit, in part. With respect to plaintiff's claims for discrete discriminatory and retaliatory acts, the Court stated that a party "must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."  *Id.* at 110. The Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. And, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  *Id.*  The Court went on to define actions that qualify as discrete, stating, *id.* at 114:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

However, the *Morgan* Court affirmed the Ninth Circuit as to plaintiff's claim for hostile work environment. *Id.* at 115. The Court observed that, unlike discrete acts, hostile work environment claims occur "over a series of days or perhaps years . . . ." *Id.*  And, the Court observed that, with respect to hostile work environment claims, "a single act of harassment may not be actionable on its own." *Id.* Thus, as to hostile work environment claims, the Supreme Court concluded, *id.* at 117: "It does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period."  The Court continued,

*id.*: "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."

In light of *Morgan*, the alleged retaliatory and harassing acts that occurred before June 28, 2013, are time-barred for the purpose of plaintiff's retaliation claim.  Thus, plaintiff must adduce retaliatory acts occurring after that date in order to survive summary judgment.  On the other hand, the continuing violation doctrine applies to Angelini's hostile work environment claim.  As in *Morgan*, 536 at 120-21, "the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Therefore, the Court may consider conduct that occurred prior to June 28, 2013, when assessing plaintiff's hostile work environment claim.

The upshot is that plaintiff's claims are not time-barred, although his retaliation claim is cabined by Title VII's  statute of limitations.

### D.  Hostile Work Environment

Count One of the Second Amended Complaint is captioned "Sexual Harassment, Sex Discrimination and Retaliation."  ECF 49-2 at 19.  Plaintiff alleges, *inter alia*, that the BDP "subjected him to sexual harassment," in violation of Title VII.   *Id.* ¶ 100.  But, the title of the claim does not control.  It is the content that is central.  And, plaintiff expressly asserts, *id.* ¶ 103 (emphasis added): "Plaintiff's sex and his complaints of sexual harassment and retaliation were motivating factors in Defendants' decision to treat Plaintiff differently and subject him to a *hostile work environment*."  Moreover, the BPD does not contend that it lacked notice of such a claim. Indeed, the record reflects otherwise.

According to the BPD, plaintiff's hostile work environment claim is without merit.  ECF 66-1 at 28-30.  Defendant argues that Angelini's claim fails because he cannot show that any unwelcome conduct was based on a protected status.  *Id.* at 29.  Further, the BPD contends that none of plaintiff's allegations cross the threshold from a stressful work environment to a hostile one.  *Id.* at 29-30.  In response, Angelini posits that he has established a claim for "retaliatory hostile work environment" that must go before a jury.  *See* ECF 77-1 at 30.

A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment[.]'"  *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993) (citations omitted).  The Fourth Circuit, like other circuits, has recognized that a claim of retaliatory hostile work environment is a distinct cause of action.  *See Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can constitute adverse employment action . . . ."), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012); *see also Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (collecting circuit decisions).

To establish a claim of retaliatory hostile work environment, a plaintiff must show that "'(1) he experienced unwelcome harassment; (2) the harassment was [in retaliation for protected conduct]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.'"  *Wells v. Gates*, 336 F. App'x 378, 387 (4th Cir. 2009) (alteration in *Wells*) (quoting *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006)); *see Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009); *Goldstein v. Univ. of Md*., CCB-18-2376, 2019 WL 4467035, at *10

(D. Md. Sept. 17, 2019); *Clarke v. DynCorp Int' l LLC*, 962 F. Supp. 2d 781, 790-91 (D. Md. 2013).

Hostile work environment claims may involve "a series of days or perhaps years . . . ." *Morgan*, 536 U.S. at 115.  Thus, for a hostile work environment claim, "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period."  *Id.* at 117.  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.*

The First element, unwelcome conduct, "is not a high hurdle."  *Strothers*, 895 F.3d at 328. The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing [his] objection . . . ."  *Id.* at 328-29.  Moreover, "the nature of the conduct may indicate whether or not the conduct is unwelcome."  *Id.* at 329.

To satisfy the second element, "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity."  *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original); *see also Perkins*, 936 F.3d at 214.  "At the prima facie stage, a plaintiff does not have to show that 'their protected activities were but-for causes of the adverse action.'" *Perkins*, 936 F.3d at 214 (quoting *Strothers*, 895 F.3d at 335).  But, the plaintiff must still make "some showing" of causation, such as demonstrating that the "'employer either understood or should have understood the employee to be engaged in protected activity'" and that "'the employer took adverse action against the employee soon after becoming aware of such activity.'" *Perkins*, 936 F.3d at 214 (quoting *Strothers*, 895 F.3d at 335).

As to the third element, a hostile work environment exists under Title VII when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult . . . .'" *Boyer-*

*Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan v. Alt. Res. Corp*., 458 F.3d 332, 339 (4th Cir. 2006)); *see Harris*, 510 U.S. at 21; *Nnadozie v. Genesis HealthCare Corp*., 730 F. App'x 151, 158 (4th Cir. 2018). The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *Harris*, 510 U.S. at 21-22; *see EEOC v. Cent. Wholesalers Inc*., 573 F.3d 167, 175 (4th Cir. 2009). Thus, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998)); *see Irani v. Palmetto Health*, 767 F. App'x 399, 416 (4th Cir. 2019); *Nnadozie*, 730 F. App'x at 158. However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Id*.; *see Harris*, 510 U.S. at 21-22.

Notably, "viable hostile work environment claims often involve repeated conduct . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Morgan*, 536 U.S. at 115-17); *see Irani*, 767 F. App'x at 416. But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

The Court stated in *Boyer-Liberto*, 786 F.3d at 278 (citation omitted): "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *See also EEOC v. Fairbrook Med. Clinic, P.A*., 609 F.3d 320, 329 (4th Cir. 2010)

Case 1:17-cv-02354-ELH   Document 85   Filed 07/28/20   Page 48 of 56

("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

However, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *see also Boyer-Liberto*, 786 F.3d at 294. Similarly, "complaints premised on nothing more than 'rude treatment by [coworkers]', 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'" *EEOC v. Sunbelt Rentals, Inc*., 521 F.3d 306, 315-16 (4th Cir. 2008) (internal citations omitted); *see Nnadozie*, 730 F. App'x at 161-62. Indeed, Title VII does not constitute "a general civility code." *Oncale*, 523 U.S. at 80.

The determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Moreover, "[n]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (internal citations and quotation marks omitted). The objective determination requires the court to

"'look[] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the] employee's work performance.'" *Parker v. Reema Consulting Servs., Inc*., 915 F.3d 297, 304 (4th Cir. 2019) (quoting *Harris*, 510 U.S. at 23).

Viewing the facts in the light most favorable to plaintiff, he has failed to raise a genuine issue of material fact that he was subjected to a retaliatory hostile work environment.  To be sure, there is no dispute that Angelini engaged in a protected activity when he met with EODS on October 5, 2012, to report homophobic graffiti scrawled on a bathroom stall at the SED station. *See Netter*, 908 F.3d at 937 (identifying participation in an investigation as a protected activity). That is so, even if plaintiff does not identify as homosexual.  *See Strothers*, 895 F.3d at 327 (observing that Title VII's anti-retaliation provision applies so long as the employee has an objectively reasonable belief that a Title VII violation has occurred).  And, it is uncontested that Angelini subjectively perceived his work environment to be abusive.  *See* ECF 77-4 (repeatedly requesting to transfer districts because of "hostile work environment"); ECF 77-39 at 95, Tr. 379-80 (stating that he believes "100 percent" that IAD investigations are retaliatory).  But, plaintiff's retaliatory harassment claim falters for two independent reasons.

First, plaintiff has failed to provide any evidence that establishes a causative link between his protected activity and the purportedly adverse actions of his superiors.  As noted, to establish the requisite causation under Title VII, the plaintiff must show that the retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see Perkins*, 936 F.3d at 214; *Irani*, 767 F. App'x at 421.  In other words, Title VII requires the plaintiff to show that the "protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.

At the summary judgment stage, the plaintiff need not conclusively establish causality, but he must put forth some "evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe*, 145 F.3d at 657. Notably, because "an employer cannot take action because of a factor of which is it unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Id.*; *see also Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) ("If an employer . . . never realized that its employee engaged in protected conduct, it stands to reason that the employer did not act out of a desire to retaliate for conduct of which the employer was not aware.").

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). Indeed, a lapse of two-and-a-half months between the protected activity and an adverse action "is sufficiently long so as to weaken significantly the inference of causation," although it does not preclude the plaintiff from establishing causation. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

Angelini has not raised a triable issue as to whether any of the allegedly harassing conduct that he endured was because he met with EODS on October 5, 2012. The parking incident, which marks the first alleged retaliatory incident, did not occur until January 17, 2013—more than three months after plaintiff's meeting. The altercation with Sergeant Brokus occurred in July 2013, and the first administrative charge lodged against Angelini by the IAD did not arise until January 2014. Thus, the timeline of events undermines, rather than supports, the notion that these acts have any

connection to plaintiff's EODS meeting. *Compare Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (finding that causation was established where employee was terminated one month after complaining about retaliatory behavior). And, even putting aside temporal issues, other causation problems abound.

Although it is not disputed that Sergeant Brickus knew of plaintiff's EODS meeting, no reasonable juror could find that her directive that Angelini move his car from Sergeant Drennon's parking space and complete a Form 95 was because of plaintiff's Title VII activity. It is undisputed that parking at the SED was an issue. Indeed, before this incident, the BDP circulated a memo to officers instructing that they not park in marked spaces, without authorization. *See* ECF 67-13. Accordingly, Sergeant Brickus's instruction to Angelini to move his car was eminently reasonable.

Further, plaintiff has offered no evidence to rebut Sergeant Brickus's testimony that Sergeant Drennon asked her to direct Angelini to write the Form 95 to explain why he parked in her space, despite her having previously addressed the matter with him. *See* ECF 77-38 at 8, Tr. 26-27. And, notably, there is no evidence that Sergeant Drennon knew of Angelini's protected activity. Moreover, plaintiff expressly invited his superiors to charge him with misconduct, with the hope that it might facilitate his transfer to another district. ECF 77-39 at 36, Tr. 145.

As a result, a reasonable juror could not find that when Captain Burris placed plaintiff on administrative duty on January 18, 2013, it was in retaliation for plaintiff's meeting with EODS.

The other asserted instances of retaliatory harassment similarly cannot be tied to plaintiff's oppositional conduct. Plaintiff claims that Sergeant Brokus caused him to suffer heat stroke on June 29, 2013, and ruined his July 4th holiday by ordering plaintiff to submit to a medical examination. *See* ECF 77-7, ¶ 38. Further, he alleges that Sergeant Jackson withheld his SWAT team invitation, causing him to miss the try out. *See id.* ¶ 41. And, Angelini claims that he was

51

verbally assaulted by Sergeant Brokus on July 28, 2013. *See* ECF 77-39 at 69, Tr. 275. But, nothing in the record suggests that either Sergeant Brokus or Sergeant Jackson knew of plaintiff's discrimination complaint. Therefore, the fact finder could not, on this record, reasonably infer that Sergeants Brokus and Jackson acted with retaliatory animus. *See Dowe*, 145 F.3d at 657.

Likewise, plaintiff's contention that the IAD investigations constitute retaliation rest on nothing more than his own speculation. *See* ECF 77-39 at 95, Tr. 379-80. Indeed, the only fact that plaintiff marshals to support his argument that he was persecuted by the IAD is that Sergeant Williams, who supervised him in the SED in 2012, managed the detective who conducted one of Angelini's IAD investigations. *See* ECF 77-1 at 33. This hardly suggests that the IAD targeted plaintiff, especially given the paucity of evidence that Sergeant Williams disapproved of plaintiff reporting the graffiti in 2012 and Detective Cornejo's testimony that Sergeant Williams did not influence his investigation of Angelini.

Ultimately, plaintiff's contentions concerning the IAD investigations rest on his conjecture. Absent corroboration from facts in the record, Plaintiff's belief that he was targeted is insufficient to create a genuine dispute of material fact. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *accord Settle v. Baltimore County*, 34 F. Supp. 2d 969, 999 (D. Md. 1999) (finding the plaintiff's subjective belief that the employer was racially motivated was insufficient, in the absence of articulable facts showing a "racial nexus"), *aff'd sub nom. Harris v. Earp*, 203 F.3d 820, (4th Cir. 2000) (per curiam).

Even if plaintiff sufficiently demonstrated causation as to the various retaliatory allegations, he has failed to show that "'a reasonable person in the plaintiff's position' would have found the environment objectively hostile or abusive.'" *Sunbelt Rentals*, 521 F.3d at 315 (citation omitted). As noted, the Supreme Court has "made it clear that conduct must be extreme to amount

to a change in the terms and conditions of employment . . . ." *Faragher*, 524 U.S. at 788.  The facts, construed in plaintiff's favor, do not come close to establishing that he experienced an objectively hostile work  environment.

Angelini complains that he was the subject of taunts  or cursing, such as Sergeant Brickus ribbing him about his wrinkled pants or Sergeant Brokus yelling at him and accusing him of lying. But, teasing and personality clashes are different in kind and degree from an employment atmosphere that is "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21; *accord Sunbelt Rentals,* 521 F.3d at 315 (observing that rude treatment is not actionable under Title VII).  Indeed, the picture painted by the evidence is that of an emotionally charged workplace exacerbated by plaintiff's own temperament. *See High v. Comm'r, Soc. Sec*., SAG-18-3334, 2019 WL 5209613, at *9 (D. Md. Oct. 16, 2019) ("A hostile work environment cannot be shown by establishing 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [a plaintiff's] supervisor.'") (citations omitted).  And, notably, none of these comments referenced plaintiff or his father's sexuality.

Regardless, courts have declined to find a hostile work environment under similar or even more egregious circumstances.  *Cf. Hopkins v. Balt. Gas & Elec. Co*., 77 F.3d 745, 753 (4th Cir. 1996) (positioning a magnifying glass over a plaintiff's crotch and giving him a congratulatory kiss at his wedding receiving line was "tasteless and inappropriately forward" but not sufficiently severe or pervasive); *McLaurin v. Verizon Md., Inc*., JKB-14-4053, 2015 WL 5081622, at *4 (D. Md. Aug. 26, 2015) (holding that the plaintiff did not allege an actionable hostile work environment claim despite allegations that one co-worker called the plaintiff a "bitch," another co-worker "urinated in front of her," and a supervisor "cursed" at her); *Holleman v. Colonial Heights Sch. Bd*., 854 F. Supp. 2d 344, 353 (E.D. Va. 2012) (supervisor frequently grabbing plaintiff's arm

and cursing her out in front of faculty and students was not hostile work environment); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003) (no hostile work environment despite one occasion when supervisor "yelled at Plaintiff, told her she was incompetent, pushed her down in her chair, and blocked the door to prevent Plaintiff from leaving while he continued to yell at her"), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).

Nor does the parking incident support plaintiff's claim of hostile work environment. For starters, Angelini was merely asked to move his car and write a Form 95. It was only after he invited his superiors to charge him with insubordination that he got his wish. And, although Angelini was placed on administrative duty, it had no impact on his pay or benefits. Likewise, however slighted plaintiff felt by not receiving accolades from Sergeant Brickus for excellent police work or his supervisor's repeated refusals to acknowledge his transfer requests, these events are neither threatening nor humiliating, and they did not affect Angelini's ability to perform his job. *See Perkins*, 936 F.3d at 214 (evidence that black employees were assigned worse shifts and subject to more stringent enforcement of workplace rules than white employees did not amount to a hostile work environment). Similarly, plaintiff's reliance on the matter of the SWAT tryout also fails, as it did not impinge on plaintiff's ability to perform his job. *See id.* (granting summary judgment on a hostile work environment claim despite evidence that black employees were denied promotions); *Dortch v. Cellco P'ship*, 770 F. App'x 643, 645-46 (4th Cir. 2019) (finding that the plaintiff did not plausibly allege hostile work environment claim where supervisor investigated her work and placed her on a performance improvement plan). Therefore, these matters do not give rise to a genuine dispute of material fact in regard to a hostile work environment claim.

As to disciplinary actions against plaintiff, the BPD provided the Court with the IAD reports for each disciplinary action. ECF 67-23; ECF 67-24; ECF 67-26. This information reveals

that those matters were not the product of retaliation.  *See Walls v. Lowe's Home Ctrs., LLC*, 789 F. App'x 852, 855 (11th Cir. 2019) (holding that being subjected to "legitimate work place investigations" did not constitute a hostile work environment).

Angelini maintains that "expert testimony is required to render any opinion regarding the propriety or impropriety of BPD's internal investigation process."  ECF 77-1 at 33.  But, plaintiff does not challenge the facts underlying the incidents that led to the investigations.  In other words, he does not dispute that he made impertinent remarks to a juvenile suspect in August 2017 or behaved improperly during Crash Investigation School.  Instead, he appears to posit that his conduct was not deserving of the IAD's attention, when measured against the actions of other BPD officers, citing the BPD's notorious Gun Trace Task Force scandal.  *See id.*  The conduct of other officers does not, however, generate a material dispute of fact as whether the investigations concerning plaintiff were retaliatory.

In sum, the record reveals much smoke, but no fire.  That is, although plaintiff points to a plethora of workplace incidents, none of them can be linked to his EODS meeting in October 2012.  And, in any event, none rise to the level of objectively severe harassment.  Accordingly, I shall grant summary judgment to the BPD as to plaintiff's claim for retaliatory hostile work environment.

## E.  Retaliation

To establish a claim of retaliation under Title VII, a plaintiff must show "(1) that [h]he engaged in protected activity, (2) that the employer took a materially adverse action against [him] and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019); *see Strothers*, 895 F.3d at 327; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *Okoli*, 648 F.3d at 223; *Navy*

*Fed. Credit Union*, 424 F.3d at 405-06. The plaintiff must establish retaliation, either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249.

For the same reasons that plaintiff's hostile work environment claim cannot survive summary judgment, his retaliation claim also fails. *See, e.g.*, *Jackson v. Md. Dep't of Commerce*, JKB-19-1693, 2020 WL 551914, at *8 n.6 (D. Md. Feb. 4, 2020) (finding that the plaintiff's retaliatory hostile work environment claim faltered for the same reasons as her retaliation claim). Here too, plaintiff has not adduced facts sufficient to create a causative link between any of the allegedly retaliatory incidents and his meeting with EODS in 2012. Therefore, a reasonable juror could not find that plaintiff has established the third element of a prima facie case of retaliation. It follows that defendant is entitled to summary judgment as to plaintiff's retaliation claim.

## IV.    Conclusion

For the foregoing reasons, I shall grant the BPD's Motion (ECF 76).

An Order follows, consistent with this Memorandum Opinion.


Date: June 2, 2020                              _____/s/_____
                                               Ellen L. Hollander
                                               United States District Judge